NATHAN STIEREN   10/28/2014

## Page 1

```
         UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF ILLINOIS
              EAST ST. LOUIS DIVISION

JORDAN QUEEN,                    )
                                 )
         Plaintiff,              )
                                 )
    vs.                          ) Case No.
                                 ) 3:14-cv-00519
W.I.C., INC. d/b/a SNIPER        )
TREESTANDS and DUNHAM'S          )
ATHLEISURE CORPORATION d/b/a     )
DUNHAM'S SPORTS,                 )
                                 )
         Defendants.             )


         DEPOSITION OF NATHAN STIEREN

         TAKEN ON BEHALF OF THE PLAINTIFF

              OCTOBER 28, 2014


(Starting time of the deposition: 9:00 a.m.)
```

## Page 2

```
                    I N D E X
QUESTIONS BY:                         PAGE
MR. BLAIR                             9, 124
MR. RYAN                              119, 128

                    E X H I B I T S

EXHIBIT                                    PAGE

Exhibit 1    Customer Service web page      20
Exhibit 2    Dealer Services web page       22
Exhibit 3    Affidavit                      23
Exhibit 4    Answers and Objections         23
Exhibit 5    Sales Rep Force web page       32
Exhibit 6    Supplemental Answers           36
Exhibit 7    E-mail from Kohlenberger       38
Exhibit 8    Spreadsheet                    47
Exhibit 9    S.A.F.E Document               61
Exhibit 10   Register Product web page      66
Exhibit 11   Installation Instructions      67
Exhibit 12   Instruction Manual             69
Exhibit 13   API web page                   71
Exhibit 14   Credit Application             72
Exhibit 15   Cabela's web page              73
Exhibit 16   Hoffman Estates web page       74
Exhibit 17   Store photos                   76
Exhibit 18   Store photos                   77
```

## Page 3

```
Exhibit 19   Store photos                   78
Exhibit 20   Store photos                   79
Exhibit 21   Store photos                   79
Exhibit 22   Store photos                   79
Exhibit 23   Store photos                   80
Exhibit 24   Treestand Buying Guide         82
Exhibit 25   Catalog                        82
Exhibit 26   Store photos                   84
Exhibit 27   Store photos                   84
Exhibit 28   Credit Application             86
Exhibit 29   Remington Treestands           87
Exhibit 30   Remington Dealer Locator       89
Exhibit 31   Catalog Request                90
Exhibit 32   Remington web page             91
Exhibit 33   Bass Pro web page              91
Exhibit 34   The Double Barrel              92
Exhibit 35   Two Person Ladderstands        93
Exhibit 36   Supplemental Disclosures       94
Exhibit 37   Angles complaint               95
Exhibit 38   Case history                  102
Exhibit 39   Corporate disclosure          105
Exhibit 40   Responses and Objections      113
```

(The original exhibits were retained by the court reporter to be attached to the original and copies of the transcript.)

## Page 4

```
         UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF ILLINOIS
              EAST ST. LOUIS DIVISION

JORDAN QUEEN,                    )
                                 )
         Plaintiff,              )
                                 )
    vs.                          ) Case No.
                                 ) 3:14-cv-00519
W.I.C., INC. d/b/a SNIPER        )
TREESTANDS and DUNHAM'S          )
ATHLEISURE CORPORATION d/b/a     )
DUNHAM'S SPORTS,                 )
                                 )
         Defendants.             )
```

DEPOSITION OF NATHAN STIEREN, produced, sworn and examined on October 28, 2014, between the hours of nine o'clock in the forenoon and five o'clock in the evening of that day, at the offices of Maslon, Edelman, Borman & Brand, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota, 55402, before Anne Marie Sager, a Court Reporter and Notary Public within and for the State of Minnesota, in a certain cause now pending in the United States District Court, Southern District of Illinois, East St. Louis Division, between JORDAN QUEEN, Plaintiff, vs. W.I.C., INC., et al, Defendants; on behalf of the Plaintiff.

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376


PLAINTIFF'S EXHIBIT C

Page 5

1
2       APPEARANCES
3  For the Plaintiff:
       Mr. W. Wylie Blair
4      Onder, Shelton, O'Leary & Peterson, LLC
       110 East Lockwood
5      St. Louis, Missouri 63119
       314-963-9000
6      blair@onderlaw.com
7
8  For the Defendant W W Industrial Corp:
       Mr. Andrew D. Ryan
9      Sandberg, Phoenix & Von Gontard, PC
       600 Washington Avenue
10     15th Floor
       St. Louis, Missouri 63101
11     314-231-3332
       aryan@sandbergphoenix.com
12
13
   For the Defendant Dunham's:
14     Mr. James A. Harfst
       The Law Office of James A. Harfst
15     7711 Bonhomme Avenue
       Suite 720
16     Clayton, Missouri 63105
       Jim.Harfst@SA-Trial.com
17
   Court Reporter:
18 Anne Marie Sager
   Midwest Litigation Services
19 711 North Eleventh Street
   St. Louis, Missouri 63101
20 314-644-2191
   1-800-280-3376
21
22
23
24
25

Page 6

1         IT IS FURTHER HEREBY STIPULATED AND
2  AGREED by and between counsel for the Plaintiffs and
3  counsel for the Defendants that this deposition may
4  be taken in shorthand by Anne Marie Sager, a Court
5  Reporter and Notary Public, and afterwards
6  transcribed into typewriting; and the signature of
7  the witness is expressly reserved.
8              *   *   *   *   *
9  (Starting time of the deposition: 9:00 a.m.)
10
11         NATHAN STIEREN,
12 having been called as a witness, having been
13 first duly sworn, was examined and testified
14 as follows:
15         EXAMINATION
16 BY MR. BLAIR:
17   Q   Would you state your name?
18   A   Nathan Stieren.
19   Q   Nathan, have you ever given a deposition
20 before?
21   A   Yes.
22   Q   When did you first give a deposition?
23   A   I'd have to look back at the first date.
24 Maybe 2008.
25   Q   And what was that in connection with?

Page 7

1    A    It was a product liability case.
2    Q    And in what capacity were you appearing?
3    A    Corporate representative.
4    Q    And whose corporate rep were you?
5    A    BGHA, Inc.
6    Q    Who is BGHA, Inc.?
7    A    That's the legal identity for
8  Big Game Treestands.
9    Q    Do you remember the style of the case?
10   A    I don't remember any details.
11   Q    Do you remember the venue where that was
12 filed?
13   A    I do not.
14   Q    Where were you deposed?
15   A    I don't remember that either.
16   Q    Do you know if you were here in Minnesota
17 when you were deposed?
18   A    I don't remember.
19   Q    What was the product at issue?
20   A    I don't remember that either.
21   Q    Do you know what the injury was?
22   A    I do not recall.
23   Q    Okay. Any other depositions that you've
24 given?
25   A    Yes. I've given a few. I would have to

Page 8

1  look back at any details though.
2    Q    Can you give me a ballpark of how many
3  depositions you think you have given?
4    A    I would say five.
5    Q    And what's the date range on those?
6         Are those all between 2008 and the
7  present?
8    A    Correct.
9    Q    Okay. When was the last time you gave a
10 deposition?
11   A    Again, I'm estimating the date, but maybe
12 the summer of 2013. Again, I'm guessing. I don't
13 really remember.
14   Q    What other entities have you acted as
15 corporate representative on behalf of?
16   A    Worldwide Industrial Corp. and BGHA are
17 the only two.
18   Q    So you think you may have given six
19 depositions all together?
20   A    Ballpark I would say, yeah, roughly.
21   Q    And you think that how many of those were
22 on behalf of Worldwide Industrial Corp.?
23   A    This is the first one.
24   Q    This is? Okay.
25        The summer of 2013, who was that on

2 (Pages 5 to 8)

Page 9

1  behalf of?
2  A  I don't remember any details, and I don't
3  even know if it was the summer of 2013. That was
4  just a guess or an estimate. I'd have to look back
5  at any details.
6  Q  Okay. If you weren't appearing for
7  Worldwide Industrial Corp. were you appearing for
8  BGHA in all of those?
9  A  That's correct.
10  Q  Do you remember any of the products
11  involved?
12  A  I do not off the top of my head.
13  Q  Were they treestands?
14  A  Yes.
15  Q  Were all of the corporate representative
16  depositions that you have appeared in in relation to
17  treestands?
18  A  Yes.
19  Q  And do you remember the names of any of
20  the plaintiffs in those cases?
21  A  Not off the top of my head, no.
22  Q  Do you remember the attorneys who
23  represented you in those cases?
24  A  I know Mel Karfis is one off the top of
25  my head. I don't remember the rest of them.

Page 10

1  Q  Could you spell his last name?
2      MR. RYAN:  K-A-R-F-I-S.
3  BY MR. BLAIR:
4  Q  Okay. I've heard his name before.
5      All right. Now, you have referenced
6  Worldwide Industrial Corp. and you reference it as
7  W W Industrial Corp. The product manual references
8  WIC, Inc.
9      Is that all synonymous?
10  A  Correct.
11  Q  What's your business address?
12  A  14607 Felton Court, suite 116,
13  Apple Valley, Minnesota, 55124.
14  Q  And are those essentially your corporate
15  offices?
16  A  Yes.
17  Q  And then you also have a facility at 1820
18  North Redding Avenue, is that right?
19  A  Correct.
20  Q  And what's the distinction between those
21  two facilities?
22  A  That was our previous office
23  headquarters.
24  Q  And do you still use that address?
25  A  No.

Page 11

1  Q  What is your position with WIC, Inc.?
2  A  President.
3  Q  And how long have you held that position?
4  A  Since 2010.
5  Q  When did you first get involved with
6  WIC, Inc.?
7  A  When I purchased it in 2010.
8  Q  And who did you purchase it from?
9  A  Tod Quiring.
10  Q  Did they continue to have some
11  involvement in the company from 2010 to present?
12  A  Yes.
13  Q  When did they no longer have any
14  involvement?
15  A  In the fall of 2013.
16  Q  And what occasioned them to no longer
17  have any involvement?
18  A  We parted ways in that time. It was a
19  joint marketing effort before that, and we separated
20  the companies and relocated WIC.
21  Q  Okay. So just so I understand, you were
22  the president and sole owner of the company, and
23  when I say "company," I mean WIC, Inc. from 2010 to
24  present, but you still had them essentially -- you
25  were working with them in a joint marketing effort

Page 12

1  in that they still owned BGHA?
2  A  Correct.
3  Q  Okay. Did you have any position with
4  BGHA during that time?
5  A  Yes.
6  Q  And were you receiving a salary from
7  them?
8  A  Yes.
9  Q  And was WIC, Inc. also paying Mr. Quiring
10  and I guess it's his son that's also involved?
11  A  I'm not familiar with his son being
12  involved.
13  Q  Okay. Let me rephrase that question.
14      Was Mr. Quiring also on the payroll of
15  WIC, Inc.?
16  A  No.
17  Q  Okay. Did he receive any financial
18  compensation from WIC, Inc.?
19  A  Yes.
20  Q  And in what form did he receive financial
21  compensation?
22  A  We had several agreements between each
23  other with consulting agreements and employee lease
24  agreements and he would get --
25  Q  In other words, the two companies would

NATHAN STIEREN 10/28/2014

Page 13

1 share employees?
2  A  Correct.
3  Q  When you purchased W W Industrial Corp.
4 was it a stock purchase or an asset purchase?
5  A  It was a stock purchase, I believe.
6  Q  How many employees does WIC, Inc.
7 currently have?
8  A  Two.
9  Q  And who is the other employees?
10  A  Michelle Toavs and Tony Overbaugh.
11  Q  Can you spell Michelle's last name?
12  A  T-O-A-V-S.
13  Q  And what was the other gentleman's name?
14  A  Overbaugh.
15  Q  O-V-E-R-B-A-C-H?
16  A  B-A-U-G-H. Overbaugh.
17  Q  Okay. First name?
18  A  Tony.
19  Q  And what are their positions?
20  A  We're a small company, so they're both
21 kind of multi-faceted positions. I would say
22 customer service is their main title.
23  Q  Just give a thumbnail sketch of what your
24 business model is.
25  A  We market treestands, ladderstands,

Page 14

1 hang-ons, tripods to hunters.
2  Q  Are you sort of a middleman?
3  A  I guess you could look at it that way.
4  Q  You don't design anything, correct?
5  A  That's correct.
6  Q  And you don't manufacture anything,
7 correct?
8  A  That's correct.
9  Q  You essentially distribute to retailers
10 or to their distribution centers?
11  A  That is correct.
12  Q  Okay. Do you ever actually take
13 possession of the products?
14  A  Yes.
15  Q  Okay. Tell me about that. Do you have a
16 warehouse?
17  A  We have a small warehouse, yes.
18  Q  And where is that?
19  A  In Apple Valley.
20  Q  I presume that not all of the products
21 come into that warehouse?
22  A  That's correct.
23  Q  So you don't take receipt of all of them,
24 correct?
25  A  That's correct.

Page 15

1  Q  Can you give me an idea of what
2 percentage you actually take receipt of?
3  A  I'm going to ballpark and say 10 percent.
4  Q  And whenever you take possession of that
5 10 percent, what's the purpose of that?
6  A  If a container comes in early or if we
7 need to hold it for a certain reason.
8  Q  And what reasons would there be for you
9 to hold a shipment?
10  A  Well, for example, if a customer would
11 cancel a shipment or something, and rather than
12 trying to ship it to them anyways, we would take it
13 into our own warehouse.
14  Q  Okay. I looked at your Linked-In
15 profile, and there was a reference to you being the
16 CEO of X-stands, is that correct?
17  A  That's correct.
18  Q  And how long have you been with X-stands?
19  A  July of 2014.
20  Q  And what is the corporate entity that
21 that DBA, so to speak, is registered under?
22  A  It's Worldwide Industrial Corp. The same
23 company.
24  Q  And is it the same set-up?
25  A  You have to rephrase the question. I'm

Page 16

1 not really sure what you're asking.
2  Q  Essentially is it the same business model
3 that we just discussed where you're essentially a
4 middleman distributor?
5  A  I guess you could say that, yes.
6  Q  And again, it's treestand products,
7 right?
8  A  That's correct.
9  Q  Now, I haven't received any information
10 on your product sales for X-stands.
11     Have you begun selling product?
12  A  No. We just got our first shipment in on
13 X-stands, and it hasn't sold anything yet.
14  Q  Sitting in the warehouse?
15  A  Yes.
16  Q  No contracts with anybody for sale of
17 those products?
18  A  Correct.
19  Q  Any direct sales off of your website?
20  A  No.
21  Q  Do you have any other DBAs that you have
22 sold product under?
23  A  No.
24  Q  I've got some print-offs from your
25 website here.

Page 17

1   (Exhibit 1 marked.)
2       MR. RYAN: You've got more than one page
3   on here?
4       MR. BLAIR: Yeah. I'm sorry. Let me
5   give you another page, Andy. There you go.
6       MR. RYAN: Thanks. Go ahead.
7   BY MR. BLAIR:
8       Q   There's on the first page reference to a
9   dealer locator, correct?
10      A   That's correct.
11      Q   And is that used so that your potential
12  consumers can find out where your products are being
13  sold?
14      A   That would be the point of it, yes.
15      Q   Okay. And then you go to the next page,
16  and there you have the consumer input certain
17  information so that they can find out by area code
18  where there are dealers, correct?
19      A   Correct.
20      Q   Okay. How does that search process work
21  internally?
22      A   Well, originally this website was
23  designed when we started Sniper in 2010. And the
24  goal was to get a dealer base set up, and that
25  project I'll say failed. It was unsuccessful.

Page 18

1   But this is remnants of that when we
2   originally set it up. So the way the system was
3   supposed to work is if we had a dealer base a
4   customer could go in and search for a dealer.
5       Q   Okay. And do you receive submissions on
6   here of people asking where can I find a dealer?
7       A   If we do, it may or may not get answered.
8   It's kind of a dead system. We just haven't updated
9   the website.
10      I guess eventually it would be nice to
11  get a dealer base set up, but we have been
12  unsuccessful doing it so far.
13      Q   And what do you mean by a dealer base set
14  up?
15      A   Dealers that would exclusively sell our
16  Sniper products in connection to our company like,
17  for example, a Ford dealership.
18      Q   So the sole product they would sell would
19  be Sniper Treestands?
20      A   That would be the goal, yes.
21      Q   Okay. Now, I've kind of gotten ahead of
22  myself. Give me an idea of your educational
23  history.
24      A   I went to school at Bold High School in
25  Olivia, Minnesota. My father owned a helicopter

Page 19

1   spraying company, and since I was 16 I managed the
2   helicopter company, and I went to school at
3   Southwest State University for business
4   administration.
5       Q   Okay. Did you get a degree?
6       A   Yes.
7       Q   A bachelors degree in business
8   administration?
9       A   That's correct.
10      Q   Any higher education?
11      A   No.
12      Q   Okay. No background in engineering,
13  correct?
14      A   That's correct.
15      (Exhibit 2 marked.)
16  BY MR. BLAIR:
17      Q   There we have another page from your
18  website. Do you recognize that page?
19      A   Yes.
20      Q   There's Dealer Services, Benefits of
21  Becoming a Dealer, and Requirements for Becoming a
22  Dealer. You've also got a "Complete our Dealer
23  Application."
24      Have you received dealer applications?
25      A   Not that I know of, no. Like I said, the

Page 20

1   whole system has kind of been on hold just because
2   it wasn't successful. Eventually, we would like to
3   start it up again, but as of right now it's not
4   active.
5       Q   Okay. Go ahead and mark that for the
6   record. This is his affidavit.
7       (Exhibit 3 marked.)
8   BY MR. BLAIR:
9       Q   I'm sorry. I didn't make you read that
10  for nothing. I'll come back to it.
11      (Exhibit 4 marked.)
12  BY MR. BLAIR:
13      Q   Now, those are the answers that you
14  prepared or someone prepared on your behalf in
15  relation to the first interrogatories that I had
16  sent you, correct?
17      A   Exhibit 4?
18      Q   Yes.
19      A   Yes.
20      Q   And if you turn to page 11, you recognize
21  your signature back there, correct?
22      A   Yes.
23      Q   Okay. And those answers contained in the
24  interrogatories are true and correct to the best of
25  your knowledge?

Page 21

1  A  Correct.
2     MR. RYAN: Well, let me object to the
3  form just to the extent there has also been
4  supplementation.
5  BY MR. BLAIR:
6  Q  I just want to go through a few of these.
7     Now, on your website you represent that
8  you have multiple dealers throughout the
9  United States and Canada, correct?
10 A  I would have to look at the website. It
11 may say that.
12 Q  I can give it to you.
13 A  I can see it here. It's on Exhibit 1.
14 Yes, it does say that.
15 Q  So is that not true?
16 A  That is not true. But, again, like I
17 said, we set this up in 2010 with the vision that
18 that would happen.
19 Q  And you understand whenever I'm
20 propounding interrogatories and you've referenced
21 dealers throughout the United States and Canada and
22 I'm interested in Illinois that I'm looking for your
23 essentially businesses in Illinois that sell your
24 products?
25 A  I don't understand. Can you repeat that?

Page 22

1  Q  Let's go on to interrogatory number 7,
2  please.
3     So you didn't give me any information
4  because you, quote, unquote, don't have any what you
5  consider "dealers." Correct?
6  A  We don't have any dealers, right,
7  that's correct.
8  Q  Okay. Interrogatory number 7 is the
9  first place that you gave me substantive information
10 on your sales, correct?
11 A  You mean the first place in
12 Exhibit Number 4? I guess I'm not completely
13 understanding.
14 Q  Yes. It's in Exhibit Number 4.
15 A  That's correct.
16 Q  And if we look at those responses, well,
17 first of all, it asks for sales totals, but you gave
18 me product units, is that right?
19 A  That's correct.
20 Q  And the scope of your endeavor there was
21 to give me the number of product units sold total as
22 opposed to shipped to Illinois distribution centers,
23 right?
24 A  Can you repeat that question?
25 Q  What you were doing there and the scope

Page 23

1  of what you were trying to give me was product units
2  in total by year versus product units shipped to
3  Illinois distributors?
4  A  Distribution centers. Yes, that's what I
5  meant.
6  Q  In 2010 you had 89,874 units that were
7  sold in total?
8  A  That's correct.
9  Q  Okay. We can go through the numbers
10 here, but let me point you to 2013.
11    You say that you had 40,380 units in
12 total sales, is that right?
13 A  That's correct.
14 Q  And that's not an accurate number, is it?
15 A  Yes, it is.
16    MR. RYAN: Well, let me just object again
17 to the extent this has been supplemented in
18 accordance with the rules and revised in accordance
19 with the rules when we determined that an answer was
20 wrong.
21 BY MR. BLAIR:
22 Q  I'll get to that.
23    Anyhow, if we start with 2012, and the
24 distribution center that you're referring to that
25 you send product to is Menards, is that right?

Page 24

1  A  Can I see that other -- where we
2  supplemented our answers? So you want to know
3  Menards?
4  Q  My question is on interrogatory number 7
5  whenever you initially responded and you were
6  referencing Illinois distribution centers, the
7  Illinois distribution center you're referring to is
8  for Menards, correct?
9  A  That's correct.
10 Q  Okay. And all products that you sell to
11 Menards go to that distribution center, correct?
12 A  No, that's not correct.
13    I believe Menards has three different
14 distribution centers, and from there I'm not sure
15 where the product goes.
16 Q  Okay. Where are Menards' two other
17 distribution centers?
18 A  Off the top of my head, I know there is
19 one in Wisconsin and one in Iowa. I don't know the
20 exact address, but I could look it up.
21 Q  Okay. So anyhow with 2012 if we looked
22 at the percentage of your total units that are going
23 to Illinois distribution centers, we're looking at
24 about 9 percent if we do the math, is that correct?
25    8,954 out of 98,503?

Page 25

1    A    To get an exact number, I would have to
2  divide that, but roughly I would say yes. Again, I
3  don't know where that product goes after it leaves
4  the distribution center.
5    Q    Okay. That wasn't my question. I'll
6  move to strike the last portion of that answer.
7         And then in 2013 your product sales in
8  terms of units that go to Illinois distribution
9  centers jump up to almost 22 percent, is that
10 correct?
11   A    Again, if you have a calculator for me, I
12 can give you a number. I'm not sure off the top of
13 my head.
14   Q    Okay.
15        MR. RYAN: You said for 2013, right?
16        MR. BLAIR: Yes.
17        MR. RYAN: Thanks.
18 BY MR. BLAIR:
19   Q    In interrogatory number 11 you say
20 W W Industrial does not track all part shipments,
21 but to the best of its knowledge, you believe no
22 replacement parts were sold or shipped to
23 individuals or business locations in Illinois for
24 the time period from 2010 to present.
25        What's the basis for your best of your

Page 26

1  knowledge information and belief? What are you
2  relying on?
3    A    Just talking to the customer service
4  staff and me taking phone calls myself. I haven't
5  had that myself.
6    Q    Okay. And in that you don't track where
7  things are going, there may or may not have been?
8    A    That's correct.
9    Q    Okay. Interrogatory number 13. It
10 doesn't surprise you that my client bought your
11 product in Illinois, does it?
12   A    Again, I know we ship to distribution
13 centers or customers that have retail locations, so
14 it doesn't surprise me. I can't predict if they did
15 or didn't.
16   Q    Okay. But if you had to guess, would you
17 expect your products to end up in Illinois?
18        MR. RYAN: Object to form.
19   A    Again, the same answer. I would say
20 I'm not surprised that somebody could buy the
21 product in Illinois, but we don't have control if it
22 goes to Illinois or not.
23 BY MR. BLAIR:
24   Q    But really no distributor has control
25 over where a retailer sells their product, do they?

Page 27

1         MR. RYAN: Object to form.
2    A    Can you rephrase the question?
3  BY MR. BLAIR:
4    Q    Well, anybody who is a middleman in
5  your position who is selling to someone like
6  Menards, I mean you can't dictate Menards' business
7  under any circumstance, can you?
8         MR. RYAN: The same objection.
9    A    I guess I don't know how everybody else
10 deals with Menards. We don't control what they do
11 with the product after they get it.
12 BY MR. BLAIR:
13   Q    Okay. Now, let me turn your attention to
14 interrogatory 15.
15        I asked you to identify all companies
16 known to W W Industrial Corp. to have Illinois
17 retail locations with which W W Industrial Corp. has
18 contracted with for the sale of W W Industrial Corp.
19 goods from 2003 to present, state the amount of
20 sales each year to each.
21        Is that correct?
22   A    Let me read that for a second.
23   Q    Sure.
24   A    Okay.
25   Q    And you told me about Dunham's and

Page 28

1  Menards, correct?
2    A    Yes, that's correct.
3    Q    And that's not an accurate representation
4  of companies with Illinois retail locations that you
5  contract with for the sale of your goods, correct?
6         MR. RYAN: Object to the form. The
7  answer has been supplemented.
8    A    Again, I don't know. I still don't have
9  a clear detail of where their retail locations are.
10        We went -- we had to go back and look at
11 the internet to find out what customers had retail
12 locations in what areas.
13 BY MR. BLAIR:
14   Q    Okay. But at the time you gave me this
15 answer in your original answers to plaintiff's first
16 interrogatories on personal jurisdiction that was
17 not an accurate answer?
18        MR. RYAN: The same objection.
19 BY MR. BLAIR:
20   Q    True?
21   A    That's correct, yes.
22        We had to do more research on the
23 internet to find out what customers had retail
24 locations in Illinois.
25   Q    Okay. On interrogatory number 20, you

Page 29

1  haven't received any complaints or customer service
2  calls from individuals, dealers, retailers or
3  businesses in the State of Illinois, is that
4  correct?
5      A   Yes, to my knowledge, that's correct.
6      Q   Okay. Okay. Are you familiar with
7  Hudalla & Associates?
8      A   Yes.
9      Q   Okay. What is Hudalla & Associates?
10     A   They're a sales rep firm.
11     Q   Okay. And how do you know of them?
12     A   When BGHA and Worldwide had a joint
13 marketing effort, BGHA had hired those guys as their
14 representatives.
15     Q   Okay. And at the same time did they
16 represent your products being Sniper?
17     A   Not directly. But like I said, with the
18 joint marketing effort, they worked for Big Game and
19 when we marketed Big Game and Sniper together, we
20 had interactions with them. They weren't directly
21 hired by Worldwide Industrial Corp.
22     Q   But they represented your products?
23     A   It's fair to say, I would say, at some
24 points they did, yes.
25         (Exhibit 5 marked.)

Page 30

1  BY MR. BLAIR:
2      Q   Do you recognize that web page?
3      A   I do not.
4      Q   Well, I'll represent to you that it's the
5  web page of Hudalla Associates, and you can see that
6  probably from the bottom left-hand corner.
7          That's your Sniper Treestands logo,
8  correct?
9      A   That's correct.
10     Q   And that's a registered trademark,
11 correct?
12     A   Yes.
13     Q   They say down below that "Logos are
14 copyrighted by the corresponding company and used
15 with permission."
16         You would agree that they were using your
17 trademark with permission?
18     A   I guess, no, I wouldn't.
19     Q   Okay. Have you called them and told them
20 that they need to quit using your trademark without
21 permission?
22     A   No. I didn't know this existed.
23     Q   Are you going to?
24     A   Yes, I will, actually.
25     Q   Now, they were representing you before

Page 31

1  during that time period that they were representing
2  you, and I mean Sniper. Were they then at that time
3  permitted to use that logo?
4      A   Yes.
5      Q   And when did you revoke your permission
6  for them to use that logo?
7      A   I guess unofficially in the fall of 2013
8  when we separated from BGHA.
9      Q   Did you give them any notice of that?
10     A   No.
11     Q   Okay. If you look at the sales rep force
12 on the right-hand side, you will see that they
13 in fact have Todd Hess who is purportedly
14 representing Sniper Treestands for northern
15 Illinois. Is that correct?
16     A   That's what it says, yes, that's correct.
17         I don't know where Todd lives, but it
18 looks like maybe he calls on people in those areas.
19 I'm not sure.
20     Q   Do you know Todd?
21     A   Not personally, no.
22     Q   Have you met him?
23     A   I don't know if I have or not.
24     Q   How about Anthony Lopez? He represents
25 southern Illinois where my client purchased his

Page 32

1  product.
2      A   Again, the same thing. You know, he
3  might be responsible to call on that area. I'm not
4  sure where Anthony lives.
5      Q   Okay. So then your response to
6  interrogatory 21 is not correct that you have never
7  had any manufacturer's representatives in Illinois
8  since 2010?
9      A   Can I see it? Where is that? Where is
10 21?
11     Q   It's in Exhibit 4.
12     A   Again, I don't think that Worldwide ever
13 had an agreement with Hudalla. I think it was off
14 of BGHA. So you can look at it several different
15 ways, but we officially never had sales reps.
16     Q   You knew they were repping you and you
17 had authorized them to use your logo, correct?
18     A   I officially didn't sign anything to have
19 them use the logo.
20     Q   Well, you did have a manufacturer's
21 representative who was marketing your products and
22 you had knowledge of that between 2010 and present,
23 correct?
24     A   Can you rephrase the question, please?
25     Q   Could you repeat the question?

Page 33

1  (Record read.)
2  A  Again, BGHA had the agreement with
3  Hudalla, so Worldwide never had an official
4  agreement with Hudalla. I understand and I'll agree
5  that Hudalla probably worked on behalf of Worldwide
6  and BGHA collectively.
7  Q  You don't have any other parent company
8  or subsidiaries or sister companies?
9  A  No.
10 Q  No other lawsuits or administrative
11 proceedings in Illinois since you took the helm in
12 2010?
13 A  Correct.
14 Q  All right.
15    (Exhibit 6 marked.)
16 BY MR. BLAIR:
17 Q  You recognize those as your supplemental
18 answers to the first personal jurisdiction
19 interrogatories that we were previously talking
20 about?
21 A  Yes.
22 Q  And that's your signature there on page
23 12?
24 A  Yes.
25 Q  And you signed that because those answers

Page 34

1  are true and correct?
2  A  To the best of my knowledge, yes.
3  Q  And if you turn to interrogatory
4  number 7, therein you initially failed to identify
5  three of your five dealers with retail locations in
6  Illinois, correct?
7    MR. RYAN: Object to form.
8  A  Again, when I -- the first time we
9  answered this, my counsel said to the best of your
10 knowledge --
11   MR. RYAN: You don't have to tell him
12 anything we talked about.
13 A  Repeat the question.
14 BY MR. BLAIR:
15 Q  When you answered interrogatory number 7,
16 your original answer failed to identify three of the
17 five customers you have with retail locations in
18 Illinois, correct?
19   MR. RYAN: Object to form.
20 A  Again, after doing research on the
21 internet we found out, yes, there was more customers
22 that had retail locations in Illinois.
23 Q  And that wasn't the question. Can you
24 read that back?
25    (Record read.)

Page 35

1    MR. RYAN: The same objection.
2  A  That's correct.
3  BY MR. BLAIR:
4  Q  Okay. And those three retailers were
5  Bass Pro, Buckeye, and Scheels All Sports, correct?
6  A  That's correct.
7  Q  Now, in response to my original request
8  for production of documents pertaining to personal
9  jurisdiction, you produced product registration
10 documents, is that correct?
11    I'm sorry. I'll mark those and hand
12 those to your counsel.
13 A  That's correct.
14   (Exhibit 7 marked.)
15 BY MR. BLAIR:
16 Q  Could you read off the Bates number on
17 those?
18 A  WWIC 0001, WWIC 0002, WWIC 0003, WWIC
19 0004 and WWIC 0005.
20 Q  All right. And if I could turn your
21 attention to WWIC 01, the first product registration
22 that you produced is from a guy in Belleville,
23 Illinois, correct?
24 A  Yes, that looks accurate.
25 Q  And that was purchased from Bass Pro,

Page 36

1  correct?
2  A  Yes, that looks correct.
3  Q  And Bass Pro has Illinois retail
4  locations, correct?
5  A  Yes. After doing research on the
6  internet, they do have retail locations in Illinois.
7  Q  Now, if you hadn't produced this product
8  registration and I would have seen that there was a
9  Bass Pro that was one of your customers, I wouldn't
10 have known to go back to Andy and ask why you're
11 missing this Bass Pro, correct?
12    MR. RYAN: Object to form. Discovery has
13 been supplemented and corrected in accordance with
14 the rules.
15    MR. BLAIR: After I pointed out the
16 deficiency.
17    I would have had no way to know that
18 Bass Pro was a customer from what you gave me had
19 this information not been contained in this
20 particular document, is that fair?
21    MR. RYAN: Object to form.
22 A  I'm not sure. Again, the only way we
23 knew that Bass Pro had an Illinois retail location
24 was we did an internet Google search.
25 BY MR. BLAIR:

9 (Pages 33 to 36)

Page 61

1  it going into distribution?
2     A    I saw this container and I inspected 8
3  items out of that container.
4     Q    You say 8 items?
5     A    Eight units out of the container.
6     Q    And how many are in a container?
7     A    730.
8     Q    So if this particular unit had a
9  manufacturing defect, you're probably not going to
10 catch that?
11        MR. RYAN: Object to form.
12    A    Yes. We would absolutely catch it, I
13 think. We have done a lot of testing and research
14 on how many units catch problems.
15        And like I said, this particular batch,
16 we inspected 8 of these units which is a very high
17 percentage that almost a hundred percent chance we
18 would catch any defect on the shipment.
19    Q    You're not an engineer, are you?
20    A    No.
21    Q    Who else does the inspection process?
22    A    There's an entire team at the factory
23 that does the inspection with me.
24    Q    Are these products shipped over in
25 shipping containers that you see on the great big

Page 62

1  boats that pull into harbor occasionally when you're
2  on the coast?
3     A    Yes.
4     Q    What actual sea port is used when they
5  get here?
6     A    That's determined by the freight
7  forwarder. I think Seattle-Tacoma is a very common
8  one that they use, but we don't have control over
9  what port they use. I think there's another one in
10 LA. I'm not positive though.
11    Q    And then they're all hauled by rail?
12    A    That's not necessarily accurate either.
13 Sometimes I think the freight forwarders truck them
14 straight from the port.
15    Q    Just depending upon how far the trucking
16 would be where it makes sense?
17    A    Yeah. Logistically, they must have a
18 system that they decide based on. We just basically
19 tell them what destination and their pick-up point,
20 and they handle the rest.
21    Q    You anticipate receiving product
22 registrations from the State of Illinois, don't you?
23    A    There's a lot of people that participate
24 in that. I guess I don't anticipate anything. I
25 did pull up the ones -- let me see.

Page 63

1         What's your question again?
2     Q    You anticipate receiving product
3  registrations from the State of Illinois, correct?
4     A    No. I would say I don't anticipate it.
5  It's not a widely-used program. We did pull that
6  form, didn't we? Yeah.
7     Q    Okay.
8         (Exhibit 10 marked.)
9  BY MR. BLAIR:
10    Q    You have a drop-down bar there on your
11 website specifically for Illinois consumers to
12 register their products, correct?
13    A    I don't know for sure. It may be a
14 drop-down that contains all 50 states. I would have
15 to jump on the website to check.
16    Q    Well, regardless of how many states,
17 Illinois is one of them, correct?
18    A    I'd have to jump on the website to check
19 that.
20    Q    Well, if you look at that document --
21    A    If this is printed from the website, then
22 yes. Illinois must be an option on there.
23    Q    And you recognize this as a page on your
24 website?
25    A    Yes.

Page 64

1     Q    Now, there are other products that you
2  haven't told me about, aren't there?
3     A    What's that?
4     Q    There are other WIC, Inc. products that
5  you didn't tell me about, aren't there?
6     A    Didn't tell you about?
7     Q    In discovery.
8     A    Not that I'm familiar with, I guess. If
9  you asked something -- I don't know.
10    Q    Tell me about API Outdoors.
11    A    API Outdoors?
12    Q    Yeah.
13    A    We don't own that company. We
14 manufactured some products for them.
15        (Exhibit 11 marked.)
16 BY MR. BLAIR:
17    Q    What is that that I handed you?
18    A    It's an instruction manual for an API
19 climber.
20    Q    Okay. And then if you look down at the
21 bottom of the page, who is that published by?
22    A    WIC.
23    Q    All right. And that's your company,
24 right?
25    A    That's correct.

16 (Pages 61 to 64)

NATHAN STIEREN  10/28/2014

Page 65

1  Q   You told me earlier you didn't have any
2  other DBAs, but this is one of your DBAs, isn't it?
3  A   No, not necessarily. I would say this
4  is -- we didn't really see this as a connection with
5  Sniper. It was just an OEM manufacturing where we
6  manufactured product for API, which is not owned by
7  us.
8  Q   Who is it owned by?
9  A   I believe that the parent company is
10 Bass Pro.
11 Q   Okay. So tell me, did you actually
12 manufacture products?
13 A   No.
14 Q   No?
15 A   I mean the factories manufactured the
16 products. We just handled the shipments for API.
17 Q   Where did those shipments go?
18 A   I don't know. We don't -- I don't handle
19 API anymore, so I don't have any documentation on
20 API.
21 Q   When did you stop handling API?
22 A   The fall of 2013.
23 Q   Okay. And if you turn to page 2 of the
24 climbing treestands manual for API, if you look at
25 the toll-free number that's in the second-to-last

Page 66

1  paragraph and even on the last sentence, that's
2  877-511-2540. Correct?
3  A   Uh-huh. That's correct.
4  Q   That's your phone number?
5  A   I don't know if -- I don't think it is,
6  no.
7  Q   It was at the time that this came out,
8  correct?
9  A   I don't think we would have owned that,
10 no. I think that would be probably owned by API.
11 I'm not positive though.
12 Q   Could you mark the instruction manual for
13 the Sniper Treestands model STLS41.
14    (Exhibit 12 marked.)
15 BY MR. BLAIR:
16 Q   And that's the same number that's
17 contained within the product manual for the product
18 at issue in this case, correct?
19 A   Yes, it is.
20 Q   So that is your phone number that you're
21 giving with an API Outdoors catalog that is
22 referenced as being produced by WIC, Inc. Correct?
23 A   It must be. I would have to look at the
24 phone company, but I thought we used a 507 number.
25 I don't know if that 877 number exists anymore.

Page 67

1  Q   Okay. And you didn't give me any
2  information on API's activities, correct?
3  A   That's correct.
4  Q   You didn't even identify it as something
5  you did business as, correct?
6  A   No, and we didn't really do business as
7  it. It's not really a connection with Sniper.
8  Q   It's a connection with WIC, right?
9  A   If I remember right, yeah, I think WIC
10 was the company that ran the products through for
11 shipments, but I was never asked to pull up any API
12 shipments.
13 Q   Okay. But it's a WIC product just like
14 Sniper is a WIC product, correct?
15 A   It's API. It's not owned by WIC. The
16 Sniper trademark is owned by WIC. API Outdoors is
17 not.
18 Q   Okay. And what's the difference in the
19 business model between API, whenever you were
20 involved with it, and WIC?
21 A   Sniper was a brand that was owned by us
22 and we tried to build that brand. We owned the
23 trademark. API was just us producing or being the
24 shipment, I guess, facilitator for API.
25 Q   So you did the same thing for API but for

Page 68

1  owning the trademark?
2  A   Not necessarily, no. We just facilitated
3  the shipments for the owner of API.
4  Q   Okay. And who are API's customers?
5  A   I don't know.
6  Q   You have no idea who API's customers
7  were?
8  A   No. I would have to look. I didn't do
9  any research on API for this.
10    (Exhibit 13 marked.)
11 BY MR. BLAIR:
12 Q   That's the website for API, correct?
13 A   It looks like it, yes.
14 Q   Okay. How many products did WIC
15 distribute through API?
16 A   I don't know. I'd have to look. Like I
17 said, I didn't do any research on API for this.
18 Q   Okay. All right. All right. Well,
19 first of all, this is the same format as Sniper
20 Treestands' website, isn't it?
21 A   I'm not sure. I'd have to compare them
22 side by side. They look somewhat similar.
23 Q   Okay. And if you look down below
24 "Complete our Dealer Application," you will see that
25 you use the same PO box number for API Outdoors that

17 (Pages 65 to 68)

Page 69

1 you do for Sniper Treestands, correct?
2   A   Our Sniper Treestands is a different
3 address. It's 14607 Felton Court.
4   Q   And what's your PO box number?
5   A   We don't have one. It's suite 116.
6 There's a mailbox right there at the office.
7   Q   What did you have as a PO box before you
8 made your split?
9   A   I believe it was PO box 3 --
10  Q   52?
11  A   Was it 352? Yeah, I think so.
12  Q   Okay. And then if we turn to the next
13 page, 1820 North Redding Avenue was the location
14 that you were working out of back in 2012, correct?
15  A   That's correct.
16  Q   And if we look at the copyright of
17 this document, it appears that this is copyright
18 2012, API Outdoors, right?
19  A   Where? I don't know where to look for
20 that.
21  Q   Look on the last page, the last script.
22  A   Okay. Yep. That looks accurate.
23      (Exhibit 14 marked.)
24 BY MR. BLAIR:
25  Q   What's that?

Page 70

1   A   It looks like it says API Outdoors Credit
2 Application and Purchase Terms Agreement.
3   Q   And could you read the next line there?
4   A   "To apply for a Worldwide Industrial
5 Corporation, Inc. account, please submit all of the
6 following information."
7   Q   So to become a dealer of an API Outdoors
8 product, you would have to submit for a Worldwide
9 Industrial Corporation account, correct?
10  A   I guess if that program went, yes.
11  Q   Okay. You distributed a lot of different
12 products for API, didn't you?
13  A   Again, I didn't look at any API
14 information for this. I'd have to look. There's
15 quite a few different models. I know that.
16  Q   Okay.
17     (Exhibit 15 marked.)
18 BY MR. BLAIR:
19  Q   Sir, now I'll represent to you that this
20 is a printout of a web page from Cabela's which you
21 can see down at the bottom left-hand corner the
22 actual web address where you can find this.
23     This is just an example. They sell the
24 API Outdoors Crusader Climbing Treestand, correct?
25  A   It looks like it based on this

Page 71

1 information, yes.
2   Q   And Cabela's has retail locations in
3 Illinois, don't they?
4   A   I have no idea.
5      (Exhibit 16 marked.)
6 BY MR. BLAIR:
7   Q   That appears to be a Hoffman Estates
8 location for Cabela's, correct?
9   A   That's correct.
10  Q   And that's in Illinois, correct?
11  A   Yes.
12  Q   And I have no idea about which product
13 sales or distribution of API products with respect
14 to Cabela's, right?
15  A   Say that again.
16  Q   I don't have any information that you
17 gave me with respect to WIC's product distribution
18 of API products to Cabela's, correct?
19  A   We didn't pull any information on API.
20  Q   So I don't have any of that information?
21     MR. RYAN: Well, is there somewhere where
22 you contend you asked for that?
23     MR. BLAIR: Andy, I asked for all product
24 information of W W Industrial Corp. with respect to
25 any products. I didn't limit it to Sniper

Page 72

1 Treestands. You'll see that.
2      MR. RYAN: And we didn't limit anything
3 to Sniper Treestands either.
4      MR. BLAIR: What's that?
5      MR. RYAN: We didn't limit anything to
6 Sniper Treestands either.
7      MR. BLAIR: Then why wasn't I given all
8 this information about all the API products?
9      MR. RYAN: Well, I think he has explained
10 to you that API is a separate company.
11     MR. BLAIR: That they were distributing
12 products for.
13     MR. RYAN: I don't think that's what his
14 testimony was.
15 BY MR. BLAIR:
16  Q   What is it that you do for API Outdoors
17 -- that you did whenever you were involved through
18 WIC?
19  A   We organized the shipments from China to
20 their distribution. There's information on API. I
21 was never asked to pull the shipments on API.
22  Q   And did you receive remuneration for
23 those shipments that you sent for whoever it may be
24 for API?
25  A   I don't understand the question.

18 (Pages 69 to 72)

Page 73

1  Q   Did you receive compensation? You
2  weren't doing it gratuitously, were you?
3  A   Correct.
4  Q   Okay. And so you were in the stream of
5  commerce?
6      MR. RYAN: Object to form.
7  A   I guess, yeah.
8      And for Cabela's case, I'd have to look
9  back at shipments to see if we ever shipped API
10 products to Cabela's. I can't say that we have or
11 not.
12     There was only a few years that we
13 produced for API, and it was produced by other
14 people before that and someone else now. So any
15 information on API, I'd have to look back at the
16 documents.
17 Q   On September 12, 2014, I went to Bass Pro
18 in Peoria, Illinois and took the following photos
19 that I'd ask that you mark as exhibits.
20     (Exhibit 17 marked.)
21 BY MR. BLAIR:
22 Q   Now, as we go through these pictures, and
23 these are just what was sitting on the shelf, you
24 recognize these as Sniper Treestand products?
25 A   Yes.

Page 74

1  Q   Does it surprise you at all that there
2  was a lot of Sniper Treestand products that were
3  available at the East Peoria Bass Pro Shop just last
4  month?
5  A   That actually does surprise me, because I
6  don't think we have sold to Bass Pro in quite a
7  while.
8  Q   These were just on the floor.
9      (Exhibit 18 marked.)
10 BY MR. BLAIR:
11 Q   Take a look at that first page for me.
12 What is that?
13 A   Which one? 17 or 18?
14 Q   Eighteen. It's the one I just handed
15 you.
16 A   It's hard to tell. It looks like it's a
17 strap for API.
18 Q   Well, I mean you can read the title,
19 can't you?
20 A   Yeah. Cam-Lok Buckle and Strap.
21 Q   And that's a product you guys distributed
22 to Bass Pro, isn't it?
23 A   Yeah, to Bass Pro.
24 Q   And then you take a look at the second
25 page, and that's a WIC, Inc. product? That's the

Page 75

1  back of the product packaging.
2  A   Yeah. Like I said, we facilitated the
3  shipment. And any of the API shipments, I didn't
4  pull any of the data for that.
5  Q   And your name actually appears on -- or
6  your company name actually appears on that product
7  as the manufacturer, correct?
8  A   Yes.
9  Q   And that's 1820 North Redding Avenue, Box
10 352, Windom, Minnesota which we all previously
11 discussed before?
12 A   Yes.
13 Q   The same 877-511-2540 phone number?
14 A   Yes.
15 Q   You didn't tell me about that product,
16 right?
17     MR. RYAN: Object to form.
18 A   We didn't pull any reports for API. I
19 was never asked to pull any information on API.
20     (Exhibit 19 marked.)
21 BY MR. BLAIR:
22 Q   Another thing hanging on the shelf. Can
23 you tell me what that is there?
24 A   Replacement pin kit.
25 Q   All right. And that's an API Outdoors

Page 76

1  product, right?
2  A   That's correct.
3  Q   If you flip over to a shot of the back of
4  that product, again, that's your company
5  representing to be the manufacturer?
6  A   Yes.
7      (Exhibit 20 marked.)
8  BY MR. BLAIR:
9  Q   Okay. And what's that?
10 A   6 foot heavy duty ratchet strap.
11 Q   Again, that's an API product?
12 A   Yes.
13 Q   If you turn around on the back, you
14 are reported to be the manufacturer?
15 A   That's correct.
16     (Exhibit 21 marked.)
17     (Exhibit 22 marked.)
18 BY MR. BLAIR:
19 Q   It appears that at the East Peoria
20 location of Bass Pro Shop the API Outdoors Voyager
21 Treestand is on sale for 79.97. Correct?
22 A   That's correct.
23 Q   And do you recognize that model?
24 A   Not off the top of my head. I don't know
25 if we would have produced that or not.

NATHAN STIEREN  10/28/2014

Page 77

1  Q  Okay.
2     (Exhibit 23 marked.)
3  BY MR. BLAIR:
4  Q  Tell me which of those product models you
5  recognize. Those are API products, correct?
6  A  It looks like it, based on what I see.
7  Q  Do you recognize the Baby Grand?
8  A  I'm familiar with the name. I guess I
9  can't tell if that's the Baby Grand in the picture,
10 but I'm familiar that API has a Baby Grand in their
11 model, yeah.
12 Q  Let's go to the third picture. API
13 Outdoors two-person stand.
14    Do you recognize that product?
15 A  Again, there's no product in the picture.
16 Not off the top of my head. I guess I can't say. I
17 notice it, yes.
18 Q  It's kind of blurred, but how about the
19 API Magnum Baby Grand, are you familiar with that?
20 A  I'm familiar with the name, but the
21 picture doesn't tell me anything.
22 Q  Okay. The next page. The API Outdoors
23 Baby Grand Treestand, 149.99. There's a picture
24 there in the picture. That's something you
25 recognize?

Page 78

1  A  I'm familiar with the name again. The
2  picture doesn't tell me anything.
3  Q  And you can actually see the API Outdoors
4  logo on the treestand below it?
5  A  Yes.
6  Q  You guys made outdoor bowhunter stands?
7  A  Say that again.
8  Q  You made outdoor bowhunter stands, API
9  did?
10 A  Outdoor bowhunter stands?
11 Q  I'm just looking at the picture, if you
12 want to flip through here. There's a red sales
13 sign, API Outdoors Bowhunter.
14 A  I'd have to look at any shipping
15 documents for API to know if we produced any of
16 that. Again, Bass Pro owns the API Outdoors brand,
17 so they get things made all over for that brand.
18 Q  Your product catalog comes along with
19 those products or with those treestands?
20 A  Say that again.
21 Q  Your product catalog with WIC, Inc. on it
22 that you have copyrighted comes with those products?
23 A  No.
24 Q  Well, we just looked at one earlier.
25 A  You mean the instruction manual?

Page 79

1  Q  Yes.
2  A  Yeah, the instruction manual, correct,
3  the ones that we would have shipped.
4     (Exhibit 24 marked.)
5  BY MR. BLAIR:
6  Q  This is a product catalog that they had
7  there that I went through. If you start flipping
8  through this, is this point of sale material?
9  A  I don't know what this is. It could be
10 product artwork. I'm not really sure what this is.
11 Q  And do you guys do product artwork for
12 Sniper?
13 A  No.
14 Q  Who does the product artwork?
15 A  We outsource it with a designer.
16 Q  Okay. So this isn't something that API
17 did in terms of taking the pictures here?
18 A  I do not believe so. But, again, we
19 didn't look at anything with API, so I'd have to
20 look back to see if we would have done that.
21 Q  All right. Why don't we go ahead and
22 mark the balance of that catalog.
23    (Exhibit 25 marked.)
24 BY MR. BLAIR:
25 Q  So the front page there, that's a Sniper

Page 80

1  Treestand that's on advertisement in the catalog
2  there at the East Peoria location. Is that artwork
3  that you guys did?
4  A  I don't know. I'm not sure. This looks
5  like it got pulled from our catalog. We wouldn't
6  have sent this to Bass Pro. It might have been
7  something they generated based off of the catalog or
8  something. I've never seen this before.
9  Q  Okay. So they carry the Vulcan, the
10 Blackhawk. Then we get back into API products,
11 right?
12    The API products they have are the
13 Crusader, the Gland Slam Extreme, the Quest, the
14 Star, Bowhunter, 20-Foot Ultra-Steel, 18-Foot
15 Ultra-Steel Deluxe, correct?
16 A  Yeah. I'm just reading along with you
17 here.
18 Q  Okay. And then we're back to Sniper and
19 we've got the Intimidator. Before we go back to
20 API Outdoors products, we've got the Deluxe Tripod,
21 20-Foot Deluxe Tripod, the Quik Stik, the Stackin'
22 Stick, Quik Stik Ladder and the Stackin' Stick
23 Ladder, correct?
24 A  That's what I'm looking at. I don't know
25 where this was drawn from. I've never seen

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 81

1  something like this before.
2  Q   And that's a lot of API products,
3  correct?
4  A   Yes.  There are several of them in here.
5      (Exhibit 26 marked.)
6  BY MR. BLAIR:
7  Q   And those are just the products that we
8  looked at earlier that are the WIC, Inc. products or
9  at least represented to be that are hanging on the
10 shelf there, and then I'll just mark the balance of
11 these photos.
12     (Exhibit 27 marked.)
13 BY MR. BLAIR:
14 Q   And those are just more Sniper products
15 that are there at the distribution center or the
16 retail center.
17     Now, you've got API product catalogs,
18 don't you?
19 A   Yes.
20 Q   You didn't give me any of those, did you?
21 A   No.  We didn't search for anything on
22 API.  I already said that.
23 Q   Even though I asked for all W W
24 Industrial Corporation product manuals?
25 A   I was told to look for Sniper stuff.

## Page 82

1  Q   Mr. Stieren, that's not the only DBA that
2  WIC, Inc. has done business under, is it?
3  A   I don't see API as a DBA.
4  Q   That wasn't my question.
5      My question was:  Is that the only DBA
6  that WIC, Inc. has done business under?
7  A   To my knowledge, yes, unless there's
8  something else that -- yeah, I think so.
9  Q   Okay.  Let me go back to Exhibit 14.
10     Read the first full number 1 paragraph
11 there.
12 A   Number 1?
13 Q   Yeah.
14 A   "I hereby certify that I have the
15 authority to apply for credit on behalf of
16 Applicant(s) identified below and the Applicant(s)
17 hereby authorize BGHA, Inc. DBA Big Game Treestands
18 and/or WIC, Inc. DBA Remington Treestands,
19 (Creditor) to investigate Applicant(s) credit
20 history, bank references and any other sources of
21 information deemed necessary to extend credit as
22 allowed by the Federal Credit Reporting Act and
23 applicable State Law."
24 Q   And you didn't tell me anything about
25 doing business as Remington Treestands, correct?

## Page 83

1  A   No.  I'm not familiar with Remington
2  Treestands.
3  Q   Now, what you're looking at is the dealer
4  application for API, right?
5  A   That looks correct, yes.
6  Q   Okay.  Pull up the dealer agreement that
7  we previously marked for Sniper.
8      Do you see it there?  It's possible I
9  didn't mark it yet.  I'll mark another just in case.
10     (Exhibit 28 marked.)
11 BY MR. BLAIR:
12 Q   Please read the first paragraph of the
13 third page of that document.
14 A   "I hereby certify that I have the
15 authority to apply for credit on behalf of
16 Applicant(s) identified below and the Applicant(s)
17 hereby authorize BGHA, Inc. DBA Big Game Treestands
18 and/or WIC, Inc. DBA Remington Treestands (Creditor)
19 to investigate Applicant(s) credit history, bank
20 references and any other sources of information
21 deemed necessary to extend credit as allowed by the
22 Federal Credit Reporting Act and applicable State
23 Law."
24 Q   So you've also done business as Remington
25 Treestands, correct?

## Page 84

1  A   Not that I'm aware of.  I don't know if
2  it was before 2010, but, no, not to my knowledge.
3  Q   Well, that's your dealer application,
4  isn't it?
5  A   It looks like it, yes.
6  Q   And it says that you are doing business
7  as Remington Treestands, doesn't it?
8  A   It must not have been updated, because I
9  don't know why it would say that otherwise.
10 Q   Okay.  That wasn't the question.  Could
11 you read my question back?
12     (Record read.)
13 A   Yes, it does say that.
14     (Exhibit 29 marked.)
15 BY MR. BLAIR:
16 Q   All right.  What's that there?
17 A   I do not know.  It looks like it's a
18 Remington Treestands assembly and installation
19 instructions.
20 Q   Okay.  And what's the address there under
21 Remington Treestands on the first page?
22 A   1680 North Redding Avenue, Windom,
23 Minnesota.
24 Q   And that's your address?
25 A   No.

Page 89

1  that I gave you before, the instruction manual with
2  respect to Remington.
3     A    Okay.
4     Q    And can you take a look at whether the
5  300 Mag Treestand is one of the products identified
6  in that catalog?
7     A    Yes, it is.
8     Q    And that catalog references that product
9  as being the product of WIC, Inc. Is that right?
10    A    Correct.
11    Q    All right. When in 2010 did you actually
12 purchase Sniper Treestands?
13    A    I'd have to look back at the dates.
14 I'm not sure.
15    Q    Okay.
16       (Exhibit 34 marked.)
17 BY MR. BLAIR:
18    Q    This is a printout from the Remington
19 Treestand website dated September 1st, 2011. So
20 this would be well in excess of the time that you
21 took over WIC, correct?
22    A    Yes.
23    Q    And it appears that that's a display for
24 the Double Barrel. Are you familiar with that
25 product?

Page 90

1     A    I am not.
2     Q    If we turn to the next page, page 2 of 2,
3  who is the manufacturer of that Remington product as
4  of September 1st, 2011?
5     A    WIC, Inc. But we wouldn't have made that
6  at that point. We didn't make any Remington
7  products after that, so this just must have been an
8  old website that still existed that I was not
9  familiar with. And it could still exist today. I
10 have no idea.
11       (Exhibit 35 marked.)
12 BY MR. BLAIR:
13    Q    A couple of two-person ladderstands in
14 2011 that are still being sold on the website or
15 advertised on the website that are attributable to
16 WIC, Inc. Correct?
17    A    Yeah. And if they were on the website,
18 they weren't available for sale, because we didn't
19 sell any Remington.
20       And I don't even know who has access to
21 Remington Treestands. I don't know if we still --
22 if that website still exists. It could still be out
23 there. I'm not even sure. If it is, I'm not aware
24 of it.
25    Q    I am going to change gears here for a

Page 91

1  moment. So you don't have any written
2  communications between you and either the
3  manufacturer of your products, the designer of your
4  products, or any of your customers?
5     A    No. Most of the time, like I said, we'll
6  do our annual meeting with our customers and then
7  they'll order one time a year, and they will call to
8  follow up, and then a lot of my communication with
9  China is when I'm over at the factories, and I go
10 over there a lot just to watch production.
11       MR. BLAIR: Andy, I don't know where the
12 copies of those are, but that's just your
13 supplemental rule 26 disclosures to produce the
14 insurance contract.
15       (Exhibit 36 marked.)
16 BY MR. BLAIR:
17    Q    That's your insurance contract, right?
18 It handles products claims, right?
19    A    That's correct.
20    Q    It's a million dollar primary, is that
21 right?
22    A    Yes, I believe so.
23    Q    And then you have a $25,000 deductible
24 for each claim?
25    A    That's correct.

Page 92

1     Q    And then you have a $4 million excess on
2  top?
3     A    That's correct.
4     Q    So do you have a total of 5 million and
5  $25,000, so to speak, in applicable insurance?
6       MR. RYAN: Object to the form.
7       MR. BLAIR: My only question is does the
8  25,000 come out of the original million or is the
9  limit 1,025,000?
10       MR. RYAN: Okay.
11    A    I don't know the answer to that question.
12       MR. BLAIR: Okay.
13 BY MR. BLAIR:
14    Q    I went to high school with a guy by the
15 name of James Angles. Do you know him?
16    A    The name sounds familiar, but I don't
17 know him.
18    Q    He's from Centralia, Illinois, which is
19 where I'm from. And did you know that's also where
20 Mr. Queen is from?
21    A    No. I guess I'm not familiar, no.
22    Q    We all grew up in Marion County together.
23       (Exhibit 37 marked.)
24 BY MR. BLAIR:
25    Q    Now, sir, when you told me earlier that

Page 93

1    you've never been sued in the State of Illinois,
2    that's not true, is it?
3        A    I guess I'm not familiar with -- let me
4    look at this once. I don't think there was a
5    lawsuit filed against us.
6        Q    Could you turn to the second page and
7    look at the title of the document?
8        A    I remember -- I'm familiar with James. I
9    remember this, but I don't think it ever got filed.
10   I don't think it was a lawsuit that got filed.
11       Q    Okay. Just read the title of that
12   document.
13       A    Where is the title at?
14       Q    It's underlined and in bold print, all
15   caps.
16       A    Complaint Count 1.
17       Q    Yeah. "Complaint" is good. And it has
18   got a cause number. Can you read the style of the
19   case there?
20       A    Where? You got to tell me what to read.
21   I'm not really sure.
22       Q    It says, "James Angles versus WIC, Inc.,
23   a corporation doing business as Sniper Treestands."
24   Correct?
25       A    Yes.

Page 94

1        Q    All right. And it appears that was filed
2    in St. Clair County on August 30th, 2013, correct?
3        A    Yes.
4        Q    And when you told me earlier you hadn't
5    received any complaints from the State of Illinois,
6    obviously you have, correct?
7            MR. RYAN: I'll object to the form, lack
8    of foundation.
9    BY MR. BLAIR:
10       Q    Go ahead.
11       A    Yeah. I don't -- I don't remember this
12   being in Illinois, but I remember the case, yeah.
13       Q    And if you look at paragraph 4, the
14   product involved is 20-Foot Stick, model STCS20,
15   correct?
16       A    I don't know where you're looking.
17       Q    Paragraph 4 on that same page.
18       A    STCS20.
19       Q    STCS20. And that's one of WIC's
20   products, correct?
21       A    That's correct.
22       Q    All right. And if you take a look at
23   paragraph 7, could you read what it is that
24   WIC, Inc. doing business as Sniper Treestands had
25   allegedly done in subparagraphs A through D?

Page 95

1        A    Do you want me to read subparagraph A
2    through E?
3        Q    A through D.
4        A    A through D?
5            "He has incurred medical bills in the
6    past and is likely to --
7        Q    No. In paragraph 7, subparagraphs A
8    through D. It's what WIC, Inc.'s acts or omissions
9    were.
10       A    So do you want me to read the 7 or just A
11   through D?
12       Q    Well, you understand that these are the
13   allegations that were lodged against WIC in that
14   lawsuit, correct?
15       A    Yes.
16       Q    And could you read subparagraphs A
17   through D as to what those allegations of negligence
18   were?
19       A    "They negligently designed and
20   manufactured the 20-Foot Stick with inadequate
21   materials that lacked the strength required to give
22   adequate support of the occupant of the Stick while
23   it being used in a foreseeable manner.
24           "B, they failed to warn of the dangerous
25   condition and weakness of the Stick to warn users of

Page 96

1    the Stick it was made of inadequate material and
2    would bend and/or break during foreseeable use. C,
3    they failed to provide adequate strapping that would
4    allow the Stick to remain attached to the tree
5    during foreseeable use.
6            "D, they failed to provide an adequate
7    safety harness and/or tether that would allow the
8    user of the Stick to remain attached during bending
9    or breaking of the Stick."
10       Q    So it was alleged that your product bent
11   and failed? That's what it says, isn't it?
12       A    Not word-for-word. I think that's what
13   they're getting at, yes.
14       Q    Well, I mean it says it bent, right?
15       A    It says, "They failed to provide an
16   adequate safety harness and/or tether that would
17   allow the user of the Stick to remain attached
18   during a bending or breaking of the Stick."
19       Q    Okay. And then if you would read
20   paragraph 8.
21       A    "They negligently designed and
22   manufactured the 20-Foot Stick with inadequate
23   materials that lacked the strength required to give
24   it --
25       Q    No, I'm sorry. I said 8, paragraph 8.

Page 97

1  A  I'm sorry.
2     "As a direct and proximate result of one
3  or more of the foregoing negligent acts and/or
4  omissions on the part of the Defendant WIC, the
5  20-Foot Stick bent and/or broke while the Plaintiff
6  was attempting to remove it from the tree causing
7  the Plaintiff to fall from the Stick to the ground.
8  Injuries and damages are herein set forth."
9  Q  So it was alleged that your product bent
10 and caused someone to fall?
11 A  That's the way it looks, yes.
12 Q  Just like it's alleged that Mr. Queen and
13 the product from WIC, Inc. that he purchased is
14 alleged to have bent and causing him to fall,
15 correct?
16 A  That's what I'm reading, yes.
17 Q  So if you look at paragraph 5 of the
18 complaint, it says that the accident occurred in
19 Dix, Marion County, Illinois.
20    Did you know that Mr. Queen also resides
21 in Marion County, Illinois?
22 A  No.
23 Q  And did you know that Mr. Angles also
24 resides in Marion County, Illinois?
25 A  No.

Page 98

1  Q  So I mean presuming that that is true,
2  your products happen to make their way to southern
3  Illinois and injure two separate individuals in a
4  small county in southern Illinois?
5     MR. RYAN: Objection, calls for
6  speculation.
7  BY MR. BLAIR:
8  Q  That's what's alleged, correct?
9  A  That's what's alleged, correct.
10 Q  And can you turn to the last page, page 4
11 of 5?
12 A  Okay.
13 Q  All right. And a summons was issued to
14 WIC, Inc. doing business as Sniper Treestands, 1820
15 North Redding Avenue, Windom, Minnesota, 56101.
16 Correct?
17 A  Where do I read that?
18 Q  It's on the bottom right-hand corner of
19 page 4.
20 A  Okay. I don't see exactly where you're
21 looking. Okay. I see it, yes.
22 Q  And that's the same place that I served
23 you with Mr. Queen's complaint, correct?
24 A  I don't believe so, no.
25    MR. BLAIR: Oh, you accepted service,

Page 99

1  didn't you, Andy? That's right.
2     MR. RYAN: I don't remember that either.
3  I'm not disputing that. I just don't remember.
4     MR. BLAIR: I think that's what happened.
5     Well, I'll tell you, you can see from the
6  writing up top of the complaint that this is a
7  document that was in federal court, so the case got
8  moved to the Southern District, and the Southern
9  District is in fact the same exact court that we are
10 in.
11    (Exhibit 38 marked.)
12 BY MR. BLAIR:
13 Q  And can you read the third line down
14 there in the heading? Do you see that? Steven C.
15 Williams?
16 A  Yes.
17 Q  And he's even the same magistrate judge
18 that is handling our case. Did you know that?
19 A  I was not familiar with that, no.
20 Q  Okay. And if you look at the docket
21 sheet, it looks like there's 17 different entries,
22 is that correct?
23 A  Yes.
24 Q  There were a number of different
25 pleadings filed to include your answer?

Page 100

1  A  Yeah. I'm not familiar with the
2  verbiage, but I can see there's 17 different doc
3  numbers.
4  Q  And when you got sued, you had to review
5  the complaint and tell your counsel what was or was
6  not accurate, is that right?
7  A  I don't remember the details of this at
8  all.
9  Q  Well, this was just in November. I mean
10 it's less than a year ago.
11 A  Right.
12 Q  And it looks like on April 28th, 2014
13 there was a judgment entered, correct?
14 A  Yeah. That's what it says. I guess I
15 don't remember the details of that either.
16 Q  Well, you settled the case, didn't you?
17 A  I -- I don't remember for sure. I don't
18 remember the details. I can look back through.
19 Q  You don't know whether you settled the
20 case in April of this year?
21 A  I remember we went back and forth
22 discussing it, but I don't remember the final detail
23 of what happened.
24    I know that it's no longer going on, but
25 I don't even remember it being a filed case. I

Page 101

1  thought this was just somebody -- a complaint. So I
2  don't have any information I can give you without
3  looking back at it.
4  **Q   Okay. Well, did you write a $25,000**
5  **check to satisfy that deductible to make this go**
6  **away?**
7  A   I -- I don't think so. I don't know.
8  I'd have to check. I don't know for sure if we did.
9  **Q   You don't know whether you issued a**
10 **$25,000 check to your insurance company to satisfy**
11 **your deductible?**
12       MR. RYAN: Objection, asked and answered.
13 A   I don't remember.
14 BY MR. BLAIR:
15 **Q   Okay. Do you sign the checks whenever**
16 **they're issued?**
17 A   Yes.
18 **Q   Okay. So if I go and track down this**
19 **check, am I going to see your name on it, do you**
20 **think?**
21 A   If there is such a check, then it would
22 have my name on it, yes.
23 **Q   And is that something you would keep**
24 **record of?**
25 A   The check? It would be in the accounting

Page 102

1  system. It wouldn't -- I wouldn't have the copy of
2  the actual check.
3  **Q   But you would be able to find**
4  **documentation of a $25,000 payment to your insurance**
5  **company to satisfy a deductible?**
6  A   Yep.
7  **Q   Do you remember who your counsel was in**
8  **that case?**
9  A   I believe it was Mel Karfis, but I'd have
10 to look back too. I don't remember. I think it was
11 Mel though.
12 **Q   Do you remember working with Mr. Hunsaker**
13 **at Heyl Royster?**
14 A   No.
15 **Q   I actually started off my career working**
16 **for him. Can you believe that? Let's take a**
17 **five-minute break.**
18       (Break taken.)
19       (Exhibit 39 marked.)
20 BY MR. BLAIR:
21 **Q   All right. I think I'm ready to go.**
22 **Back on the record.**
23       **Sir, how many other complaints or**
24 **petitions have you had against you filed in the**
25 **State of Illinois that you didn't tell me about?**

Page 103

1  A   None that I know of, at least off the top
2  of my head.
3  **Q   Is that how you responded to these**
4  **interrogatories or requests for production was off**
5  **the top of your head?**
6  A   I looked back through documents. Yeah, I
7  did the best that I could looking through documents.
8  **Q   Okay. And you told me that you**
9  **remembered this case in Illinois, but you didn't**
10 **think it got filed, is that right?**
11 A   Correct.
12 **Q   And you didn't think that that was**
13 **responsive to my request of whether you've had any**
14 **complaints?**
15 A   I believe the question was did you have
16 any lawsuits in Illinois, and I said no.
17 **Q   I asked both. Okay.**
18       **Earlier you told me that there were none**
19 **in response to my question of please state the**
20 **number of complaints and/or customer service calls**
21 **received from individuals, dealers, retailers or**
22 **businesses in the State of Illinois and the product**
23 **to which each pertained, and that was interrogatory**
24 **number 20 of W W Industrial Corp.'s answers and**
25 **objections to plaintiff's first interrogatories on**

Page 104

1  **personal jurisdiction.**
2       **Now, that's not true, correct, sir?**
3  A   Yes. I was not -- I was not -- I didn't
4  know this was actually in Illinois.
5  **Q   Well, you just told me you realized that**
6  **there was an Illinois matter but that it hadn't**
7  **gotten filed, correct?**
8  A   No. I knew there was a matter that I
9  didn't think got filed, and I didn't know it was in
10 Illinois.
11 **Q   All right. Let's start with the answers**
12 **to interrogatories again on personal jurisdiction.**
13       **Starting with interrogatory number 7,**
14 **total product unit shipments for 2013 is incorrect,**
15 **is that right?**
16       MR. RYAN: Object to the form due to
17 supplementation.
18       MR. BLAIR: You didn't supplement that,
19 Andy.
20       MR. RYAN: Interrogatories on personal
21 jurisdiction?
22       MR. BLAIR: You didn't supplement that
23 specific number in your subsequent supplementation.
24       MR. RYAN: Which one are you saying we
25 didn't supplement?

Page 117

1  Pro Shops.
2  Q  Does WIC, Inc. have any ownership
3  interest in API?
4  A  No.
5  Q  Do you consider API to be part of WIC,
6  Inc.?
7  A  No.
8     MR. BLAIR:  Objection, form.
9  BY MR. RYAN:
10  Q  Is the information you keep about API and
11  API products that are shipped, are those kept
12  separate and apart from the WIC, Inc. information
13  that you maintain?
14  A  Yes.
15  Q  So information on API products that are
16  shipped would be separate from information on WIC
17  products that are shipped, right?
18  A  That's correct.
19  Q  Where are API products shipped,
20  do you know?
21  A  I'd have to look at reports.
22  Q  It's a Bass Pro trademark, right?
23  A  Yes.
24     MR. BLAIR:  Object to form.
25  BY MR. RYAN:

Page 118

1  Q  And API products are shipped to
2  Bass Pro's distribution centers, right?
3     MR. BLAIR:  Object to form.
4  A  I would have to look at reports to see
5  exactly what.
6  Q  Are API products shipped to anyone other
7  than Bass Pro?
8     MR. BLAIR:  The same objection.
9  A  Again, I'd have to look at reports.
10    MR. BLAIR:  You're just supposed to agree
11  with him.
12  BY MR. RYAN:
13  Q  None of Bass Pro's distribution centers
14  are in Illinois to your knowledge, is that true?
15  A  That's correct.
16  Q  Take a look at Exhibit 27.
17     Do you remember when Mr. Blair was asking
18  you questions about photos that if memory serves me
19  correct he took at a Bass Pro in Peoria?
20     MR. BLAIR:  East Peoria.
21  BY MR. RYAN:
22  Q  Take a look at page 2 of Exhibit 27.
23     Are you there?
24  A  Yes.
25  Q  Look at the second box from the top.

Page 119

1  There's a label on the right-hand side of that box,
2  right?
3  A  Yes.
4  Q  Do you recognize that label?
5  A  Yes. We apply that label at the factory.
6  Q  The factory in China?
7  A  Correct.
8  Q  Okay. And what does that label say?
9  Does it say where that product is coming from and
10  where it's going?
11  A  Correct.
12  Q  Who does it say the product is coming
13  from?
14  A  WIC.
15  Q  And then where is it going?
16  A  Bass Pro in Springfield, Missouri.
17  Q  And is there a Bass Pro distribution
18  center in Springfield, Missouri?
19  A  Yes.
20  Q  All right. Now, that middle sticker on
21  that second box from the top, do you recognize that
22  sticker?
23  A  No.
24  Q  Do you know who applies that sticker to
25  the box?

Page 120

1  A  I don't know.
2  Q  And that sticker indicates Peoria on it,
3  right?
4  A  Correct.
5  Q  And nobody from WIC, Inc. would apply
6  that sticker to the box, right?
7  A  Correct.
8     MR. BLAIR:  Object to form.
9  BY MR. RYAN:
10  Q  So the only sticker on that box that
11  would be applied by WIC, Inc. would be the one that
12  says the box is coming from WIC and going to the
13  Bass Pro distribution center in Springfield,
14  Missouri, right?
15  A  That's correct.
16  Q  So it appears what happened here is even
17  though a product is shipped to Springfield,
18  Missouri, it still ends up in Illinois, right?
19     MR. BLAIR:  Object to form.
20  A  Say that again.
21  BY MR. RYAN:
22  Q  It would appear here that what happened
23  is a product that you all distributed to
24  Springfield, Missouri still ended up in Illinois,
25  right?

30 (Pages 117 to 120)