```
 1                 THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2

 3   JORDAN QUEEN,                   )
                                     )
 4                  Plaintiff,       )
                                     )
 5        vs.                        ) No. 14-00519-DRH-SCW
                                     )
 6   W.I.C., INC.,                   )
                                     ) March 22, 2016
 7                  Defendant.       )

 8

                          TRANSCRIPT OF PROCEEDINGS
 9                    DISCOVERY DISPUTE CONFERENCE
                 BEFORE THE HONORABLE STEPHEN C. WILLIAMS
10                   UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:        William W. Blair, Esq.
                               Onder, Shelton, et al.
13                             110 E. Lockwood, 2nd Floor
                               Webster Groves, MO  63119
14                             (314) 963-9000

15   For the Defendant:        Andrew D. Ryan, Esq.
                               Sandberg, Phoenix, et al.
16                             600 Washington Ave., 15th Floor
                               St. Louis, MO  63101-1313
17                             (314) 231-3332

18

19   Court Reporter:           Laura A. Esposito, RPR, CRR
                               U.S. District Court
20                             750 Missouri Avenue
                               East St. Louis, IL  62201
21                             (618) 482-9481

22

23

24
          Proceedings recorded by mechanical stenography;
25   transcript produced by computer.
```

1      *(Court convened)*

2           THE COURT:  Good afternoon.  This is

3      Judge Williams.  We are on the record in *Queen vs. WW*

4      *Industrial Copper*.  This is 14-519-DRH-SCW.  We're here for

5      a discovery dispute conference relating to testing for

6      experts and expert reports.  That's really what we're down

7      to in the case.

8           Who do we have on the line for plaintiff?

9           MR. BLAIR:  Wiley Blair.

10          THE COURT:  Okay, Mr. Blair.  And how about for

11     defendant?

12          MR. RYAN:  Andrew Ryan.  Good afternoon,

13     Your Honor.

14          THE COURT:  Okay, Mr. Ryan.  Good afternoon.

15          So the parties have provided letter briefs to the

16     Court, as well as attachments to those briefs.  When we last

17     talked we kind of tried to narrow in on what the dispute was

18     going to be about.

19          The Court has looked at the briefs, and I'm not

20     100 percent certain, to be honest with you, and I want to

21     clarify this before we get started as to exactly what

22     additional testing the plaintiff is asking to do.  I believe

23     it's just two things but maybe I'm wrong.

24          So, Mr. Blair, my understanding is you want to --

25     in the first instance, you want to conduct some sort of

1  strength testing on a -- I'm not clear if you want to do it

2  just on an exemplar, but I think that's what you want to do.

3       MR. BLAIR:  That's right, Judge.

4       THE COURT:  This isn't composition testing; this is

5  just strength testing.  And then the second thing appears to

6  simply be you want to just visually inspect the exemplars

7  that the defendant used to conduct its strength testing; is

8  that right?

9       MR. BLAIR:  Well, I do want to visually inspect the

10 stands that they used for their testing.

11      THE COURT:  Yeah, that's what I said, but is that

12 all you want to do?

13      MR. BLAIR:  No.  Let me get back to the first issue

14 and --

15      THE COURT:  This is -- the first issue is, I still

16 don't know what you want to do.

17      MR. BLAIR:  Sure.  Okay.  Let me give just a

18 30-second -- what I want to do is demonstrate that the

19 testing that is requested in the document that they produced

20 after my expert discovery closed does not -- is not

21 sufficient to demonstrate a rating of 500-pound capacity

22 consistent with what they are representing the load capacity

23 to be of this stand.  So what I want to do is take the

24 exemplar stand and do strength testing to show that, first

25 of all, what they're representing in terms of that

1  documentation is not reflective of what should be done to

2  test the capacity of a ladder the way they did it; and,

3  number two, that the stand, based upon their representation,

4  does not meet that specified strength rating.  And then the

5  second testing goes to the issue of their misuse defense.

6      THE COURT:  Okay.  Let's first talk about this

7  first testing.  What is it that you want to do?  You said

8  you want to do something that demonstrates this.  What is it

9  that you want to do?  What testing do you want to do that's

10 going to demonstrate that?  That's -- when I ask what

11 testing is going to be done, when you say, *I want to do*

12 *testing that demonstrates*, I don't know what that means.

13     MR. BLAIR:  Sure.  I want to set up the stand,

14 properly configured, and apply a load to the rungs to

15 demonstrate that the rungs cannot withstand a 500-pound load

16 capacity, which in itself shows that the testing documents

17 that they produced are insufficient to support their

18 contention that there's a 500-pound load capacity with this

19 stand.

20     THE COURT:  Okay.  So --

21     MR. BLAIR:  -- the ladder sections.  There's no

22 ladder testing documentation produced whatsoever prior to

23 this document.

24     THE COURT:  All right.  And and as to that,

25 Mr. Ryan, do you contest -- I don't think you did, because

 1   you didn't say so in your letter, but they were produced

 2   simultaneously, which is what we discussed, but I want to

 3   make sure.  Do you contest that this testing, four-time test

 4   procedure, was produced after Mr. Blair produced his expert

 5   report?

 6          *MR. RYAN:*  Yes.  I probably could have

 7   short-circuited this conversation.  If Wiley wants to do the

 8   four-times weighted testing, I don't have any objection to

 9   that.  Now, my understanding is, can he do it on his

10   exemplar?

11          *MR. BLAIR:*  We would do it on the exemplar.  I will

12   tell you that the actual accident stand is weaker than the

13   exemplar based upon composition, but we're going to do it on

14   the exemplars that we have.

15          *THE COURT:*  Okay.  The -- all right, fine.  So

16   there's agreement on that.  Fantastic.  Okay.  So that's --

17          *MR. RYAN:*  Judge, I'm sorry I didn't say that I

18   agreed earlier in this.

19          *THE COURT:*  That's all right.  I didn't ask you

20   until now.  So I was just trying to make sure I understood

21   what we're going to do, and it's probably good that it was

22   on the record so now we know exactly what it is you're

23   agreeing to.

24          Okay.  Then the second piece, are we still in

25   dispute as to piece two, what the second bit of testing is?

1   Mr. Blair?

2           *MR. BLAIR:*  Inspect.

3           *THE COURT:*  He said he wants to do more than that,

4   so let's get into that further.  One thing you want to do is

5   visually inspect the exemplars that the defense experts used

6   when doing their load capacity or strength testing.  I'm

7   using the word "strength testing", put that probably isn't

8   specific enough, so --

9           *MR. BLAIR:*  I just want to visually inspect them

10  for whether there's deformation.

11          *THE COURT:*  Right.  And then what else did you want

12  to do?  Is that it?

13          *MR. BLAIR:*  No.  The other component goes to how

14  they contend the stand had to have been set up for this

15  accident to have occurred.  And, namely, this all goes to

16  the testimony of one witness that he doesn't recall the

17  "criss-cross straps" being in place prior to my client

18  climbing the stand.

19          *THE COURT:*  Right.  Okay.  Hang on one second, I'm

20  sorry, because this is probably where the biggest bone of

21  contention is.

22          But, Mr. Ryan, you don't have any objection to him

23  coming and visually inspecting the exemplars that were used

24  by your experts to see if there's any deformation, correct?

25          *MR. RYAN:*  You know, I think it's probably

1    premature.  As I think about it more, yeah, I think I've

2    kicked back at Wiley a little bit more than -- after

3    contemplating it, but, no, I don't think I have a problem

4    with that because he probably asked my expert to make the

5    stand available at his deposition anyway.

6              THE COURT:  Okay, yeah.  All right.  So that's --

7              MR. RYAN:  The concern I have is where that's going

8    to take place.

9              THE COURT:  He said he wanted to do it in your

10   office.

11             MR. RYAN:  Yeah.  I mean it's not in St. Louis.

12   Whether it goes to my office or to Dr. Ramsey's office in

13   Rolla, it's going to have to get packed up and shipped, and

14   I don't know that I want to do that.

15             Now, I would like to have the option on where to

16   produce it because, on the one hand, I don't know that I

17   want to have this thing shipped up, taken apart, run the

18   risk of damage during shipment, whatever the case may be.

19   On the other hand, I don't know if the client's going to

20   want to pay for me to go out to Maryland, you know, to a

21   company Wiley or his expert or whatever out there.  I would

22   like to have the option for us to decide where it's going to

23   be produced and how we're going to deal with it.

24             THE COURT:  Let's get back to that once we address

25   the second part of this.  I just wanted to clarify that you

1   didn't have an objection to a visual inspection of some type

2   somewhere, and we'll get to where that will be because I

3   want to figure out what more is being requested here.

4           All right.  So I cut you off, Mr. Blair.  Let's get

5   back to that.  So what else you want to do is an opportunity

6   to challenge the means or the manner in which they're

7   claiming there was misuse based upon this deposition wherein

8   the witness said that we didn't put the ropes -- he was

9   using the term "ropes", but these are these criss-cross

10  straps, right?

11          MR. BLAIR:  Right.  They're actually straps, and in

12  deposition referred to them as criss-cross ropes.  There are

13  ropes that are used to secure the stabilizer bar to the tree

14  that are not the straps that we're talking about.  But if

15  you look at the witness's testimony, it's pretty clear that

16  he's talking about the ropes as opposed to the straps when

17  he says that the straps -- or that the criss-cross ropes

18  weren't attached yet.  And if you look at his deposition

19  transcript, he actually -- whenever he is talking about what

20  is going to be used to attach the stabilizer bar to the

21  tree, he actually refers to them as the, whatever you call

22  them, criss-cross -- or he referred to them as cross-criss

23  ropes whenever talking about what's used to secure the

24  stabilizer bar to the tree.  So they then took --

25          THE COURT:  So wait.  Are you distinguishing

1  between cross-criss ropes that secure the stabilizer versus

2  the criss-cross straps that secure the ladder?

3         *MR. BLAIR:*  Yes.

4         *THE COURT:*  Now, the thing -- well, that's awfully

5  confusing.  So the rope or strap that secures the stabilizer

6  bar, is it criss-cross in some way?  What I recall from

7  looking at the picture is that just wraps around the tree

8  once.

9         *MR. BLAIR:*  It wraps around the back of the tree

10  and ties off.  The thing is, in deposition the witness got

11  confused as to what criss-cross straps are versus the ropes

12  because they were referred to by Andy as ropes as opposed to

13  straps.  And I'm reading from his testimony, and he said --

14  he's asked*: What did you use to connect the stabilizer bar*

15  *to the tree?  Do you remember?*  And he said:  *A piece that*

16  *came with like tie-down thing that wraps around.  I guess*

17  *you call it cross-criss, whatever.*

18         He doesn't know what he's talking about in terms of

19  the straps versus the ropes.  He thinks that he's talking

20  about a criss-cross rope, which isn't a correct term, but

21  that's what was used in deposition.  So then what the

22  defense does is take that and says, *Well, whenever you climb*

23  *the tree, the actual criss-cross straps were not on the tree*

24  *or were not attached to the stand, were not wrapped around*

25  *the tree.*

1        From that, they have to figure out how to find a

2   force vector that would produce a bend anywhere consistent

3   with what's in the accident stand.  And what they do there

4   is to surmise that the stabilizer bar was at a position

5   over -- I think it's over 2 feet from its actual extension,

6   to where the ladder is actually leaning away from the stand

7   or from the -- vertical to where it would not be actually

8   leaning against the tree when you're setting it up.

9        So that's how they've brought up this misuse

10  configuration, despite all the other testimony being

11  consistent with the properly configured stand.  So what I

12  want to show is that, number one, if you do apply a force,

13  as the defense has concocted this configuration, you're not

14  going to get a bend like you see in the accident stand.

15  Number two, if you look at the physical evidence it will

16  reflect that the stabilizer bar was placed at the correct

17  setting as opposed to --

18       *THE COURT:*  Hang on a second.

19       **(Noise in courtroom)**

20       *THE COURT:*  Sorry about that.  We had some -- well,

21  we had a buzzer going off.  We don't know why.

22       All right.  So keep going, Mr. Blair.

23       *MR. BLAIR:*  All right.  So the two things that I

24  want to do are to apply a force under the configuration that

25  the defense has posited to show that the resulting bend that

1    you do get if you test that to failure is not consistent

2    with the bend as seen in the actual accident stand, which

3    shows that their set-up is not how the actual stand was set

4    up.

5         And, secondarily, I want to look at the physical

6    evidence, namely the stabilizer bar, which will show that

7    the bar was adjusted to the correct setting as opposed to

8    the setting that they have to contend it was on under their

9    misuse scenario.

10        *THE COURT:*  Well, don't you have the actual stand

11   still?

12        *MR. BLAIR:*  I do, yes.

13        *THE COURT:*  So you don't need -- you don't need

14   them to give you anything to look at the stabilizer bar.

15   You're just saying you want to disclose some supplemental

16   information concerning that?

17        *MR. BLAIR:*  Right.

18        *THE COURT:*  So your expert's going to look at the

19   stabilizer bar and is going to say, I'm looking at it in

20   the -- my assumption is, based on what we know or at least

21   what has been said in the record, is that this hasn't been

22   changed, and so this is where it was at.

23        *MR. BLAIR:*  Well, not exactly.  The thing is that

24   whenever you take these things out in the field, you know,

25   you're taking them down, you're taking them through the

```
 1   woods.  They get adjusted so that they're at the shortest

 2   length possible for transportation purposes, and after

 3   Andy's experts looked at the stand here at my office, Andy

 4   came back and said, Was that the adjustment that the

 5   stabilizer bar was on whenever it was erected or has that

 6   been since put in the shorter length for purposes of

 7   transportation?  And I said, Let me check with my client.

 8          I checked with my client, I got back to Andy, and

 9   he says, No, it was a lot longer than that.  But

10   nonetheless, his experts disregard the fact that it was

11   taken off the tree and reduced to size for ease of

12   transportation, and that's the basis for the contention.

13   Stabilizer bar, as they inspected it at my office, was at

14   the same length it was in the field, and therefore, the

15   stand had to have been leaning away from the tree.

16          THE COURT:  Well, isn't it -- if it was actually

17   longer than what it is in the office, then that would tend

18   to make it lean further from the tree.

19          MR. BLAIR:  The other way around because,

20   otherwise, the platform's not going to be in contact with

21   the tree.  In other words, the base is going to move

22   whenever you have a longer stabilizer bar.

23          THE COURT:  Okay.  Let me -- I'm trying to -- okay.

24          MR. BLAIR:  The geometry of the ladder and the

25   stand -- the platform itself is fixed.
```

1          THE COURT:  I mean whether or not it's leaning,

2     it's got -- if it's -- I see.  If it's short, then it's

3     going to be straight up and down?

4          MR. BLAIR:  Well, more than straight up and down.

5     It's actually going to be leaning away from the tree.

6          THE COURT:  Because of the fact that the stand

7     itself sticks -- points in that direction of the tree and

8     has a certain amount of length to it?

9          MR. BLAIR:  That's right.

10          THE COURT:  Okay.  So in order for it to lean into

11     the tree, it's got to be at a longer setting.  And you're

12     saying that they put it at a setting that makes it straight

13     up and down, so it just pulls away?

14          MR. BLAIR:  Right.

15          THE COURT:  And so their theory is that the -- it's

16     just the stabilizer bar straps that are around it, and it

17     pulls back and bends.  Now, with the way -- see, I only see

18     the one bend in the picture.  And this is going to get into

19     disputed issues but I just want to understand what

20     everybody's saying.

21          Your view of it is that you can have that bend even

22     with the straps on, but isn't that going to necessarily mean

23     that the base gets kicked out further away from the tree

24     once that bend occurs?

25          MR. BLAIR:  No.  I think that the base is going to

1    stay.  It's going to stay put.  And these cave-in

2    situations -- and that's a term of art, I think, for the

3    tree stand industry -- for these ladders is not an uncommon

4    occurrence.

5        THE COURT:  So what happens, the top part that

6    those teeth that are leaning into the tree move up some.

7    Something has to move.

8        MR. BLAIR:  They stay stationary and I think the

9    platform would actually rotate down.

10       THE COURT:  So there's some moving parts in the

11   platform itself?

12       MR. BLAIR:  Only whenever it starts to bend.

13       THE COURT:  When you say "rotate", can you try to

14   explain that a little bit further.

15       MR. BLAIR:  Sure.  Okay.  If you've got the stand

16   as you're supposed to configure it, you position the base so

17   that the platform is parallel to the ground because you want

18   to have a platform to sit in that's parallel to the ground.

19   Whenever that stand starts to bend where you see it bending

20   in the ladder section, the third ladder section before you

21   get the platform, as that bends inward, the platform is

22   going to go from parallel to the ground to sloping towards

23   the ground away from the tree.

24       THE COURT:  Right.

25       MR. BLAIR:  It's going to stay affixed to the

1    tree -- the bark biters is what they are called -- but the

2    platform itself, due to the bend, will rotate or slope

3    towards the ground as it bends forward.

4         THE COURT:  So how can that -- if the stabilizer

5    bar is in place, how can that happen without moving the base

6    out?

7         MR. BLAIR:  I'm not entirely sure.  I'm trying to

8    visualize it but --

9         THE COURT:  Yeah, me too.

10        MR. BLAIR:  If you look at the bend, it's only in

11   one section of the ladder and it's the top section.

12        THE COURT:  Right.  That's why I'm asking.

13        MR. BLAIR:  Well, the base is going to stay fixed

14   because, first of all, it's basically fixed down in the mud

15   because the feet so-to-speak sink into the mud or the dirt

16   as you put the stand up.  Because what you're doing is

17   you're essentially -- one of the steps is that you step onto

18   the first rung of the stand and get it -- you kind of bounce

19   on it in order to stabilize that, the footing into the

20   ground.  So it's in a fixed position and then the stabilizer

21   bar above is in a fixed position.  So the only parts or

22   components that can move are going to be the section from

23   above the ladder -- above the stabilizer bar to the

24   platform.  So that's why you're only seeing the deformation

25   in the platform -- or, I'm sorry, in the top rung.

1          THE COURT:  Yeah, it just seems like if one

2   piece -- if everything is stable from the stabilizer bar up,

3   then if one piece bends then there has to be another bend

4   somewhere or something has to move.

5          MR. BLAIR:  Well, I think that if we actually took

6   the stand itself and erected it, it becomes pretty apparent

7   what's moved and bent and that the only piece that you're

8   going to see bent is that third ladder section.  So the

9   criss-cross straps are completely immaterial under this

10  failure situation, as the plaintiff has described his stand

11  was set up, because the --

12         THE COURT:  Well, I guess I just have a failure of

13  vision because I can't see how that's possible, but that's a

14  limitation that I'm just having in visualizing it, and that

15  doesn't mean that I'm right.  I'm just not able to visualize

16  it because I don't -- assuming that the way you're -- if

17  everything's set up correctly, then -- the fact, if the

18  straps are immaterial, fine, that would be the case I

19  suppose if what you're saying is the base is immovably

20  entrenched into the ground by jumping up and down on it.

21  But it seems like, otherwise, if it's going to be leaning in

22  and it collapses in in one spot, that means that it's

23  getting -- you know, that's changing the distances and the

24  relationships between those angles, and so something else

25  has to either give or move.

1        MR. BLAIR:  Well, I think to some degree that's

2   probably true, but keep in mind that these pieces of ladder

3   section will deform and then return to shape.  And in

4   Mr. Queen's accident, his buddy tells him it's coming down

5   so he steps off the side of the ladder and drops before he

6   had a complete and catastrophic failure.  So I think there

7   would have been some flexion in the other component parts,

8   but by virtue of them having been affixed by the ground and

9   by the stabilizer bar itself, the most vulnerable part in

10  the equation is going to be where you see the actual failure

11  to where it's not surprising that you see the resulting bend

12  that resulted in a deformation that stuck as opposed to the

13  flexion you'd see in the lower ladder sections that have

14  some stabilizer there.  And I think that you're also going

15  to end up having a concentration in force on that third

16  ladder section that you see.

17        THE COURT:  Okay.  So let's then -- now that we've

18  gone through that, let's get back to, you're going to --

19  what piece do you want to test?  Whose do you want to test

20  to see if you can make it bend in a different way?

21        MR. BLAIR:  I'm going to use the exemplar stand to

22  set it up as they've got it configured with the stand

23  leaning away from the tree and apply a force, as they've

24  suggested be applied, to where the stand is being pulled

25  away from the tree, and to show that the bend that you get

 1   is not going to be consistent with what's seen in the

 2   accident stand is what I envision.

 3           THE COURT:  And the exemplar stand being the --

 4   which one?

 5           MR. BLAIR:  The one that's at my expert's office.

 6           THE COURT:  Okay.

 7           MR. BLAIR:  Not Andy's.

 8           THE COURT:  All right.  And then your view of it

 9   is, this is rebuttal, and Mr. Ryan's view is that it's not,

10   that this should have been anticipated because of the fact

11   that this witness said that the criss-cross straps were --

12   or, rather, that the ropes were not on.

13           MR. BLAIR:  He also said that it was leaning

14   towards the tree as opposed to away from it, and that

15   whenever they initially set up the base, they had to move

16   the base away from the tree.  And a third witness said that

17   whenever they went and took it down, if there had been

18   something not set up properly he thought that he would

19   have -- it would have occurred to him at the time.  He

20   doesn't recall anything being set up improperly.

21           So I mean I have no -- whenever you look at how

22   they propose that my client had it set up, which is

23   completely inconsistent with everything other than two

24   things that they're resting their cap on:  One, the

25   confusing testimony that the guy who was there with the

1   plaintiff gave, who had never set up a tree stand before and

2   has never actually erected one himself.  In fact, he didn't

3   know what the word "erected" meant, and whether the straps

4   were or were not on -- the criss-cross straps were or were

5   not on the tree -- or on the stand when my client began

6   climbing; and, number two, that the stabilizer bar was in

7   the same position a year later when inspected at my office

8   after having been transported from the scene when my client

9   told Andy -- granted, through me -- that the stabilizer bar

10  was not at the same position in the field that it was when

11  it was inspected.

12       THE COURT:  Andy, did the -- I couldn't -- one of

13  the other things that I wasn't clear on is how much of a

14  bend -- when your expert did the test, what happened?

15       MR. RYAN:  Which part of the test?

16       THE COURT:  When it's basically -- I'm looking at

17  Figure 9.  It's almost -- looks to me like it's straight up

18  and down, not leaning away, but --

19       MR. RYAN:  What page is that on of his report?

20       THE COURT:  Figure 9 is on page 26 of 35.

21       MR. RYAN:  Yeah.  So that's in his second test

22  where he erects it, and it is at a near vertical.

23       THE COURT:  Right.  This is what you're saying is

24  what actually happened?

25       MR. RYAN:  Right.  So, in other words, what he

1   did -- Wiley's right.  You know, the use of criss-cross

2   ropes is immaterial if you put the thing up right.  And

3   that's what the first part of his test showed is that if you

4   put the thing up correctly, angled it away from the tree

5   appropriately so that the stabilizer bar and the foot

6   platform would be parallel to the ground, the thing's going

7   to stay connected regardless of whether you have the

8   criss-cross ropes on it; when you put it in this two

9   vertical position, that you run into an issue.

10          You know, to the extent that we're talking about

11  any confusion on this Chris Brown's part, I frankly can't

12  believe that there's -- it's even an issue as to whether he

13  was confused about criss-cross ropes being used.  I sent you

14  his testimony and I mean I asked the guy I think at least

15  three times, *Do you know what criss-cross ropes are?*  He

16  says yes.

17          On page 41, one of the pages we cite from his

18  deposition, he himself recognizes there's a rope for the

19  stabilizer bar, and then he also goes on to say, *Then*

20  *there's other criss-cross ropes on top too.*  He knows what

21  the criss-cross ropes are.  And he goes on to say those

22  still aren't attached to the stand when the stabilizer bar's

23  connected, and they never get attached to the stand.

24  There's no confusion whatsoever from Chris Brown to whether

25  criss-cross ropes are on.

```
 1              When I asked Wiley's expert if he agreed with me
 2   that the testimony was that the criss-cross ropes weren't
 3   attached, Wiley objected.  I don't know why.  You know, I
 4   can certainly add, the guy's using an assumption that
 5   criss-cross ropes were used.  I can ask him if there's
 6   contradictory testimony.  He admits, yeah, I have to agree
 7   that what Chris Brown says, there weren't criss-cross ropes
 8   on.  So I can't believe that's even an issue, first of all.
 9   I mean you're free to look through Brown's testimony and see
10   that he knows what the difference is and that they --
11              MR. BLAIR:  Andy --
12              THE COURT:  Wait, wait, wait, Mr. Blair.  I'm going
13   to give you a chance.  Mr. Ryan sat there and listened the
14   whole time so it's his turn.
15              MR. RYAN:  The point is, cutting through all that,
16   Your Honor, they knew back in May, after we took
17   Chris Brown's deposition in April, whenever we took his
18   deposition that our position was going to be criss-cross
19   ropes weren't used.  Their expert --
20              THE COURT:  But it's immaterial.
21              MR. RYAN:  It's immaterial if you put it up right.
22   If you put it up wrong, that's when it comes into play.
23   What I think -- what's telling of Wiley's submission is he's
24   wanting to prove that the resulting bend that you see in the
25   accident stand is when the stand is configured as plaintiff
```

1   testified, and that's consistent with that scene in the

2   accident scene.  What he wants to do is go out and do

3   testing to show that if you put the stand up like plaintiff

4   testified, then you'll see the bend that the accident stand

5   ultimately exhibits.  Well, he should have gone out and done

6   that before he provided his report.

7        THE COURT:  No, but what he's also saying is he

8   wants to go out and do the testing that you did and show

9   that you wouldn't get that bend.

10       MR. RYAN:  But the testing we did is without the

11  ropes.  He knew that that's the position we were going to

12  take.  His accident -- or his expert could have gone out and

13  done that and he didn't do it.

14       THE COURT:  Hang on a second.  Let me ask you --

15  I'm going to ask you a question.

16       So if the -- you've just told me the ropes are

17  irrelevant, and I tend to agree that it's not -- it doesn't

18  look to me like the guy was confused because he said that

19  there were some ropes that weren't on, and obviously the

20  stabilizer bar was on, so that's the one he thinks was on.

21  That's -- the other ones were off.  He could have been

22  wrong, he could have been right, that's a dispute of fact.

23  The fact that the ropes aren't on is different than your

24  theory that the thing was straight up and down.

25       MR. RYAN:  I don't think it is, Your Honor, because

1   our theory is, he was misusing the stand without the ropes

2   and then erected the stand improperly.  By doing -- both of

3   those things caused the stand to be in a position where you

4   get the bend that's exhibited in the stand that you see.

5          THE COURT:  Can you erect the stand straight up and

6   down?  Can you get it that way without putting the ropes on?

7          MR. RYAN:  I'm sure you can erect it without the

8   ropes being on, yes.

9          THE COURT:  And -- I'm sorry.  Can you get it

10  straight up and down with the ropes on?

11         MR. RYAN:  Sure.

12         THE COURT:  Okay.  So, again, you said the ropes

13  are irrelevant, at least to the extent that what we're

14  talking about is -- if it's put up right, it doesn't matter,

15  but if it's put up wrong, can you -- if you have the ropes

16  on and you put it up straight up and down, you're saying you

17  can't get this bend, but --

18         MR. RYAN:  Right.

19         THE COURT:  -- even if it's straight up and down.

20         MR. RYAN:  Right.  And even Ramsey testified that

21  if you've got the criss-cross ropes on you're not going to

22  see the stand bend backwards.

23         THE COURT:  So he was supposed to anticipate though

24  that you guys were going to say that the stand bent

25  backwards?

1        MR. RYAN:  I think that's correct.

2        THE COURT:  All right.  That's -- your theory is,

3   that's the part of it that he was supposed to anticipate?

4        MR. RYAN:  I think that's what the testimony is.  I

5   didn't get into that in my submission, but yes.

6        THE COURT:  I know you didn't get into it in your

7   submission.  That's why I'm trying to figure out -- I want

8   to narrow in on exactly what it is that he didn't -- that he

9   was supposed to anticipate by way of what the evidence was,

10  and didn't.  And so that's on him, so, therefore, it's not

11  rebuttal.

12       MR. RYAN:  Sure.  I think the long and short of it

13  is, Your Honor, is that -- and I made the leap to my

14  experts, the testimony about whether the ropes are

15  irrelevant or not.  Hopefully I didn't speak out of line.

16  You know, they're still on there as an added layer of

17  safety.  It's my understanding, if you've got it configured

18  correctly, as Saunders [ph.] shows in his report, that if

19  you've got it set up correctly, even without the ropes

20  you're not going to get any deformation in the stand.

21       But the long and short of it is, is that they knew

22  we were going to take the position that criss-cross ropes

23  weren't going to be used.  What he wants now is a second

24  chance to go out and say, *Hey, you would see this*

25  *deformation in the stand even with criss-cross ropes being*

1  *used, as I assumed all along.*  He shouldn't be able to go

2  out and prove -- go do testing that he should have done

3  before that would arguably show that, hey, if you got the

4  thing erected properly, assembled correctly with criss-cross

5  ropes attached, you could still get a bend in the stand

6  consistent with what you see, because that's something he

7  should have done before.  I don't know why he didn't take

8  his exemplar out and test it in the first place.  He said he

9  didn't need to do it.

10      *THE COURT:*  You just said you're okay with him

11  doing the load testing because you sent those records to him

12  after he had sent in his report.  I mean we're talking

13  about -- so that's already something you've agreed that he

14  can do.

15          So then the extra issue is, him testing it in the

16  manner that you tested it in, and that is straight up and

17  down basically.  That's the part that you're saying he

18  shouldn't get to do, and it doesn't -- and the basis is that

19  he should have known, based on the fact that we were

20  contending that you didn't have the straps on, that we were

21  going to also contend that the way it bent was bending back

22  because it was put up straight up and down.

23      *MR. RYAN:*  But he wants to do our testing in an

24  effort to show that -- he wants to use it to show the

25  reverse, which is that somehow the accident could have

1   occurred with the stand configured in the manner in which

2   plaintiff testified, and what he should have done was, he

3   should have taken that stand out first, configured it like

4   plaintiff testified, with criss-cross ropes on, and seen

5   what happens.  Now he wants to do the reverse, disprove what

6   we've gone out and done, in an effort to show that that

7   somehow proves his theory.

8        *THE COURT:*  I don't think it's exactly --

9        *MR. RYAN:*  He wants the benefit of our testing,

10   what we did, what our testing was, and basically to reverse

11   engineer, for lack of a better word, to show that his

12   theory's actually appropriate.  He should have tested his

13   theory in the first place.

14        *THE COURT:*  Didn't we get past that by virtue of

15   the fact that you've already said he can go ahead and do the

16   testing based upon the way his client said it was set up?

17   Because you disclosed to him, after the report was

18   disclosed, that you had done this load testing, which he was

19   not aware of, so that's the part you're now telling me he

20   shouldn't be allowed to do.  But we started off the

21   conversation with, he can do that.

22        *MR. RYAN:*  No.  That's a different test.  That's

23   that test procedure that Wiley attached to his submission.

24        *THE COURT:*  Yeah.  So that's not with the ladder

25   set up at all is what you're telling me?

1              MR. BLAIR:  That's with the properly configured

2    ladder.

3              MR. RYAN:  Right.  And that's to test load.

4              THE COURT:  That's what he's wanting to re-do,

5    right?

6              MR. BLAIR:  Yes.

7              MR. RYAN:  No.  Take a stand out and actually --

8    essentially do reconstructive testing.

9              THE COURT:  All right.  In order to do the ladder

10   stand four times test procedure that you have -- that you

11   disclosed to him after his report was produced, he's got to

12   go set the ladder up and do it, right?

13             MR. RYAN:  I think that's correct.

14             THE COURT:  Okay.  So we agreed on that at the very

15   beginning of the hearing that he can do that because when he

16   disclosed his report he didn't have any information that you

17   had done that, so it was just a matter of doing the

18   composition testing from his theory and showing that it's

19   not the right composition, so -- and you didn't test it, so

20   you got something that's the wrong composition that hadn't

21   been tested.  Then he gets the four times testing and now

22   he's allowed to recreate that.

23             MR. RYAN:  Four times testing, right.  He didn't

24   have the data from the testing.  He had the testimony from

25   our witness that that testing was performed and that the

1    factory had the results of the testing that we had to get,

2    and that's what was ultimately produced.  It wasn't a

3    surprise that the four times testing was done; it's the data

4    that we hadn't provided to him until after the expert

5    submitted his report.

6              *THE COURT:*  Okay.

7              *MR. RYAN:*  I agreed that, given the timing of the

8    production, that they ought to be able to do the four times

9    weight-rated test procedure.  What I don't agree that they

10   should be able to do is, we do the reconstructive testing

11   that they decided against doing.  Ramsey testified he didn't

12   think it was necessary to go out and erect a stand because

13   there were more important things for him to do.  Now they

14   want the benefit of us doing our reconstructive testing

15   showing how plaintiff's accident could have happened based

16   on testimony that criss-cross ropes weren't used and

17   basically reverse the order that they get to have the

18   benefit of our testing first to prove their version of what

19   happened.

20             *THE COURT:*  And, see, one of the reasons I try to

21   break this down is because when you lump it all together

22   like that it doesn't take into account the component parts

23   of what actually happened.  So we're already past the fact

24   that you're agreeing, based on the late disclosure, that he

25   gets to go out and do testing, and that necessarily involves

1   putting up the ladder.

2         So the only thing we're talking about is, should he

3   be able to also test it in the manner that you say it

4   happened?  And your claim is that he should have anticipated

5   that part of it.  And the Court isn't in a position to judge

6   whether or not that should have happened or not.  The fact

7   is, in my view, that would be considered, at a minimum, to

8   be rebuttal.  So maybe you're left with -- we're going to

9   talk about their test after they talk about it.

10        But I'm going to allow him to do the test because

11  it's the Court's view that simply knowing that there's going

12  to be a claim that the straps weren't applied or used, the

13  criss-cross straps, doesn't necessarily mean that you also

14  know that there's going to be a theory presented that the

15  ladder was essentially vertical.  That's the best I'm going

16  to do.  So I'm going to allow those two types of testing to

17  be performed, and I think that's all that plaintiff is

18  asking for, Mr. Blair; is that correct?

19        MR. BLAIR:  That's right.  And the only other thing

20  that I mentioned earlier was to actually look at the

21  stabilizer bar itself.

22        THE COURT:  You've got that and you can look at

23  that and that's part of the -- that's part of what you're

24  going to be opining that relates directly to the

25  configuration that they're claiming was used.  Again, I

```
 1   think that, to the Court, that appears to be something that

 2   could be properly characterized as rebuttal.  And if the

 3   district judge decides that that means that you can't

 4   present that evidence in your case in chief, that may end up

 5   having to be what happens, but certainly I'm going to allow

 6   a report to be disclosed on it.

 7        Now, where is this going to happen?  The testing

 8   that you're going to do, you can just go ahead and do.  And,

 9   Mr. Ryan, you don't want to produce the ladder at your

10   office.  Where is the deposition going to take place of your

11   expert?

12        MR. RYAN:  You know, that's something, Your Honor,

13   Wiley and I need to talk about.  I think I found dates,

14   Wiley, the week of April 4th.  If we do it the week of

15   April 4th, it's going to need to be in Maryland just by

16   virtue of Saunders's timing and it would need to be the 4th

17   or the 6th.  So if you want to go out to Maryland and depose

18   him you can look at the stand out there when you depose him.

19        MR. BLAIR:  Where in Maryland, Andy?

20        MR. RYAN:  I think he's right outside of Baltimore,

21   a town called Severna Park.

22        MR. BLAIR:  Let's get that on the calendar.

23        THE COURT:  Let's just do that then.  That's where

24   you can do your visual inspection, and if you want to take a

25   picture, you can take a picture.
```

 1          *MR. BLAIR:*  That works.

 2          *MR. RYAN:*  Does the 4th work for you, Wiley?

 3          *MR. BLAIR:*  The 4th . . .

 4          *MR. RYAN:*  That's a Monday.

 5          *MR. BLAIR:*  Let the Judge go.

 6          *MR. RYAN:*  Sorry, Your Honor.

 7          *THE COURT:*  That's all right.  So let's talk about,

 8  we've got -- you guys will work that out and that's fine.

 9  But let's just talk about scheduling real quick because the

10  district judge did continue the trial date and we need to

11  though nail down what's going to end up being the schedule

12  here for finishing expert discovery up.  Unless you all want

13  to talk about that and make a proposal to me, again, in the

14  first instance, now that we've worked out what the Court's

15  going to allow.

16          *MR. BLAIR:*  I think that makes sense, Judge.

17          *THE COURT:*  Andy, you all right with that?

18          *MR. RYAN:*  I think that makes sense too.

19          *THE COURT:*  Do you want to just check in in

20  mid-April after the deposition has occurred?  And maybe the

21  testing and -- because with a trial month of February, we've

22  got to have dispositive motions on file.  I mean really

23  we've got lots of time.  I think October's still within the

24  local rules so we should be able to more than easily meet

25  that.

1          *MR. RYAN:*  Yeah.  I suspect we'll be done, Wiley,
2    don't you think, with everything in the next -- with expert
3    stuff in the next 45 to 60 days?
4          *MR. BLAIR:*  Yes.
5          *THE COURT:*  All right.  Well, do you want to just
6    see if you can work it out and we'll check in again in 45
7    days?  All right.
8          *MR. RYAN:*  Sure.  I think that saves you time,
9    Your Honor.
10         *THE COURT:*  It does.  That sounds good.  Let's
11   check in mid-May and -- all right.  I'm looking at the week
12   of May 9th.  How about on the 11th?  Doesn't have to be
13   then.  I can go 11, 12, 13.
14         *THE COURT:*  I can go the 6th or we can go into the
15   next week.
16         *MR. BLAIR:*  I'm wide open.
17         *THE COURT:*  Eleventh.  May 11th at 9:00 a.m.  And
18   we'll finalize any details regarding expert discovery if
19   there is anything more at that point, and we'll also set a
20   date then for dispositive motions.
21         *MR. BLAIR:*  Sounds good.
22         *THE COURT:*  All right.  Anything else?
23         *MR. RYAN:*  Nope.
24         *MR. RYAN:*  I'm sorry, Your Honor.  What time was
25   that on the 11th?

1          *THE COURT:*  9:00 a.m.  Okay.  Thanks.  Talk to you

2     then.

3          *(Court adjourned)*

4                              *   *   *   *

5

6

7

8

9

10                      **REPORTER'S CERTIFICATE**

11

12          I, Laura A. Esposito, RPR, CRR, CCR(MO), Official Court
      Reporter for the U.S. District Court, Southern District of
13     Illinois, do hereby certify that I reported in shorthand the
      proceedings contained in the foregoing 32 pages, and that
14     the same is a full, true, correct, and complete transcript
      from the record of proceedings in the above-entitled matter.

15          Dated this 17th day of May, 2016.

16

17          *Laura A Esposito*  Digitally signed by Laura Esposito
                                  Date: 2016.05.17 15:22:23 -05'00'

18          LAURA A. ESPOSITO, RPR, CRR, CCR

19

20

21

22

23

24

25