UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *JORDAN QUEEN,* | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:14-cv-00519 |
| | ) |
| *W.I.C., INC., d/b/a SNIPER TREESTANDS, et al.,* | ) |
| | ) |
| Defendants. | ) |

**WW INDUSTRIAL CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE PLAINTIFF'S LIABILITY WITNESS CHRISTOPHER W. RAMSAY'S APRIL 26, 2016, SUPPLEMENTAL REPORT AND OPINIONS**

WW Industrial Corp. (improperly identified as W.I.C., Inc. d/b/a Sniper Treestands), by and through its attorneys Sandberg Phoenix & von Gontard P.C., submits its Memorandum in Support of its Motion to Strike (Doc. 88) plaintiff's witness Christopher W. Ramsay's April 26, 2016, Supplemental Report and Opinions:

**INTRODUCTION**

**I.   BACKGROUND ON PLAINTIFF'S ACCIDENT.**

Plaintiff Jordan Queen filed this action for compensatory and punitive damages resulting from injuries he experienced on October 12, 2013, when he fell from a Sniper STLS41 "Scout" ladder stand that Queen and Chris Brown both said bent *backward* while Queen was climbing it. (Queen Deposition, Exhibit 1, at 84:17-19, 91:06-11, 109:09-19; Brown Deposition, Exhibit 2, at 46:08-25; Brittany Queen Deposition, Exhibit 3 at 15:04-09.)  Brown also testified at his May 21, 2015, deposition that Queen was not using the stand's two criss-cross straps, which are attached to the seat platform at the top of the stand, wrapped around the back of the tree, and tied to the opposite leg to provide stability as a user climbs a tree for the first time in order to connect

7352928.1

a ratchet strap to the seat platform. (Brown Deposition, Exhibit 2, at 17:16-23, 41:18-42:03, 44:02-45:22; Instruction Manual, at 9.)

II.     **PLAINTIFF'S LIABILITY WITNESS CHRISTOPHER W. RAMSAY'S INITIAL CASE WORK AND OPINIONS.**

Queen's sole liability witness is Christopher W. Ramsay, a metallurgist originally hired to perform materials analysis and forensic investigation that included subjecting an exemplar Scout "to destructive laboratory tests that included compositional analysis, hardness testing, and microstructural evaluation." (Ramsay Deposition I, Exhibit 4, at 13:02-21; Ramsay Report I, Exhibit 5, at 1.) Ramsay submitted his first Report on November 5, 2015, and he was thereafter deposed on November 12, 2015.

Ramsay's initial work was limited to observing the accident stand without evaluating the accident stand's composition or performing any destructive testing on the device. (Ramsay Deposition I, Exhibit 4, at 10:11-17.) He also did not conduct a full tensile strength test while analyzing the composition of one of the two exemplars he was provided. (Ramsay Deposition I, Exhibit 4, at 147:07-10.) Ramsay testified the tensile strength test would have enabled him to measure the yield strength, which Ramsay said is "the strength that we're most concerned about" "with regard to design of the assembly particularly with regard to the bending failure exhibited by the subject stand." (Ramsay Deposition I, Exhibit 4, at 145:21-147:10, 169:23-170:02; Ramsay Report, Exhibit 5, at 5.) He admitted tensile strength testing could have been performed as part of his analysis. (Ramsay Deposition I, Exhibit 4, at 146:12-24.) Further, Ramsay does not know "[h]ow much load . . . Queen exerted on the stand when it bent" and did nothing to "calculate the stress that would be exerted against the stand under normal use." (Ramsay Deposition I, Exhibit 4, at 175:22-176:06; Ramsay Deposition II, Exhibit 6, at 187:10-13.)

2

Additionally, Ramsay chose not to erect his exemplars despite admitting they "could be put up at any time." (Ramsay Deposition I, Exhibit 4, at 10:24-11:13.) In fact, Ramsay testified he "didn't feel [erecting his exemplars] was necessary" because he "suspected that there were other issues that were more important to do first than actually put it up." (Ramsay Deposition I, Exhibit 4, at 11:05-13.) Further, Ramsay said the stand's configuration "doesn't make a lot of difference in terms of my conclusions, per se, in that, while it's obvious that the ladder stand needs to be erected to conform to the instruction manuals, *my work was observing that it bent and then, of course, for the compositional and hardness issues*" (emphasis added). (Ramsay Deposition I, Exhibit 4, at 77:15-79:15.)

Instead of erecting one of his exemplars to observe how it performed under various configurations, Ramsay simply relied on Queen's testimony with respect to the angle at which the stand was erected. (Ramsay Deposition I, Exhibit 4, at 77:19-79:01.) Ramsay also testified he believed the stabilizer bar was attached at the fifth rung from the ground even though in his Report he said "[i]nspection of the subject products suggests the subject stand was configured with the stabilizer bar on the 7th rung." (Ramsay Deposition I, Exhibit 4, at 78:07-17; Ramsay Report I, Exhibit 5, at 2 n.1.)

Additionally, Ramsay did nothing to confirm whether Queen was using the two criss-cross straps. (Ramsay Deposition I, Exhibit 4, at 70:05-07, 71:22-72:03.) Of course, Queen's attorney and Ramsay were both aware criss-cross strap usage was an issue because Brown testified at his May 21, 2015, deposition nearly six months before Ramsay issued his Report that criss-cross straps were not in place when Queen fell. (Ramsay Deposition II, Exhibit 6, at 46:20-47:21; Brown Deposition, Exhibit 2, at 17:16-23, 41:18-42:03, 44:02-45:22.)

Ramsay acknowledged Brown testified the criss-cross straps were not being used at the time of Queen's accident (Ramsay Deposition I, Exhibit 4, at 13:22-25, 15:12-17, 80:02-05), and Judge Williams following his review of Brown's deposition transcript similarly observed Brown was not confused when he testified the criss-cross straps were not connected when Queen fell. (March 22, 2016, Hearing Transcript, Exhibit 7, at 22:17-21.) Further, Ramsay should have been aware the criss-cross straps were an issue since WW Industrial asserted as an affirmative defense nearly four months before Ramsay's Report was served that Queen's failure to use what were referred to as tie-off ropes (another name for criss-cross straps) caused Queen's accident. (Doc. 63, at ¶¶ 2, 3, 5, 8, 9, 10, 12.) Despite the fact Queen and Ramsay both knew WW Industrial would focus on whether criss-cross straps were being used, Ramsay did not even look at the accident stand's criss-cross straps for signs of usage even though he admits he could have tested the straps to determine whether they had been used. (Ramsay Deposition I, Exhibit 4, at 70:05-07, 71:22-72:03.)

Finally, Ramsay did not try to reconstruct Queen's accident and did not perform an "analysis of how either of [his] exemplar stands would perform if they were erected" with or without criss-cross straps. (Ramsay Deposition I, Exhibit 4, at 12:14-18, 17:15-17, 171:08-14.) Consequently, Ramsay does not "know whether you'd be able to observe a similar bending if somebody put up the stand, climbed, and didn't have the crisscross ropes attached." (Ramsay Deposition I, Exhibit 4, at 171:15-20.) Nevertheless, Ramsay conceded "there might be a possibility we could produce this kind of deformity absent crisscross ropes" when asked if he is "able to rule out the possibility that crisscross ropes were not used." (Ramsay Deposition I, Exhibit 4, at 105:08-15.) Ramsay's failure to perform any meaningful testing or investigation meant he was only able to offer the opinion that the stand "was defective simply because it bent"

"with someone climbing who was less than 500 pounds." (Ramsay Deposition I, Exhibit 4, at 170:09-171:07.)

Even though Ramsay concluded the ladder stand bent because its steel composition was insufficient, his opinion was meaningless because he did not measure the yield strength at which the stand would bend in order to compare that strength to the load Queen would have exerted against the stand (which Ramsay also did not calculate). Ramsay's original conclusions were also suspect in that he says the accident stand bent *inward* toward the tree Queen was using even though Queen and Brown both testified the stand bent *backward*. (Ramsay Deposition I, Exhibit 4, at 14:04-15, 16:11-21, 91:04-98:16, 103:18-104:18; Ramsay Report, at 8.) Further, Ramsay believes the bark biters located behind the stand's seat platform "maintained contact with the tree" during Queen's accident "because the crisscross straps were in place." (Ramsay Deposition I, Exhibit 4, at 13:22-25, 104:12-18; Ramsay Deposition II, Exhibit 6, at 159:08-21; 164:15-19.) This latter opinion contradicts Queen's testimony in which he said he is "sure" the bark biters at the top of the seat platform did not stay attached to the tree as the stand bent *backward*. (Queen Deposition, Exhibit 1, at 109:20-110:07.)

### III. WW INDUSTRIAL'S LIABILITY EXPERT GEORGE M. SAUNDERS, JR.

WW Industrial retained George M. Saunders, Jr., to evaluate Queen's accident and to determine what caused the incident. (Saunders Report, Exhibit 8, at 1.) Saunders performed several tests and examined a number of issues Ramsay chose to ignore, which included determining the accident stand's composition from pieces cut on December 22, 2015, as well as measuring the accident stand's all-important tensile strength and yield strength. (Saunders Report, Exhibit 8, at 28; Accident Stand Test Certificate, Exhibit 9.) Pieces of the accident stand were also sent to Ramsay so he could do his own compositional evaluation, though Ramsay

obviously never performed that analysis since Ramsay relied on Saunders' data in the Supplemental Report that is the subject of this Motion. (Ramsay Deposition II, Exhibit 6, at 05:08-06:07.) Additionally, Saunders performed compositional analysis on two exemplar stands, which included the tensile strength and yield strength testing Ramsay failed to do on his exemplars. (Exemplar Stand Test Certificate, Exhibit 10.)

Saunders' work, unlike Ramsay's evaluation, also involved erecting one of his exemplars in the manner Queen described to examine deformation and to determine whether the stand could bend backwards like Queen and Brown testified. (Saunders Report, Exhibit 8, at 23-25.) He conducted a second, similar test with the stand erected too vertical to perform the same deformation examination and to determine whether the stand could bend backward. (Saunders Report, Exhibit 8, at 25-27.) The criss-cross straps were intentionally not attached in either test. (Saunders Report, Exhibit 8, at 23, 25.) Saunders' testing demonstrated Queen's accident happened because Queen "installed the treestand too vertical and did not install the crisscross stabilizer straps." (Saunders Report, Exhibit 8, at 29-30.) Additionally, Saunders carefully examined the accident stand's criss-cross straps and determined based on the absence of displaced fibers or accumulation of organic debris that they had not been used. (Saunders Report, Exhibit 8, at 19.)

## IV. RAMSAY'S SUPPLEMENTAL WORK AND OPINIONS.

Once they had the benefit of WW Industrial's experts' Reports, Queen's counsel and Ramsay for the first time decided they needed to evaluate the manner in which Queen erected and configured the accident stand even though Ramsay previously testified he "didn't feel [erecting his exemplars] was necessary" and previously stated the stand's configuration "doesn't make a lot of difference in terms of my conclusions." (Ramsay Deposition I, Exhibit 4, at 11:05-

6

7352928.1

13, 79:02-09.) Consequently, Queen's counsel asked that Ramsay be allowed to conduct so-called "rebuttal" testing to evaluate Saunders' opinion on the manner in which the stand was configured.[1] (Plaintiff's March 16, 2016, Discovery Submission, Exhibit 11.) WW Industrial objected to any additional testing because it knew the testing was not intended to "rebut" any new or unforeseen facts WW Industrial or its experts raised. (WW Industrial's March 16, 2016, Discovery Submission, Exhibit 12.)

To the contrary, WW Industrial anticipated Ramsay would try to "correct [his] decision not to assemble, erect, and test one of his exemplars" in order to demonstrate Queen was using his stand correctly. (March 22, 2016, Hearing Transcript, Exhibit 7, at 22:02-06; WW Industrial's March 16, 2016, Discovery Submission, Exhibit 12.) Over WW Industrial's objection, Judge Williams at a March 22, 2016, Discovery Dispute Conference allowed Ramsay "to perform testing of an exemplar *in the configuration posited by Defendant's expert (vertical)* in order to rebut Defendant's theory that that configuration was used when the ladder failed" (emphasis added). (Doc. 84.)

On April 26, 2016, Queen served what even Ramsay characterized as a "Supplemental" Report rather than a "rebuttal" report. (Ramsay Report II, Exhibit 13, at 1.) Once again, Ramsay failed to measure tensile strength or yield strength even though he concedes yield strength is the force with which he is most concerned. (Ramsay Deposition II, Exhibit 6, at 05:08-18, 06:24-07:09.) Moreover, Queen's counsel and Ramsay disregarded the Court's order that permitted "testing of an exemplar *in the configuration posited by Defendant's expert (vertical)*"

---

[1] WW Industrial did not object to Queen's other requests, which were for Ramsay to evaluate the 4X rated weight testing WW Industrial performed on samples pulled during production and for Queen's counsel to inspect and photograph Saunders' exemplars.

(emphasis added). Tellingly, Ramsay admitted his supplemental activity involved more than simply "looking at how Mr. Saunders had his stand configured." (Ramsay Deposition II, Exhibit 6, at 19:18-22.)

Rather than following the Court's instructions and erecting an exemplar in a vertical configuration, Ramsay for the first time erected one of his exemplars "according to the instruction/assembly materials found in the box with the exception of the ratchet strap." (Ramsay Report II, Exhibit 13, at 4.) In other words, Ramsay erected the stand exactly as Queen described since Queen testified he assembled and erected the stand in accordance with the instructions. (Ramsay Deposition II, Exhibit 6, at 19:18-20:02, 21:04-06, 132:15-133:06; Saunders Deposition, Exhibit 14, at 74:25-75:11.)

Ramsay also connected the stabilizer bar to the sixth ladder rung, which was the third stabilizer bar configuration he posited (he said the stabilizer bar was at the seventh rung in his initial Report and then testified at his first deposition that the bar was on the fifth rung). (Ramsay Deposition I, Exhibit 4, at 78:07-17; Ramsay Report I, Exhibit 5, at 2 n.1.) Ramsay undoubtedly performed his exemplar testing with the stand configured in the manner Queen described rather than in the configuration Saunders tested so he could try to develop demonstrative evidence that might (but ultimately does not) contradict Saunders' demonstration.

In addition to his unauthorized exemplar testing, Ramsay for the first time conducted stereo-microscopic analysis of the criss-cross straps in response to Saunders' criss-cross strap evaluation even though Ramsay and Queen both knew criss-cross strap usage was a critical issue. (Ramsay Report II, Exhibit 13, at 9-10.) A similar stereo-microscopic analysis was performed on the stabilizer bar to determine the length to which the component was set. (Ramsay Report II, Exhibit 13, at 7-9.) Ramsay's stereo-microscopic analysis was the first time

he tried to establish the stabilizer bar's length even though he admits the bar's length "is significant in determining the manner in which the stand was [con]figured," which in turn "is significant to [Ramsay's] *original opinions*" (emphasis added). (Ramsay Deposition II, Exhibit 6, at 46:10-13, 84:01-07.)

Like Ramsay's exemplar testing, none of the stereo-microscopic analysis of the criss-cross straps or the stabilizer bar was authorized by the Court. (Doc. 84.) Moreover, Ramsay's criss-cross strap examination is not "rebuttal" activity because Ramsay knew WW Industrial would argue based on Brown's testimony that Queen misused the stand by not attaching the criss-cross straps. (Ramsay Deposition II, Exhibit 6, at 46:20-47:21.) Similarly, Ramsay's efforts to determine the stabilizer bar's length cannot be characterized as "rebuttal" because the bar's length "is significant to [Ramsay's] *original opinions*" (emphasis added). (Ramsay Deposition II, Exhibit 6, at 46:10-13, 84:01-07.) Ramsay even admitted his exemplar testing, criss-cross strap examination, and stabilizer bar evaluation were all activities he would normally have done as part of his initial case work and that he would have preferred to complete those activities before issuing his original Report. (Ramsay Deposition II, Exhibit 6, at 21:07-22:04, 45:20-46:09, 115:03-06, 132:15-133:07.)

Instead, Queen's counsel and Ramsay decided to wait until they had the benefit of WW Industrial's experts' Reports to perform any meaningful analysis of the events surrounding Queen's accident, how the Scout stand performed when assembled and erected, how the stabilizer bar's length affects the stand's configuration, and whether the criss-cross straps demonstrated any signs of usage. Ramsay's delay in performing his most significant data collection and analysis until after issuing his initial Report and opposing experts had rendered

7352928.1

their Reports is inherently prejudicial to WW Industrial's defense. *See Dixie Steel Erectors, Inc. v. Grove U.S., L.L.C.*, 2005 WL 3558663, at *9 (W.D.Okla. Dec. 29, 2005).

The explanation Ramsay gave that he was too busy to perform all of his unauthorized "rebuttal" testing before generating his first Report rings hollow given he had upwards of seven months to perform the testing between the time Queen's attorney advised WW Industrial's counsel sometime in April 2015 that Ramsay would serve as Queen's liability witness and the time Ramsay issued his Report on November 5, 2015. (Ramsay Deposition II, Exhibit 6, at 21:07-22:04, 45:20-46:09, 132:15-133:07; E-mails filed as Docs. 56-1, 56-2, 56-3, and 56-4.) In reality, Queen's counsel and Ramsay appear to have been dragging their feet since Queen's counsel gave the impression Ramsay's original report was near completion at the beginning of May 2015. (E-mails filed as Docs. 56-1, 56-2, 56-3, and 56-4.) Ramsay did not even look at the accident stand until July or August 2015. (Ramsay Deposition I, Exhibit 4, at 38:09-24.)

Regardless of whether Queen's and Ramsay's strategy was deliberate, the fact is the work Ramsay performed after receiving Saunders' Report was well beyond the limited activity the Court approved at the March 22, 2016, Discovery Dispute Conference. (Doc. 84.) Queen's and Ramsay's improper attempt to reverse the order of proof by performing unauthorized expert work that should (and by Ramsay's own admission normally would) have been completed before Ramsay's initial Report warrants an Order striking Ramsay's Supplemental Report generated in connection with that work and the opinions flowing from that work.

## CITATIONS AND ARGUMENT

I.  **STANDARD FOR SUPPLEMENTING EXPERT REPORTS.**

Rule 26 of the Federal Rules of Civil Procedure requires that a retained expert prepare a written report including (i) "a complete statement of all opinions [he] will express and the basis

10

and reasons for them" and (ii) "the facts or data considered by the witness in forming" those opinions. FED.R.CIV.P. 26(b)(2)(B)(i)–(ii). A party has an ongoing duty to supplement expert disclosures in a timely manner "if the party learns the disclosure or response is in some material respect incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED.R.CIV.P. 26(e)(1)(A).

"Although parties are permitted to supplement expert disclosures, Rule 26(e) 'does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report.'" *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 2010 WL 3909204, at *4 (N.D.Okla. Sept. 29, 2010) (quoting *Leviton Mfg. Co. v. Nicor, Inc.*, 245 F.R.D. 524, 528 (D.N.M. 2007)). *See also Downs v. River City Group, LLC*, 2014 WL 814303, at *2 (D. Nev. Feb. 28, 2014); *Cage v. City of Chicago*, 2012 WL 5557410, at *2 (N.D.Ill. Nov. 14, 2012); *In re President Casinos, Inc.*, 2007 WL 7232932, at *2 (Bankr. E.D.Mo. May 16, 2007) (a rebuttal expert report is not "the proper place for presenting new arguments," for presenting new evidence, or for correcting "any oversights in the plaintiff's case in chief"). Moreover, allowing an expert to accomplish "his most significant data acquisition and analysis only after he has rendered his report and the opposing experts have rendered their reports[] is inherently prejudicial." *Dixie Steel Erectors, Inc.*, 2005 WL 3558663, at *9. "[W]hen a veteran expert, working with experienced counsel, waits until more than three months have passed after the original report was rendered to do the most meaningful work in support of that report, the expert, and counsel, know exactly what they are doing. *Id.* at *10.

## II. RAMSAY'S SUPPLEMENTAL REPORT AND OPINIONS SHOULD BE STRICKEN BECAUSE THE WORK DESCRIBED IN THE REPORT AND THE OPINIONS FLOWING FROM THAT WORK WERE NOT AUTHORIZED BY THE COURT'S MARCH 22, 2016, ORDER.

The overriding justification for excluding Ramsay's Supplemental Report is nearly all the work described in the Report (other than the 4X rated weight testing and the inspection of Saunders' exemplars) was not authorized by the Court. Specifically, the Court limited Ramsay's additional work to "testing of an exemplar *in the configuration posited by Defendant's expert (vertical)* in order to rebut Defendant's theory that that configuration was used when the ladder failed" (emphasis added). (Doc. 84.) No mention was made as to any additional testing or analysis Ramsay was permitted to conduct on a completely assembled exemplar or any of the exemplar's component parts such as the criss-cross straps or the stabilizer bar.

As WW Industrial predicted, however, Ramsay did not confine his activity to evaluating Saunders' vertical stand configuration. In fact, Ramsay did not even *try* to evaluate Saunders' suggested vertical configuration. (Ramsay Deposition II, Exhibit 6, at 10:03-06.; Ramsay Report II, Exhibit 13, at 4-7) Instead, Ramsay tested his own theory that the stand was assembled and configured as Queen described in accordance with the instructions that accompanied the device even though Ramsay previously testified the stand's configuration "doesn't make a lot of difference in terms of my conclusions." (Ramsay Deposition I, Exhibit 4, at 77:15-79:15.)

Undoubtedly, Queen's counsel and Ramsay decided they in fact needed Ramsay to do this unauthorized exemplar work because without it, they had nothing to contradict Saunders' demonstration depicting a stand that was erected at an angle that was too vertical. Ramsay also performed stereo-microscopic analysis of the criss-cross straps and the stabilizer bar even though neither of these activities was approved by the Court or even requested by Queen's counsel. For

12

these reasons alone, Ramsay's Supplemental Report should be stricken because his testing went well beyond the scope of the work contemplated by the Court's March 22, 2016, Order.

**III.     RAMSAY'S SUPPLEMENTAL REPORT AND OPINIONS SHOULD BE STRICKEN BECAUSE THE WORK DESCRIBED IN THE REPORT CONSTITUTES AN IMPROPER ATTEMPT TO CORRECT OVERSIGHTS IN RAMSAY'S PREVIOUS OPINIONS AND TO PRESENT ALTERNATIVE EVIDENCE THAT SUPPOSEDLY SUPPORTS THOSE OPINIONS.**

Regardless of whether Ramsay's work was authorized, his Supplemental Report should be excluded because it describes work Ramsay agrees should have been completed before his initial Report was issued. To that end, although Queen bears the burden of proving in his case in chief that the stand failed despite having been assembled and erected properly, Queen's counsel and Ramsay decided not to do *anything* meaningful as part of Ramsay's initial work to evaluate how Queen's accident happened, the load Queen would have exerted against the stand, how the stand was configured at the time of the accident, how the stabilizer bar's length affected the stand's configuration, and whether the criss-cross straps had ever been used.

Specifically, Ramsay to this day has not conducted a full tensile strength test that would have enabled him to measure the yield strength, which Ramsay said is "the strength that we're most concerned about" "with regard to design of the assembly particularly with regard to the bending failure exhibited by the subject stand." (Ramsay Deposition I, Exhibit 4, at 145:21-147:10, 169:23-170:02; Ramsay Report I, Exhibit 5, at 5.) He also did nothing to calculate the "[h]ow much load . . . Queen exerted on the stand when it bent" (Ramsay Deposition I, Exhibit 4, at 175:22-176:06.), which would have allowed Ramsay to determine whether Queen could exceed the yield strength with the stand assembled and erected properly.

Additionally, Ramsay at the time he issued his initial Report believed erecting his exemplars was unnecessary, and he did nothing to determine whether the criss-cross straps were

13

7352928.1

in place despite recognizing criss-cross strap usage was a key component to WW Industrial's defense based on Brown's testimony. (Ramsay Deposition I, Exhibit 4, at 11:05-13, 13:22-25, 15:12-17, 80:02-05.) Further, Ramsay originally decided against investigating the stabilizer bar's length and its impact on the stand's configuration, presumably because Ramsay believed the configuration was unimportant and "doesn't make a lot of difference in terms of [Ramsay's] conclusions." (Ramsay Deposition I, Exhibit 4, at 77:15-79:15.)

Once Ramsay and Queen's counsel had the benefit of WW Industrial's experts' Reports, they apparently realized the stand's configuration *was* important because they immediately requested permission to evaluate an erected exemplar. The fact Ramsay performed his testing by erecting the stand in the manner Queen described and on which Ramsay relied in forming his initial opinions (rather than in Saunders' configuration) leads to the inescapable conclusion that Ramsay's so-call "rebuttal" activity was in fact an improper attempt to bolster his own opinions rather than to address any new, unforeseen facts the defense proffered. *Quapaw Tribe of Oklahoma*, 2010 WL 3909204, at *4 (quoting *Cook v. Rockwell Int'l Corp.*, 2006 WL 3533049, at *87 (D. Colo. Dec. 7, 2007)); *In re President Casinos, Inc.*, 2007 WL 7232932, at *2.

Queen's attorney and Ramsay also should have realized the importance of examining the criss-cross straps and the stabilizer bar in light of the fact Queen's failure to use the criss-cross straps was critical to WW Industrial's comparative fault and misuse defenses and the fact the stabilizer bar's length directly affects how the stand is configured. Examining the criss-cross straps in an effort to evaluate whether witness marks were consistent with their use is of particular significance considering the straps were on the ground after the accident and moved on multiple occasions. (Ramsay Deposition II, Exhibit 6, at 122:07-123:09.) The need to examine the stabilizer bar to determine its length at the time of the accident is also of added significance

14

considering the number of times Queen and others adjusted the stabilizer bar between the time of the accident and the time it was delivered to Queen's counsel for safekeeping and the fact Ramsay has now identified three different ladder rungs to which he says the stabilizer bar was connected. (Ramsay Deposition II, Exhibit 6, at 85:09-16.)

Nevertheless, Queen's attorney and Ramsay waited until *after* WW Industrial's expert provided evidence demonstrating the criss-cross straps were not used along with evidence of the length to which the stabilizer bar was set at the time of the accident to perform stereo-micrograph testing on those components. The sole purpose for this testing was to contradict an anticipated portion of WW Industrial's defense that the stand was configured improperly and that the criss-cross straps were not connected. Consequently, Ramsay's criss-cross strap and stabilizer bar examinations should be stricken because they are not properly characterized as rebuttal testing "or anything analogous to" rebuttal testing. *See Century Indem. Co.*, 2015 WL 5521986, at *3; *Downs*, 2014 WL 814303, at *2; *Amos*, 2011 WL 43092, at *2. To the contrary, the testing is a belated attempt to conduct a meaningful examination of issues that should have been part of Ramsay's original analysis. *See In re President Casinos, Inc.*, 2007 WL 7232932, at *2.

## CONCLUSION

Ramsay was permitted to do so-called "rebuttal" "testing of an exemplar *in the configuration posited by Defendant's expert (vertical)* in order to rebut Defendant's theory that that configuration was used when the ladder failed" (emphasis added). (Doc. 84.) Instead of obeying this directive, Ramsay conducted his first meaningful work in this case by erecting one of his exemplars in the manner Queen described in a blatant attempt to bolster his original opinions about how the stand performed rather than to address any new, unforeseen facts WW Industrial's experts raised. Ramsay also performed unauthorized stereo-microscopic testing as

15

7352928.1

part of his first meaningful effort to determine criss-cross strap usage and stabilizer bar length despite the fact these issues are central to Queen's product defect claim and the fact Ramsay and Queen's counsel were aware of WW Industrial's comparative fault and product misuse defenses. In short, Ramsay's "rebuttal" work described in his Supplemental Report is nothing of the sort since it constitutes new evidence that should have been developed before Ramsay issued his original Report. Consequently, Ramsay's Supplemental Report should be stricken and the work described in the Report excluded from evidence.

**WHEREFORE**, Defendant WW Industrial Corp. prays for an Order striking Christopher W. Ramsay's April 26, 2016, Supplemental Report and prohibiting plaintiff and Ramsay from offering into evidence any of the work or opinions described in Ramsay's Supplemental Report or in Ramsay's May 19, 2016, deposition, for an Order awarding WW Industrial Corp. its costs incurred herein, and for such other and further relief as the Court deems just and proper in the premises.

SANDBERG PHOENIX & von GONTARD P.C.

By: */s/ Andrew D. Ryan*
John S. Sandberg, #2451700
Andrew D. Ryan, #6270539
600 Washington Avenue – 15th Floor
St. Louis, MO 63101-1313
314-231-3332
314-241-7604 (Fax)
jsandberg@sandbergphoenix.com
aryan@sandbergphoenix.com
*Attorneys for Defendant*
*W W Industrial Corp.*

## CERTIFICATE OF SERVICE

  The undersigned certifies that on July 15, 2016, a copy of this document was filed electronically with the Clerk of the Court, using the Court's CM/ECF filing system, which is programmed to cause automated delivery of this document to all counsel of record in this case, to the following counsel of record:

W. Wylie Blair, Esq.
Onder, Shelton, O'Leary & Peterson, LLC
110 E. Lockwood, Ste. 200
St. Louis, MO 63119
blair@onderlaw.com
*Attorney for Plaintiff*

James A. Harfst, Esq.
Pitzer Snodgrass, P.C.
100 S. Fourth St., #400
St. Louis, MO 63102
harfst@pspclaw.com
*Attorneys for Defendant Dunham's Athleisure Corporation,*
 *d/b/a Dunham's Sports*

                */s/ Andrew D. Ryan*