UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| *JORDAN QUEEN,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-00519 |
| | ) | |
| *W.I.C., INC., d/b/a SNIPER* | ) | |
| *TREESTANDS, et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## WW INDUSTRIAL CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFF'S LIABILITY WITNESS CHRISTOPHER W. RAMSAY

WW Industrial Corp., submits its Memorandum in Support of its Motion (Doc. 90) to Exclude plaintiff's liability witness Christopher W. Ramsay:

## INTRODUCTION

### *The Product*

This case involves a Sniper STLS41 "Scout" ladder stand WW Industrial Corp. ("WW Industrial") manufactured. (Queen Deposition, Exhibit 1, at 38:12-39:04.) The Scout is an 18-foot stand that weighs 65 pounds and has a 500-pound weight capacity for two people. (Sniper Scout Specifications, Exhibit 2; Instruction Manual, Exhibit 3, at 6.) It is comprised of a steel seat platform, a steel foot platform, and three steel ladder sections that connect to one another with components called safety sleeves and snap pins. (Instruction Manual, Exhibit 3, at 6-7.) The seat platform is located at the top of the stand and includes components called "bark biters" that are placed against a tree when erecting the device. (Instruction Manual, Exhibit 3, at 6, 9.)

Two "stabilizer straps" or "criss-cross straps" that reach from the top of the stand to the ground are tied to either side of the bark biters during assembly before the stand is erected.

(Instruction Manual, Exhibit 3, at 9.) "Stabilizer straps" and "criss-cross straps" are interchangeably referred to as "criss-cross ropes" since many manufacturers use ropes instead of straps. (Saunders Deposition, Exhibit 4, at 89:05-23; Smith Deposition, Exhibit 5, at 155:02-09.) When the stand is in place, the criss-cross straps are wrapped around the back of the tree and tied to the opposite leg of the middle ladder section. (Instruction Manual, Exhibit 3, at 9.) This configuration stabilizes the stand as the hunter climbs the stand for the first time before installing a ratchet strap that secures the seat platform. The criss-cross straps also provide stability while the hunter descends the stand after he or she removes the ratchet strap during disassembly.

Another component is an adjustable stabilizer bar (or support bar) that is connected to one of the middle section ladder rungs. (Instruction Manual, Exhibit 3, at 9.) This stabilizer bar runs parallel to the ground from the stand to the tree and prevents the stand from buckling inward. (Instruction Manual, Exhibit 3, at 9.) Exhibit 6 depicts a fully-assembled stand.

Although the Scout stand's rated weight is 500 pounds, the Treestand Manufacturers Association only requires load testing on the ladder rungs to 600 pounds and repetitive load testing on the rungs to 300 pounds. (Saunders Deposition, Exhibit 4, at 146:11-147:06; Smith Deposition, at 205:03-15; Scientific Testing Corporation, Inc., Test Report, at 6-7.) Repetitive load testing is only required up to 300 pounds because 300 pounds is the maximum weight capacity for fall arrest systems hunters must wear when using a treestand and only one person at a time can stand on a ladder step. (Saunders Deposition, at 146:11-147:06; Smith Deposition, Exhibit 5, at 206:08-25; TMS 05 Rev. D, Exhibit 7, at §§ 6.1.6-6.1.7.)

### *The Accident*

On October 11, 2013, Queen, Chris Brown (the accident stand's owner), and another man named Justin Davis assembled the stand at issue. (Queen Deposition, Exhibit 1, at 38:12-39:04,

43:22-25.)  Queen confirmed all the appropriate screws, pegs, and other hardware accompanied the stand and that no pieces of the stand were missing.  (Queen Deposition, Exhibit 1, at 48:07-21.)  Additionally, the stand came with an instruction manual and a safe treestand hunting video. (Queen Deposition, Exhibit 1, at 44:24-45:06; Instruction Manual, Exhibit 3, at 2.)

Queen and Brown then took the stand to Randy Youngblood's property in Orchardville, Illinois.  (Queen Deposition, Exhibit 1, at 52:15-21.)  They located a tree when they arrived and then retrieved the stand from Brown's pickup piece by piece to set up.  (Queen Deposition, Exhibit 1, at 70:20-71:05.)  Queen indicated he placed the base of the stand's ladder section about two to three feet from the tree before connecting the seat platform.  (Queen Deposition, Exhibit 1, at 73:17-23.)  He also said he tied the criss-cross straps to either side of the bark biters, though Brown stated the criss-cross straps were ***not*** attached.  (Queen Deposition, Exhibit 1, at 70:20-72:01; Brown Deposition, Exhibit 8, at 17:16-23, 41:18-42:03,44:02-45:22.)

After the stand was centered against the tree, Queen attached the stabilizer bar to the ladder section.  (Queen Deposition, Exhibit 1, at 70:20-72:06, 77:03-14.)  Although experts originally agreed the stabilizer bar was attached at the seventh rung (the third rung up the middle ladder section), Queen's liability witness Christopher W. Ramsay now thinks the stabilizer bar was connected to the sixth rung.  (Ramsay Report I, Exhibit 9, at 2 n.1; Saunders Report, Exhibit 10, at 19; Smith Report, Exhibit 11, at 5; Ramsay Deposition II, Exhibit 12, at 140:10-15.)

Queen tightened the stabilizer bar using a ratchet strap instead of the rope that came with the stand.  (Queen Deposition, Exhibit 1, at 77:21-79:05.)  He says he then wrapped the criss-cross straps behind the tree and tied them beneath the stabilizer bar to either side of the stand's middle ladder section.  (Queen Deposition, Exhibit 1, at 79:11-16.)  Of course, Queen could not

have wrapped the criss-cross straps behind the tree and tied them to the stand's ladder section if he failed to attach the straps to the bark biters in the first place like Brown said.

Next, Queen ascended the stand to connect the seat platform to the tree using the ratchet straps he carried with him in his pockets.  (Queen Deposition, Exhibit 1, at 83:19-85:02, 86:05-15.)  Brown recalled that Queen had the criss-cross straps in his hands as Queen went up the ladder.  (Brown Deposition, Exhibit 8, at 45:11-18.)  Queen at some point during the climb "remember[s] feeling like [he] was coming ***backwards***" and "remember[s the stand] coming down bending ***backwards***" (emphasis added).  (Queen Deposition, Exhibit 1, at 84:17-19, 91:06-11, 109:09-19.)  Brown also noticed the stand was "starting to fall ***back***" and was "bending ***back***" (emphasis added).  (Brown Deposition, Exhibit 8, at 46:08-25.)  Queen even told his wife Brittany Queen the stand bent ***backwards*** when he described how his accident happened.  (Brittany Queen Deposition, Exhibit 13, at 15:04-09.)

As the stand bent backward, Queen stepped off the ladder and landed on his feet.  (Queen Deposition, Exhibit 1, at 84:23-85:02, 93:15-94:02, 96:16-22.)  He testified the reason he stepped off to the side of the ladder was to prevent the ladder from "***falling on top of me*** or impaling me" (emphasis added).  (Queen Deposition, Exhibit 1, at 91:21-92:03.)

Queen said he is "sure" the seat platform bark biters did not stay attached to the tree as he fell.  (Queen Deposition, Exhibit 1, at 109:20-110:07.)  Instead, they "would have came ***away*** from the tree" (emphasis added) while the stand was bending.  (Queen Deposition, Exhibit 1, at 109:20-110:07.)  In fact, Queen's testimony when asked if the bark biters stayed attached was, "***I'm sure it wouldn't*** if it, as it was ***bending away*** from it it would have came away from the tree" (emphasis added).  (Queen Deposition, Exhibit 1, at 109:20-25.)  When asked again if the bark biters maintained contact, Queen testified, "***I'm sure it did not***.  Yes or no, I can't answer,

but the way the stand, I know it came *away from the tree* so I would assume it came *away from the tree*, the bark biter" (emphasis added).  (Queen Deposition, Exhibit 1, at 110:01-07.)

### *Plaintiff's Liability Witness Christopher W. Ramsay*

Queen disclosed Ramsay on November 5, 2015, as his sole liability witness and produced Ramsay for deposition on November 12, 2015.  Significantly, Queen's counsel contacted Ramsay to work on this matter at least seven months earlier in April 2015, which is evidence by an email string in early May when the parties discussed a deadline for Ramsay's report and possible deposition dates.  (May 1, 2015, to May 19, 2015, email string, Exhibit 14.)  According to Ramsay's report, he was hired to perform materials analysis and forensic investigation that included subjecting an exemplar Scout "to destructive laboratory tests that included compositional analysis, hardness testing, and microstructural evaluation."  (Ramsay Report I, Exhibit 9, at 1; Ramsay Deposition I, Exhibit 15, at 13:02-21.)

Ramsay is a metallurgist who has never erected a ladder stand and has never seen anyone erect a ladder stand outside of litigation.  (Ramsay Deposition I, Exhibit 15, at 17:18-20, 53:13-18, 63:18-65:04.)  He has no training or experience designing or manufacturing hunting products, has never designed or manufactured a ladder stand, has never authored any warnings or instructions for ladders or hunting-type products, and does not know what factors are considered when selecting steel used to manufacture ladder stands for hunting.  (Ramsay Deposition I, Exhibit 15, at 30:18-24, 33:18-34:01, 58:18-21.)  Moreover, Ramsay is not an accident reconstructionist.  (Ramsay Deposition I, Exhibit 15, at 54:13-17.)

### *Ramsay's Initial Methodology and Conclusions*

The work Ramsay originally performed prior to issuing his first report included observing the accident stand, which he did sometime in July or August 2015 despite having been contacted

no later than April 2015.  (Ramsay Deposition I, Exhibit 15, at 10:11-13, 38:09-24.)  He did not

conduct his own evaluation of the accident stand's composition and did not perform destructive

testing on the accident stand.  (Ramsay Deposition I, Exhibit 15, at 10:14-17.)  In fact, Ramsay

did not do his own compositional analysis of the accident stand even after pieces from the stand

were supplied to him despite testifying "he would still like to measure" the accident stand's

composition.  (Ramsay Deposition II, Exhibit 12, at 25:11-15; Ramsay Deposition I, Exhibit 15,

at 67:02-16.)  Instead, Ramsay was provided two exemplars for "destructive laboratory tests that

included compositional analysis, hardness testing, and microstructural evaluation."  (Ramsay

Report I, Exhibit 9, at 1; Ramsay Deposition I, Exhibit 15, at 12:05-13:13.)

      Ramsay stated he "relied" on Queen's testimony that the stand was assembled correctly

with the criss-cross straps attached and concluded the stand "folded ***forward*** towards the tree"

(emphasis added) because the criss-cross straps kept the stand from bending ***backward***.  (Ramsay

Deposition II, Exhibit 12, at 165:09-11; Ramsay Deposition I, Exhibit 15, at 14:04-15, 16:11-21,

78:05-80:09, 91:04-98:16, 103:18-104:18.)  Additionally, Ramsay believes the seat platform's

bark biters "maintained contact with the tree" during Queen's accident "because the crisscross

straps were in place."  (Ramsay Deposition II, Exhibit 12, at 159:08-21, 164:15-19; Ramsay

Deposition I, Exhibit 15, at 13:22-25, 104:12-18.)  This scenario, of course, disregards Queen's

and Brown's testimony the stand bent ***backward*** and ***away from the tree*** and that the bark biters

did not maintain contact.

      According to Ramsay, Queen's accident could have been prevented if the Scout stand

would have utilized two steel rails for its ladder section or if the stand's design included a

stabilizer bar that attached at two different ladder rungs.  (Ramsay Report I, Exhibit 9, at 5.)

Ramsay came to this conclusion despite only seeing pictures of other stands WW Industrial

distributes with this design and without investigating whether other manufacturers use a double-rail design.  (Ramsay Deposition I, Exhibit 15, at 150:03-16, 154:19-25.)  Similarly, Ramsay has never seen a stand with his alternative stabilizer bar design and does not know whether other manufacturers have incorporated a comparable component into their stands.  (Ramsay Deposition I, Exhibit 15, at 151:07-20, 154:10-16.)  Further, Ramsay did not test his alternative stabilizer bar design.  (Ramsay Deposition I, Exhibit 15, at 151:21-23.)

Ramsay says the accident stand "was defective simply because it bent" "with someone climbing who was less than 500 pounds."  (Ramsay Deposition I, Exhibit 15, at 170:09-171:07.) He reached this conclusion without "any mechanical engineering calculations to determine why the stand bent under [plaintiff's] weight."  (Ramsay Deposition I, Exhibit 15, at 169:10-14.)

### What Ramsay Did Not Do Before His Initial Report

According to Ramsay, "the strength that we're most concerned about" "with regard to design of the assembly particularly with regard to the bending failure exhibited by the subject stand" is the yield strength.  (Ramsay Report I, Exhibit 9, at 5; Ramsay Deposition I, Exhibit 15, at 145:21-23.)  He also said Queen's weight was "sufficient to exceed the yield strength" because the accident stand "bent under [plaintiff's] weight."  (Ramsay Deposition I, Exhibit 15, at 169:15-22.)  Nevertheless, Ramsay before submitting his initial report failed to perform a full tensile strength test on his exemplar that would have allowed him to measure the yield strength even though he admitted he could have performed tensile strength testing as part of his materials analysis.  (Ramsay Deposition I, Exhibit 15, at 145:21-147:10, 169:23-170:02.)  He also does not know "[h]ow much load . . . Queen exerted on the stand when it bent."  (Ramsay Deposition I, Exhibit 15, at 175:22-176:06.)

In addition to Ramsay's decision against measuring his exemplars' tensile strength or yield strength, he chose not to erect either of his exemplars against a tree before generating his initial report despite admitting the exemplars "could be put up at any time."  (Ramsay Deposition I, Exhibit 15, at 10:24-11:13.)  In fact, Ramsay testified he "didn't feel [erecting his exemplar stands] was necessary" because he "suspected that there were other issues that were more important to do first than actually put it up."  (Ramsay Deposition I, Exhibit 15, at 11:05-13.)  Further, Ramsay did not test his exemplar stands in accordance with Treestand Manufacturers Association or ASTM standards.  (Ramsay Deposition I, Exhibit 15, at 134:11-23.)

Ramsay also did nothing before his first report to confirm whether Queen was using criss-cross straps with his stand despite the fact he assumed criss-cross straps were in place.  (Ramsay Deposition I, Exhibit 15, at 13:22-25, 80:02-05.)  To that end, Ramsay did not look at the accident stand's criss-cross straps for signs of usage even though he admits he could have tested the straps to determine whether they had been used.  (Ramsay Deposition I, Exhibit 15, at 70:05-07, 71:22-72:03.)  Similarly, he did not do any testing to determine the effectiveness of the criss-cross straps on his exemplar stands.  (Ramsay Deposition I, Exhibit 15, at 102:19-22.)

Finally, Ramsay did not try to reconstruct Queen's accident and did not analyze "how either of [his] exemplar stands would perform if they were erected" with or without criss-cross straps.  (Ramsay Deposition I, Exhibit 15, at 12:14-18, 17:15-17, 171:08-14.)  Consequently, Ramsay does not "know whether you'd be able to observe a similar bending if somebody put up the stand, climbed, and didn't have the crisscross ropes attached."  (Ramsay Deposition I, Exhibit 15, at 171:15-20.)

Nevertheless, Ramsay admitted at his November 12, 2015, deposition that "there might be a possibility we could produce this kind of deformity absent crisscross ropes" when asked if

he is "able to rule out the possibility that crisscross ropes were not used." (Ramsay Deposition I, Exhibit 15, at 105:08-15.) He also conceded the reason Brown has not had a similar incident with an identical stand Queen later gave to Brown could be because Brown used criss-cross straps and Queen did not. (Queen Deposition, Exhibit 1, at 104:16-105:07; Brown Deposition, Exhibit 8, at 52:07-15, 53:17-54:12; Ramsay Deposition I, Exhibit 15, at 127:19-25.)

### Ramsay's Supplemental Methodology and Conclusions

After WW Industrial's experts were disclosed and deposed, Queen's attorney asked the Court's permission for Ramsay to perform additional testing to evaluate WW Industrial's four-times rated weight test procedure and to "rebut" WW Industrial's misuse defense that focused on how the stand was assembled and erected. (Plaintiff's March 16, 2016, Letter Submission, Exhibit 16.) Part of the requested testing included erecting an exemplar stand in the nearly vertical configuration WW Industrial's expert George M. Saunders, Jr., described. (March 22, 2016, Hearing Transcript, Exhibit 17, at 17:21-18:02.)

WW Industrial's counsel objected to the additional testing Queen's counsel requested out of concern Ramsay would instead evaluate the stand's performance if it were erected in the manner to which Queen testified rather than in Saunders' configuration. (March 22, 2016, Hearing Transcript, Exhibit 17, at 22:02-06.) Additionally, WW Industrial's counsel observed testing an exemplar that was assembled consistent with Queen's testimony was not "rebuttal" testing but was instead activity Ramsay should have performed as part of his initial case activity. (March 22, 2016, Hearing Transcript, Exhibit 17, at 24:23-25:09, 26:09-13.) Nevertheless, the Court entered an Order permitting Ramsay "to perform testing of an exemplar *in the configuration posited by Defendant's expert (vertical)* in order to rebut Defendant's theory that that configuration was used when the ladder failed" (emphasis added). (Doc. 84.)

Ramsay issued a supplemental report dated April 26, 2016, and was deposed a second time on May 19, 2016. Not surprisingly, Ramsay's testing involved more than simply "looking at how Mr. Saunders had his stand configured." (Ramsay Deposition II, Exhibit 12, at 19:18-22; Ramsay Report II, Exhibit 18, at 4-7.) Contrary to the Court's express instructions, Ramsay erected one of his exemplars in the manner Queen described consistent with the instructions accompanying the stand. (Ramsay Deposition II, Exhibit 12, at 19:18-20:02, 21:04-06, 132:15-133:06; Ramsay Report II, Exhibit 18, at 4-7.) When asked whether he did "any testing of any of your exemplars with the configuration posited by Defendant's expert in a vertical position," Ramsay responded, "Not dead vertical, no." (Ramsay Deposition II, at 10:03-06.)

Additionally, Ramsay's new work involved examining the accident stand's criss-cross straps to determine if they had been used. (Ramsay Report II, Exhibit 18, at 9-10.) Ramsay's so-called "rebuttal" activity also included examining the accident stand's stabilizer bar to ascertain the length to which the bar had been extended. (Ramsay Report II, Exhibit 18, at 7-9.)

Notably, the Court did not authorize Ramsay's exemplar testing with a stand erected in the manner Queen described and did not authorize the criss-cross strap and stabilizer bar examinations. (Doc. 84.) Ramsay's self-styled "rebuttal" activity should be stricken from any analysis as to whether he properly tested his accident scenario for the reasons more fully set forth in WW Industrial's Motion to Strike Ramsay's Supplemental Report and Opinions.

Moreover, Ramsay's criss-cross strap examination is not "rebuttal" activity because Ramsay knew WW Industrial would argue based on Brown's testimony that Queen misused the stand by not attaching the criss-cross straps. (Ramsay Deposition II, Exhibit 12, at 46:20-47:21.) Similarly, Ramsay's efforts to determine the stabilizer bar's length cannot be characterized as "rebuttal" because the bar's length "is significant in determining the manner in which the stand

10

was [con]figured" and because "[t]he manner in which the stand was [con]figured is significant to [Ramsay's] original opinions."  (Ramsay Deposition II, Exhibit 12, at 46:10-13, 84:01-07.)

Ramsay even admitted he would normally have done his exemplar testing, criss-cross strap examination, and stabilizer bar evaluation as part of his initial work and that he would have preferred to complete those activities prior to his issuing his original report.  (Ramsay Deposition II, Exhibit 12, at 21:07-22:04, 45:20-46:09, 115:03-06, 132:15-133:07.)  While Ramsay testified he was too busy, his explanation rings hollow considering he had at least seven months from the time he was contacted until he issued his first report to evaluate Queen's claims.  (Ramsay Deposition II, Exhibit 12, at 21:07-22:04, 45:20-46:09, 132:15-133:07.)  In reality, Queen's counsel and Ramsay appear to have been dragging their feet since Queen's counsel gave the impression Ramsay's original report was near completion at the beginning of May 2015.  (See emails filed as Docs. 56-1, 56-2, 56-3, and 56-4.)  Ramsay did not even look at the accident stand until July or August 2015.  (Ramsay Deposition I, Exhibit 15, at 38:09-24.)

### *What Ramsay Did Not Do Before Issuing His Supplemental Report*

Despite being given an opportunity to correct the omissions in his original report, Ramsay once again failed to measure tensile strength or yield strength even though he concedes yield strength is the calculation with which he is most concerned.  (Ramsay Deposition II, Exhibit 12, at 05:08-18, 06:24-07:09.)  He also did nothing to "calculate the stress that would be exerted against the stand under normal use."  (Ramsay Deposition II, Exhibit 12, at 187:10-13.)  Additionally, Ramsay did not document were he observed debris in the accident stand criss-cross straps or measure how far the debris was located from either end of the straps, which prevented him from providing an opinion on whether the debris was located where the straps would have

contacted the tree Queen was using.  (Ramsay Deposition II, Exhibit 12, at 117:21-24, 118:15-24, 120:25-121:08, 125:20-126:06.)

Further, Ramsay failed to test the debris to determine its source and admitted the debris could have come from the ground and not a tree.  (Ramsay Deposition II, Exhibit 12, at 123:10-18.)  This is consistent with Brown's testimony the criss-cross straps were on the ground when he retrieved the stand the day after the accident.  (Brown Deposition, Exhibit 8, at 50:13-19.)  In other words, Ramsay even with this second opportunity to evaluate Queen's accident was no closer to determining whether the criss-cross straps were used at the time of the accident than he was when he issued his original report.  (Ramsay Deposition II, Exhibit 12, at 128:25-129:03.)

Ramsay's unauthorized exemplar testing was nevertheless significant in that the testing confirmed his earlier premonition about the criss-cross straps' effect on the stand during the accident scenario Queen illustrated.  Specifically, Ramsay observed during his exemplar testing with the stand configured in accordance with the instructions that the bark biters remained connected to the tree.  (Ramsay Deposition II, Exhibit 12, at 157:22-158:02, 158:16-25, 163:17-164:01.)  He testified the straps assisted in keeping the bark biters in place and even stated "[i]t's very likely" "the bark biters on the stand Mr. Queen was using would have pulled away from the tree" if the criss-cross straps were not in place.  (Ramsay Deposition II, Exhibit 12, at 164:24-165:02.)  Ramsay's exemplar testing shows Queen could not have erected the stand properly with the criss-cross straps attached because had Queen done so, his accident could not have happened in the manner Queen described with the seat platform bending *away* from the tree.

## CITATIONS AND ARGUMENT

## I.  STANDARD OF REVIEW.

Expert testimony admissibility is governed by FED.R.EVID. 702, which provides,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011).

The United States Supreme Court has explained district courts perform a "gatekeeping role" regarding expert testimony in applying Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The district judge must ensure "an expert's testimony both rests on a stable foundation and is relevant to the task at hand." *Id.* Expert testimony in order to be reliable must be based on "the methods and procedures of science" rather than on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-90.

To ensure expert testimony is relevant and reliable, "the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis*, 663 F.3d at 893 (quoting 2000 version of FED.R.EVID. 702). Factors courts may "consider when assessing an expert's methodology" include "(1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community." *Id.* at 893-94. Ultimately, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (citing *Daubert*, 509 U.S. at 593 n.10).

## II. RAMSAY'S TESTIMONY AND OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NOT BASED ON SUFFICIENT FACTS OR DATA.

FED.R.EVID. 702(d) requires a testifying expert to have "applied the principles and methods to the ***facts of the case***" (emphasis added). Opinions without factual support and that are contrary to the evidence are inadmissible because they are legally unsupportable and not helpful to a jury. *Nunez v. BNSF Ry. Co.*, 2012 WL 2874059, at *7 (N.D.Ill. July 13, 2012), *aff'd*, 730 F.3d 681, 684-85 (7th Cir. 2013); *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *5 (N.D.Ill. Aug. 30, 2007). *See also Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir. 2000) ("[expert testimony] is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data). An expert is prohibited from "simply ignor[ing] evidence that does not support his opinion." *Nunez*, 2012 WL 2874059, at *6. Further, an expert may not impugn a lay witness' credibility where the testimony runs contrary to the expert's opinions. *See Nunez*, 730 F.3d at 684 (characterizing an expert's attempt "to wrap [a] lay witness in the expert's prestige and authority" as "a disreputable tactic that the plaintiff's lawyer should not have countenanced").

Here, Ramsay's accident scenario in which he posits the stand bent ***inward*** is not only unsupported by the evidence, it is completely contradicted by Queen's and Brown's eyewitness testimony. Specifically, Queen said three times during his deposition that he "remember[ed the stand] coming down bending ***backwards***" (emphasis added) rather than ***forward*** towards the tree. (Queen Deposition, Exhibit 1, at 84:17-19, 91:06-11, 109:09-19.) Brown also testified the stand bent ***backward*** rather than toward the tree like Ramsay suggested. (Brown Deposition, Exhibit 8, at 46:08-25.) Queen's wife confirmed her husband told her the stand bent ***backward*** as the accident transpired. (Brittany Queen Deposition, Exhibit 13, at 15:04-09.)

The fact Queen was worried about the stand "falling ***on top*** of [him]" (emphasis added) is telling and further indicates the stand was bending ***backward*** because Queen would not have had the same concern if the stand were bending ***forward*** (in which case he would have eventually contacted the tree rather than having the stand come on top of him). (Queen Deposition, Exhibit 1, at 91:21-92:03.) Ramsay conveniently picks and chooses testimony he disregards and testimony on which he relies depending on whether the testimony fits his opinions since he utterly ignores Queen's testimony about the stand falling ***backward*** while at the same time accepting Queen's description of erecting the stand properly with the criss-cross straps attached.

Ramsay's opinion that the seat platform bark biters maintained contact with the tree is also contrary to Queen's testimony. Queen said he is "sure" the bark biters "would not have stayed attached to the tree" because the stand as it was bending "would have came ***away*** from the tree" (emphasis added). (Queen Deposition, Exhibit 1, at 109:20-25.) Again, Ramsay improperly disregards Queen's accident scenario because the description he provides differs from Ramsay's opinions.

On the other hand, Queen's accident description is consistent with Brown's testimony the criss-cross straps were not attached since Ramsay concedes he "would expect [the stand] to fold ***backwards*** away from the tree" like Queen described with the seat platform disconnecting from the tree ***only*** if the criss-cross straps were not in place. (Ramsay Deposition I, Exhibit 15, at 102:23-103:09, 103:18-104:18; Ramsay Deposition I Exhibits 54 and 55.) Ramsay for a third time disregards testimony contrary to his opinions by attributing Brown's comments about criss-cross strap usage to "confusion." (Ramsay Deposition I, Exhibit 15, at 14:04-22, 15:21-16:01, 16:17-21.) Even Judge Williams commented, "[I]t doesn't look to me like the guy was confused because he said that there were some ropes that weren't on, and obviously the stabilizer bar was

on, so that's the one he thinks was on. That's – the other ones were off." (March 22, 2016, Hearing Transcript, Exhibit 17, at 22:17-21.) Moreover, Ramsay's efforts to impugn Brown's testimony are beyond Ramsay's role as an expert. *Nunez*, 2012 WL 2874059, at \*6.

Ultimately, there is no factual support for Ramsay's opinion the stand bent ***inward*** and the "seat platform had to maintain contact with the tree" "because the crisscross straps were in place." (Ramsay Deposition I, Exhibit 15, at 104:14-18.) To the contrary, all the eyewitness testimony and Ramsay's own analysis confirms Queen misused the accident stand when he failed to attach the criss-cross straps based on the undisputable evidence establishing the stand bent ***away*** from and the bark biters disconnected from the tree. Ramsay's testimony and opinions should be excluded since they are contrary to the evidence and therefore of no assistance to the jury. *Nunez*, 2012 WL 2874059, at \*7; *Martinez*, 2007 WL 2570362, at \*5.

## III.  RAMSAY'S TESTIMONY AND OPINIONS SHOULD BE EXCLUDED BECAUSE THEY WERE NOT TESTED.

An expert's failure to test his or her hypothesis justifies excluding his or her testimony. *Bielskis*, 663 F.3d at 894-95; *Oddi*, 234 F.3d at 158. In *Bielskis*, the plaintiff's expert testified a scaffold collapsed because the caster stem above one of the scaffold's wheels broke "on account of a brittle fracture brought on by overtightening." 663 F.3d at 894. The expert's opinions were excluded, however, because he failed to measure the caster stem, admitted "he had no idea what alloy was used to construct the caster stem," and "made no effort to quantify [the caster stem's] tensile strength or yield strength." *Id.* at 894-95. Conversely, the defendant's expert measured various scaffold components, created replicas of the fracture surfaces, and performed stress analysis calculations, all of which demonstrated caster stem testing could be performed and was helpful. *Id.* at 895. Similarly, an expert was prohibited from testifying in the *Oddi* case involving a truck that supposedly was not crashworthy where the expert failed to calculate the

forces involved in the accident and failed to determine the tensile strength or gauge of the metal used in the alternative design he suggested for the truck's flooring. 234 F.3d at 156, 158.

Similarly, Ramsay's analysis is deficient because of his decision not to measure or test the most important forces for determining why the stand bent – tensile strength and yield strength. (Ramsay Deposition II, Exhibit 12, at 05:08-18, 06:24-07:09.) He also did nothing to "calculate the stress that would be exerted against the stand under normal use" and does not know "[h]ow much load . . . Queen exerted on the stand when it bent." (Ramsay Deposition II, Exhibit 12, at 187:10-13; Ramsay Deposition I, Exhibit 15, at 175:22-176:06.) Obviously, Ramsay could have performed his own tensile strength and yield strength measurements because WW Industrial's expert Saunders had those forces measured as part of his analysis. Moreover, Ramsay admitted the laboratory he used for his compositional analysis could have measured tensile strength and yield strength. (Ramsay Deposition I, Exhibit 15, at 147:07-17.) Nevertheless, he failed to authorize this work.

Ramsay's criss-cross strap testing also leaves much to be desired. Notably, Ramsay did not document where the debris he observed in the accident stand's criss-cross straps was located and did not measure how far the debris was from either end of the straps. His failure to perform the measurements leaves him unable to provide an opinion on whether the debris' placement "would have been consistent with where the crisscross straps would have been attached to the tree as alleged by Mr. Queen." (Ramsay Deposition II, Exhibit 12, at 126:01-06.) Moreover, Ramsay's failure to test the debris to determine the source and his admission the debris could have come from the ground rather than a tree prevents him from saying with any certainty whether the criss-cross straps were in fact in use at the time of the accident or whether they were lying on the ground as Brown testified. (Brown Deposition, Exhibit 8, at 50:13-19.)

Although Ramsay erected his exemplars and examined the criss-cross straps and stabilizer bar *after* WW Industrial's experts produced their reports and were deposed, he nevertheless admitted this supplemental work was something he normally would have done as part of his initial evaluation even though he and Queen's attorney claimed the activity was necessary to "rebut" WW Industrial's experts' opinions.  (Ramsay Deposition II, Exhibit 12, at 21:07-22:04, 45:20-46:09, 115:03-06, 132:15-133:07.)  The supplemental testing Ramsay performed should therefore be excluded from consideration as set forth in WW Industrial's Motion to Strike Ramsay's Supplemental Report and Opinions since the work exceeded the scope of the "rebuttal" testing the Court authorized in its March 22, 2016, Order.

## IV.  RAMSAY'S ALTERNATIVE DESIGN OPINIONS SHOULD BE EXCLUDED BECAUSE THEY HAVE NOT BEEN TESTED AND HAVE NOT BEEN SUBJECTED TO PEER REVIEW.

When considering whether to admit expert testimony regarding an alternative design, courts are typically required to evaluate the extent to which the expert's opinions have been tested, the extent to which those opinions have been subjected to peer review, and the extent to which the expert's alternative design theory has gained general acceptance in the engineering/ manufacturing community.  *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007).  In *Johnson*, a plaintiff who was injured when a boom truck crane with a partially retracted outrigger tipped over on him sought to introduce expert testimony that the crane was defectively designed because it lacked an interlocking system that would render the crane inoperable if any one outrigger was not in contact with the ground.  *Id.* at 427-28.  At deposition, however, plaintiff's expert conceded he never implemented or tested his proposed alternative design and knew of no other "manufacturer of mobile truck cranes of the type and style and function and use of the [crane at issue] had interlocks on their outriggers. . . ."  *Id.* at 430-34.

Consequently, the Sixth Circuit Court of Appeals held plaintiff's expert's testimony was properly excluded because he failed to satisfy the "testing factor" and the "general acceptance factor" critical to a *Daubert* analysis. *Id.* at 433-34.

Other courts, including the Seventh Circuit Court of Appeals, have reached similar conclusions. *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536-38 (7th Cir. 2000) (expert precluded from testifying about alternative forklift design where he did no scientific testing to support his alternative design theory, did not prepare "detailed design or calculations," did not perform "an economic feasibility study," and did not perform "any risk utility type testing," and where "no lab or organization has tested his theories; no other manufacturer incorporates his proposed design; and he has not seen any industry studies regarding accident experience with the [forklift at issue]"); *Dancy v. Hyster Co.*, 127 F.3d 649, 651 (8th Cir. 1997) (expert prohibited from offering testimony about forklift design where he failed to test alternative design theory, had not seen alternative design on another forklift, and had not even designed device he suggested would have prevented plaintiff's injury); *Pestel v. Vermeer Mfg. Co.*, 64 F.3d 382, 383-85 (8th Cir. 1995) (testimony of expert who designed guard for stump cutter excluded where he failed to test guard, did not look at any other manufacturer's stump cutters, did not make search for patents on guards for stump cutters, and did not consult any stump cutter operators to determine how his design would work in the field).

Ramsay is a classic example of an expert whose alternative design opinions are patently unreliable and therefore properly excluded. Although Ramsay suggests Queen's injury could have been prevented if the accident stand had two steel ladder section rails or a different stabilizer bar that connected at two ladder rungs, he admits he did not develop, implement, or test

either design.  Ramsay has never even seen a stand that incorporated either of these designs and could not identify any other manufacturers who utilized the configurations he recommends.

The failure by Ramsay failure to develop or test either of his alternative design theories or to identify any other ladder stand manufacturer that incorporates his proposed designs into their stands cause his opinions regarding the allegedly defective condition of the Scout stand to "fall into the category of subjective belief or unsupported speculation" that amounts to nothing more than a "'bottom line' conclusion" of no assistance to the trier of fact.  *Bourelle*, 220 F.3d at 537 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir. 1999)).  Consequently, Ramsay should be prohibited from providing any testimony or opinions at trial regarding the Scout stand.

## CONCLUSION

Ramsay's opinion regarding the manner in which Queen's accident happened is contradicted by evidence and testimony indicating Queen misused the accident stand by failing to attach the criss-cross straps to the seat platform.  Queen's failure to connect the criss-cross straps allowed the stand to bend ***backward*** and caused the seat platform's bark biters to detach from the tree, which is consistent with eyewitness testimony and contrary to Ramsay's opinion the stand bent ***inward*** while the bark biters maintained contact with the tree.  The absence of any evidentiary or factual support for Ramsay's opinions coupled with his failure to test his accident scenario hypothesis in a timely manner or to test his alternative design theory render his opinions and conclusions legally unsupportable and subject to exclusion.

**WHEREFORE,** WW Industrial Corp. prays for an Order excluding plaintiff's liability witness Christopher W. Ramsay's testimony and opinions, and for such other and further relief as the Court deems just and proper in the premises.

20

SANDBERG PHOENIX & von GONTARD P.C.

By: _/s/ Andrew D. Ryan_
   John S. Sandberg, #2451700
   Andrew D. Ryan, #6270539
   600 Washington Avenue – 15th Floor
   St. Louis, MO  63101-1313
   314-231-3332
   314-241-7604 (Fax)
   jsandberg@sandbergphoenix.com
   aryan@sandbergphoenix.com
   *Attorneys for Defendant*
   *W W Industrial Corp.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 15, 2016, a copy of this document was filed electronically with the Clerk of the Court, using the Court's CM/ECF filing system, which is programmed to cause automated delivery of this document to all counsel of record in this case, to the following counsel of record:

W. Wylie Blair, Esq.
Onder, Shelton, O'Leary & Peterson, LLC
110 E. Lockwood, Ste. 200
St. Louis, MO  63119
blair@onderlaw.com
*Attorney for Plaintiff*

James A. Harfst, Esq.
Pitzer Snodgrass, P.C.
100 S. Fourth St., #400
St. Louis, MO  63102
harfst@pspclaw.com
*Attorneys for Defendant Dunham's Athleisure Corporation,*
 *d/b/a Dunham's Sports*

       _/s/ Andrew D. Ryan_

7161865.1