UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| *JORDAN QUEEN,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-00519 |
| | ) | |
| *W.I.C., INC., d/b/a SNIPER* | ) | |
| *TREESTANDS, et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## WW INDUSTRIAL CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S PUNITIVE DAMAGE CLAIM

WW Industrial Corp. submits its memorandum in support of its Motion (Doc. 92) for

Summary Judgment or, in the Alternative, for Partial Summary Judgment on plaintiff Jordan

Queen's punitive damage claim:

### INTRODUCTION

#### *The Product*

This case involves a two-man Sniper STLS41 "Scout" ladder stand WW Industrial

distributes.  (Second Amended Complaint, Doc. 70, ¶ 9; Answer to Second Amended Complaint,

Doc. 71, ¶ 9.)  The stand's purpose is to provide an elevated platform from which users are able to

shoot when hunting.  (Second Amended Complaint, Doc. 70, at ¶ 6; Answer to Second Amended

Complaint, ¶ 6.)

A Scout ladder stand is 18 feet tall, weighs 65 pounds, and is comprised of a steel seat

platform, a steel foot platform, and three steel ladder sections that connect to one another with

components called safety sleeves and snap pins.  (Sniper Scout Specifications, Exhibit 1;

Instruction Manual, Exhibit 2, at 6-7.)  Although the stand has a 500-pound weight capacity for

two people, the maximum weight for an individual hunter using the stand is 300 pounds since the full-body safety harness a hunter must wear when using a ladder stand is only rated to 300 pounds.  (Instruction Manual, Exhibit 2, at 6, 8; Saunders Deposition, Exhibit 3, at 146:11-147:06; Smith Deposition, Exhibit 4, at 206:08-25; TMS 05 Rev. D, Exhibit 5, at §§ 6.1.6-6.1.7.)

Accompanying the Scout are two "stabilizer straps" or "criss-cross straps" that reach from the top of the stand to the ground.  (Instruction Manual, Exhibit 2, at 9.)  The straps are tied to either side of the bark biters located at the back of the seat platform while the stand is on the ground during assembly before it is erected against a tree.  (Instruction Manual, Exhibit 2, at 9.) Additionally, the Scout comes with an adjustable support bar that is connected to one of the middle section ladder rungs and is designed to prevent an erected stand from buckling inward. (Instruction Manual, Exhibit 2, at 9.)  All but one treestand manufacturer use the same stabilizing support bar system used on the Scout.  (Smith Deposition, Exhibit 4, at 222:11-21, 225:06-24.) A ratchet strap is connected to the top of the stand and wrapped around the tree after the stand is assembled.  (Instruction Manual, Exhibit 2, at 10.)

### The Scout's Conception and Manufacture

WW Industrial created the Scout in 2012 for distribution through Dunham's Sports beginning in 2013.  (Stieren Deposition, Exhibit 6, at 39:18-24.)  It was developed by a team consisting of employees from an affiliated company called BGHA, Inc., factory engineers, a factory management team, and WW Industrial's Chief Executive Officer Nathan Stieren. (Stieren Deposition, Exhibit 6, at 18:04-25.)  The design process involved sending samples from a competitor's stand to WW Industrial's Chinese factory along with a request for an 18-foot stand with a flip-up shooting rail and a two-inch-thick seat pad.  (Stieren Deposition, Exhibit 6, at 14:17-16:02, 39:25-40:14.)  Additionally, testing was performed at the factory level and in the

field as part of the design process.  (Stieren Deposition, Exhibit 6, at 15:17-20, 40:10-14.)

Approximately 85% of treestands on the market are, like the Scout, reverse engineered from

other stands.  (Smith Deposition, Exhibit 4, at 26:23-27:08.)

Stieren supervises the Scout's production when he is at the factory in China during the

heavy production season.  (Stieren Deposition, Exhibit 6, at 24:13-23, 26:12-22.)  He also

observes the entire production process, which includes inspecting the raw materials, checking the

seat cushions as they arrive from the sewing supplier, and watching the welding and powder

coating that is applied to the stands.  (Stieren Deposition, Exhibit 6, at 24:13-23, 27:16-28:08.)

Stieren also performs a quality inspection of several completed stands from each batch that

comes off the assembly line before shipment.  (Stieren Deposition, Exhibit 6 at 25:11-26:06,

27:16-28.)

Currently, an estimated 90% to 95% of treestands are manufactured in China.  (Smith

Deposition, Exhibit 4, at 99:19-24.)  Additionally, the Chinese Q195 steel from which the Scout

stand is made "is a material that gets widespread use" with other treestands made in China.

(Saunders Deposition, Exhibit 4, at 152:01-08; Ramsay Deposition II, Exhibit 7, at 29:11-30:10.)

### Product Testing

The testing to which the Scout was subjected included a 2X test procedure to determine

how much the stand slips down a tree before the ratchet strap is installed and a 4X test procedure

to determine how much weight the stand can hold.  (2X Test Procedure, Exhibit 8; 4X Test

Procedure, Exhibit 9.)  Under the 2X procedure, the seat platform is tested to 1,000 pounds,

whereas the 4X procedure involves testing the stand's seat platform, foot platform, and ladder

sections up to 2,000 pounds.  (2X Test Procedure, Exhibit 8; 4X Test Procedure, Exhibit 9.)

According to plaintiff Jordan Queen's liability witness Christopher W. Ramsay, testing the stand

3

to 1,000 pounds (or two times the stand's rated weight) is the appropriate method by which to address dynamic loads to which the stand might be subjected.  (Saunders Deposition, Exhibit 3, at 28:21-29:08; Ramsay Deposition I, Exhibit 10, at 164:04-165:10.)  The Scout passed both the 2X test procedure and the 4X test procedure.  (2X Test Procedure, Exhibit 8; 4X Test Procedure, Exhibit 9.)  In addition to the 2X test procedure and the 4X test procedure, Stieren tested the Scout in the field by climbing up and down the stand a number of times before putting the Scout into production.  (Stieren Deposition, Exhibit 6, at 18:04-18, 85:20-86:14.)

WW Industrial also hired Scientific Testing Laboratories, Inc., to test the Scout to Treestand Manufacturers Association (TMA) standards.  (Scientific Testing Laboratories Test Summary, Exhibit 11, generally.)  TMA standards have been replaced with ASTM standards.  (Smith Deposition, Exhibit 4, at 98:21-99:08.)  Scientific Testing Laboratories administered a number of tests on the Scout, which included subjecting a ladder rung to a 9,000-cycle, 300-pound repetitive load and multiple ladder rungs to a 600-pound load.  (Scientific Testing Laboratories Test Summary, Exhibit 11, at 6.)  Repetitive load testing is only required up to 300 pounds because 300 pounds is the maximum weight capacity for fall arrest systems hunters must wear when using a treestand and only one person at a time can stand on a ladder step.  (Saunders Deposition, Exhibit 3, at 146:11-147:06; Smith Deposition, Exhibit 4, at 206:08-25; TMS 05 Rev. D, Exhibit 5, at §§ 6.1.6-6.1.7.)  The Scout passed each test Scientific Testing Laboratories conducted and was therefore qualified for TMA certification.  (Saunders Deposition, Exhibit 3, at 48:02-21; Scientific Testing Laboratories Test Summary, Exhibit 11, generally.)

### *Scout Performance*

Records indicate 10,950 Scout stands were sold in 2013 alone to settled-defendant Dunham's Sports.  (Distribution Spreadsheet, Exhibit 12.)  The TMA Standard Test Method for

Repetitive Loading Capability indicates a typical ladder stand has 10-year life expectancy. (TMS 15-96 Rev. C, Exhibit 13, at § 7.6.)  During those 10 years, the ladder stand will normally be used twice a day with at least 10 cycles up the stand and 10 cycles down the stand for 25 days per year.  (TMS 15-96 Rev. C, Exhibit 13, at § 7.6.)  Accordingly, a typical ladder stand can be expected to be exposed to 1,000 cycles per year.  The TMA's projection that a ladder stand will be used 25 days per year is consistent with the testimony of witness Chris Brown, who stated he used an identical Scout stand Queen gave him at least 20 to 30 times without incident in the year after he erected the stand.  (Queen Deposition, Exhibit 14, at 104:16-105:07; Brown Deposition, Exhibit 15, at 52:07-15, 53:17-54:12.)

The Instruction Manual accompanying each Scout stand includes a product registration along with a phone number and email address customers can use to order replacement parts or to report problems.  (Instruction Manual, Exhibit 2, at 11 and last page.)  Despite the number of Scout stands on the market and the availability of contact information to report problems, there were no reports of injury or alleged product failure involving the Scout prior to Queen's accident.  (Stieren Deposition, Exhibit 6, at 49:21-50:11.)  There was one post-accident incident that allegedly involved a Scout STLS41 stand that was reported via correspondence dated December 14, 2015.  The report as of the time this brief was filed had not been verified, though an inspection is presently scheduled for July 22, 2016.

### *Plaintiff's Underlying Claims*

Plaintiff Jordan Queen filed this action for compensatory and punitive damages resulting from injuries he experienced on October 12, 2013, when a Sniper STLS41 "Scout" ladder stand he was climbing supposedly bent.  (Second Amended Complaint, Doc. 70, ¶¶ 5 and 7.)  Witness

Chris Brown had purchased the stand in 2013 from Dunham's Sports' facility in Mount Vernon, Illinois.  (Queen Deposition, Exhibit 14, at 38:12-39:04.)

Queen and Brown testified the stand bent ***backwards*** while Queen ascended the ladder for the first time after it was assembled and erected.  (Queen Deposition, Exhibit 14, at 84:17-19, 91:06-11, 109:09-19; Brown Deposition, Exhibit 15, at 46:08-25; Brittany Queen Deposition, Exhibit 16, at 15:04-09.)  According to Queen, he stepped off the ladder as it bent ***backward*** to prevent the stand from "falling on top of me or impaling me."  (Queen Deposition, Exhibit 14, at 91:21-92:03.)  Queen did not report his accident to the Illinois Department of Natural Resources (DNR) despite the fact he is required to do so under 520 ILCS § 5.3/40(b).  (Queen Deposition, Exhibit 14 at 107:10-15; 2013 Illinois DNR Report Summaries from https://www.dnr.illinois.gov/safety/Pages/IncidentReportSummaries.aspx, Exhibit 17.)

Queen hired metallurgist Christopher W. Ramsay to perform materials analysis and forensic investigation that included subjecting an exemplar Scout "to destructive laboratory tests that included compositional analysis, hardness testing, and microstructural evaluation."  (Ramsay Deposition I, Exhibit 10, at 13:02-21; Ramsay Report I, Exhibit 18, at 1.)  Ramsay's initial work was limited to observing the accident stand without evaluating the accident stand's composition or performing any destructive testing on the device.  (Ramsay Deposition I, Exhibit 10, at 10:11-17.)  According to Ramsay, the accident stand "was defective simply because it bent" "with someone climbing who was less than 500 pounds."  (Ramsay Deposition I, Exhibit 10, at 170:09-171:07.)  Ramsay also said Queen's accident could have been prevented if the Scout stand would have utilized two steel rails for its ladder section or if the stand's design included a stabilizer bar that attached at two different ladder rungs.  (Ramsay Report I, Exhibit 18, at 5.)

After WW Industrial's experts submitted their reports and were deposed, Ramsay for the first time conducted testing in which he erected one of the exemplars he was provided as well as stereo-microscopic testing of the accident stand's criss-cross straps and stabilizer bar. (Ramsay Report II, Exhibit 19, generally.) Each of these tests exceeded the scope of the so-called "rebuttal" activity the Court authorized. (Doc. 84.) Ramsay's testimony and opinions offered in his two reports and the two depositions he gave are inadmissible as a matter of law and subject to exclusion under Rule 702 of the Federal Rules of Evidence as more fully set forth in WW Industrial's Motion (Doc. 90) to Exclude Plaintiff's Liability Witness Christopher W. Ramsay.

### *Plaintiff's Punitive Damage Claim*

In support of his punitive damage claim, Queen contends WW Industrial supposedly (1) used insufficient steel that allegedly did not meet its internal specifications (Second Amended Complaint, Doc. 70, ¶¶ 14.a., 14.b., 14.e., 22.a., 22.b., and 22.e.), (2) did not test to ensure the Scout conformed to the rated weight capacity and other safety standards (Second Amended Complaint, Doc. 70, ¶¶ 14.c., 14.d., 14.f., 22.c., 22.d., and 22.f.), (3) selected and relied on individuals to make design decisions regarding the Scout when those individuals were allegedly not qualified to construct ladder stands (Second Amended Complaint, Doc. 70, ¶¶ 14.g., 14.h., 14.i., 14.j., 14.k., 22.g., 22.h., 22.i., 22.j., and 22.k.), (4) provided instructions that did not advise users on the stabilizer bar's proper placement (Second Amended Complaint, Doc. 70, ¶¶ 14.l., 14.m., 22.l. and 22.m.), and (5) did not incorporate an alternative stabilizer bar or ladder railing design to reduce the Scout's bending risk (Second Amended Complaint, Doc. 70, ¶¶ 14.n. and 22.n.).[1]

---

[1]     Queen also contends punitive damages are warranted because WW Industrial allegedly does not have a method for tracking consumer complaints or reporting complaints to the

Each of Queen's punitive damage allegations is simply background for Queen's strict liability and negligence claims.  They ***do not*** constitute additional conduct above and beyond the conduct Queen is required to prove in order to prevail on his underlying claim, which is a prerequisite for a punitive damage award.  Moreover, the negligent conduct Queen cites is an insufficient basis for punitive damages in light of Illinois public policy that frowns upon punitive damage awards.   Summary judgment in WW Industrial's favor on Queen's punitive damage claim is therefore warranted.

## CITATIONS AND ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD.

A principal purpose of summary judgment is to dispose of claims or defenses that are factually unsupported.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The procedure is no longer a disfavored shortcut but instead an integral part of the Federal Rules of Civil Procedure designed to lead to the just, speedy, and inexpensive determination of a case.  *American States Ins. Co. v. Boycom Cable Vision, Inc.*, 336 F. Supp. 2d 950, 952 (E.D.Mo. 2004).   Summary

---

Consumer Product Safety Commission ("CPSC").  (Second Amended Complaint, Doc. 70, ¶¶ 14.o. and 22.o.)  Curiously, Queen criticizes WW Industrial's recordkeeping despite the fact Queen himself could not be bothered to report his accident to the Illinois Department of Natural Resources like he is required to do under 520 ILCS § 5.3/40(b).  Regardless, whether WW Industrial had a reporting system in place has absolutely nothing to do with whether the Scout is defective or unreasonably dangerous.  Moreover, there is no private right of action against a business for failing to comply with CPSC's reporting requirements because the causal connection between a reporting violation and a plaintiff's injury is too speculative.  *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 941-44 (7th Cir. 1988).

judgment is appropriate where the moving party demonstrates an absence of evidence supporting the nonmoving party's case and the nonmoving party is unable to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322, 325).

Frequently, nonmovants mistakenly believe summary judgment is improper unless the moving party submits material that ***negates*** the nonmoving party's claim. *Id.* at 1167. To the contrary, once the movant satisfies his initial burden by showing the absence of evidence supporting the nonmovant's case, the nonmovant must "come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question." *Id.* at 1167-68. The court ***must*** enter summary judgment if the nonmoving party after adequate time for discovery is unable to establish such a genuine issue of material fact. *Id.* at 1167.

A plaintiff's failure to produce expert testimony in a product defect claim alleging strict liability or negligence is typically held to demonstrate the absence of genuine issues of material fact in summary judgment proceedings. *See, e.g., Fulton v. Theradyne Corp.*, 2007 WL 772953, at *4 (N.D.Ill. Mar.12, 2007) (granting summary judgment and holding expert testimony is required to prove a product defect in strict products liability and negligence cases involving a specialized product and knowledge not within laypeople's purview); *Kloottwyk v. DaimlerChrysler Corp.*, 2003 WL 21038417, at *3-*4 (N.D.Ill. May 7, 2003) (summary judgment appropriate in a case involving an alleged defect in an automobile when an airbag failed to deploy because the plaintiff did not offer expert testimony to establish the airbag's design was unreasonably dangerous or the proximate cause of the plaintiff's injury).

Although the determination of whether expert testimony is necessary to support a product defect claim is judged according to "[t]he specific facts and issues involved" in a case, expert

testimony is generally required in strict products liability and negligence cases involving specialized products and "specialized knowledge." *Baltus v. Weaver Div. of Kidde & Co, Inc.*, 557 N.E.2d 580, 588-89 (Ill.App. 1990) ("[m]anufacturing negligence resulting in an unreasonably dangerous product seems particularly appropriate for expert opinion"). A jury cannot in the absence of expert testimony be allowed to "speculate that [a product] was in fact . . . unreasonably dangerous[.]" *Id.* at 589. *See also Sorce v. Naperville Jeep Eagle, Inc.*, 722 N.E.2d 227, 238 (Ill.App. 1999) (a "legal inference of defectiveness may not be drawn merely from evidence that an injury occurred"); *Norman v. Ford Motor Co.*, 513 N.E.2d 1053, 1056 (Ill.App. 1987) (quoting *Artis v. Fibre Metal Prods.*, 450 N.E.2d 756, 759 (Ill.App. 1983) ("In a cause of action premised on a theory of strict products liability, 'a legal inference of defectiveness may not be drawn merely from evidence that an injury occurred.'")).

## II.   ILLINOIS' PUNITIVE DAMAGE STANDARD.

Punitive damages are disfavored in Illinois because of their penal nature. *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 641 (7th Cir. 2003); *Loitz v. Remington Arms Co.*, 563 N.E.2d 397, 401 (Ill. 1990). Significantly, "punitive damages should ***not*** be awarded if the defendant's misconduct is not above and beyond the conduct needed for the basis of the action." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 560 (7th Cir. 1986) (emphasis added) (quoting *Parsons v. Winter*, 491 N.E.2d 1236, 1241 (Ill.App. 1986); *O'Brien v. State Street Bank & Trust Co.*, 401 N.E.2d 1356, 1359 (Ill.App. 1980)).

A plaintiff in order to recover punitive damages must prove "the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others.'" *Zelinski*, 335 F.3d at 641 (quoting *Loitz*, 563 N.E.2d at 402). "[T]he degree or moral blame attached to intentional

conduct" is also required before punitive damages are justified.  *Gray v. Nat'l Restoration Sys., Inc.*, 820 N.E.2d 943, 961 (Ill.App. 2004).

Typically, "punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."  *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978).  Negligence is not the same as wantonness, however, and "[o]rdinary negligence," "mere inadvertence, mistake, errors of judgment and the like" will not support an award of punitive damages. *Zelinski*, 335 F.3d at 641; *Bachman v. General Motors Corp.*, 776 N.E.2d 262, 301-02 (Ill.App. 2002), *appeal denied*, 787 N.E.2d 154 (Ill. 2002); *Loitz*, 563 N.E.2d at 402.  In fact, punitive damages can be awarded only for conduct that involves "some element of outrage similar to that usually found in crime."  *Loitz*, 563 N.E.2d at 402 (quoting RESTATEMENT (SECOND) OF TORTS § 908, cmt. b, at 464-65 (1979)).

## III.   ILLINOIS OPINIONS ON PUNITIVE DAMAGE CLAIMS.

Illinois courts have addressed numerous scenarios in determining whether particular conduct justifies imposing of punitive damages.  In most situations, punitive damages have been rejected.  For example, in *In re Salmonella Litig.*, a group of class action plaintiffs sought punitive damages against a milk producer and its parent corporation following a Salmonellosis outbreak because the producer continued marketing one milk line that shared the same production system as another milk line that was withdrawn.  556 N.E.2d 593, 599-600 (Ill.App. 1990), *appeal denied*, 561 N.E.2d 707 (Ill. 1990).  Jurors rejected plaintiffs' request for punitive damages, however, after hearing evidence that the producer fully cooperated with investigations conducted by three governmental agencies to determine the source of the milk contamination as

well as evidence that no governmental agency recommended closing the second milk line that eventually became contaminated. *Id.* at 594-600. The appellate court agreed compliance with government requirements belies a contention that a defendant's conduct constitutes a "callous disregard for public safety." *Id.* at 600.

In *Stojkovich v. Monadnock Bldg.*, a plaintiff sought punitive damages in connection with a suit against an elevator repair/maintenance company for injuries the plaintiff experienced while jumping from a stalled elevator. 666 N.E.2d 704, 707 (Ill.App. 1996). Significantly, the evidence and testimony indicated the elevator repair/maintenance company's "director of operations lacked an understanding of the safety problems posed by an elevator prone to unexpected stoppages" even though the elevator at issue "experienced 17 unexpected stoppages" in the year before plaintiff's accident. *Id.* at 712. Despite the director of operations' inability to appreciate the elevator's dangers, plaintiff's punitive damage claim was rejected where there was no evidence the elevator maintenance/repair company "failed to respond to service calls, failed to attempt to repair the subject elevator when called upon to do so, or placed the elevator back in service knowing" it was defective and unrepaired. *Id.* at 713.

The number of complaints and lawsuits when compared to "the total number of products sold and in use, the frequency of the product's use, and the product's inherent dangers" must also be considered when determining whether a defendant has knowledge or notice of an alleged defect that establishes the "willful and wanton" conduct necessary to justify punitive damages. *Loitz*, 563 N.E.2d at 404; *Bachman*, 776 N.E.2d at 302. In *Loitz*, a punitive damage award was reversed where 94 prior similar shotgun barrel explosion cases constituted only 0.003% of the defendant's total gun production of three million barrel during the time span in question. 563 N.E.2d at 404. Significantly, the Illinois Supreme Court in that case noted the actually failure

rate would have been even smaller if one were to consider the number of times each shotgun would have been used (the plaintiff testified he used his shotgun thousands of times).  *Id.*

Similarly, the Fourth District Appellate Court of Illinois determined an inadvertent airbag deployment rate of 0.008% of total vehicle production would not support a punitive damage award, particularly given the actual rate would be "infinitesimal" if based on the number of miles those vehicles were driven.  *Bachman*, 776 N.E.2d at 302.  In another case, a 0.5% injury rate for a meat cutting saw based on the number of saws sold that was reduced to 0.0000007% when considering the estimated total number of cuts made with those saws was insufficient for punitive damages.  *Kopczick v. Hobart Corp.*, 721 N.E.2d 769, 776 (Ill.App. 1999).

## IV.   PUNITIVE DAMAGE CLAIMS IN HUNTING STAND CASES.

Although there do not appear to be any Seventh Circuit or Illinois appellate opinions evaluating punitive damages in a case involving a hunting stand, a decision from the United States District Court for the Middle District of Georgia involving WW Industrial's former affiliate BGHA, Inc., is instructive.  In that case, a man asserted defective design, failure to warn, and punitive damage claims as a result of an incident in which he broke his neck when he fell from a ladder stand after he tripped on a piece of metal protruding from the top ladder rung.  *Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374, 1380, 1382 (M.D.Ga. 2014).  Interestingly, the plaintiff in *Bryant* erected and installed the ladder stand improperly by wrapping the stabilizer straps horizontally around the tree he was using rather than crisscrossing them in accordance with the instructions.  *Id.* at 1381.

Notably, Georgia's punitive standard is almost identical to Illinois' and requires "clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of

13

conscious indifference to consequences." *Id.* at 1396 (quoting GA. CODE ANN. § 51-12-5.1(b)). Moreover, "mere negligence" is not enough to support punitive damages. *Id.* (quoting *Trotter v. Summerour*, 614 S.E.2d 887, 889 (Ga.App. 2005)). Instead, "'conscious disregard to consequences' means an intentional disregard of the rights of another, knowingly or willfully disregarding such rights." *Id.* (quoting *Trotter*, 614 S.E.2d at 889).

In *Bryant*, the Middle District of Georgia court rejected the plaintiff's punitive damages claims because there was no evidence the manufacturer knew of or received any reports of similar incidents. *Id.* The court also determined punitive damages were not supported where the evidence established the manufacturer's competitors used designs similar to the ladder stand at issue. *Id.* Further, "punitive damages are not appropriate in cases where a manufacturer complies with regulatory standards" such as TMA/ASTM standards. *Id.* Finally, evidence the ladder stand at issue "was mass produced in China with little oversight may support an issue of fact as to Defendant's negligence or even gross negligence, but [did] not demonstrate maliciousness or willful conduct" necessary for punitive damages. *Id.*

## V.   WW INDUSTRIAL IS ENTITLED TO SUMMARY JUDGMENT ON QUEEN'S ENTIRE CLAIM BECAUSE RAMSAY'S OPINIONS AND TESTIMONY ARE SUBJECT TO EXCLUSION.

This case requires the assistance of an expert to help the jury understand numerous technical and complex issues, to include the composition of the steel used to manufacture the Scout ladder stand, the various alloying elements added to form the steel, the purpose those alloying elements serve, and the effect the allowing elements have on the steel's hardness, ductility, tensile strength, yield strength, and other mechanical and physical properties.

Additionally, expert testimony is necessary to explain tensile strength and yield strength measurements for the stand, the load Queen would have exerted against the stand while climbing

it, and the significance of the tensile strength and yield strength in terms of explaining why the stand Queen used bent under the load Queen exerted.  Expert testimony is also needed to discuss Ramsay's microstructural analysis, the steel's grain structure, the intergranular attack Ramsay supposedly observed, and how that intergranular attack affected the stand's performance. Further, expert testimony is required to demonstrate how Ramsay's two alternative designs would have prevented Queen's accident.

Without expert testimony, jurors might do exactly what Ramsay did – somehow conclude the stand Queen was using was defective simply because it bent.  Consequently, once Ramsay is excluded, WW Industrial is entitled to summary judgment on all Queen's claims in order to prevent jurors from inferring a defect existed with the stand simply because there was an accident.  *Sorce*, 722 N.E.2d at 238; *Norman*, 513 N.E.2d at 1056.

## VI.     QUEEN'S PUNITIVE DAMAGE CLAIM SHOULD BE REJECTED AS A MATTER OF LAW.

WW Industrial is entitled to summary judgment on Queen's punitive damage claim irrespective of whether WW Industrial is granted summary judgment on Queen's entire claim. Specifically, Queen's creative attempt to describe conduct that supposedly warrants imposition of punitive damages is nothing more than a simple elaboration of the conduct forming the basis for his underlying strict liability, negligence, and negligent misrepresentation counts. Specifically, paragraphs 14.a., 14.b., 14.e., 22.a, 22.b, and 22.e. of the Second Amended Complaint all contend WW Industrial negligently selected insufficient steel for the stand at issue. Similarly, paragraphs 14.c., 14.d., 14.f., 22.c., 22.d., and 22.f. allege WW Industrial negligently tested the Scout ladder stand because WW Industrial supposedly did not ensure the stand conformed to weight specifications and capacities.  Further, paragraphs 14.g., 14.h., 14.i., 14.j., 14.k., 22.g., 22.h., 22.i., 22.j., and 22.k. allege WW Industrial negligently selected and relied on

15

unqualified individuals to design and manufacture the stand.  Finally, paragraphs 14.l., 14.m., 22.l. and 22.m. argue WW Industrial was negligent in providing instructions that did not advise users on the stabilizer bar's proper placement, while paragraphs 14.n. and 22.n. criticize the Scout's overall design because it did not incorporate an alternative stabilizer bar or ladder railing design to reduce the Scout's supposed bending risk.

None of these allegations exceed the conduct necessary for Queen to prevail on his underlying claims.  To the contrary, the allegations all recite ***negligent*** conduct, which will not support a punitive damage award.  *See Zelinski*, 335 F.3d at 641.  As explained previously, Queen's contention in paragraphs 14.o. and 22.o. that WW Industrial's complaint tracking system violated CPSC guidelines is also insufficient to establish entitlement to punitive damages because there is no private right of action against a business for failing to comply with CPSC's reporting requirements.  *Zepik*, 856 F.2d at 941-44.  Curiously, while Queen criticizes WW Industrial's complaint tracking system, he could not be bothered to report his accident to the Illinois DNR despite a legal obligation to do so.  520 ILCS § 5.3/40(b).

Moreover, the conduct plaintiff describes is insufficient to justify imposition of punitive damages even if the conduct (1) is proven to be true (it is not), (2) is conduct beyond what must be established to support his underlying claims, and (3) is conduct that exceeds simple negligence.  For example, while plaintiff contends WW Industrial's Scout testing was inadequate, it was nevertheless tested to a factor of two, which Queen's expert Ramsay said addresses dynamic loads.  Additionally, the stand was tested by a third-party facility in accordance with industry standards and specifications the TMA developed.  (Scientific Testing Laboratories Test Summary, Exhibit 11.)  The stand conformed to all test specifications and was certified by the third-party facility as having met or exceeded the TMA specifications.

Compliance with industry standards is indicative of conduct that does not justify a punitive damage award. *See Bryant*, 9 F. Supp. 3d at 1396; *In re Salmonella Litig.*, 556 N.E.2d at 600.

The fact supposedly unqualified individuals might have been involved in the Scout's design and manufacture is also insufficient for punitive damages. Importantly, this is not a situation where WW Industrial hired a factory to mass produce a product without any supervision, which in any event is insufficient as a matter of law to justify a punitive damage award. *Bryant*, 9 F. Supp. 3d at 1396.

To the contrary, the Scout was designed, developed, and manufactured by a team of individuals that included Stieren, factory engineers, and a factory management team. Stieren was also intimately involved in the manufacturing process, during which he supervised the Scout's production, observed entire production process, and performed quality inspections of several completed stands from each batch that comes off the assembly line. The Scout's design was then tested on three separate occasions by the third-party testing facility, by the manufacturing facility, and by WW Industrial personnel (who conducted field testing). (Stieren Deposition, Exhibit 6, at 11:14-20, 39:25-40:14, 61:05-22.) The stand passed all the tests that were administered (including a review of the instructions that are provided with the Scout), indicating there was no defect with the product's design or warnings. In short, Queen's punitive damage claim should be rejected because there is nothing to suggest WW Industrial knowingly placed a defective stand into commerce. *Stojkovich*, 666 N.E.2d at 713.

WW Industrial's design and manufacturing process is also similar to the process its competitors employ. Like the Scout, upwards of 85% of treestands are reverse engineered from stands already on the market. An estimated 90% to 95% of treestands are also manufactured in China. The Chinese Q195 steel from which the Scout stand is manufactured enjoys widespread

use throughout China to make other treestands.  Further, all but one company uses the same adjustable support bar system WW Industrial utilizes on the Scout.  A plaintiff is not entitled to punitive damages from a treestand manufacturer where the manufacturer's competitors' products are constructed in accordance with a similar design.  *See Bryant*, 9 F. Supp. 3d at 1396.

Finally, the existence of just one other report besides Queen's indicating another Scout stand failed justifies summary judgment on Queen's punitive damage claim.  *Bryant*, 9 F. Supp. 3d at 1396.  According to WW Industrial's records, 10,950 Scout stands were distributed in 2013 alone.  At most there were only two failures, one of which is Queen's and the other of which is currently unverified.  Assuming a typical stand is exposed to 1,000 cycles per year according to TMS 15-96 Rev. C, the 10,950 Scout stands distributed in 2013 would have been subjected to nearly 33 million cycles in the three years since the Scout stand was first manufactured.  The resulting failure rate (assuming Queen and the other person claiming his or her stand failed can even establish their accidents were the result of defective products rather than product misuse) is infinitesimal.  *See Loitz*, 563 N.E.2d at 404; *Bachman*, 776 N.E.2d at 302; *Kopczick*, 721 N.E.2d at 776.  Two alleged failures in an estimated 33 million cycles is nowhere near the probability necessary to indicate knowledge of an alleged defect that is necessary for punitive damages.

## CONCLUSION

Queen is unable to make a submissible case against WW Industrial on Queen's underlying product defect claims because he will be left without expert testimony supporting those claims following the exclusion of his sole liability witness Christopher W. Ramsay.  Additionally, Queen cannot satisfy the strict standard necessary to make a submissible case on punitive damages because WW Industrial's alleged misconduct in support of punitive damages does not exceed the conduct supporting his underlying claims.  Moreover, there is no evidence

7256781.1

WW Industrial's alleged misconduct was "committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."  *Kelsay*, 384 N.E.2d at 359.

Specifically, the Scout was designed by a team of factory engineers and factory managers that was supervised by WW Industrial's Chief Executive Officer.  Almost all of WW Industrial's competitors utilize a similar process whereby they reverse engineer stands from existing models and then have their stands manufactured in China using the same type of steel and incorporating designs similar to the Scout's configuration.  The Scout was then subjected to multiple tests both inside and outside the factory, to include independent third-party testing in accordance with standards promulgated by TMA.  The Scout passed all of these tests, including tests Queen's witness Christopher W. Ramsay said were sufficient to address dynamic loading situations.

Finally, assuming Queen is able to establish his accident was the result of his stand bending under normal use rather than product misuse, the failure rate for Scout stands is infinitesimal given there are at most only two reported problems out of an estimated 33 million cycles to which the 10,950 stands distributed in 2013 would have been exposed. Queen's inability to satisfy his evidentiary burden on punitive damages justifies summary judgment for WW Industrial on Queen's punitive damage claims.

**WHEREFORE,** Defendant WW Industrial Corp. requests entry of a summary judgment in its favor and against plaintiff Jordan Queen as to all of Queen's claims against it or, in the alternative, for partial summary judgment on Queen's punitive damage claims, for Defendant WW Industrial Corp.'s costs incurred herein, and for such other and further relief as the Court deems just and proper in the premises.

7256781.1

SANDBERG PHOENIX & von GONTARD P.C.


By:    */s/ Andrew D. Ryan*
          John S. Sandberg, #2451700
          Andrew D. Ryan, #6270539
          600 Washington Avenue – 15th Floor
          St. Louis, MO  63101-1313
          314-231-3332
          314-241-7604 (Fax)
          jsandberg@sandbergphoenix.com
          aryan@sandbergphoenix.com
          *Attorneys for Defendant*
          *WW Industrial Corp.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 15, 2016, a copy of this document was filed electronically with the Clerk of the Court, using the Court's CM/ECF filing system, which is programmed to cause automated delivery of this document to all counsel of record in this case, to the following counsel of record:

W. Wylie Blair, Esq.
Onder, Shelton, O'Leary & Peterson, LLC
110 E. Lockwood, Ste. 200
St. Louis, MO  63119
blair@onderlaw.com
*Attorney for Plaintiff*

James A. Harfst, Esq.
Pitzer Snodgrass, P.C.
100 S. Fourth St., #400
St. Louis, MO  63102
harfst@pspclaw.com
*Attorneys for Defendant Dunham's Athleisure Corporation,*
  *d/b/a Dunham's Sports*

*/s/ Andrew D. Ryan*

7256781.1