UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *JORDAN QUEEN,* ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:14-cv-00519 |
| ) | |
| *W.I.C., INC., d/b/a SNIPER* ) | |
| *TREESTANDS, et al.,* ) | |
| ) | |
| Defendants. ) | |

**WW INDUSTRIAL CORP.'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFF'S PUNITIVE DAMAGE CLAIM**

WW Industrial Corp. (improperly identified as W.I.C., Inc. d/b/a Sniper Treestands), by and through its attorneys Sandberg Phoenix & von Gontard P.C., submits the following statement of uncontroverted material facts in support of its Motion (Doc. 92) for Summary Judgment or, in the Alternative, for Partial Summary Judgment on plaintiff Jordan Queen's punitive damage claim pursuant to Rule 7.1(e) of the Local Rules of the United States District Court for the Southern District of Illinois:

1.  This case involves a Sniper STLS41 "Scout" Scout ladder stand WW Industrial distributes. (Second Amended Complaint, Doc. 70, ¶ 9; Answer to Second Amended Complaint, Doc. 71, ¶ 9.)

2.  The Scout stand's purpose is to provide an elevated platform from which users are able to shoot when hunting. (Second Amended Complaint, Doc. 70, at ¶ 6; Answer to Second Amended Complaint, ¶ 6.)

7274986.1

3. The Scout stand is 18 feet tall, weighs 65 pounds, and is comprised of a steel seat platform, a steel foot platform, and three steel ladder sections that connect to one another with components called safety sleeves and snap pins. (Sniper Scout Specifications, Exhibit 1; Instruction Manual, Exhibit 2, at 6-7.)

4. The maximum weight for an individual hunter using the stand is 300 pounds since the full-body safety harness a hunter must wear when using a ladder stand is only rated to 300 pounds. (Instruction Manual, Exhibit 2, at 6, 8; Saunders Deposition, Exhibit 3, at 146:11-147:06; Smith Deposition, Exhibit 4, at 206:08-25; TMS 05 Rev. D, Exhibit 5, at §§ 6.1.6-6.1.7.)

5. Accompanying the Scout are two "stabilizer straps" or "criss-cross straps" that reach from the top of the stand to the ground. (Instruction Manual, Exhibit 2, at 9.)

6. The "stabilizer straps" or "criss-cross straps" are tied to either side of the bark biters located at the back of the seat platform while the stand is on the ground during assembly before it is erected against a tree. (Instruction Manual, Exhibit 2, at 9.)

7. The Scout comes with an adjustable support bar that is connected to one of the middle section ladder rungs and is designed to prevent an erected stand from buckling inward. (Instruction Manual, Exhibit 2, at 9.)

8. All but one treestand manufacturer use the same stabilizing support bar system used on the Scout. (Smith Deposition, Exhibit 4, at 222:11-21, 225:06-24.)

9. A ratchet strap is connected to the top of the stand and wrapped around the tree after the stand is assembled. (Instruction Manual, Exhibit 2, at 10.)

10. WW Industrial created the Scout in 2012 for distribution through Dunham's Sports beginning in 2013. (Stieren Deposition, Exhibit 6, at 39:18-24.)

11. The Scout was developed by a team consisting of employees from an affiliated company called BGHA, Inc., factory engineers, a factory management team, and WW Industrial's Chief Executive Officer Nathan Stieren. (Stieren Deposition, Exhibit 6, at 18:04-25.)

12. The design process for the Scout involved sending samples from a competitor's stand to WW Industrial's Chinese factory along with a request for an 18-foot stand with a flip-up shooting rail and a two-inch-thick seat pad. (Stieren Deposition, Exhibit 6, at 14:17-16:02, 39:25-40:14.)

13. Testing was performed at the factory level and in the field as part of the design process. (Stieren Deposition, Exhibit 6, at 15:17-20, 40:10-14.)

14. Approximately 85% of treestands on the market are, like the Scout, reverse engineered from other stands. (Smith Deposition, Exhibit 4, at 26:23-27:08.)

15. Stieren supervises the Scout's production when he is at the factory in China during the heavy production season. (Stieren Deposition, Exhibit 6, at 24:13-23, 26:12-22.)

16. Stieren observes the entire production process, which includes inspecting the raw materials, checking the seat cushions as they arrive from the sewing supplier, and watching the welding and powder coating that is applied to the stands. (Stieren Deposition, Exhibit 6, at 24:13-23, 27:16-28:08.)

17. Stieren also performs a quality inspection of several completed stands from each batch that comes off the assembly line before shipment. (Stieren Deposition, Exhibit 6, at 25:11-26:06, 27:16-28.)

18. An estimated 90% to 95% of treestands are manufactured in China. (Smith Deposition, Exhibit 4, at 99:19-24.)

19. The Chinese Q195 steel from which the Scout stand is made "is a material that gets widespread use" with other treestands made in China. (Saunders Deposition, Exhibit 3, at 152:01-08; Ramsay Deposition II, Exhibit 7, at 29:11-30:10.)

20. The Scout was subjected to testing that included a 2X test procedure to determine how much the stand slips down a tree before the ratchet strap is installed and a 4X test procedure to determine how much weight the stand can hold. (2X Test Procedure, Exhibit 8; 4X Test Procedure, Exhibit 9.)

21. The Scout's seat platform is tested to 1,000 pounds under the 2X test procedure. (2X Test Procedure, Exhibit 8.)

22. The 4X procedure involves testing the Scout's seat platform, foot platform, and ladder sections up to 2,000 pounds. (4X Test Procedure, Exhibit 9.)

23. Plaintiff Jordan Queen's liability witness Christopher W. Ramsay stated testing the stand to 1,000 pounds (or two times the stand's rated weight) is the appropriate method by which to address dynamic loads to which the stand might be subjected. (Saunders Deposition, Exhibit 3, at 28:21-29:08; Ramsay Deposition I, Exhibit 10, at 164:04-165:10.)

24. The Scout passed both the 2X test procedure and the 4X test procedure. (2X Test Procedure, Exhibit 8; 4X Test Procedure, Exhibit 9.)

25. Stieren tested the Scout in the field by climbing up and down the stand a number of times before putting the Scout into production. (Stieren Deposition, Exhibit 6, at 18:04-18, 85:20-86:14.)

26. WW Industrial also hired Scientific Testing Laboratories, Inc., to test the Scout to Treestand Manufacturers Association (TMA) standards. (Scientific Testing Laboratories Test Summary, Exhibit 11, generally.)

27. TMA standards have now been replaced with standards promulgated by ASTM. (Smith Deposition, Exhibit 4, at 98:21-99:08.)

28. Scientific Testing Laboratories administered tests that included subjecting a ladder rung to a 9,000-cycle, 300-pound repetitive load and multiple ladder rungs to a 600-pound load. (Scientific Testing Laboratories Test Summary, Exhibit 11, at 6.)

29. Repetitive load testing is only required up to 300 pounds because 300 pounds is the maximum weight capacity for fall arrest systems hunters must wear when using a treestand and only one person at a time can stand on a ladder step. (Saunders Deposition, Exhibit 3, at 146:11-147:06; Smith Deposition, Exhibit 4, at 206:08-25; TMS 05 Rev. D, Exhibit 5, at §§ 6.1.6-6.1.7.)

30. The Scout passed each test Scientific Testing Laboratories conducted and was therefore qualified for TMA certification. (Saunders Deposition, Exhibit 3, at 48:02-21; Scientific Testing Laboratories Test Summary, Exhibit 11, generally.)

31. Records indicate 10,950 Scout stands were sold in 2013 alone to Dunham's Sports. (Distribution Spreadsheet, Exhibit 12.)

32. The TMA Standard Test Method for Repetitive Loading Capability indicates a typical ladder stand has 10-year life expectancy. (TMS 15-96 Rev. C, Exhibit 13, at § 7.6.)

33. The TMA Standard Test Method for Repetitive Loading Capability also indicates that during those 10 years, the ladder stand will normally be used twice a day with 10 cycles up the stand and 10 cycles down the stand for 25 days per year. (TMS 15-96 Rev. C, Exhibit 13, at § 7.6.)

34. Witness Chris Brown stated he used an identical Scout stand Queen gave him at least 20 to 30 times without incident in the year after he erected the stand. (Queen Deposition, Exhibit 14, at 104:16-105:07; Brown Deposition, Exhibit 15, at 52:07-15, 53:17-54:12.)

35. The Scout's Instruction Manual includes a product registration along with a phone number and email address customers can use to order replacement parts or to report problems. (Instruction Manual, Exhibit 2, at 11 and last page.)

36. There were no other reports of injury or alleged product failure involving the Scout prior to Queen's accident. (Stieren Deposition, Exhibit 6, at 49:21-50:11.)[1]

37. Plaintiff Jordan Queen filed this action for compensatory and punitive damages resulting from injuries he experienced on October 12, 2013, when a Sniper STLS41 "Scout" ladder stand he was climbing supposedly bent. (Second Amended Complaint, Doc. 70, ¶¶ 5 and 7.)

38. Witness Chris Brown purchased the stand in 2013 from Dunham's Sports' facility in Mount Vernon, Illinois. (Queen Deposition, Exhibit 14, at 38:12-39:04.)

39. Queen and Brown testified the stand bent *backwards* while Queen ascended the ladder for the first time after it was assembled and erected. (Queen Deposition, Exhibit 14, at 84:17-19, 91:06-11, 109:09-19; Brown Deposition, Exhibit 15, at 46:08-25; Brittany Queen Deposition, Exhibit 16, at 15:04-09.)

40. Queen said he stepped off the ladder as it bent *backward* to prevent the stand from "falling on top of me or impaling me." (Queen Deposition, Exhibit 14, at 91:21-92:03.)

---

[1] There was one post-accident incident that allegedly involved a Scout STLS41 stand that was reported via correspondence dated December 14, 2015. The report as of the time this brief was filed had not been verified, though an inspection is presently scheduled for July 22, 2016.

41. Queen did not report his accident to the Illinois Department of Natural Resources. (Queen Deposition, Exhibit 14, at 107:10-15; 2013 Illinois DNR Report Summaries from https://www.dnr.illinois.gov/safety/Pages/IncidentReportSummaries.aspx, Exhibit 17.)

42. Queen hired metallurgist Christopher W. Ramsay to perform materials analysis and forensic investigation that included subjecting an exemplar Scout "to destructive laboratory tests that included compositional analysis, hardness testing, and microstructural evaluation." (Ramsay Deposition I, Exhibit 10, at 13:02-21; Ramsay Report I, Exhibit 18, at 1.)

43. Ramsay's initial work was limited to observing the accident stand without evaluating the accident stand's composition or performing any destructive testing on the device. (Ramsay Deposition I, Exhibit 10, at 10:11-17.)

44. According to Ramsay, the accident stand "was defective simply because it bent" "with someone climbing who was less than 500 pounds." (Ramsay Deposition I, Exhibit 10, at 170:09-171:07.)

45. Ramsay also said Queen's accident could have been prevented if the Scout stand would have utilized two steel rails for its ladder section or if the stand's design included a stabilizer bar that attached at two different ladder rungs. (Ramsay Report I, Exhibit 18, at 5.)

46. After WW Industrial's experts submitted their reports and were deposed, Ramsay for the for the first time conducted testing in which he erected one of the exemplars he was provided as well as stereo-microscopic testing of the accident stand's criss-cross straps and stabilizer bar. (Ramsay Report II, Exhibit 19, generally.)

47. Each of these tests exceeded the scope of the so-called "rebuttal" activity the Court authorized. (Doc. 84.)

48. Ramsay's testimony and opinions offered in his two reports and the two depositions he gave are inadmissible as a matter of law and subject to exclusion under Rule 702 of the Federal Rules of Evidence as more fully set forth in WW Industrial's Motion (Doc. 90) to Exclude Plaintiff's Liability Witness Christopher W. Ramsay.

49. In support of his punitive damage claim, Queen contends WW Industrial used insufficient steel that allegedly did not meet its internal specifications. (Second Amended Complaint, Doc. 70, ¶¶ 14.a., 14.b., 14.e., 22.a., 22.b., and 22.e.)

50. In support of his punitive damage claim, Queen contends WW Industrial did not test to ensure the Scout conformed to the rated weight capacity and other safety standards. (Second Amended Complaint, Doc. 70, ¶¶ 14.c., 14.d., 14.f., 22.c., 22.d., and 22.f.)

51. In support of his punitive damage claim, Queen contends WW Industrial selected and relied on individuals to make design decisions regarding the Scout when those individuals were allegedly not qualified to construct ladder stands. (Second Amended Complaint, Doc. 70, ¶¶ 14.g., 14.h., 14.i., 14.j., 14.k., 22.g., 22.h., 22.i., 22.j., and 22.k.)

52. In support of his punitive damage claim, Queen contends WW Industrial provided instructions that did not advise users on the stabilizer bar's proper placement. (Second Amended Complaint, Doc. 70, ¶¶ 14.l., 14.m., 22.l. and 22.m.)

53. In support of his punitive damage claim, Queen contends WW Industrial did not incorporate an alternative stabilizer bar or ladder railing design to reduce the Scout's bending risk. (Second Amended Complaint, Doc. 70, ¶¶ 14.n. and 22.n.)

**WHEREFORE,** Defendant WW Industrial Corp. requests entry of a summary judgment in its favor and against plaintiff Jordan Queen as to all of Queen's claims against it or, in the alternative, for partial summary judgment on Queen's punitive damage claims, for Defendant

WW Industrial Corp.'s costs incurred herein, and for such other and further relief as the Court deems just and proper in the premises.

                                              SANDBERG PHOENIX & von GONTARD P.C.

By: */s/ Andrew D. Ryan*
     John S. Sandberg, #2451700
     Andrew D. Ryan, #6270539
     600 Washington Avenue – 15th Floor
     St. Louis, MO 63101-1313
     314-231-3332
     314-241-7604 (Fax)
     jsandberg@sandbergphoenix.com
     aryan@sandbergphoenix.com
     *Attorneys for Defendant*
     *WW Industrial Corp.*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on July 15, 2016, a copy of this document was filed electronically with the Clerk of the Court, using the Court's CM/ECF filing system, which is programmed to cause automated delivery of this document to all counsel of record in this case, to the following counsel of record:

W. Wylie Blair, Esq.
Onder, Shelton, O'Leary & Peterson, LLC
110 E. Lockwood, Ste. 200
St. Louis, MO 63119
blair@onderlaw.com
*Attorney for Plaintiff*

James A. Harfst, Esq.
Pitzer Snodgrass, P.C.
100 S. Fourth St., #400
St. Louis, MO 63102
harfst@pspclaw.com
*Attorneys for Defendant Dunham's Athleisure Corporation,*
 *d/b/a Dunham's Sports*

                                                  */s/ Andrew D. Ryan*