**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

JORDAN QUEEN

        Plaintiff,

v.

W.I.C., INC. d/b/a SNIPER TREESTANDS

        Defendant.

Case No. 3:14-cv-00519

**JURY TRIAL DEMANDED**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT WW INDUSTRIAL
CORP.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S PUNITIVE DAMAGES CLAIM**

      COMES NOW Plaintiff Jordan Queen, by and through his undersigned counsel, and for

his Response in Opposition to Defendant WW Industrial Corp.'s Motion for Summary Judgment

or, in the Alternative, for Partial Summary Judgment on Plaintiff's Punitive Damages Claim

[CM/ECF Doc. 92] states:

## INTRODUCTION

      This case is not just about Mr. Queen; more people are going to continue being

unnecessarily injured if WIC and the treestand industry at large do not change.  WIC makes

treestands that place users in a platform as high as 18 feet above the ground.  Each year falls from

treestands result in many serious injuries and death.  Given the magnitude of the hazard at issue,

it is incumbent upon treestand manufacturers to produce quality products that are not going to

expose users to unnecessary risks.  WIC does not have the knowhow and does not carry out the

steps necessary to ensure its products are safe.  The fact of the matter is WIC does not know what

it is doing and does not care.  It is not even attempting to administer an appropriate program to

design, manufacture, and monitor its products.  WIC is designing products that at baseline are

dangerous by nature despite nobody at WIC being qualified to do so.  WIC is instructing users to

assemble products arbitrarily despite WIC having no understanding of the implications of variance

in assembly on propensity to fail.  WIC does not verify raw materials conform to specifications.  Its products are making their way to market that are not even made of steel.  When they receive a report of product failure resulting in injury, they do not even disclose it in litigation, let alone take any action to determine the problem. [CM/ECF Docs. 95, 102].

The fact WIC is a small company is no excuse.  They are held to the same expert standard of knowledge as any other company.  They are producing the same type of products as their larger corporate counterparts and are held to the same level of care.  If WIC continues operating in this fashion, they are going to continue putting defective products on the market and people are going to continue getting hurt.  Mr. Mr. Queen was lucky enough to escape with a debilitating leg injury that will plague him for the rest of his life.  Daniel Vivian, who reported the same failure of the same product from the same manufacturing batch, was lucky enough to escape with fractured vertebrae, ribs, and clavicle.  The next person might not be so lucky, despite these product failures being preventable.  A jury can change that with a punitive verdict, and they will be armed with ample evidence to support same.

## ARGUMENT

### A.    Plaintiff Has Presented Highly Reliable Expert Opinion on Causation and Defect.

WIC has moved for summary judgment contingent on its motions to strike Plaintiff's liability expert's opinions.  To that end, Plaintiff incorporates by reference his Response in Opposition to WIC's Motion to Strike Plaintiff's Expert Ramsay's April 26, 2016, Supplemental Report and Opinions [CM/ECF Doc. 106] and Response in Opposition to WIC's Motion to Exclude Plaintiff's Liability Witness Christopher W. Ramsay [CM/ECF Doc. 107].  As discussed therein, WIC's rendition of Plaintiff's expert's work up and opinions is incomplete and misleading and WIC's arguments for exclusion meritless.

**B.      Plaintiff Has Developed Ample Evidence to Support A Punitive Verdict.**

Punitive damages serve both to punish the defendant and to deter others from committing like offenses and similar acts of wrongdoing in the future. *Slovinski v. Elliot*, 237 Ill. 2d 51 (Ill. 2010. "Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Id.* (quoting *Kelsay v. Motorola, Inc*., 74 Ill. 2d 172, 186 (Ill. 1978)).  In Illinois, it is well established that willful and wanton acts may be found where the tortious conduct was either intentional or unintentional. *Ziarko v. Soo Line R. Co*., 161 Ill. 2d 267, 274 (Ill. 1994).  "[T]he preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law." *Kelsay,* 74 Ill. 2d 172, 186 (Ill. 1978).  This is the quintessential punitive case.

Defendant WIC markets its treestands as "safety certified above [Treestand Manufacturers Association] Requirements." https://www.snipertreestands.com.  The TMA standards have been adopted by the ASTM.  http://www.tmastands.com/members-only/current-standards.com. Included in those is TMS 09/ASTM F2275, "Standard Practice for Treestand Manufacturer Quality Assurance Program. *Id*.; ASTM F2275, Ex. A.  To obtain certification to TMA standards, treestand companies are mandated to have a written quality assurance program.  ASTM F2275, § 3.1, Ex. A.  The packaging label for the STLS41 bears the TMA stamp of approval. (STLS41 Product Label, WWIC – 0103, Ex. B).

Defendant WIC has a written Quality Assurance Program Manual. (WIC Quality Assurance Program, WWIC – 0106-0110, Ex. C).  WIC had to submit its Quality Assurance Program Manual to the Treestand Manufacturers Association for its approval before WIC could

gain a TMA Certification for the subject STLS41 and all of its other treestands. (Stieren Depo Vol. II, 84:20-24, Ex. D).

WIC's CEO Nathan Stieren admits the Quality Assurance Program is designed to ensure that the products WIC puts on the market are safe. (Stieren Depo Vol. II, 84:2-4, Ex. D).  Stieren further admits the importance of following the policies set forth in the Quality Assurance Program Manual. (*Id* at 84:5-7).  He admits it would be irresponsible for WIC not to have a very strong and heavily monitored Quality Assurance Program given the nature of WIC's business. (*Id* at 85:7-11).  But the evidence shows Quality Assurance Program Manual only exists to placate and get TMA approval.  WIC's Quality Assurance Program is a complete fiction, and discovery has yielded reckless, wanton, and grossly negligent conduct by Defendant.  The jury will hear ample evidence which would support a punitive verdict as to each and every punitive allegation.

What follows are the punitive allegations of Plaintiff's Second Amended Complaint [CM/ECF Doc. 70, ¶ 14(a.–o), ¶ 22(a. – o.)] constituting Defendant WIC's gross negligence so as to indicate a wanton disregard for the safety of Plaintiff and others, followed by the record supporting same.

a.      **Using inferior steel in the manufacturing process that did not meet internal design specifications or those sufficient to comply with rated product capacities;**

As part of the Quality Assurance Program, WIC's Carbon Steel Tubing Specifications provide for the composition of its ladders to be between 8% and 15% Carbon and 30% to 60% Manganese. (Quality Assurance Manual, WWIC – 0110, Ex. C).  These specifications are the industry standard that have been used as long as WIC's CEO, Nathan Stieren, has been in the industry. (Stieren Depo Vol. II, 13:12-18, 92:7-17, Ex. D).  WIC specified that its ladder treestands, including the STLS41, be comprised of this specified range of Carbon and Manganese. (Id at 14:17-23, 39:25 – 40:9).  In fact, Stieren claims to have personally instructed the production

4

manager in China as to the materials to be used in the STLS41. (*Id* at 89:24 – 90:3).  He also claims responsibility for overseeing the purchasing of raw materials by the Chinese manufacturer. (*Id* at 90:17-23).  Prior to getting the composition test results of the accident stand, Stieren testified in deposition that if the accident STLS41 treestand had a manufacturing defect they would have absolutely caught it, "almost a hundred percent." (Stieren Depo Vol. I, 61:8-18, Ex. E).  The evidence, though, reflects none of this to be true.

Chemical composition analysis of the accident stand yielded there is no detectable level of Carbon and only 20% Manganese. (Element Materials Tech., Report No. SAU001-16-01-44754-1, Ex. F).  Thus, Plaintiff Queen's stand was woefully noncompliant with the industry standard specifications for Carbon and Manganese.  These two elements are critical in determining the strength of steel.  A metal alloy without any Carbon composition is not even steel. (Ramsay Supp. and Rebuttal Report, p. 3, Ex. G).  Notably, WIC expressly represents to consumers they are purchasing a product made of steel. https://www.snipertreestands.com.  Indeed, Plaintiff Queen's stand was not made of steel at all, let alone the carbon steel called for by specifications.

Carbon is the most essential element in any steel alloy, which defines the material as steel and provides the most significant strengthening effect in plain carbon steel alloys by mean of the interstitial strengthening mechanism. (Ramsay Report, p. 3, Ex.H; Ramsay Supp. and Rebuttal Report, p. 3, Ex. G).  Manganese also provides a strengthening effect by virtue of the solid solution strengthening mechanism. (Ramsay Report, p. 3-4, Ex. H; Ramsay Supp. and Rebuttal Report, p. 3, Ex. G).  Manganese also combines with Sulfur to produce Manganese Sulfide nonmetallic inclusion and eliminates free Sulfur in the alloy, free Sulfur being detrimental in the steel and causing significant embrittlement of the alloy. (Ramsay Report, p. 4, Ex. H; Ramsay Supp. and Rebuttal Report, p. 3, Ex. G).  The deficient Carbon and Manganese composition of the accident

stand is a manufacturing defect that was the proximate cause of the stand's failure resulting in Plaintiff's injury. (Ramsay Report, p. 8, Ex. H).  It was not detected because WIC does not actually carry out what is required of it in order to live up to its certification.

b.   **Failing to implement, follow, and/or enforce quality control measures to verify the tree stand was being manufactured in compliance with product specifications, industry standard, and/or rated product capacities;**

WIC's Quality Assurance Program Manual subscribes to the motto "a quality product must begin with quality manufacturing" and claims WIC's "full team of specialists are dedicated to the manufacture and control and quality inspection of each product." (Quality Assurance Program Manual, WWIC - 106, Ex. C).  The Quality Assurance Program Manual acknowledges, along with testing, WIC's primary focus after the product has been manufactured needs to be on its "inspection audit process." (Quality Assurance Program Manual, Quality Inspection Audit, WWIC - 0106, Ex. C).  In relation to the inspection audit process, WIC recognizes each inspector needs to be qualified through certification to conduct the inspection audit. (Quality Assurance Program Manual, Quality Inspection Audit, WWIC – 0108, Ex. C)  These commitments, again, are submitted for purposes of certification but are not carried out in any meaningful way.

Mr. Stieren wears the hat as WIC's Quality Assurance Coordinator. (Stieren Depo Vol. II, 97:20-22, Ex. D).  He oversees quality assurance and quality compliance on behalf of his company (*Id* at 22:15-17).  Stieren considers himself to be one of the "specialists dedicated to the manufacture and control and quality inspection of each product," despite having no engineering degree, no higher education than a bachelor's degree in business administration, no certifications, no formal background in terms of design, inspection, or testing, and no background or training in human factors. (*Id* at 86:15-25, 10:8-24, 11:3-9, 13:25-14:2).

Despite recognizing the importance of certification reflecting competence to conduct an inspection audit, Mr. Stieren does not hold a certification as a qualified inspector. (*Id* at 101:11-13). However, Mr. Stieren himself certifies people as qualified inspectors. (*Id* at 101:14-20). Mr. Stieren literally claims to have certified himself as a qualified inspector. (*Id* at 101:19-20).

WIC's Quality Assurance Manual provides "We use specific certification for chemical and physical properties on all materials such as the carbon steel tubing specification sheet attached. Random test result reports on raw materials are stored in electronic form." (Quality Assurance Program Manual, WWIC 0106, Ex. C; Stieren Depo Vol. II, 92:18-22, Ex. D). WIC claims "All documents and specifications are stored on company database and intranet for future reference" and "Test results and applicable documents will be retained for as long as the product remains in production or distribution and for a period of five (5) years after distribution ends." (Quality Assurance Program Manual, WWIC 0107, Ex. C). These come directly from the mandates of ASTM F2275 §§ 5.1, 5.1.2, 5.1.4, 7.2, Ex. A. "A procedure shall be in effect to ensure that all materials, processes, and components, including raw materials, are in accordance with the engineering specifications." (ASTM F2275 § 5.1, Ex. A). A receiving procedure shall be in effect so that incoming material is checked against purchasing specifications." *Id*. at § 5.1.2. "Documentation on any materials, process, or components certified shall be filed for reference." *Id*. at § 5.1.4. "These…documents must be retained as long as the product remains in production or distribution and for a period of five (5) years after distribution ends." *Id*. at ASTM F2275 § 4.1. The evidence reflects none of this is being done.

Stieren testified he directs the Chinese factory to follow the procedures for certification of the chemical and physical properties on carbon steel tubing to ensure compliance with WIC's specification sheet. (Stieren Depo Vol. II, 91:22 – 92:6, 93: 17-20, Ex. D). In reality, WIC does

not actually quality test the carbon steel tubing or any of the other raw materials. (Stieren Depo Vol. II, 93:1-8, Ex. D; WIC's 1st Supp. Ans. to Pl's Supp. Int. of Mar. 25, 2015, No. 2, Ex. I).  Nor does WIC maintain any random test result reports on the raw materials. (Stieren Depo Vol. II, 92:23-25, 93:9-16).   WIC claims random test reports on raw materials are maintained by the factory in China. (*Id* at 92:18-22). But no such random test reports have been produced by WIC in response to Plaintiff's discovery.  This is in spite of the fact any such documents, if they were to exist, are readily available to WIC. (*Id* at 92:18-22, 103:18-20).

Mr. Stieren has access to design, testing and quality assurance documents housed at the factory in China. (*Id* at 103:18-21, 127:7-12).  Mr. Stieren could obtain design, testing, and quality assurance documents from the factory in China if he simply asked for them. (*Id* at 103:18-20).  Mr. Stieren has been to the factory in China about 40 times and makes the trip five to six times a year on average. (*Id* at 103:22-24, 127:13-14).  Mr. Stieren could also obtain any WIC design, testing, and quality assurance documents housed at the factory in China via email. (*Id* at 103:22-24, 127:13-14).   An obvious inference is to be drawn from WIC's failure to produce any of this mandatory documentation under the terms of WIC's written Quality Assurance Program Manual and ASTM Standards – it does not exist.

WIC does not actually itself do or oversee any specific certification for chemical and physical properties on the carbon steel tubing as it contends in its Quality Assurance Program Manual. (WIC's 1st Supp. Ans. to Pl's Supp. Int. of Mar. 25, 2015, No. 2, Ex. I).  The fact of the matter is, WIC does not even know if chemical composition testing is done, who actually does it if at all, or, if so, whether any records are kept.  WIC merely "understands" that quality testing is performed by the carbon steel tubing manufacturer and/or supplier, as opposed to the Chinese factory. *Id*.

WIC has not taken any steps to address metal composition for the carbon steel tubing being used in its treestands since learning of the deficiency in Mr. Queen's stand, despite the Chinese manufacturer not even using steel. *Id.* This reflects WIC's recalcitrant behavior, in utter disregard for the hazard the clearly defectively manufactured batch of 18-foot treestands presents users.

c.       **Representing to Plaintiff and other consumers the subject model tree stand was "field tested" to conform to specified weight capacity when in fact the field testing performed does not assure conformance to the rated weight capacity and the subject model does not in fact conform to the rated weight capacity;**

The Sniper STLS41 "The Scout" model treestand that Plaintiff was using at the time of his accident was rated at 500 lbs. weight capacity. (Stieren Depo Vol. II, 13:5-8, Ex. D). The STLS41 Product Label that comes on the box for the Sniper Model STLS41 "the Scout" expressly provides it has a 500 pound weight capacity. (Sniper STLS41 Product Label, WWIC – 0103, Ex. B). The Scout Instructional Manual rates the stand's "Max. Weight Capacity" at 500-pounds for "User(s) and Gear," with the term "user(s)" meaning it is appropriately read in both the singular and plural forms. (Instruction Manual, WWIC – 0092, 0096, Ex. J).

WIC does not internally confirm the weight capacity of its tree stands. (Stieren Depo Vol. II, 12:18-25). WIC's "field testing" consists of Mr. Stieren personally climbing up and down the stands in the field. (*Id* at 86:4-7). This is the only analysis WIC does that purportedly analyzes the propensity of the ladder to move laterally inward toward the tree is Mr. Stieren's climbing up and down the ladder. (*Id* at 100:3-14). Mr. Stieren only weighs 190 lbs. (*Id* at 125:10-13). Mr. Queen weighed between 250 and 260 lbs. at the time of the accident. (Queen Depo, 169:14-18, Ex. K). Mr. Stieren, at 190 lbs., climbing up and down the ladder does not constitute field testing replicating Mr. Queen's usage, nor does it verify conformance to the 500 lb. rated capacity as WIC represents.

**d.     Representing to Plaintiff and other consumers the subject model tree stand is "safety certified" above the "Treestand Manufacturers Association" standards whereas the testing performed does not reflect real world usage, does not meet internal testing standards, and does not ensure safety;**

All of the testing that Scientific Testing Laboratories did to "safety certify" above the Treestand Manufacturers Association standards were on fully assembled treestands. (Scientific Testing Laboratories STLS41 TMA Testing, Ex. L; Stieren Depo Vol. II, 99:11-14, Ex. D).  It does not take into account the fact the user must climb the ladder during installation before the seat platform is secured to the tree with ratchet straps.  Plaintiff Queen had not gotten to the point in the installation process whereby the seat platform is ratchet strapped to the tree. (Queen Depo., 83:19 – 86:9, Ex. K).

The Treestand Manufacturer's Association standards do not test the treestand ladder sections themselves, rather all weight is distributed across the platform. (Scientific Testing Laboratories STLS41 TMA Testing, Ex. L).  The CPSC has been urging the members of the Treestand Manufacturers Association to test ladder capacity during ingress and egress for over a decade, but WIC and the TMA have failed to do so. (Ramsay Depo. Vol I, 180:7-25, Ex. M).

Similarly, WIC's Quality Assurance Program Manual states "Quarterly assessments are made by our research and development team for each product." (Quality Assurance Program Manual, Product Adjustments, WWIC – 0109, Ex. C).  Mr. Stieren claims there have been quarterly assessments for the STLS41 but that the documentation pertaining to those assessments, again, are at the factory in China. (Stieren Depo Vol. II, 103:12-17, Ex. D).  No documentation has been produced despite readily available, if they were to exist

**e. Ignoring or failing to recognize the Chinese manufacturer's non-compliance with W.I.C., Inc.'s internal testing protocol and standards**                    and,                    **f. Failing to implement appropriate testing to verify compliance with rated specifications and capacities;**

The only testing documentation for the STLS41 consists of TMA Testing by Scientific Laboratories and "4X Test" performed by the factory. (Scientific Testing Laboratories STLS41. TMA Testing, Ex. N; "4X Testing" Document, Ex. N).  Neither are appropriate or adequate to establish the 500 pound rated capacity.

WIC's Quality Assurance Program Manual provides "Every component and assembly must pass a 4-times weight rating test." (Quality Assurance Program Manual, WWIC – 0108, Ex. C).  However, the "4-times" weight rating test does not test the capacity of the ladder sections that bent on Plaintiff's stand to four-times the rated capacity, let alone "every component." ("4X Testing" Document, Ex. N).  None of the testing conducted in China was under the situation that Plaintiff Queen was in at the time of the accident where the platform had not yet been ratchet-strapped to the tree. (Stieren Depo Vol. II, 98:6-14, Ex. D).

The "4X Testing" protocol implemented by the factory in China was not an appropriate method to evaluate or establish load carrying capacity for the STLS41 treestand. (Ramsay Supp. and Rebuttal Report, p. 1, Ex. G).  The "4X Test," involving incremental increases in weight distributed across the STLS41 platform and ladder, does not reflect the application of forces consistent with what a user would apply in the field. (Ramsay Supp. and Rebuttal Report, p. 1, Ex. G).  The fact the stand as a whole could support a load of 2,000 pounds distributed in the fashion provided does not support the conclusion that the 500-pound rating is based upon a factor of safety of four. (Ramsay Supp. and Rebuttal Report, p. 1, Ex. G).

The TMA testing conducted by Scientific Testing Laboratories does not reflect real world usage encountered by Mr. Queen upon ingress during the installation process. (Ramsay Supp. and Rebuttal Report, p. 1, Ex. G).   Further, the "4X Test" results from testing of an STLS41 – presumably manufactured in accordance with WIC's specifications – in no way speaks to the load capacity of the defectively manufactured accident stand. (Ramsay Supp. and Rebuttal Report, p. 1, Ex. G).   The CPSC has been urging the members of the Treestand Manufacturers Association to test ladder capacity during ingress and egress for over a decade, but WIC and the TMA have failed to do so. (Ramsay Depo. Vol I, 180:7-25, Ex. M).

| | |
|---|---|
| **g.  Allowing WW Industrial employee(s) with no engineering background or other qualifications to design consumer products to make design decisions that ultimately rendered the subject model tree stand defective;** | **h.  Failing to follow appropriate design protocols to ensure safe product design when producing a new product, to include the subject model tree stand;** |

WIC is instrumental in the design process, to include provision of product specifications. (Stieren Depo Vol. II, 14:17-23, Ex. D).   Yet, no one at WIC is qualified to design products or administer WIC's Quality Assurance Program.   WIC has a total of three people, including Mr. Stieren, working for the company. (*Id* at 16:4-12).   No one within WIC has an engineering degree. (*Id.* At 10:25 – 11:2).   WIC's CEO Nathan Stieren has a bachelor's degree in business administration obtained from Southwest State University in 2006. (*Id* at 10:8-18).   He has no higher education beyond his bachelor's degree in business administration. (*Id* at 10:19-21).   He holds no certifications. (*Id* at 11: 3-4).   He has no formal background in terms of design, inspection, or testing. (*Id* at 11:5-9).   Mr. Stieren does not know what the product safety hierarchy is. (*Id* at 14:3-6).   Mr. Stieren is unable to explain from a technical standpoint what properties of carbon steel tubing makes it safe for use in the STLS41. (*Id* at 13:19-21).   Mr. Stieren is not a warnings

expert. (*Id* at 13:22-24).  Mr. Stieren has no background or training in human factors. (*Id* at 13:25 – 14:2).

When WIC comes out with a newly designed ladder stand, they have taken an old design and modified it. (Stieren Depo Vol. II, 15:21-25).  WIC has no one who can evaluate the implications of design change. *Id*.  WIC is not capable of assessing how a design change is going to reflect changes in stress on component parts. (Stieren Depo Vol. II, 12:5-9; 44:5-9, 115:8-16, 116:7-12).  WIC is simply flying by the seat of its pants when putting a new product on the market and hoping for the best.  When things go wrong, they duck their heads in the sand.

i.   **Providing specifications "on the fly" to a third party manufacturer in China to create a new model tree stand despite W W Industrial Corp. having no qualifications to evaluate safety concerns associated with the specifications;**

WIC's Quality Assurance Program Manual provides that "Manufacturing drawings and engineered revisions are utilized for each product." (Quality Assurance Program Manual, Drawing Control Procedures, WWIC – 0106, Ex. C).  This is another mandate of ASTM F2275, § 4.1, Ex. A.  In truth, there are no engineered revisions for the STLS41 or any other WW Industrial Corp. product. (Stieren Depo Vol. II, 88:7–9, Ex. D).  And Mr. Stieren disregards the design drawing when it comes to assembly; he claims the design drawing has nothing to do with how the stand is to be properly assembled. (*Id* at 110:18-25, 111:23 – 112:5).

WIC admits that a responsible company would use the utmost care in the design of the product and the instruction to users. (*Id* at 65:20-24).  Nonetheless, WIC's internal research and development team consists just of Mr. Stieren. (*Id* at 90:4-8).  As discussed above, he has no expertise in engineering.  Nonetheless, the STLS41 was the product of Mr. Stieren while at the factory in China asking for an 18-foot ladder stand with a flip-up shooting rail. (*Id* at 39:25 – 40:9).

Stieren failed to specify a design feature present in all of WIC's other two-man ladder stands to guard against the bending hazard. (*See, e.g.,* STLS51 "The Spotter" Specs and Features,

Ex. O).  Specifically, every other two-man ladder stand in Sniper's product line uses two bars running from where the bark biters contact the tree down several rungs. (https://www.snipertreestands.com/products.html).  Sniper advertised this product design as early as 2011. (Nov. 20, 2011, Sniper Website Snapshot for STLS51 "The Spotter" 17' two-man Ladder Stand, Ex. P).  Nonetheless, it was not included in Stieren's specifications.

WIC was reckless, a far cry from the use of utmost care, in the design of the STLS41.

| | |
|---|---|
| **j. Relying on employees of a third party manufacturer in China to create a new model tree stand pursuant specifications provided by W W Industrial Corp. despite having inadequate information as to whether the "designer" is actually qualified to design the product or to evaluate product safety concerns associated with the specifications;** and, | **k.   Relying on employees of a third party manufacturer in China to create a new model tree stand pursuant specifications provided by W W Industrial Corp. despite having no adequate means of communicating with the third party designer to ensure competence and product safety due to a language barrier;** |

WIC has not vetted the Chinese designer of the STLS41 in relation to credentials. (Stieren Depo Vol. II, 44:9-11).  WIC does not know even know whether the designer is qualified to design treestands. *Id*.  Despite the failures seen in Queen's stand and Vivian's stand, Mr. Stieren has not asked and has no intention of asking the Chinese designer who created the design drawing for the STLS41 whether he intended upon the bracket being placed at the eighth rung when he designed the product. (*Id* at 128:6-10).

The Chinese designer of the STLS41 does not speak English. (*Id* at 44:12-15).  Mr. Stieren does not speak Mandarin. (*Id* at 44:16-17).  Mr. Stieren has not discussed with the Chinese designer of the STLS41 what he contemplated with design of the STLS41. (*Id* at 44:12-15).

**l.     Expressly deviating from the designer's design drawing in the instruction manual in instructing users how the subject tree stand is to be constructed and installed thereby creating or exacerbating the bending hazard Plaintiff fell victim to;**

WIC admits that a responsible company would use the utmost care in the design of the product and the instruction to users. (*Id* at 65:20-24). WIC admits it expects users to rely on the illustrations that are included in the instruction manual, in conjunction with the text, when assembling the tree stand. (*Id* at 69:5-15). WIC admits the average consumer would not expect to receive a manual telling them to assemble the STLS41 in a manner inconsistent with the design. (*Id* at 115:23 – 116:4). WIC admits providing an instruction that tells the user to assemble the tree stand wrong can create a dangerous condition. (*Id* at 67:21 – 68:25). WIC agrees a failure of the instructions to explain how to erect a tree stand in conformance with the design can create an unsafe condition. (*Id* at 67:5-9). WIC agrees it would be reckless and irresponsible to instruct users to assemble the stand in a manner inconsistent with the tree stand's design. (*Id* at 68:12-25). Yet, that is exactly what WIC has done.

A design drawing was created for the STLS41 by the designer in China. (*Id* at 40:15-20). The design drawing for the STLS41 generated by the designer in China contemplates the stabilizer bar being placed at the eighth rung. (STLS41 Design Drawing, WWIC - 0458, Ex. Q). Prior to Mr. Stieren's deposition on April 23, 2015, he was unaware the design drawing for the STLS41 calls for the stabilizer bar being assembled at the eighth rung. (STLS41 Design Drawing, Ex. Q; Stieren Depo Vol. II, 114:24 – 115:7, Ex. D). Mr. Stieren is not knowledgeable on how rung placement of the stabilizer is going to affect the stress placed on stand components. (Stieren Depo Vol. II, p. 44, lns 5-9, Ex. D). Mr. Stieren does not rely on the designer in China's design drawing for the STLS41 in instructing users by way of the Instruction Manual where to place the stabilizer bar and how to assemble the stand. (*Id* at 111:23 – 112:5).

There is a complete disconnect between the Chinese designer, whose credentials are unknown and who may or may not have the requisite credentials to design a treestand, and WIC,

then deciding how the stand should be assembled.  The instruction manual for the STLS41 is unique to its design. (*Id* at 62:7-13).  Mr. Stieren was responsible for development of the assembly instructions for the Instruction Manual of the STLS41. (Stieren Depo Vol. I, 59:13-16, Ex. E).  Mr. Stieren directed a third-party graphics company on what illustrations are to make up the instruction manual. (Stieren Depo Vol. II, 59:13-16).   The product illustrations within the assembly instructions are derived from the engineering drawings from the factory in China. (*Id* at 59:23 – 60:20).  But the designer in China who created the engineering design drawing does not have expertise in knowing how to go about assembling the STLS41. (*Id* at, 123:2-5).  So WIC reviews the product illustrations derived from the engineering drawings and decides for itself whether that is how the illustration should appear in the manual. (*Id* at 60:12-20).   Thus, the assembly instructions are divorced from the designer's concept.

In a hollow defense of the fact the design drawing and assembly instructions do not match up, Mr. Stieren claims the stabilizer bar is located on the eighth rung in the design drawing because the "computer decided to put it there." (*Id* at 110:8-12).  Mr. Stieren does not know how computer generated design drawings work. (*Id* at 117:22 – 118:4).

**m.     Instructing users in the Installation Manual for the subject product to install the adjustable brace on the wrong rung of the ladder, creating a bending hazard;**

Illustration 1A at page 7 of the STLS41 Instruction Manual tells the user to install the stabilizer bar on the first rung of the middle ladder section, which is the fifth rung from the bottom of the assembled ladder sections of the STLS41. (Instruction Manual, Figure 1A, p. 7, Ex. J; Stieren Depo Vol. II, 78:20 – 81:2, Ex. D).  Again, Mr. Stieren is not capable of assessing how much stress is going to be placed on any particular component of the STLS41 tree stand with varying rung placement of the stabilizer bar. (Stieren Depo Vol. II, 12:5-9, Ex. D).  Mr. Stieren does not know

whether the STLS41 is going to have a higher propensity to bend if the stabilizer bar is on the fifth rung or the eighth rung. (*Id* at 115:8-16, 116:7-12).

However, Plaintiff's and Defendant's liability experts agree there is an exponential increased in load as the unsupported column length of the ladder increases as seen where placing the stabilizer bar at the eighth rung compared with the fifth rung. (Ramsay Supp. and Rebuttal Report, p. 11, Ex. G; Saunders Depo, 51:3 – 56:8, Ex. R).  Significantly, Sniper does not advertise the STLS41 or any other eighteen-foot two man ladder in its portfolio. https://www.snipertreestands.com/products.html.

The stabilizer bar must be attached to a ladder rung reachable from ground level. (Stieren Depo Vol. II, 114:16-20, Ex. D).  Placing the stabilizer bar on the eighth rung would defeat the purpose of having the user being able to assemble the stabilizer bar on the ground because it would require the user to climb up the ladder to put the support bar on. (*Id* at 114:16-23).  It would not make sense for WW Industrial Corp. to tell someone to climb up to attach the stabilizer bar and then climb back down. (*Id* at 118:19-25).  It would be dangerous to instruct a user to climb up to attach the stabilizer bar. (*Id* at 119:1-3).  Of course, by WIC's own admission the designer in China is disconnected from how to assemble the stand. (*Id* at 123:2-5).

**n.    Failing to implement feasible alternative design(s) of which it was aware and in fact had used in other W W Industrial Corp. tree stands to eliminate or reduce the bending hazard associated with the subject model tree stand;**

WIC's API Outdoors brand of tree stands includes a model where the stabilizer bar has an additional bar that runs from approximately midway across the stabilizer bar to up three rungs. (API Outdoors Ladder Stands and Tripods Installation and Usage Instruction, p. 15-16, Bates numbered WWIC 537-538, Ex. S).  Mr. Stieren does not even know the purpose of the additional bar that runs from approximately midway across the stabilizer bar up three rungs. (Stieren Depo

Vol. II, 130:1-2, Ex. D).  As Plaintiff's and Defendant's experts agree, the additional bar acts to further stabilize the ladder and prevent it from collapsing inward or pulling away from the tree. (Ramsay Report, p. 5, Ex. H; Smith Depo, 223:6-17, Ex. T).

Similarly, another design alternative already incorporated in WIC's product line, namely the STLS61 "The Instinct," is the double-railed ladder, which increases the strength of the ladder and resist the bending hazard. (Ramsay Report, p. 5, Ex. H; Instinct Model STLS61, WWIC 1204-1205, Ex. U).

WIC should have been keenly aware of the added bar stabilizer system and double-rail ladder designs it already has treestand models in its product line incorporating these features. The fact Mr. Stieren does not even understand the simple function of the added bar exemplifies why he should not be designing treestands.

WIC has another design alternative to guard against the bending hazard at issue.  Similar to the added bar on the API stabilizer system, WIC has a design feature that uses two bars running from where the bark biters contact the tree down several rungs. (See, e.g., STLS51 "The Spotter" Specs and Features, Ex. O).  In fact, all of WIC's two-man ladder stands incorporate this feature, to include the STLS51 "The Spotter," STLS55 "The Alpha," STLS 58 "The Striker" and STLS61 "The Instinct." (https://www.snipertreestands.com/products.html).  Sniper advertised this design as early as 2011. (Nov. 20, 2011, Sniper Website Snapshot for STLS51 "The Spotter" 17' two-man ladderstand, Ex. P).  At the same time, the STLS41 is not currently listed among Sniper's two-man ladder stands. *Id*.  Nor does it list any two-man stand available that are above 17-foot. *Id*. This is a recognition that as the unsupported column length increases there is an exponential effect on critical buckling load. (Ramsay Supp. and Rebuttal Report, p. 11, Ex. G; Saunders Depo, 51:3-56:8, Ex. R).

18

o. **Having no internal means of tracking or documenting reports of other claims, lawsuits, injuries, or product defect with respect of any of W W Industrial's products and, therefore, no way of monitoring product safety in the field and no way of ensuring compliance with CPSC reporting guidelines.**

It is common industry practice to track customer complaints, especially those of product failure in the field, to evaluate whether defective products are being placed on the market. (Ramsay Report, p. 6, Ex. H).  It is also commonplace to investigate and document reports of product failures, particularly where pertaining to critical safety issues. (*Id* at p. 6).  Tracking customer issues is an important an integral need for a Quality Control / Quality Assurance Program. (*Id* at p. 6).  It is vitally important to track customer feedback to refine and optimize designs and ensure user safety. (*Id* at p. 6).  Once again, WIC does not do any of this.

Mr. Stieren is responsible for CPSC reporting for WIC. (Stieren Depo Vol. II, 22:18-20, Ex. D).  WIC had a joint marketing effort with another tree stand company, Big Game (BGHA), up until October 2013. (*Id* at 18:11-18, 19:4-7).  Prior to October 2013, all WIC records were stored on a server owned by BGHA. (*Id* at 19:21-25).  It had no procedure in place for keeping records. (*Id* at 19:21-25).

WIC failed to obtain any of its documents that were purportedly on the BGHA server when WIC split from the joint marketing effort with BGHA in October 2013. (*Id* at 20:1-4).  Any documentation of injury reports, customer complaints, product warranty claims, and other claims and lawsuits concerning WIC's tree stands would have been on the BGHA server. (*Id* at 20:8-17).  WIC has no information regarding other injury reports, customer complaints, product warranty claims, and other claims and lawsuits concerning WIC's tree stands prior to October 2013. (*Id* at, 20:25 – 21:4).

To this day, WIC has no system in place for tracking other claims, lawsuits, and injury reports. (*Id* at 35:8-10).  There is only one employee other than Mr. Stieren who has responsibility

for fielding calls. (*Id* at 102:23 – 103:ln 2).   If the call center receives a call from someone saying one of WW Industrial Corp.'s tree stand bent and caused a fall it would be transferred to Mr. Stieren. (*Id* at 35:16-22).   If Mr. Stieren is unavailable there is no one else within WIC who could handle the call. (*Id* at 49:13-25).   Mr. Stieren testified if he is unavailable to take a call reporting an injury or product failure he would call the person back. (*Id* at 49:21-25).   Mr. Stieren testified he is unaware of having ever received a call or an email about a WW Industrial Corp. product failing in any respect. (*Id* at 50:9-11).   If Mr. Stieren receives a call from someone saying one of WW Industrial Corp.'s tree stands bent and caused a fall he would not write it down. (*Id* at 35:16-22,).   If Mr. Stieren receives a call from someone saying one of WW Industrial Corp.'s tree stands bent and caused a fall he does not create an incident report or any other record of the call. (*Id* at 35:23 – 36:1).   Calls to WW Industrial Corp.'s call center are taken by whoever is available at the time. (*Id* at 35:11-13).   Calls to WW Industrial Corp.'s call center are not logged. (*Id* at 35:14-15).   The Court is certainly familiar with WIC's handling of other claims and lawsuits. [CM/ECF Docs. 95, 102].

## CONCLUSION

WW Industrial's behavior easily rises to the level of willful, wanton, and grossly negligent conduct.   They claim to have a Quality Assurance Program as mandated under TMA and ASTM Standards in order to get a TMA certification but in reality it is fiction.   WIC has no expertise in the field and no business making treestands.   As a result, people like Plaintiff Queen are being sold products that are not even made of steel resulting in serious injury.   WIC is simply reckless and favors their bottom line rather than safety.   Punitive damages are warranted.

Defendants' Motion for Summary Judgment, or, in the Alternative, Motion for Summary Judgment on Plaintiffs' Punitive Claim must be denied.

ONDER, SHELTON, O'LEARY & PETERSON, LLC

By:    */s/ William W. Blair*
       William W. Blair, #6285762
       110 E. Lockwood, Suite 200
       St. Louis, MO  63119
       (314) 963-9000 (Telephone)
       (314) 963-1700 (Fax)
       blair@onderlaw.com

       ***Attorneys for Plaintiff Jordan Queen***

### Certificate of Service

The undersigned certified the foregoing document was served on all counsel of record by way of the Court's electronic filing system this 19th day of September, 2016.

*/s/ William W. Blair*