## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JORDAN QUEEN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.   14-cv-519-DRH-SCW** |
| | ) | |
| **W.I.C., INC. d/b/a SNIPER** | ) | |
| **TREESTANDS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

#### INTRODUCTION

This suit is a personal injury action in diversity involving the Plaintiff's fall from a deer stand. The matter is before the Court on Plaintiff's Second Motion to Strike Defendant WW Industrial Corp.'s Pleadings (Doc. 95). Plaintiff claims that Defendant WW[1] failed to disclose, to Plaintiff's prejudice, another accident involving another of Defendant's tree stands. Defendant filed a Response in Opposition (Doc. 101), and Plaintiff filed a Reply (Doc. 102). On August 23, 2016, a hearing was held on Plaintiff's motion. At that hearing, the undersigned took testimony from the owner and CEO of WW, Nathan Stieren, heard argument from the parties, and took the matter under advisement. Following the hearing Defendant filed a Motion for Leave to File Affidavit of Andrew Ryan in support of its Response in Opposition. (Doc. 155). The Court

---

[1] Defendant states that it has been improperly identified as "W.I.C., Inc. d/b/a Sniper Treestands" and its proper identification is "W W Industrial Corp." (Doc. 32, p. 1).

**GRANTS** Defendant's Motion for Leave (Doc. 155) and considers Mr. Ryan's affidavit in deciding Plaintiff's motion.

Given the above, Plaintiff's motion is now ripe for disposition.   As further elaborated below, the undersigned finds that Defendant and its attorneys willfully and without substantial justification failed to timely disclose the separate incident, to Plaintiff's prejudice.   Therefore, the undersigned **RECOMMENDS** that the district judge **GRANT** Plaintiff's Motion to Strike Defendant's Pleadings (Doc. 95) and **STRIKE** Defendant WW's Answer.

FACTUAL BACKGROUND

### 1.   Plaintiff's Allegations and Experts' Opinions

Plaintiff Jordan Queen brought the present lawsuit alleging he was injured when the tree stand he was using for deer hunting collapsed.   (Doc. 2, p. 2).   The stand was a "The Scout" model STLS41 tree stand distributed by Defendant WW (hereinafter "W W" or "Defendant").   (Doc. 2, p. 2; Doc. 32, p. 2).   Plaintiff alleges that on October 12, 2013, while he was at the top of the ladder, the stand's ladder bent, causing Plaintiff to fall. (Doc. 2, p. 2).   As a result of the fall, Plaintiff alleges he suffered serious injuries, including breaking both bones in his right leg, "shattering" his right ankle, as well as, damage to his ligaments, tendons, and joints.   (*Id.* at 3).   As a result of these injuries Plaintiff claims he has incurred medical expenses and lost wages, and that he will continue to lose wages in the future due to the debilitating condition of his leg and ankle. (*Id.*).   Plaintiff sued WW, the distributor of the stand, and it is the only remaining

defendant in the case.   (*Id.* at 2).

Christopher Ramsey, Plaintiff's metallurgical expert, opined that the ladder stand used by Plaintiff was defective due to inferior grade material, including a lack of sufficient carbon and manganese in the composition of the metal.   (Plf. Ex. 6, p. 3 – 4, 7 - 8; Plf Ex. 17, p. 3, 11-12).   Dr. Ramsey opined that when Plaintiff was nearing the platform portion of the stand, while climbing the ladder, the ladder began to bend inward toward the tree.   (Pl. Ex. 6, p. 2).   According to Dr. Ramsey, the ladder began to bend "just above the second and third ladder sections".   (*Id.*).   Plaintiff fell to the ground as the ladder was bending.   (*Id.*).   According to Dr. Ramsey, the area where the bend occurred, as well as the fact that the bend occurred inward, are consistent with the stand's stabilizer bar being secured to the tree, with the stabilizing crisscross straps in place.   (*Id.* at 8).   In Dr. Ramsey's April 2016 rebuttal report, he states his belief that "the coupling sleeve between the second and third ladder sections act[s] as a stress concentrator localizing the area that would then be the most vulnerable to buckling and bending failure just above the sleeve."   (Pl. Ex. 17, p. 7).   Dr. Ramsey conducted physical testing on an exemplar stand.   (*Id.* at p. 4).   It was established at the hearing that WW was unable to provide exemplar stands from the same batch as the Queen stand due to problems getting such stands from the factory.

Defendant WW's expert, on the other hand, is of the opinion that the ladder bent away from the tree, not toward the tree.   (Doc. 110-1, p. 30, 34).   Defendant's expert asserts that Plaintiff's stand was not defective; rather, Plaintiff did not utilize the

crisscross stabilizer straps as the manufacturer intended, and the stand deformed due to Plaintiff's misuse.   (*Id.* at 35).   In fact, he opines that the stand, when set-up properly, could not bend inward to permanent deformation from Mr. Queen's weight.   (*Id.* at 29 – 31).

### 2.   The First Motion to Strike Defendant's Pleadings

This instance is the second time Plaintiff has sought to strike Defendant's Answer as a sanction for an alleged discovery violation.   The facts surrounding Plaintiff's previously filed Motion to Strike (Doc. 36) are relevant to this inquiry.

On June 23, 2014, WW filed a Motion to Dismiss for lack of personal jurisdiction. (Doc. 5).   In response to the motion, Plaintiff conducted jurisdictional discovery, to include deposing the defendant.   (*See* Doc. 36-3).   After Defendant's Rule 30(b)(6) deposition relating to jurisdictional issues, Defendant supplemented its written discovery responses and withdrew its Motion to Dismiss.   (Docs. 34-5, 34-6, 34-11, 34-16, 31).

Defendant supplemented its written discovery in several respects, to include: (1) adding additional "dealers" (referred to by the Defendant as "customers") that sold Defendant's products and also did business in Illinois (Doc. 34-3, p. 4, 6; Doc. 34-5, p. 4 – 5); (2) that Defendant previously had an authorized sales representative in Illinois up until 2013 (Doc. 34-6, p. 6); and (3) disclosing that the Defendant had, in fact, two other lawsuits against it involving tree stands (Doc. 34-16, p. 2 – 5).   One of the lawsuits—in Missouri—was still pending at the time of the supplementation (Doc. 34-17; Doc. 34-18),

while the other had been brought in this very district, *See Angles v. WIC, Inc.,* **3:13-cv-01018-JPG-SCW**.

Plaintiff then filed his first motion seeking to strike Defendant's pleadings alleging intentional misrepresentations in Defendant's discovery responses.   (Doc. 36). However, later, at the hearing on the motion, Plaintiff withdrew his request to strike the pleadings and requested fees and costs instead.   (Doc. 47).   Ultimately, the Court did not issue a ruling on Plaintiff's first Motion to Strike as the parties negotiated a resolution.   (Doc. 51).   The agreement required the Defendant to pay fees and costs to Plaintiff relating to discovery on Defendant's Motion to Dismiss.

### 3.   The Pennsylvania Accident and Plaintiff's Second Motion to Strike

The second motion to strike stems from a separate accident in Pennsylvania involving another of Defendant's tree stands.   A man named Daniel Vivian claims that he sustained injuries as a result of a collapse of a Scout Model STLS41 tree stand in or around Mineral Point, Pennsylvania on October 29, 2014.   (Doc. 95-1).   Defendant received at least two letters from an attorney for Mr. Vivian notifying Defendant of Vivian's incident.   The first letter was sent on October 21, 2015 (Plaintiff's Exhibit 27), and the second was sent on December 14, 2015 (Plf. Ex. 8; Doc. 95-1).   However, WW's attorneys in the present suit indicate they were not made aware of the Vivian claim until April 2016, and Plaintiff's counsel, Wylie Blair, was not made aware until July 2016. Plaintiff's counsel was first made aware of the Vivian claim when he was told about it by one of Defendant's attorneys, Andrew Ryan, in a chance encounter in a parking garage

in the late afternoon of July 7, 2016.   (Doc. 101, p. 5; Doc. 115-1, p. 2).   At 2:11 p.m. on that same day, in an email, an attorney for Mr. Vivian indicated an intent to file suit after an attorney for WW emailed an intent to inspect the tree stand and accident scene.   (Plf. Ex. 20, p. 2).   Mr. Vivian's attorney indicated the suit would have to be prepared within the following three to four weeks due to the statute of limitations.   (*Id.*).

After talking with Mr. Blair in the parking garage, Mr. Ryan then followed up with an e-mail letter to Mr. Blair the next day.   (Doc. 95-2, p. 1).   Attached to the e-mail letter was the December 14, 2015 letter to Defendant from Mr. Vivian's attorney at the law firm of Friday & Cox.   (Doc. 95-1.   In the e-mail to Mr. Blair, Mr. Ryan stated that WW's owner and CEO, Nathan Stieren, had been informed the Vivian stand was purchased from Wal-Mart, and that WW did not distribute through Wal-Mart.   (Doc. 95-2, p. 1).   Mr. Ryan indicated that since notification, WW had "been working towards confirming 100% that this was a product that WW Industrial produced."   (*Id.*).   He indicated that Mr. Stieren had received a copy of the Vivian stand's manual on May 27, 2016, and that Stieren believed the manual to be one of WW's.   (*Id.*).   Noting a belief that the Vivian claim would soon be barred by the statute of limitations, Ryan asked Mr. Blair not to contact the Friday & Cox firm until October 29, 2016.   (*Id.*).   Mr. Ryan also revealed that an inspection of the Vivian stand and accident scene was going to be scheduled in the following few weeks.   (*Id.*).   In an affidavit, Mr. Ryan indicates he later learned on July 11, 2016 that the inspection of the Vivian stand was to take place on July 22, 2016 at Mr. Vivian's residence, and that he informed Mr. Blair of the inspection

in an email on July 11th.   (Doc. 115-1, p. 2).   Other emails confirm that the attorneys in the Vivian suit had agreed to the July 22 inspection date on July 8, 2016.   (Plf. Ex. 20, p. 1).

Interrogatory 7 of Plaintiff's First Set of Interrogatories to WW asked, in relevant part, to "[s]tate whether this defendant [WW] from 2005 to present received any report, notice or complaint regarding any incident in which the model STLS41 or any other WW Industrial Corp. model treestand was involved in which it was alleged any part of the treestand bent or otherwise failed".   (Plf. Ex. 25).   Defendant WW made no objection to this interrogatory, and it supplemented its answer to reflect the Vivian accident on July 29, 2016.   (*Id.*).   Plaintiff's expert disclosures were due on October 26, 2015 (Doc. 64, p. 1); the discovery cut-off was March 9, 2016 (*Id.*); and Plaintiff's expert in metallurgical engineering sat for a deposition on May 19, 2016.   (Plf. Ex. 18; Plf. Ex. 30, p. 1).

At the evidentiary hearing on Plaintiff's motion and in an affidavit, Mr. Stieren testified that he is responsible for all communications regarding complaints of product performance, including handling claims and lawsuits relating to WW.   (Doc. 101-3, p. 1).   He testified that such claims handling is performed only by himself, and if an employee receives notice of a claim, they are to bring the claim to him.   Mr. Stieren agreed that in regards to handling claims and lawsuits relating to WW, the "buck stops" with him.

Initially, Mr. Stieren indicated that he was first notified of the Vivian incident on "December 17, 2015 when [he] received…[the letter] dated December 14, 2015, from the

Friday & Cox law firm….” (Doc. 101-3, p, 1).  In fact, at first, he was consistent in asserting that he first learned of the Vivian accident from the December letter, saying as much in an affidavit (*id.*), and initially testifying the same way at the evidentiary hearing.  However, at the hearing, Mr. Stieren was confronted by Plaintiff's counsel with an earlier letter from Friday & Cox dated October 21, 2015 that is nearly identical to the December 14 letter.  (*See* Plf. Ex. 27).  Neither Mr. Stieren nor his counsel had never previously mentioned this letter.  In response to questioning from the Court, Mr. Stieren confirmed that a woman at his company had signed the certified mail receipt for the letter in October 2015, (*id.*), and that he recalled there being two envelopes with the same letter when he opened the mail in December 2015.  Mr. Stieren's counsel represented to the Court that they were not aware that Mr. Stieren had failed to disclose the October letter.

Regardless of when it was first notified, Defendant claims that its delay in disclosure to Plaintiff was due to the purported fact that Mr. Stieren was in the middle of his busy season when he received notification, combined with the supposed fact that Stieren and his attorneys were working to confirm "100%" that the Vivian stand was a WW product.   Mr. Stieren claims he notified his insurance carrier on December 31, 2015, was given a lawyer, and on January 14, 2016, he was notified that the Vivian stand was purchased at a Wal-Mart.  (Doc. 101-3, p. 2).  Mr. Stieren claims that WW itself has never distributed any of its stands through Wal-Mart, however.  (*Id.*).  Rather, he alleges that WW products have been illegitimately offered for sale on Wal-Mart's

website.   (*Id*. at 3).   In addition, he claims a Chinese manufacturer with whom WW had previously contracted has sold WW products in Europe without WW's permission. (*Id*.).   According to Mr. Stieren, he cannot be sure that a tree stand is a WW one "without an inspection and/or review of the literature that accompanies the stand even where the model number of the stand is identical to a model WW industrial distributes." (*Id*.).   Mr. Stieren purports that on January 27, 2016, he was provided a copy of the user's manual that allegedly accompanied the Vivian stand; however, he did not review the manual until March or May of 2016.[2]   (*Id*.).   The claimed reason for the delay in reviewing the manual is that Mr. Stieren received it during his trade show season.   He testified that he went to eleven trade shows relating to his business from January to March, and that his busy season extended through April.   Mr. Stieren claims that it was only after reviewing the user's manual did he conclude that the Vivian stand was most likely distributed by WW.   (Doc. 101-3, p. 2).

In an affidavit submitted after the hearing, Mr. Ryan indicates that the first time he learned from Mr. Stieren that the WW owner was confident the Vivian stand was a WW product was in a July 7, 2016 email sent at 1:24 p.m.   (Doc. 115-1, p. 1).   Though the affidavit fails to mention when he first had knowledge of the existence of the Vivian accident, attorney John Sandberg represented to the Court at the hearing that WW's attorneys in this case were made aware in April.

---

[2] In his affidavit, Mr. Stieren testified that he reviewed the manual on May 27, 2016 (Doc. 101-3, p. 2); however at the hearing, he waffled on the month, first saying he reviewed the manual in March and then saying he didn't review it until May.

Dr. Ramsey, Plaintiff's metallurgical expert, reviewed photos of the Vivian stand. (Plf. Ex. 30, p. 1).   From his review of the photos, Dr. Ramsey believes that Vivian's ladder also bent inward toward the tree, and that, consistent with Plaintiff's stand, the bend occurred between the second and third ladder section and ladder extension above the coupling sleeve.   (*Id.* at 2).   Dr. Ramsey indicates that as he opines in his April rebuttal report, he believes "the coupling sleeves act as stress concentrators localizing the areas that would then be most vulnerable to buckling and bending failure just above the sleeves along the unsupported column length."   (*Id.*).   Dr. Ramsey also notes, as was also confirmed by Mr. Stieren at the hearing, that the Vivian stand and Plaintiff's stand came from the same manufacturing batch.   (*Id.*).   The batch that the Queen and Vivian stands came out of contained 730 product units.   (Plf. Ex. 29, p. 7).

### ANALYSIS

The scope of discovery in federal court consists of "any nonprivileged matter that is relevant to any party's claim or defense and [is] proportional to the needs of the case". FED.R.CIV.P. 26(b)(1).   Throughout the course of the discovery process a party is required to supplement or correct any written discovery responses, as well as, Rule 26(a) disclosures, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect," and where the other party has not been made aware of the new or corrected information.   ***Id.* at 26(e)(1)(A)**.

Failure to timely supplement can result in a party being subjected to sanctions. Rule 37(c) indicates that a court may sanction a party that fails to comply with the

supplementation requirements of 26(e), unless the failure to comply is "substantially justified or is harmless."   *Id.* **at 37(c)(1)**.   If a court finds sanctions are warranted, on a motion and after a hearing, a court may impose a sanction listed under Rule 37(b)(2)(A), including "striking pleadings in whole or in part".   *Id.* **at 37(c)(1)(C), 37(b)(2)(A)(iii)**.

District Courts have broad discretion in selecting an appropriate sanction for a discovery violation.   ***Barreto v. Citibank, N.A.,* 907 F.2d 15, 16 (1st Cir. 1990); 8B Wright & Miller,** *Federal Practice & Procedure: Federal Rules of Civil Procedure* **§ 2284**. However, an imposition of sanctions "must be proportionate to the circumstances surrounding the failure to comply with discovery."   ***Langley v. Union Elec. Co.,* 107 F.3d 510, 515 (7th Cir. 1997) (quoting** *Crown Life Ins. Co. v. Craig***, 995 F.2d 1376, 1382 (7th Cir. 1993)**.   A court must look at the procedural history as a whole and "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit."   ***e360 Insight, Inc. v. Spamhaus Project,* 658 F.3d 637, 643 (7th Cir. 2011)**.   A sanction that would result in a default judgment is appropriate "only where 'there is a clear record of delay or contumacious conduct'", ***Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014) (quoting** *Maynard v. Nygren***, 332 F.3d 462, 467 (7th Cir. 2003))**, where lesser sanctions have failed, *id*, or where the offending party has displayed "willfulness, bad faith, or fault."   ***Domanus*, 742 F.3d at 301 (quoting** *In re Thomas Consol. Indus., Inc.***, 456 F.3d 719, 724 (7th Cir. 2006)**.   All of the above are present here.

**1.  Timeliness**

In determining whether sanctions are appropriate, it must first be decided whether Defendant's supplementation of its discovery responses regarding the Vivian claim was timely.   The triggering event for supplementation is the discovery by the party that its discovery responses are incomplete "in some material respect."   *See* **Fed. R. Civ. P. 26(e)(1)(A); Wright & Miller,** *supra*, **at § 2049.11993**.   The undersigned has no problem determining supplementation was untimely.

The relevant interrogatory asks whether WW had received any "notice" regarding incidents alleging failures of an STLS41 or other WW product.   Certainly, when Mr. Stieren read the letter from Friday & Cox, he had received a "notice" of an incident alleging a failure of an STLS41.   At that time, Defendant WW's answer to Interrogatory 7 was materially incomplete and a duty to timely supplement was triggered.   Even assuming that Mr. Stieren first read one of the letters from Friday & Cox in December 2015[3], the fact that his attorneys did not find out about the Vivian claim until four months later in April 2016 alone renders the ultimate supplementation to Plaintiff untimely.

For their own part, WW's attorneys also themselves rendered supplementation untimely.   When WW's attorneys found out about the Vivian claim in April 2016, they then had received a "notice" of another claim responsive to Interrogatory 7.   They should have swiftly supplemented their answer to the interrogatory.   However, instead, they waited three months before disclosing in July.

---

[3] As further discussed below, the undersigned does not find Mr. Stieren to be a credible witness and essentially discounts any testimony regarding what he knew and when he knew it.

Defendant's reliance on the claim that they were working to determine with "100%" certainty whether the Vivian stand was a WW product fails to hold water.   The interrogatory in question did not ask whether WW had received "notice" of an incident involving a WW product where WW had determined with 100% certainty it was indeed its own product involved.   It merely asked about "notice…regarding any incident in which…[an] STLS41 or any other W W Industrial Corp. model treestand was involved," where failure of the stand was alleged.   Mr. Stieren received such "notice" of an incident alleging failure of an STLS41 at least as early as December 2015 and his attorneys in this matter received such "notice" in April 2016.   In failing to disclose this "notice" to Plaintiff's counsel and supplement Interrogatory 7 until July 2016, well after the close of discovery, Defendant did not timely supplement its discovery responses. The other reasons for the delay given by Defendant are irrelevant for analyzing timeliness and relate to the issue of substantial justification.

### 2.  Substantial Justification or Harmlessness

In order for sanctions to be imposed for failure to timely supplement discovery, Rule 37 requires there to be no substantial justification for the tardy supplementation and that it not be harmless.   **FED.R.CIV.P. 37(c)(1).**   District courts are entrusted with broad discretion in determining whether a Rule 26 violation is justified or harmless. *David v. Caterpillar, Inc.*, **324 F.3d 851, 857 (7th Cir. 2003)**.   Though a district court need not make explicit findings regarding substantial justification or harmlessness, the court's discretion is guided by the following factors: (1) the prejudice or surprise to the

non-moving party; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness in the offending party's failure to disclose.  *See id; see also Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* **170 F.3d 985, 993 (7th Cir. 1999)**.

The most important factor in the matter at hand is whether WW's tardy supplementation was willful and/or in bad faith.  Defendant's given reasons for the delay in disclosing the Vivian accident are that Mr. Stieren was busy and that he and his attorneys were attempting to confirm with "100%" certainty that the stand was a WW stand since it was claimed to have been purchased at a Wal-Mart.  However, a great deal of the evidence supporting this position comes in the form of testimony by Mr. Stieren, either live or through affidavit, and the undersigned finds Mr. Stieren to be completely lacking in credibility.  Until he was confronted in open court with the October 21 letter, Mr. Stieren consistently maintained that he was first notified of the Vivian accident in the December letter.   After being confronted with the October letter, and under questioning from the Court, Mr. Stieren all of a sudden recalled there being two envelopes with the same letter from Friday & Cox on his desk when he opened the December letter.  It is clear to the undersigned that until he was confronted with the October letter, Mr. Stieren was likely untruthful with his attorneys, and was certainly untruthful with Plaintiff's counsel and the Court regarding when he first received the Vivian letter.

Further, Mr. Stieren also made intentional misrepresentations during

jurisdictional discovery as brought to light in the first motion to strike.   The undersigned finds that during jurisdictional discovery, Mr. Stieren initially intentionally misrepresented the other claims and lawsuits involving WW stands, as well as, the fact that it had an authorized sales representative in Illinois up until 2013.   Additionally, at a minimum, Mr. Stieren buried his head in the sand regarding whether WW had additional "dealers" doing business in Illinois.   Though Mr. Stieren did not testify at the hearing on the first motion to strike, after hearing his testimony at the hearing on the second motion, the undersigned does not find to be a credible witness, regardless.

Given the pattern of misrepresentations by Mr. Stieren, and, therefore, his lack of credibility as a witness, the undersigned cannot rely upon his testimony as to what he knew about the Vivian accident, when he knew it, and what he did about it and why. As such, the undersigned does not find credible Mr. Stieren's claim that he did not believe the Vivian accident involved a WW stand because the stand was purchased at Wal-Mart.   The undersigned notes that Mr. Stieren's own testimony is that he was notified on January 14, 2016 that the Vivian stand had been purchased at Wal-Mart, *an entire month* after he claims he first read the Friday & Cox letter.   Therefore, even taking the Wal-Mart story at face value, during that month Mr. Stieren had little to no reason to doubt that the Vivian stand had been distributed to WW, yet he still failed to notify his attorneys in this lawsuit of the Vivian accident.   This fact, combined with Mr. Stieren's untruthful and obfuscatory statements and testimony regarding when he received notification from Friday & Cox lends the undersigned to believe that he sought to

prevent disclosure of the Vivian claim to Mr. Blair, perhaps hoping that it would simply go away, or at least not be discovered by Mr. Blair.  Mr. Stieren's claim that WW products have been sold at Wal-Mart without WW's consent, and by way of example claiming that a Chinese company has illicitly sold WW products in Europe, is likely an excuse generated to justify Mr. Stieren's willful delay regarding the Vivian claim.

Even assuming *arguendo* that Mr. Stieren's reasons for the delay can be taken at face value, Mr. Stieren's own testimony clearly demonstrates he willfully delayed the disclosure of the Vivian notice.  According to Mr. Stieren, due to his doubts regarding the Vivian stand, he did not know the stand was "most likely" a WW distributed product until he reviewed the user's manual provided to him by Friday & Cox. However, by his own testimony he did not review the manual for either one or (more likely) four months after receiving it because he was "busy".  Given that at the time he received the user's manual, Mr. Stieren's company was already a defendant in at least one personal injury lawsuit involving one of its stands and was being threatened with another, his claim that he was too busy to review the manual is nothing more than a poor excuse.  However, busy or not, it is inexcusable for Mr. Stieren to have waited a likely *four months* before reviewing the user's manual given the pending and probable litigation his company was in—particularly given his prior conduct during jurisdictional discovery.  Having willfully delayed in reading the manual, and therefore delaying a determination as to the distributor of the Vivian stand, Mr. Stieren's self-described conduct can be characterized as no less than contumacious.

The bad behavior does not end with Mr. Stieren, however.  His attorneys engaged in their own willful and bad faith conduct.  Defense counsel claim that they waited to disclose the Vivian claim to Plaintiff until they could confirm with certainty that the stand had been distributed by WW.  However, as already discussed, the relevant interrogatory asked only for any "notice[s]" received of incidents involving the alleged failure of an STLS41, and it did not limit responses to notices wherein WW had confirmed was indeed their stand involved.  As attorneys, defense counsel certainly should have appreciated such a distinction, and when they were notified of the Vivian claim in April 2016, defense counsel should have known they had a duty to timely supplement their discovery and disclose the Vivian notice.  The claim that WW's attorneys were waiting to confirm with "100%" certainty that the tree stand was a WW product before disclosing is not credible.  Indeed, at the evidentiary hearing, when asked by the undersigned whether defense counsel's given reasons for not disclosing were really "a legitimate excuse", Attorney John Sandberg stated that "once it got into counsels' hands in late April you know, we did try to figure out ourselves what we were going to do at that point in time."

From the record submitted, the undersigned can only determine that in "figur[ing] out" what to do after receiving notice, defense counsel willfully delayed in disclosing the Vivian notice for strategic purposes.  It is telling that in his July 8, 2016 letter to Mr. Blair, defense attorney Andrew Ryan requested that Mr. Blair not contact Friday & Cox until after the limitations period had run in the Vivian matter.  Further,

the first disclosure of the Vivian claim in the parking garage only occurred after Friday & Cox had threatened suit in the email exchange with WW's attorney in the Vivian matter. It is clear to the undersigned that Defense counsel were willfully delaying disclosing the Vivian notice to Mr. Blair, perhaps in hopes that the Vivian claim would somehow go away, and only disclosed it once it appeared that Vivian's attorneys were digging in. As such, their failure to timely disclose was willful and in bad faith, and such intentional tardy disclosure weighs heavily in favor of a severe sanction.

The second most important factor in the matter at bar is whether Defendant's untimely supplementation is prejudicial.   At the hearing, Defendant argued that Plaintiff is not prejudiced by the late disclosure of the Vivian incident because that incident is not relevant to the case at bar.   Defendant argues that Plaintiff's expert's opinion is that the Queen stand is defective due to sub-standard composition of the metal, and that the composition of the Vivian stand has no bearing on the composition of the Queen stand.   We already know the composition of the Queen stand, the argument goes, and knowing the composition of the Vivian stand is not going to tend to prove anything.   What is important, Defendant argues, is whether the accidents are "substantially similar".   The Vivian accident is only relevant if it is substantially similar to the Queen accident.   However, while Defendant's expert opines on the strength of the metal in the Queen stand as tested in that stand, Plaintiff's expert did no such analysis, and focused on the composition of the accident stand.   Moreover, the facts of how Mr. Queen and Mr. Vivian each used and set up the stand differed, leading to

different accidents.   Therefore, Defendant argues that the Queen and Vivian accidents are dissimilar and Plaintiff is not prejudiced because the Vivian accident is not relevant.

From Plaintiff's perspective, Mr. Blair asserts he would have worked-up the case differently had the Vivian accident been timely disclosed, and argues that the accident is highly relevant to his liability case.   The Vivian stand collapsed inward, Plaintiff claims. He argues that while Defendant's expert asserts that the Queen stand could not have collapsed inward as Mr. Queen contends, the Vivian stand supports Plaintiff's theory that Plaintiff's stand could and did collapse inward.   Plaintiff notes that the bend in the Vivian stand is seen just above a connector sleeve, albeit at a different location of the stand, which supports Dr. Ramsey's position that the connector sleeves act as stress concentrators.   The Vivian stand was firmly affixed to the tree with a ratchet strap, Plaintiff argues, and the Vivian accident harms Defendant's theory that Mr. Queen's accident was caused by his failure to utilize the stand's crisscross straps.

While a dispute over the relevancy and admissibility of the Vivian matter is one to ultimately be sorted out by a district judge, Plaintiff should have had the opportunity to fully develop his liability case, as well as, the full opportunity to rebut Defendant's expert.   Plaintiff was denied those opportunities, however, when Defendant waited until four months after the formal close of discovery and a month and a half after the final deposition of Plaintiff's expert to disclose the Vivian accident.   Other than the compositional analysis, the testing Dr. Ramsey performed was on exemplar stands that were not from the same manufacturing batch as the Queen stand.   Had the Vivian

accident been timely disclosed, Plaintiff's expert may have had the opportunity to perform testing, including compositional and strength, on a WW stand *from the same manufacturing batch* as the Queen stand.   Moreover, had disclosure been timely, Plaintiff may have had the opportunity to further rebut Defendant's expert—particularly the opinion that the stand, when set-up properly, could not bend inward to permanent deformation from Mr. Queen's weight.   (Doc. 110-1, p. 31).   Dr. Ramsey's opinion that the Queen stand was properly set-up and bent inward just above the coupling sleeve, could be supported by testing and analysis of the Vivian stand.   However, Plaintiff was denied this opportunity by Mr. Stieren and his attorneys.   It is disturbing to the undersigned that Plaintiff's expert sat for a deposition relating to his rebuttal report in May 2016, while being questioned by Defendant's counsel who secretly knew of the existence of another clearly discoverable accident.   The undersigned finds Plaintiff was prejudiced by Defendant's failure to timely disclose, and that this factor weighs in favor of sanctions.

In its Response to Plaintiff's motion, Defendant indicated that since there was no prejudice to Plaintiff, there is nothing to cure and made no argument in its support as to this factor.   The undersigned could find the "ability to cure" factor to weigh against harmlessness on that ground alone.   Regardless, the undersigned is hard-pressed to believe that the prejudice can be cured, at least short of moving the trial date.   Even if Plaintiff were to be allowed to now perform testing of the Vivian stand, and issue new expert reports, such a course of action would be no substitute for Plaintiff having the

ability to develop his case and expert opinions through the ordinary course of litigation. Further, the time for Plaintiff to have the opportunity to develop his case is during discovery, which has long since closed.   Due to Defendant's conduct, Plaintiff was not given the opportunity to develop his case in the manner in which he is entitled. Regardless, in order to allow Plaintiff to develop a new expert report that includes the Vivian accident, the trial, currently set for February 1, 2017, would have to be delayed. Though in its Response, filed on July 29, 2016, Defendant claimed that additional investigation into the Vivian claim would not disrupt the February trial, Defendant does not account for the time necessary to issue a decision on the matter after the August 22, 2016 evidentiary hearing, given the Court's full docket.   In sum, Plaintiff has suffered prejudice and little can be done to cure it.

In reviewing the relevant factors, the undersigned finds that Defendant's untimely disclosure was clearly neither harmless nor substantially justified.   Therefore, sanctions are appropriate under Rule 37.   Rule 37 allows a court to impose the sanction of striking a party's pleadings, as is requested by Plaintiff.   **FED. R. CIV. P. 37(c)(1)(C); 37(b)(2)(A)(iii)**.   Having considered the evidence presented, the undersigned can only conclude that Defendant, beginning with Mr. Stieren and then continuing with his lawyers, sought to refrain from disclosing the Vivian claim to Plaintiff—even when a duty to disclose clearly existed—in the hopes that the Vivian claim would somehow go away and Plaintiff would be none the wiser.   Only when it was apparent that the claim would not go away did Defendant disclose and supplement its discovery.   These

actions were done to Plaintiff's prejudice, which cannot be easily cured, if at all.   The evidence before the undersigned clearly and convincingly demonstrates that Defendant violated Rule 26(e) in failing to timely supplement its discovery responses and that the inexcusable and contumacious conduct from Mr. Stieren and his lawyers make the striking of pleadings an appropriate sanction under Rule 37.   *See Hogue v. Fruehauf Corp.*, **151 F.R.D. 635, (C.D. Il. 1993) (Where the defendant tractor trailer manufacturer failed to disclose a list of product defects and complaints identical or similar to the accident at issue, and where the court did not believe the defendant's employees' various explanations for the failure to disclose, the defendant's Answer was stricken and default was entered).** *See also Monsanto Co. v. Ralph*, **382 F.3d 1374, 1378, 82, (Fed. Cir. 2004) (where the defendant "engaged in a systematic pattern of lying" and intentionally "obstruct[ed]...the discovery process" by,** *inter alia*, **lying about his contacts with Missouri, destroying and/or hiding evidence, and failing to disclose his land holdings and stored cottonseed in response to interrogatories, striking the defendant's pleadings was not abuse of discretion).**

Of course, a sanction must be proportionate to the circumstances surrounding the discovery violation, and the undersigned has no problem finding that the recommended sanction is appropriate.   The undersigned realizes the severity of the sanction being recommended, understands the consequences such a sanction would have, and does not make such a recommendation lightly.   Nonetheless, the severe sanction of striking WW's Answer is in line with Mr. Stieren's and defense counsel's willful and bad faith

failure to timely disclose the Vivian notice, especially given Mr. Stieren's actions during jurisdictional discovery.   It should be noted that had the parties not reached an agreement regarding the first motion to strike, the undersigned would have found sanctions to be appropriate in that instance.   Therefore, the conduct relating to the disclosure of the Vivian stand is the second sanctionable offense carried out by Defendant in this matter.   Had this been only the first offense, the undersigned would merely recommend a monetary sanction.   However, the conduct of Mr. Stieren and his attorneys in the circumstances surrounding their handling of the disclosure of the Vivian notice is made all the more worse when viewed in light of the sanctionable conduct in jurisdictional discovery.   It is therefore clear to the undersigned that Mr. Stieren and his lawyers have not learned their lesson, and a lesser sanction in the situation at bar would not be sufficient.   In light of the continued contumacious, willful, and bad faith conduct by those involved with the Defendant, the sanction of striking WW's Answer is appropriate and proportionate.  *See Crown Life Ins. Co. v. Craig*, **995 F.2d 1376, 1383 – 84 (7th Cir. 1993) (where a less severe sanction had failed, in that, the plaintiff failed to comply with discovery orders and engaged in "willful" and "contumacious" conduct, even after being sanctioned and ordered to pay attorneys' fees, district court's sanction resulting in default judgment was proportionate to the violation).**

## CONCLUSION

For the reasons already articulated, the undersigned **RECOMMENDS** that the district judge **GRANT** Plaintiff's Motion to Strike Defendant's Pleadings (Doc. 95) and

**STRIKE** Defendant WW's Answer.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *See, e.g., Snyder v. Nolen*, **380 F.3d 279, 284 (7th Cir. 2004).** Accordingly, Objections to this Report and Recommendation must be filed on or before **December 30, 2016.**

**IT IS SO ORDERED**.
DATED: 12/13/2016

*/s/ Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge