```
 1                    IN THE UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF ILLINOIS
 2

 3    JORDAN QUEEN,                       )
                                          )
 4                     Plaintiff,         )
                                          )
 5    v.                                  )  No. 3:14-cv-00519-DRH-SCW
                                          )  East St. Louis, Illinois
 6    W.I.C. INC., et al.,                )
                                          )
 7                     Defendants.        )

 8
                        TRANSCRIPT OF PROCEEDINGS
 9              BEFORE THE HONORABLE STEPHEN C. WILLIAMS

10                        FEBRUARY 13, 2015

11    MOTION HEARING

12
      APPEARANCES:
13
      FOR THE PLAINTIFF:     William W. Blair, Esq.
14                           Onder, Shelton, et al.
                             110 East Lockwood, 2nd Floor
15                           Webster Groves, MO  63119
                             314-963-9000
16                           blair@onderlaw.com

17    FOR THE DEFENDANTS:    Andrew D. Ryan, Esq.
                             Kyle Lane, Esq.
18                           Sandberg, Phoenix & von Gontard
                             600 Washington, 15th Floor
19                           St. Louis, MO  63101-1313
                             314-231-3332
20                           aryan@sandbergphoenix.com
                             klane@sandbergphoenix.com
21

22
                     Stephanie Rennegarbe, RDR, CRR, CBC
23                        IL CSR #084-003232
                          301 West Main Street
24                        Benton, IL  62812
                             618-439-7735
25              Stephanie_Rennegarbe@ilsd.uscourts.gov
```

1          (Proceedings began in open court at 9:51 a.m.)

2                ******************************

3          THE CLERK:  U.S. District Court for the Southern

4     District of Illinois is now in session.  The Honorable Stephen

5     C. Williams presiding.

6          Case *Jordan Queen v. W.I.C., Inc., et al.*, case

7     #14-519-DRH-SCW.  Case is called for hearing on a Motion to

8     Strike.  Will the parties please get their name on the record?

9          MR. BLAIR:  Wiley Blair for the Plaintiff.

10         THE COURT:  Good morning.

11         MR. RYAN:  Andrew Ryan here on behalf of Defendant,

12    Your Honor.

13         THE COURT:  Good morning, Mr. Ryan.  We are here on

14    Plaintiff's Motion to Strike the Defendants' pleadings.  And,

15    the Court has reviewed the motion and response, and we will

16    start with Mr. Blair.

17         MR. BLAIR:  Thank you, Your Honor.  I want to start

18    out by saying I'm very surprised that Mr. Stieren himself is

19    not here.  I would think that the severity of the allegations

20    that are being levied against him he would want to clear the

21    record if he had anything to say, but I'd also say that I'm --

22    I think that the alternative is perhaps that he doesn't want

23    to be here, in fact, to answer questions about the discovery

24    history and his conduct.

25              To begin with, I want to say that this is not Andy's

1    fault in my mind and --

2          THE COURT:  Yeah, you made that clear.  Understood.

3    And I'm not taking it that way.

4          MR. BLAIR:  Sure; sure.  And, you know, I was also

5    kind of taken aback by the response that was filed.  And it

6    was in my mind *mea culpa, mea culpa, no harm no foul,*

7    *essentially you caught me, we withdrew our motion, so no*

8    *biggie, let's just move on.*

9          But, the thing is that I know that Mr. Ryan wouldn't

10   have filed a motion that he didn't think he had potential of

11   winning, and I think his client wanted the affidavit and the

12   representations that were made in that motion and supporting

13   affidavit to be taken at face value.  So, I think that there

14   was a significant possibility that my client could have gotten

15   kicked out of court on material misrepresentations had I not

16   gone to the lengths that I did in order to investigate what

17   was being represented.

18         THE COURT:  So, this is, you know, serious

19   allegations, and it boils down to specifics.  You know, we

20   have to look at this granularly and then globally, as well, --

21         MR. BLAIR:  Absolutely.

22         THE COURT:  -- but each individual allegation of

23   lying.  And that's really what Mr. Stieren is being accused

24   of.  It has got to be looked at and then looked at globally.

25   And, certainly the Court is concerned when you have got

1  repeated examples of things that require correction.  Whether

2  you call it supplementation or not, it's correction.  And, so,

3  then the next question is why did that happen; was it an

4  innocent mistake, was it negligence, or was it intentional,

5  you know.  Each of these things falls within one of those

6  three categories.  And, to the extent that it's intentional,

7  the number of them that fall into that category is also

8  important.  So, you know, if we have five examples and if the

9  Court were to look at that and say they are all innocent

10  mistakes or there's a few that are negligent, but none of them

11  are intentional, that would be one thing.  There may be some

12  relief that would be justified under those circumstances,

13  probably striking pleadings.  If this -- If the Court were to

14  conclude that there are multiple examples and maybe even one

15  example of intentionally lying about the facts, you know,

16  that's a whole other matter.

17          So, the issues that are raised here when we start

18  with, for example, the allegation about customers versus

19  dealers -- Now, I'm going to start with that one, because

20  that's the one that you started with, essentially.

21          The problem that the Court has with categorizing this

22  as a fraud on the Court or alive versus something other than

23  that stems from in looking at the response to the initial

24  interrogatory, it's clear that he -- Mr. Stieren is

25  differentiating between what is a company that sells his

1    product and a quote/unquote dealer.  So, you know, I look at

2    this and say, "Well, gee, aren't all these places his

3    dealers?"  No, he doesn't look at it that way.  And even in

4    the response in the interrogatory he didn't hide the fact that

5    Menards and Dunham sell his products, but they were not

6    included as dealers that would falsely come up in the search.

7    So, and maybe that's not the point you were trying to make,

8    but I see that he's -- he clearly was trying to differentiate

9    between the two and wasn't hiding that particular fact.

10             MR. BLAIR:  Well, if I can respond, I think the issue

11   is that he didn't apply that definition historically.  He

12   applied that definition whenever he got my discovery and

13   molded it so that he wouldn't have to give me responsive

14   information.  And I have got some other evidence of that being

15   the case, if I could.

16             THE COURT:  Okay.  In other words, what you are

17   saying is that when he said, "No, I don't have any dealers,"

18   despite the fact that he's revealing that there's other

19   individuals who sell for him, that's not how he defined

20   dealers previously?

21             MR. BLAIR:  Right, I think he was playing games, and

22   I have some evidence suggesting as much here that I would like

23   to --

24             THE COURT:  Okay.  Just let me ask you one more

25   question.  If he was playing games wouldn't he -- If he had to

1    answer that question of, then, who his dealers were, your

2    suggestion is he should have included Menards and Dunham's

3    within that definition?

4        MR. BLAIR:  Yeah, and the other three that he

5    subsequently identified.

6        THE COURT:  Well, he should have included the other

7    three in the same answer to the question that resulted in him

8    disclosing Menards and Dunham's.

9        MR. BLAIR:  Right.

10       THE COURT:  So, that's where I -- that's what I'm

11   getting at is if there's a valid distinction between dealer

12   and customer, that's just one issue.  And whether you are

13   going to also say that Bass Pro Shops and Buchheit are

14   customers that distribute in Illinois, those should have been

15   included in there, that's another issue, also.

16       So, anyway, go ahead.  What else do you have?

17       MR. BLAIR:  Well, I will say, first of all, that Mr.

18   Stieren in his deposition at one point was using the term

19   *dealer* and *retailer* or *customer* interchangeably if you look at

20   page 40.

21       *Question:  So, your answer to interrogatory number 7*

22   *originally as to 2013 total products units is wrong?*

23       *Answer:  I believe when I pulled this it was based*

24   *off of dealers in Illinois.*

25       THE COURT:  All right.  Hang on.  I'm pulling up his

1    depo.

2            Oh, that part isn't in the record.

3            MR. BLAIR:  I have a copy.

4            THE COURT:  Do you have an extra page?

5            MR. BLAIR:  I do.

6            THE COURT:  The excerpts from the deposition Exhibit

7    3 are a motion.  We have got page 36, and then it skips to

8    page 61.

9            MR. BLAIR:  Your Honor, may I approach?

10           THE COURT:  Sure.

11           MR. BLAIR:  It begins at line 13, on page 40.

12           THE COURT:  Okay.  Okay.  So, the point being that in

13   his deposition he's referencing these customers as dealers,

14   and he hadn't done -- he distinguished between the two when he

15   answered the interrogatory?

16           MR. BLAIR:  Yeah.

17           THE COURT:  When you get on the website and it says

18   *dealers by area code*, does it spit out the result right away

19   if you punch it in and -- or is it because the -- I got the

20   impression that that's not what happens, it gets submitted to

21   the company.  There's something else later on in the

22   deposition that suggested --

23           MR. BLAIR:  I don't believe it does.  I personally

24   haven't done that just because I didn't want to be accused of

25   ex parte communications with the Defendant.  But, from his

 1    testimony I understand that it doesn't spit out, you know,

 2    dealer locations.

 3             THE COURT:  Yeah; okay.

 4             MR. BLAIR:  The next thing I wanted to bring to the

 5    Court's attention, if I could approach again, Your Honor, --

 6             THE COURT:  Sure; yeah.

 7             MR. BLAIR:  -- this is the Sniper Treestands'

 8    website, at least one of the pages there.  And, you know, Mr.

 9    Stieren -- He applied the definition of dealer as someone who

10    is exclusively retailing the Sniper products.  I think that it

11    was at one point compared to like a Ford dealership.  If you

12    look there on the right-hand side there's a section on

13    requirements for becoming a dealer, and there's four different

14    requirements that are set forth; one being have an up-to-date

15    business and current tax license on a retail facility in the

16    hunting/archery industry, maintain a positive credit history

17    with our company, and submit an order of at least $1,500.

18             Now, that criteria for becoming a dealer does not

19    sound like a location that is going to exclusively retail

20    Sniper products.  I mean, does Mr. Stieren really envision a

21    retailer or a quote/unquote dealer maintaining $1,500 worth of

22    inventory?  I mean, there's no reference to franchising.  Why

23    would you have a shop if you are going to be an exclusive

24    retailer or exclusive dealer?

25             THE COURT:  Well, now, when he -- when he's talking

1    about what he means by *exclusive dealer*, at least as to that

2    portion of his deposition he's explaining that, my

3    interpretation of it was that you have got a store and you

4    sell all kinds of things, and when it comes to tree stands it

5    would just be the Sniper version.

6          MR. BLAIR:  Well, my reading of what he was saying

7    was that the company was only going to be selling Sniper

8    products, the retailer was, just like a Ford dealership isn't

9    going to be selling, you know, Porsches --

10         THE COURT:  He does mention --

11         MR. BLAIR:  -- or non-automobiles, for that matter.

12         THE COURT:  He does mention a Ford dealership.

13         MR. BLAIR:  So, I mean, from the requirements for

14   being a dealer, either he expects a current company to halt

15   all other operations and just go into the tree stand-selling

16   business, or that's not really the definition that anyone has

17   historically applied in terms of who constitutes being a

18   dealer.

19         Another thing that Mr. Stieren mentioned in his

20   deposition was in relation to what happens when you do get a

21   request on that system.  And he said, "Well, you may or may

22   not get an answer."  If they -- If he does give an answer, do

23   you think he's going to say, "We don't have any dealers," and

24   leave it at that?  Of course not.  He's going to tell them

25   where they can find the products to purchase, which is a

1   reasonable interpretation of that request.  And it was pretty

2   obvious what I was asking for in my interrogatory, and I don't

3   think it's a stretch that I should get the same answer that a

4   customer would whenever making the same query.

5          You know, there's some more proof of this if you look

6   at Exhibit L to the -- to my motion and they talk about what's

7   required to submit a credit application.  They want proof of

8   business status in the way of a business card, copy of phone

9   book listing, a newspaper ad, storefront photograph, etcetera.

10  And, if, again, he's applying this notion of exclusive

11  retailing of the Sniper products, why would anybody who's

12  applying to get into that business have a business card?  I

13  mean, why would they have a phone book listing?  What would

14  that newspaper ad say?  "Aspiring to become a Sniper dealer"?

15  I mean, I just don't think that what's included in the credit

16  application, what's included in the requirements for becoming

17  a dealer are at all consistent with what Mr. Stieren is

18  representing he understands the dealer to be.

19         I mean, it goes on to want to know what types of

20  products are sold.  I don't know how that has any relevance if

21  the end all and be all is that they are only going to sell Mr.

22  Stieren's products.

23         And, I think that largely addresses the issues that I

24  have with the distinction made between retailer and dealer.

25         THE COURT:  Okay.  The next issue that you appear to

1    raise is the incomplete disclosure of customers and/or

2    dealers, whatever we want to call them; businesses that sell

3    Sniper products or *products*, we will say.  The explanation is,

4    "Well, I didn't know who had businesses in Illinois," best I

5    can tell.  Mr. Ryan, can correct me on that, but --

6              MR. RYAN:  I think that's accurate, Your Honor.

7              MR. BLAIR:  Yeah, and that -- I'm sorry.

8              THE COURT:  I guess his point is that, "I knew

9    Menards and Dunham's was in Illinois, but I had no idea that

10   Buchheits was in Illinois or I had no idea that Bass Pro Shops

11   had a store anywhere."

12             MR. BLAIR:  Right.  Well, Your Honor, if I could

13   respond to that, you know, in the response that the Defendant

14   filed to my motion they say -- they question whether there's

15   an obligation to investigate the locations from which its

16   dealers sell the distributor's products.  And I disagree with

17   that whenever it's their burden to bring the motion and,

18   secondarily, it's asked in discovery and that information is

19   readily available.

20             Now, Mr. Stieren disagrees that it's readily

21   available.  And I asked him -- I asked him about that in

22   deposition.  If you look at page 39 of his deposition he says,

23   quote, "It's very difficult for us to know whether or not

24   customers have retail locations in Illinois."

25             Well, then I turn around and asked him how they

 1   figured out that their customers that they've disclosed had

 2   retail locations in Illinois, and he said, "We do a Google

 3   search."  I mean, is doing a Google search to pull up the home

 4   page for these customers that he has very difficult?

 5          And another thing that I take issue with is the fact

 6   that not only did they only disclose two of the five -- or

 7   five or six, I forget which it is right now -- but they

 8   objected to providing me the identities of their other

 9   customers.  In other words, they are saying, "Here's who's in

10   Illinois.  We are not telling you who our other customers are

11   because there's no relevance there, because this is related to

12   jurisdiction in Illinois and those are outside of Illinois."

13   So, I have no way of doing the independent investigation

14   myself.

15          THE COURT:  In other words, "We don't have to tell

16   you any of our other customers, because this is it"?

17          MR. BLAIR:  Right.

18          THE COURT:  "Here's our ones in Illinois.  It's none

19   of your business who else we deal with, because they are not

20   in Illinois"?

21          MR. BLAIR:  Yeah, "Rely on this.  Rest assured, I

22   have submitted the verification page saying this is true and

23   accurate."

24          So, I wouldn't have even necessarily stumbled onto

25   Bass Pro, but there was a reference to Bass Pro being a site

1    of purchase of one of the Sniper warranty registrations.  So,

2    I myself know that there's Bass Pro Shops in Illinois.  So,

3    that's when I said, "Andy, what's going on here?  There are

4    obviously Bass Pro Shops in Illinois, and there's reference to

5    the Sniper product at issue being purchased in the -- from

6    Bass Pro in the warranty registrations.  I mean, can you

7    reconcile this for me?"  To Andy's credit, he said, "I'm not

8    sure."  He went back and then they disclosed the additional

9    folks.

10            THE COURT:  Yeah, I mean, did you -- where Bass Pros

11   got its locations is available on Google they represented to

12   you?

13            MR. BLAIR:  It's available on their website, yeah.

14            THE COURT:  I'm assuming Bass Pro's website has all

15   their locations nationwide.

16            MR. BLAIR:  Absolutely, as all of their retailers do.

17            THE COURT:  And I'm wondering how this contrasts with

18   the affidavit.  It wasn't the focus, the Court's review of

19   this, but you mentioned it.  I think that's clearly a relevant

20   topic, the affidavit that was submitted in support of the

21   Motion to Dismiss for jurisdictional purposes.  I'm looking

22   for that.

23            There we go.  Affidavit of Maintenance Hearing.

24            So, you're not -- You didn't make -- And I'm looking

25   at this.  You are not making a claim there was a lie in the

```
 1   affidavit itself, or are you?
 2           MR. BLAIR:  Well, you know, it's a crafty half truth.
 3   And if you take a look at the affidavit, it says, "WW
 4   Industrial does not design or manufacture products for sale,
 5   distribution, purchase, marketing, development, or assembly in
 6   Illinois."
 7           The only reason that that statement is true is
 8   because WW Industrial Corporation does not design or
 9   manufacture anything.  They are just a middleman.  Now, they
10   orchestrate the manufacture, but they claim, "Well, we don't
11   manufacture it ourselves and someone else designs it; so,
12   therefore, the factual predicate being that we don't design or
13   manufacture holds true with respect to all of the other areas
14   of -- of work being sale, distribution, purchase, marketing,
15   development, or assembly in Illinois."
16           Now, they can't say that if they make a
17   straightforward non-hide-the-ball representation that, "We are
18   the middleman and yes, we do have -- engage in these
19   activities in the State of Illinois."  So, I think it's very
20   carefully crafted.  Now, whether it's --
21           THE COURT:  Which of those activities -- I mean, do
22   they -- They don't manufacture products.  So, what you are
23   saying is what they should have said is, yet, "We don't
24   manufacture products," but if they were being honest they
25   could have simply said, "We are a distributor"?
```

1          MR. BLAIR:  Right, and "We distribute products

2     directly into Illinois, we -- you know, our products are sold

3     in Illinois," etcetera, etcetera.

4          THE COURT:  "We coordinate the distribution of

5     products for sale, distribution, purchase, marketing

6     development, or assembly."

7          MR. BLAIR:  Well, that's right.  And, I mean, Mr.

8     Stieren finally acknowledges in his deposition that at least

9     for one year -- I think it was 2012, when we were looking at

10     the records -- that at least 50 percent of their products at

11     some point entered the State of Illinois.

12          Now, one other thing.  It was like pulling teeth with

13     Mr. Stieren in his deposition.  There were just words of

14     qualification that never ended.  It was -- Everything was,

15     "Well, not officially; well, not necessarily," and "I don't

16     remember," and then, "Well, it didn't really."  I mean, at one

17     point, just to give you an example of wrestling over the

18     context with Illinois, the question is, "Okay.  You drive

19     through Illinois to get to Marion, Indiana from Chicago,

20     Illinois?"  "I would have to look at a map."  I mean, he

21     wouldn't even acknowledge that Chicago is in Illinois.  So,

22     that was what I was dealing with there in terms of his

23     deposition in trying to figure out what was accurate and what

24     was not accurate in the way of the affidavit.

25          THE COURT:  So, getting back to that question of, "I

1    simply didn't know the answer to that," in your view was,

2    "Well, A, you represented to the contrary.  You didn't -- you

3    represented that you didn't know by telling me two businesses

4    that did sell your products."

5            MR. BLAIR:  Well, right.

6            THE COURT:  "So, to say that you don't know and to

7    represent affirmatively that this is it is a

8    misrepresentation"?

9            MR. BLAIR:  Correct.

10           THE COURT:  So, the next -- If you want to add

11   anything to that point -- I'm just going through these the way

12   I identified them in order in your brief.

13           MR. BLAIR:  Sure; that's fine.

14           THE COURT:  Okay.  So, the next issue has to do with

15   API.

16           MR. BLAIR:  And that's another thing, Your Honor.  I

17   just stumbled onto API.  I only found API because I went to

18   Bass Pro in East Peoria and checked out what products are on

19   their shelves.  So, I'm tooling around Bass Pro and I'm

20   looking at various products of Sniper, and I started looking

21   at other manufacturers' products.  I mean, I looked at BGHA,

22   which is a former affiliate of W.I.C., and I get to API and,

23   lo and behold, I turn around the package and it says, you

24   know, "W.I.C., Inc., 1820 Redding Avenue, Windom, Minnesota,"

25   and there were a whole host of them.  So, I say, why was I not

 1   given this information?

 2          Now, in deposition he says, "Well, we don't own that

 3   company."  Well, API isn't a company; it's a trademark.  The

 4   trademark is owned by Bass Pro.  And while none of this

 5   documentation that been produced, I have got to think there's

 6   a licensing agreement somewhere between Bass Pro and W.I.C. in

 7   order to use that trademark.  Where that is, I don't know.

 8   But I got past --

 9          THE COURT:  Well, because they sell the API products

10   not just at Bass Pro, but also at Cabela's.

11          MR. BLAIR:  At Cabela's and a number of other

12   different places.

13          THE COURT:  You had specifically mentioned Cabela's.

14          MR. BLAIR:  As far as an Illinois location, yes;

15   right.

16          THE COURT:  Right.  Now, so what interrogatory

17   responses specifically do you contend should have included

18   information from API regarding these API products?  Which they

19   are the same product, aren't they?

20          MR. BLAIR:  I'm sorry?

21          THE COURT:  It's the same -- It's just the same tree

22   stand in its different branding, right?

23          MR. BLAIR:  Right.

24          THE COURT:  So, and they have got a manufacturer

25   who's making Sniper products and making API products, and they

1    are the ones who are stamping them *Sniper* or *API* and pushing

2    them out?

3           MR. BLAIR:  It's coming out the same assembly line.

4    Mr. Stieren is doing the same product inspections over there

5    in China.

6           THE COURT:  Now, so, anyway, back -- my question,

7    then, is what specific interrogatory responses do you contend

8    should have had the API information?

9           MR. BLAIR:  It should have been 2.

10          THE COURT:  I'm looking back at Exhibit 1 to your

11   initial interrogatories, and that's what you are referring to?

12          MR. BLAIR:  What I'm looking at right here is Exhibit

13   E to my motion.

14          THE COURT:  Okay.  Well, let me pull that one.  Is

15   that a different set of interrogatories?

16          MR. BLAIR:  It is.  It's supplemented from the

17   original set.  And, Your Honor, let me make this a lot easier.

18   I'm sorry.  If we look at Exhibit F there, *Second Supplemental*

19   *Answers and Objections to Plaintiff's First Interrogatories* --

20   and this is post -- post deposition where they actually did go

21   back and provide the information and response with respect to

22   API, and that's in interrogatory 2, interrogatory 3,

23   interrogatory 4, and those are the ones I'm seeing offhand.

24          THE COURT:  So, they are still contending in the

25   supplemental answer that they really didn't have to answer it

1    basically this way, because they are still saying there's no

2    dealers located in Illinois and these are just customers with

3    locations in Illinois?

4         MR. BLAIR:  Well, I mean, that may be the way that

5    they are crafting it.

6         THE COURT:  In other words, "We are giving you this

7    additional information, but we don't really have to," --

8         MR. BLAIR:  Yeah.

9         THE COURT:  -- at least as to number two.

10        Where are we talking about the API stuff now?

11        MR. BLAIR:  Let's take a look at page five, which is

12   part of response number three where you get to their second

13   supplemental answer.  And they say, "As a preliminary manner,

14   WW Industrial Corp notes its prior answers provided

15   information on Sniper Treestand-brand product shipments.  In

16   addition to its prior answers, WW Industrial Corp states it

17   organized shipments for API Outdoors products from 2010

18   through 2013 to the following customers with Illinois retail

19   locations."  Then it identifies Cabela's, Dunham's, Bass Pro,

20   and then it goes on to refer me to the records of product

21   shipments for API Outdoors' customers that were also produced

22   in response supplementally to the Request for Production on

23   Personal Jurisdiction.

24        THE COURT:  Okay.  With that -- Ultimately all of

25   this gets us back to this dealer-versus-customer distinction.

```
 1              MR. BLAIR:  Well, yes and no, because there were
 2   other interrogatory responses that API information was
 3   responsive to regardless of characterization of dealer versus
 4   customer.  And --
 5              THE COURT:  Which ones can we say that about?
 6              MR. BLAIR:  I want to say it's number seven.  I'm not
 7   -- And, in addition, Andy and I had agreed that they would
 8   supplement to provide the information on their customers in
 9   response to interrogatory number two whenever --
10              THE COURT:  What about interrogatory number 15?
11   "Please identify all companies known to WW Industrial Corp to
12   have Illinois retail locations which WW Industrial Corp has
13   contracted with for the sale of WW industrial Corp goods."
14              MR. BLAIR:  Exactly.
15              THE COURT:  Did that get supplemented?
16              MR. BLAIR:  I did not see that that one was
17   supplemented in the second supplemental responses, so it may
18   have been that I just did not include that because I didn't
19   specifically cite to it in the motion.  So, I don't know that
20   I have a full set of all of the discovery responses here,
21   but --
22              MR. RYAN:  Your Honor, if I can interrupt, number 15
23   was supplemented multiple times.
24              THE COURT:  Okay.  I'm looking at Exhibit E, which is
25   their first supplemental response, and 15 is on there.  And,
```

```
 1   so, it has the original answers of Dunham's, Menards, and then

 2   it's got Bass Pro Shops, Buchheits, Scheels, and then -- Well,

 3   that doesn't have the API stuff in it.

 4           MR. BLAIR:  I believe the second supplemental

 5   response would.

 6           THE COURT:  Okay.  And that's the one we were just

 7   talking about.  That's after that.

 8           MR. BLAIR:  Yes.  But, again, that's -- I don't

 9   believe I included that particular page of the set of

10   interrogatories.

11           THE COURT:  Do you have it?

12           MR. BLAIR:  I have got it in electronic form, I

13   believe.

14           THE COURT:  Well, I will let you file it with the

15   Court.

16           MR. RYAN:  Your Honor, I have an extra copy if you

17   would like it.

18           THE COURT:  Sure.

19           MR. RYAN:  May I approach?

20           THE COURT:  Yeah.  So, that's -- Yeah, the Cabela's,

21   Dunham's, and Bass Pro for the API products is included in the

22   second supplemental answer to question 15 or interrogatory 15.

23           All right.  Anything else you want to add on that?

24           MR. BLAIR:  Well, we are probably going to get to the

25   other lawsuits, so I can defer comment about API on that.
```

1          THE COURT:  Yeah, unless you want to comment how they

2    are relevant to this particular issue, but I know there may be

3    some overlap.  So, go ahead, however you want to -- We are

4    going to get to that in other questions.

5          MR. BLAIR:  Well, I will hold off until we get to

6    those.

7          THE COURT:  Okay.  So, it appears to the Court that

8    the next issue is raised -- Well, number -- I had number six,

9    but that's really folded into the API issue with three other

10   dealers, and we just talked about that.

11         There is a specific issue raised as to Mr. Stieren

12   claiming that he didn't have API records.

13         MR. BLAIR:  Right.

14         THE COURT:  I did see that in his deposition on page

15   65.

16         MR. BLAIR:  Yeah, and that's raised in the

17   Defendant's response to the motion, and they say that Mr. --

18   something to the effect of Mr. Stieren never claimed not to

19   have information on API, and they go on to say they divulged

20   that information when asked about it in deposition.  But, in

21   deposition he did, whenever I was asking questions,

22   specifically deny having documents for API.  And then Mr. Ryan

23   turns around on his examination and asked him about these

24   documents.

25         "Are they kept separately?  Yes.

 1          And you have those records?  Yes.

 2          And you can go back and get those?  Yes."

 3          And, they were eventually produced to me.  So, I

 4   don't know how he can say in deposition, "We don't have

 5   records of that," and then acknowledge to his own counsel they

 6   do and subsequently produce them.

 7          THE COURT:  Does he say anywhere other than on page

 8   65 that he doesn't have any documentation on API?  I mean, the

 9   quote is -- in response to the question this is what -- no

10   doubt you were referring to, "Where did those shipments go?"

11   Answer:  I don't know.  We don't -- I don't handle API

12   anymore, so I don't have any documentation on API."

13          Did he say anything substantially similar to that

14   anywhere else that you are aware of?

15          MR. BLAIR:  No, I think that that's the only place.

16          THE COURT:  Okay.  Anything else on that discrete

17   issue?

18          MR. BLAIR:  No, I think that that's it.

19          THE COURT:  Okay.  The next thing that I have flagged

20   here relates to Hudalla & Associates.

21          MR. BLAIR:  Yeah, Hudalla & Associates is a

22   manufacturer's sales representative agency that has been

23   engaged by BGHA and W.I.C., Inc. as part of their joint

24   marketing endeavors.  And, you know, I specifically asked

25   about this in written discovery and was told they don't have a

1    manufacturer sales representative, and then I start digging

2    and finding that there's Hudalla & Associates, they are using

3    the Sniper trademark, and they clearly have representatives

4    both for the Northern District of Illinois and the Southern

5    District of Illinois.

6          So, we get into deposition and, again, this is a lot

7    of qualification and, "Well, we didn't really have an

8    agreement," and, "Well, yes, we had an agreement with BGHA,

9    and they are the ones who actually contracted for them to rep

10   for Hudalla to represent both BGHA and W.I.C."  And, again,

11   keep in mind that Mr. Stieren at this time is one of the

12   officers in BGHA, so it -- I mean, he subsequently admits that

13   they were indeed representing W.I.C. out in the field with

14   respect to Sniper products.

15         So, the last point is in Defendant's response they

16   say, "Well, that -- you were just asking for a nonlawyer's

17   opinion on whether Hudalla was, in fact, Worldwide's

18   representative," but they acknowledge that they were, in fact,

19   in the field representing them, and I don't know how they can

20   suggest that they weren't categorized as a representative in

21   anybody's mind when their actual title is manufacturer's sales

22   representative.  So, again, I think --

23         THE COURT:  When you say the *actual title*, where

24   specifically can you -- is that made clear?

25         MR. BLAIR:  Well, we can pull it up on Hudalla's

1    website.  I mean, they have labeled themselves as a

2    manufacturer's sales representative.

3            THE COURT:  You reference page 29 through 32 of the

4    deposition.  It says -- You asked the question, "But they

5    represented your products?  Answer:  It's fair to say, I would

6    say, at some points they did."

7            So, they are -- One of the responses is, "But to the

8    extent that they are still using the mark, they are not

9    supposed to be."

10           MR. BLAIR:  Well, yeah, but no one's communicated

11   that to them.  No one's actually told Hudalla that they are

12   not supposed to be representing them anymore, but, you know,

13   it's not authorized.

14           THE COURT:  But they were certainly allowed to and

15   authorized to up until the fall of 2013?

16           MR. BLAIR:  Oh, absolutely.  And no one had

17   subsequently ever told them that they weren't to be.  I

18   think --

19           THE COURT:  I'm just trying to parse out whether or

20   not somebody told them and how much that matters is one issue.

21   But, my question more specifically is your position would be

22   regardless of that, as of before 2013 or into 2013, they were

23   authorized?

24           MR. BLAIR:  Yeah, I think that the issue of

25   authorization only came up whenever I deposed Mr. Stieren

1        about the issue.

2                THE COURT:  Well, I mean, because he says that they

3        are not -- they are not -- they have separated from BGHA, and

4        at that point in time he's claiming, "Well, they don't have

5        the authority to use the marketing."

6                MR. BLAIR:  Right.  You know, I think even today it's

7        still on Hudalla's website; at least it was in the last few

8        weeks when I checked.

9                THE COURT:  Okay; all right.  Anything else to add on

10       that?

11               MR. BLAIR:  No, Your Honor.

12               THE COURT:  I think, then, the last issue that I had

13       flagged -- If there's an additional one you can tell me -- but

14       it has to do with lawsuits, for which you identified two --

15               MR. BLAIR:  Yes.

16               THE COURT:  -- other ones besides this one, one of

17       which was before me.

18               MR. BLAIR:  Yes, and just settled back in April.

19               So, my jurisdictional interrogatories asked for any

20       other claims and lawsuits or administrative proceedings in the

21       State of Illinois.  Contemporaneously I served general

22       interrogatories that asked for other claims and lawsuits

23       anywhere.

24               THE COURT:  And the jurisdictional ones, which

25       numbers were those?

1          MR. BLAIR:  It's number 23.

2          "Question:  If WW Industrial Corp has ever been a

3     party to a lawsuit or administrative proceeding in any court

4     in Illinois, state the jurisdiction, style of the case,

5     whether lack of personal jurisdiction was asserted as a

6     defense, and the Court's ruling if asserted."

7          And the answer is:  "WW Industrial has not been a

8     party to a lawsuit or administrative proceeding in Illinois

9     since 2010."  And, he goes on to qualify with respect to prior

10    to 2010, but that clearly wasn't true.

11         I asked Mr. Stieren again in deposition whether he

12    had been a party to any other claim or lawsuit before pulling

13    the *Angles* complaint out.  He again confirmed, "No, we haven't

14    been." I believe his exact response was, "That's correct."

15         So, then I pulled out the *Angles* complaint and I say,

16    "Can you take a look at this," and went through it with him.

17    And the Defendant's response kind of struck me where they say

18    in their written response to my motion that Mr. Stieren never

19    denied that the *Angles* complaint was filed in the State of

20    Illinois after I had handed him the pleading.  Well, how in

21    the world could he?  And that's not a matter of refreshing the

22    witness's recollection there; that was a matter of

23    impeachment.

24         THE COURT:  But, still there is the issue of did he

25    realize that this was a lawsuit prior to you showing it to

1    him.  Can you make a case for the notion that, "Well, you

2    know, I knew there was an issue and we had a complaint," I

3    think is how he described it, and, "It got resolved, settled,

4    but it did settle early on in the case.  I mean, not much

5    happened.  I think it was only pending for a short period of

6    time"?  So, the point being from the Defendant's perspective

7    is, "I didn't even realize that there had been a lawsuit that

8    was filed.  I certainly didn't remember it as being a lawsuit,

9    I thought it was something else, just a claim."

10              MR. BLAIR:  Well, regardless, I think his testimony

11   reflects that he knew there was back and forth in settlement

12   negotiations, that he was familiar with Mr. Angles, and that

13   he knew that the matter was not pending.  I think he

14   speculated that his counsel in that matter was Mel Karfus, and

15   then there's the issue of the settlement.  Under the terms of

16   his insurance policy, at least what's been produced to us,

17   he's going to have to make a $25,000 -- to pay his SIR,

18   whatever you want to refer to it as, in order to settle that

19   claim.

20              Now, Defense counsel says it's just supposition on my

21   part that that actually happened, but I noted in their

22   response that there was no denial that he had written that

23   check.  This is not a big company.  I would venture to guess

24   if Mr. Stieren is writing a $25,000 check, what, four months

25   before I took his deposition that he should have some

1  recollection of it.

2          Now, secondarily, outside of whether he knew that it

3  was a filed lawsuit --

4          THE COURT:  Well, that's kind of an important part of

5  this, --

6          MR. BLAIR:  It is, but --

7          THE COURT:  -- because you can settle a case before

8  it gets filed.

9          MR. BLAIR:  You can, but you also can't deny in

10  discovery that that doesn't constitute another claim or

11  complaint.

12          THE COURT:  "Party to a lawsuit or administrative

13  proceeding."  That's what I'm looking at.

14          MR. BLAIR:  And there was -- I believe that I have

15  attached here the interrogatories that I had propounded on

16  general topics.

17          THE COURT:  Yeah; okay.

18          MR. BLAIR:  And I believe they are Exhibit M.

19          THE COURT:  Exhibit M.

20          MR. BLAIR:  So, if you look at #7 to Exhibit M, I'm

21  asking about, "State whether this Defendant from 2005, to

22  present, received any report, notice or complaint regarding

23  any incident in which the model STLS41 or any other WW

24  Industrial Corp model tree stand was involved in which it was

25  alleged that any part of the tree stand bent or otherwise

1    failed."  And then the answer, of course, is "WW Industrial

2    Corp has not received any reports, notices, or complaints for

3    the time period 2010 to present alleging any part of a tree

4    stand sold or distributed by WW Industrial Corp bent or

5    otherwise failed."

6              THE COURT:  That's the fine point.

7              Okay.  Anything else on this issue?

8              MR. BLAIR:  Specifically the *Angles* complaint?

9              THE COURT:  And/or the other one, yeah.

10             MR. BLAIR:  Yeah, well, in *Beach* -- Again, this is a

11   case that's filed in rural Missouri -- Mr. Stieren is -- it's

12   not only another claim or lawsuit involving allegations that a

13   tree stand bent or failed, Mr. Stieren is named individually

14   in addition to W.I.C., and that's in relation to an API

15   product.  So, I don't know how he can claim not to have

16   knowledge of a lawsuit against W.I.C. whenever he's named as

17   individual Defendant in that lawsuit, which remains pending to

18   this day, by the way.

19             THE COURT:  I understand your point.

20             Anything else you want to sum up or that we haven't

21   already covered?

22             MR. BLAIR:  Well, I think the most powerful evidence

23   before the Court is just the pattern of misconduct.  I mean,

24   it's just one issue after another.  And Mr. Stieren isn't some

25   country bumpkin who just fell off the turnip truck.  He's been

1  running businesses to include his father's business to begin

2  with since the age of 16.  He knows what he's doing.  He's

3  been involved in litigation before.  He's served as corporate

4  representative at least, I think he said, six times in

5  deposition just in relation to the tree stand business.  He's

6  not unsophisticated.  Now, I think that $25,000 probably does

7  mean a lot to him and his business these days and that if he

8  can find a way to skirt his obligations and not have to pay

9  $25,000 by bending the truth or not being fully forthcoming, I

10  think he'll do that.

11        You know, the issue that I am left with is that if my

12  ultimate Prayer for Relief is to strike their pleadings, my

13  fear is that that's going to trigger coverage issues.  And, if

14  there's no insurance coverage, I don't think that Mr. Stieren

15  is going to be able to write a check big enough to compensate

16  my client, and my client and I are not interested in taking

17  inventory or owning a tree-stand manufacturing company.

18        So, while I think that striking the pleadings is

19  warranted under this situation, I'm not sure that I want it

20  done and --

21        THE COURT:  Well, you better tell me now if you are

22  changing your request.

23        MR. BLAIR:  Yeah, I think that ultimately my request

24  is going to be for my costs and my attorney's fees.  And I

25  have submitted my time to Mr. Ryan.  There's been some

1  additional time and preparation for this hearing and for

2  today, but ultimately my Prayer for Relief is going to be for

3  my costs and for my time.

4          THE COURT:  So, you are modifying your Prayer for

5  Relief?

6          MR. BLAIR:  I am, Your Honor.

7          THE COURT:  And you are asking for attorney's fees

8  and costs associated with, one, defending against Motion to

9  Dismiss on the basis of jurisdiction; two, ferreting out

10  proper responses to interrogatories and requests to produce;

11  and, three -- and this is probably worth some additional

12  compensation -- this motion.  But, this motion originally was

13  seeking to strike the pleadings.

14          MR. BLAIR:  Right.

15          THE COURT:  You know, I don't know what their

16  position is regarding paying attorney's fees and costs.

17          When is it that you had your first conversation with

18  them about that?

19          MR. BLAIR:  Thursday?  Last Thursday.

20          MR. RYAN:  Your Honor, I think it was sometime late

21  last week.  I responded to Mr. Blair yesterday afternoon, so

22  we have talked.

23          THE COURT:  Okay; all right.  So, my point on that is

24  if you're -- you know, if you have thought about this and

25  thought, you know, maybe attorney's fees and costs is the

1    better approach, that might have been a conversation that

2    could have been had before you found it necessary to file the

3    Motion to Strike, is my point.  And I'm not questioning the

4    motivation for filing the Motion to Strike at all.  What I'm

5    saying is that we are talking about costs and fees at this

6    point.  You know, that's a far different type of relief that

7    might cause the Defense to have a different response.  I don't

8    know.  I haven't asked them yet, but I'm going to.

9         MR. BLAIR:  Well, and, I mean, this has been an

10   ongoing discussion and not just with me, but amongst other

11   counsel, in terms of whether this would create a coverage

12   issue.  I can tell you that as of yesterday I was still on the

13   fence.  So, costs and fees -- I think that we were going to

14   have to get here and go through the actual litany of sins to

15   get where we are.

16        THE COURT:  Well, that's a legitimate question, is my

17   point.  I understand that that's the position that you are

18   taking.  And, let's hear from Mr. Ryan.

19        MR. BLAIR:  Thank you, Your Honor.

20        MR. RYAN:  Thank you, Your Honor.  May it please the

21   Court.

22        THE COURT:  It does.

23        MR. RYAN:  I apologize to Mr. Blair that he had to go

24   through the inconvenience of dealing with all these discovery

25   mistakes that were admittedly made.  I am sorry to you and to

1   the Court that you are having to address these issues as far

2   as these discovery mistakes.  There's no doubt the mistakes

3   were made.  Some incorrect answers were made and, as we

4   pointed out in our brief, you know, that's something that's

5   contemplated by the rules.  Mistakes are going to be made,

6   incorrect responses are going to be given.  The rules provide

7   that we can correct those responses.  When the mistakes were

8   learned we worked to correct them.  My associate, Mr. Lane,

9   and I have for the past four or five months, as you can see

10  from our supplementations, spent countless hours correcting

11  all these mistakes, providing Mr. Blair with the information

12  that not only he requested but that he was entitled to.  You

13  notice I'm not the type of attorney that goes through

14  discovery and object, object, object, object.  If he's

15  entitled to something I'm going to give it to him, and that's

16  what we have been working to do.

17          I don't think that this case warrants striking

18  pleadings.  I think Mr. Blair's -- While I know that there's

19  -- he's mentioned an issue about coverage and whether that

20  might trigger some type of coverage problem.  You know,

21  regardless of whether there is some type of coverage issue, I

22  don't think this is the type of case that will warrant

23  striking pleadings.

24          THE COURT:  Well, that's not the Court's concern, all

25  right?

1              MR. RYAN:  Okay.

2              THE COURT:  And where -- the procedural posture now

3    is he's not asking for pleadings to be stricken.

4              MR. RYAN:  Right.

5              THE COURT:  So, that's off the table.  I'm not going

6    to do it, because that's not what he's asking me to do.  So,

7    at this point the question is are fees and costs appropriate

8    and as a lesser sanction, and, if so, what should that

9    encompass.

10             MR. RYAN:  Well, and this is something that -- Mr.

11   Blair approached me about that issue for the first time -- It

12   was sometime last week.  Whichever day it was I can't tell

13   you.  I responded to him yesterday with a suggestion that he

14   rejected.  He has given us a spreadsheet showing the time that

15   he attributes to the work that he's done.  And in reviewing

16   our discovery responses, he's talked to some other lawyers in

17   particular, I think, about the *Angles* case, going up to

18   Minnesota and taking our guy's deposition, filing his motion.

19             The point I would make is on -- if we can't resolve

20   or come to a number that we can agree to on what he should be

21   compensated for as far as the work that he's put in, the point

22   that I would make is if this comes back to you for a decision

23   is our position is a lot of this discovery as far as how many

24   products are sold in Illinois, what gets shipped to Illinois,

25   whether we know or we don't know whether the products end up

1    in Illinois, that's really irrelevant as to our personal

2    jurisdiction Motion to Dismiss.  We have never denied that

3    Worldwide's products end up in Illinois, we have never denied

4    that Worldwide products get sold to customers in Illinois from

5    Illinois retail locations.  Our first discovery responses when

6    we identified information about what was sold through Menards,

7    what was sold through Dunham's, I think we identified in the

8    order of a combined 180,000 products that we were selling to

9    customers that had retail locations in Illinois.  That was

10   never the argument that we were making on our Personal

11   Jurisdiction Motion to Dismiss.

12        The argument that we were making is Worldwide is a

13   Minnesota corporation, they don't have any contacts with

14   Illinois in the way of owning real estate, paying any taxes,

15   doing any advertising, everything that we lay out in our

16   affidavit that we attached to our Personal Jurisdiction Motion

17   to Dismiss.  They deal with customers who have headquarters

18   outside of Illinois.  All their customers have headquarters

19   outside of Illinois.  They have one customer -- I think

20   Menards is the only customer that has an Illinois distribution

21   center.  So, fortuitously one customer has an Illinois

22   distribution center.  That's the only time they have any -- I

23   hesitate to use the word *contact,* because it's really not.

24   But, that's the only relationship they have whatsoever with

25   Illinois.  They have got Menards.  It has an Illinois

1    distribution center and some of the product gets shipped

2    through the Illinois distribution center.  Where that product

3    goes after it goes through that distribution center, Worldwide

4    doesn't know.  Some of it could go to Illinois.  Obviously it

5    does, because some product gets sold in Illinois through

6    Menards, but some of it doesn't.  For some of the customers

7    Worldwide has --

8            THE COURT:  Are you -- I mean, are you contending

9    truthfully or would you have been saying, "Well, we don't know

10   where these end up"?  Is that part of the claim, "We don't

11   know where it ends up and we don't know a single product ends

12   up in Illinois"?

13           MR. RYAN:  That would have been part of the argument

14   that was made, that we would have made, and it's supported by

15   some of the case law that we would have found.  Now, would we

16   have won?  I don't know.

17           THE COURT:  But, so, to make that argument, in other

18   words, knowledge of, well, either "I don't know what happens

19   to it, I just kick it out the door and, you know, they have

20   got stores all over the country, whether they decide to put

21   one of them in their Illinois stores is up to them," that's

22   essential to the motion, was essential to the Motion to

23   Dismiss.

24           MR. RYAN:  That's correct.

25           THE COURT:  So, the nature, extent, and character of

1   what reality is and whether or not that is, in fact, a

2   credible statement to make is something that the Court would

3   necessarily have to weigh.

4            MR. RYAN:  I understand that.

5            THE COURT:  Okay.  So, my point being is the stuff

6   that was being asked for relates directly to that.

7            MR. RYAN:  Okay.

8            THE COURT:  It's not as if he was asking for

9   irrelevant information.  Yeah, you are saying, "We are not

10  saying we didn't have stuff end up in Illinois."  What you are

11  saying is, "We don't know if anything ends up in Illinois."

12  But, if you have got five dealers -- no, actually seven who

13  are distributing nationwide and they all have stores in

14  Illinois, what are the chances that one isn't going to get

15  sold there?  What reason do you actually have to believe that

16  that's not the case?

17           MR. RYAN:  That's a good point, Your Honor, and I

18  certainly understand that point.  And if I were Mr. Blair

19  that's certainly the response I would make.  But, as Mr.

20  Stieren pointed out in his deposition, not all of the products

21  that go to Menards, to Dunham's, to whoever are sold at every

22  Menards, Dunham's, or whoever's stores.  You know, they might

23  choose to sell a particular model that goes through the

24  Chicago distribution center in Pennsylvania, but not Illinois

25  or somewhere else.  I understand the Court's point, but, you

1    know, there is a response from our perspective to that

2    suggestion, as well.  So, you know, those are the points that

3    we would have made in our motion when it came time for us to

4    provide our reply brief.

5         But, getting back to the larger point, you know, we

6    weren't ever disputing the fact that products were ending up

7    in Illinois.  So, that's something you could -- if it comes

8    back to you to make a decision on Mr. Blair's relief if we

9    can't -- Prayer for Relief if we can't resolve things, that's

10   one of the things I'd like the Court to take into

11   consideration.

12        THE COURT:  So, and, then, before we leave that

13   issue, because, you know, hey, I get it, the motion was

14   withdrawn, good idea, and that's better than having it not

15   having been withdrawn for sure in this situation.  But, there

16   was, in fact, an affidavit attached to that and, you know,

17   under oath, and the affidavit makes a point of saying, "We are

18   not manufacturing anything for distribution or sale in

19   Illinois."  And that statement is an interesting one.  If the

20   point is *we don't manufacture anything*, then maybe that's what

21   should have been stated or, "We are not handling anything that

22   ends up in Illinois."  Well, that's not true, and maybe that's

23   what happens.  That wasn't stated, either.

24        So, there is something about that paragraph that is

25   misleading when one reads it, because it says -- what it

1    really suggests is, "We are not doing stuff that causes stuff

2    that we touch to end up in Illinois."  But, tying it to the

3    manufacturer is pretty misleading.

4         MR. RYAN:  Understood, Your Honor.  Again, I think in

5    drafting that portion of the affidavit -- And it's been

6    several months since we went through it, so I don't recall the

7    specifics about any conversation that we had on that.

8         THE COURT:  I'm not asking you to reveal client --

9    He's not here to testify and I'm not asking for

10   attorney/client.  I'm just pointing out that that's a problem.

11        MR. RYAN:  And I wasn't going to divulge any, but the

12   only suggestion I can give to you as we sit here today is the

13   fact that he's dealing with customers whose headquarters are

14   outside of Illinois and, you know, the face of those companies

15   for him is outside of Illinois, so, you know, perhaps, you

16   know, his thinking is, "Since I'm dealing with somebody

17   outside of Illinois, that's who I need to be concerned with as

18   far as who I'm manufacturing -- or who product is being

19   manufactured for, who I'm selling to, things of that nature."

20   That's the only suggestion I can have for you as we sit here

21   today, but that's the first thing that comes to my mind.

22        THE COURT:  Okay.  Anyway, I got off on this track.

23        I want to give you an opportunity to argue any other

24   points that you wish to argue.  Ultimately I do want the

25   parties to talk about whether or not an agreement can be

 1   reached, because it sounds like you are willing to at least

 2   engage in that process.

 3           MR. RYAN:  Yes.

 4           THE COURT:  Okay.

 5           MR. RYAN:  If you do have any questions on any of our

 6   discovery responses, Your Honor, I'm certainly prepared to

 7   address those, though.  I don't know that I can go in any more

 8   depth than what's contained in our response.  But, given the

 9   time you spent with Mr. Blair, if you feel the need to address

10   anything with me I'm certainly happy to.

11           THE COURT:  Well, I think what I'm going to do -- You

12   heard the questions that I raised.  I mean, certainly I've

13   heard your response.  And if I'm not -- If you sense that I

14   wasn't understanding what your response was to these arguments

15   such that, "Well, we didn't -- we didn't -- we didn't know who

16   all is selling the stuff that had locations in Illinois."

17   But, one of the rejoinders to that was, "Yeah, but in your

18   response in the interrogatory you specifically say, 'I'm not

19   telling you about anybody else except the folks who are

20   selling in Illinois, and here are the two'."  So, your

21   response does not address that, and if you have anything more

22   to say about that I'd be interested in hearing that.

23           MR. RYAN:  I don't.  Well, I say I don't.  I'm a

24   lawyer.  Of course, I have something to say about it.

25           The first thing I would point out is there were

1   objections that were never called up.  So, you know, we lodged

2   objections.  If there was an issue with those they could have

3   been taken up.

4         THE COURT:  Let me look at what the objections were,

5   though.  Are the objections germane to the substance that was,

6   in fact, represented?

7         MR. RYAN:  The objections to those particular

8   requests, Your Honor, were that it was irrelevant to personal

9   jurisdiction issues as far as contacts with Illinois, because

10   information regarding customers outside of Illinois were

11   irrelevant on the issue of personal jurisdiction.

12         THE COURT:  Yeah, and so the fact that you objected

13   to that, though, and it wasn't called up is simply conceding,

14   "Okay, if what you are telling me is I'm not giving you

15   anybody who only sells outside of Illinois, I am giving you

16   those customers who sell within Illinois," --

17         MR. RYAN:  Sure.

18         THE COURT:  -- he didn't call that up.

19         MR. RYAN:  Sure, and that would get to the second

20   point that I was going to make.  So, when Mr. Blair pointed

21   out to us the Bass Pro issue, I had Mr. Lane get a complete

22   customer list from Mr. Stieren.  We went through that customer

23   list -- Mr. Lane went through that customer list himself, went

24   through every single customer on that list, did website

25   searches, did his own investigation so we, and not Mr.

1    Stieren, could figure out which of those customers had

2    Illinois retail locations.

3          So, to the point about the objection, yes, we did

4    object to it.  The objection was never called up, but then

5    attorneys, between Mr. Lane and me, went through, did our own

6    work to ensure that the information that we got listing every

7    customer we could verify ourselves who those Illinois

8    customers were.

9          So, based on the entire customer list we were given,

10   the investigation that we did, you know, we could represent

11   that the listing that we gave as far as who -- which Worldwide

12   customers had Illinois retail locations, we were confident

13   that the list was complete and that, you know, regardless of

14   the objection, he had the information that he requested.

15         THE COURT:  That's -- But, now you are talking about

16   the supplement.

17         MR. RYAN:  Correct.

18         THE COURT:  Yeah, he's not arguing with the

19   supplement.

20         MR. RYAN:  Right.

21         THE COURT:  Okay.  Anything else?

22         MR. RYAN:  I don't think I have anything else, Your

23   Honor.  I appreciate your time.  And, again, my apologies to

24   the Court that you had to be inconvenienced with this, and

25   also my apologies to Mr. Blair for the same inconvenience.

```
 1          THE COURT:  Well, here -- and so here's what I'm
 2  going to say in observation.  And I'm obviously going to take
 3  this under advisement, give the parties an opportunity to
 4  discuss this further.
 5          Obviously these issues are of grave concern to the
 6  Court, because, you know, it's legit when a company says,
 7  "Boy, you know, this costs me a lot of money to defend cases."
 8  And that's -- that's -- there's a lot of reasons for that.
 9  Some people bring frivolous lawsuits, and lawsuits are
10  expensive.  You guys are expensive and it's all expensive.
11  And, running the Courts is expensive.  But, when we get
12  motions that are bases, it compounds and multiplies
13  litigation.  So, to the extent that I would find that there is
14  a problem in that respect, it's a serious problem.
15          Now, I -- that said, their request for striking the
16  pleadings has been withdrawn and what we are left with is
17  what's the appropriate remedy.  And, to the extent you are
18  discussing this issue, the Court's view, also, note is that is
19  a topic you may be mulling over the coverage issue.  You know,
20  that's something you have to do.  But, when you pull the
21  trigger and file a motion, you've pulled the trigger and filed
22  a motion.  The Court can't ignore it and say, "Wait, are you
23  sure you want to do that?  Do you want to go back and consider
24  some of these other issues before I have to take the time to
25  deal with that before additional money has to be expended by
```

 1  both sides?"

 2          So, my sense is that what is really at stake here is

 3  everything leading up to filing that motion, and I think that

 4  that's how the parties should be looking at this.  And it's

 5  usually not appropriate for me to give advice during rulings,

 6  and I'm not, but I'm telling you how I'm thinking about it as

 7  of now, because I think it will help you all in your

 8  discussions about this.  And, I'm going to give you some time.

 9  Do you want to give me how much time you want to talk about it

10  and then come back for a status and say, "We've either agreed

11  or disagreed and we don't have an agreement, so here's my

12  affidavit of costs and etcetera," and if there's additional

13  arguments or briefing that needs to be done I can take that --

14  hopefully won't be much -- and then go ahead and issue a

15  ruling?

16          MR. RYAN:  Your Honor, my only suggestion on timing

17  is I have got a huge case I'm trying over in Kansas City

18  toward the end of March and we have a bunch of pretrial

19  disclosures due over the next couple of weeks.  So, I would at

20  least probably want to go into early March.  Our pretrial

21  conference is March 6th, so I would prefer something after

22  that.

23          THE COURT:  To come back and talk to me?

24          MR. RYAN:  Right.

25          THE COURT:  I don't have a problem with that.

1          MR. RYAN:  If need be.

2          THE COURT:  Yeah, I don't have a problem with that.

3          MR. BLAIR:  That's fine.

4          THE COURT:  Okay.

5          MR. RYAN:  Should we just contact you, then, if we

6    need your further involvement?

7          THE COURT:  Well, I'm going to put something on the

8    calendar.  And, I mean, I can do it -- We can put it March

9    13th or March 20th.  If we go with the 20th, we would do it

10   early in the morning.  Let's see.  We have got the 19th.  I

11   can talk to you in the afternoon on the 19th.  And if you call

12   me in advance of that, no need to do it.

13         Do we have anything on the calendar for just a status

14   sometime down the road?

15         MR. RYAN:  The afternoon of the 19th works for me.  I

16   don't think we have anything right now set for status.

17         MR. BLAIR:  Fine with me, too.

18         THE COURT:  So, this is what we will do:  If I get a

19   call from you saying, "We've worked it out," I will moot out

20   the motion.  Otherwise we will talk on the 19th at 3:30 p.m.

21         I'm going to make it 4:00.  For some reason I think I

22   might have just given this date away to somebody earlier this

23   morning that's not docketed yet.

24         So, 4:00 on March 19th.  If you do call me, then what

25   we will do is I'll just pick a date that's another few months

1    out to talk to you again as you are proceeding with

2    substantive discovery and see if at that point we can address

3    settlement negotiations or not, okay?

4         MR. RYAN:  While we are on that topic, Your Honor,

5    Wiley and I were speaking yesterday about our current

6    scheduling order.  We still need to talk to our co-Defendant

7    on that, but our suggestion was to push our current deadlines

8    out 60 days other than the discovery deadline and the trial

9    date.

10        THE COURT:  You can do it.

11        MR. RYAN:  That just -- That keeps us on track.

12        THE COURT:  By agreement you can do all those -- move

13   all those deadlines on your own, and I don't have any problem

14   with it.  The only -- You know, if you need to move something

15   in one of those other two deadlines, then you are going to do

16   it by motion.

17        MR. RYAN:  Okay.

18        THE COURT:  But, go ahead and by agreement do those

19   other moots.

20        All right.  Anything else?

21        MR. BLAIR:  Nothing else, Your Honor.

22        THE COURT:  Okay.  Thank you, very much.

23        MR. RYAN:  Thank you, Your Honor.

24        THE COURT:  We are adjourned.

25

1                    *   *   *   *   *   *   *

2

3   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

4

5   /S/ Stephanie K. Rennegarbe                12/19/2016
    Certified Shorthand Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25