1

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF ILLINOIS


JORDAN QUEEN,              )      14-519
                          )
                          )
          Plaintiffs,     )
                          )
     Vs.                  )      East St. Louis, Illinois
                          )      August 22, 2016
W.I.C., Inc.,             )
                          )
          Defendants,     )

                 TRANSCRIPT OF MOTION HEARING,
          BEFORE THE HONORABLE STEPHEN C. WILLIAMS,
                UNITED STATES MAGISTRATE JUDGE.


APPEARANCES:

For the Plaintiffs:        Onder, Shelton et al.,
                           By:  William W. Blair
                           110 East Lockwood, 2nd Floor
                           Webster Groves, MO  63119

For the Defendants:        Sandberg, Phoenix et al.,
                           By:  John Sandberg
                                Andrew Ryan
                                Courtney Cox
                           600 Washington Avenue
                           St. Louis, MO  63101

Court Reporter:            Barbara Kniepmann
                           750 Missouri Avenue
                           East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

2

1      (Whereupon the following proceedings were held in open

2  Court.)

3          COURTROOM CLERK:  This is Jordan Queen vs. W.I.C.,

4  Inc., et al., 14-cv-519-DRH-SCW, is called for Motion to

5  Strike.  Will the parties identify themselves for the record

6  please?

7          THE COURT:  Start with plaintiffs.

8          MR. BLAIR:  William Blair on behalf of Plaintiff

9  Queen.

10          THE COURT:  Good afternoon, Mr. Blair.

11          MR. SANDBERG:  John Sandberg, Andy Ryan and Courtney

12  Cox on behalf of the defendant.

13          THE COURT:  Good afternoon.

14          MR. SANDBERG:  Mr. Stieren is also present in the

15  courtroom, Judge.

16          THE COURT:  Good afternoon Mr. Ryan, Mr. Sandberg and

17  Mr. Cox and Mr. Stieren.  Mr. Stieren is a corporate

18  representative, so the record is clear.

19          We're here for the plaintiff's second Motion to

20  Strike, W.W. Industrial's response, or I am sorry, W.W.

21  Industrial's pleadings, and the Court has read the initial

22  motion, the response, the reply, so we'll go ahead and get

23  started.  Mr. Blair?

24          MR. BLAIR:  I would call Nathan Stieren to testify.

25          THE COURT:  Mr. Stieren, come on up to the witness

3

1    stand.

2              NATHAN STIEREN, PLAINTIFF'S WITNESS, SWORN

3                        DIRECT EXAMINATION

4    Questions by Mr. Blair:

5              COURTROOM CLERK:  State and spell your name for the

6    record.

7    A.    Nathan Stieren, S T I E R E N.

8              THE COURT:  Mr. Blair, it may help the Court.  The

9    one thing I wanted to ask before you get started here, you

10   mentioned the supplemental response to your seventh

11   interrogatory, and I don't think I have the actual seventh

12   interrogatory in the record.

13             MR. BLAIR:  Okay, I got a copy of it right here I

14   believe.  That is the one asking for other claims and

15   lawsuits, batch numbers?

16             THE COURT:  I don't know.  That is why I want to see

17   it.  There didn't seem to be any dispute that there was such

18   an interrogatory and you indicated that you got an official

19   supplementation to it on August 1st, but I don't think the

20   interrogatory itself is in the record, so --

21             MR. BLAIR:  I previously marked it as Plaintiff's 25.

22   Would you like the clean copy?

23             THE COURT:  That one is fine.  All right, so what is

24   your numbering scheme?  In the motion you have attachments

25   that go A through -- are you going to have up to -- you are

4

1   going to have 25 numbered exhibits for this hearing?

2        MR. BLAIR:  Quite possibly, yeah.  I premarked them.

3   I'll tell you I did not start off where I had left at what has

4   been submitted with the motion here of B1 through premarked.

5        THE COURT:  We'll use that.  So this is Plaintiff's

6   25.  So Mr. Sandberg or Mr. Ryan, any dispute about the fact

7   that the interrogatory was served and then I guess this is the

8   supplemental response, correct?

9        MR. BLAIR:  That is the most recent.  I believe it

10  was served on July 28th.  It says 29th, but I think Andy

11  clarified it was the 28th, is that correct?

12       MR. RYAN:  That's right, Your Honor.

13       THE COURT:  This is the same one you refer under the

14  footnote as August 1st, right?

15       MR. BLAIR:  I may have gotten the date wrong

16  certainly.

17       THE COURT:  I understand we may be off, but this is

18  what you are talking about?

19       MR. BLAIR:  Right.

20       THE COURT:  Okay.

21  Questions By Mr. Blair:

22  Q.    Mr. Stieren, we have spoken several times before,

23  correct?

24  A.    Yes.

25  Q.    You are the owner and CEO of W.W. Industrial Court,

5

1   otherwise known as W.I.C., Inc.?

2   A.    That's correct.

3   Q.    At W.I.C., you are also the quality assurance

4   coordinator, is that right?

5   A.    Yes.

6   Q.    You are no stranger to the litigation process, is that

7   fair?

8   A.    I would say that's fair.

9   Q.    You have served as a corporate representative not only

10  for W.I.C., but another company by the name of D.G.H.A., is

11  that true?

12  A.    Yes.

13       THE COURT:  You might need to speak up a little bit.

14  You can move it if you want to.

15  A.    Okay.

16  Q.    Now I understand that you have actually served as a

17  corporate representative at least six or seven times.  At

18  least that is how many times you told me you had been deposed

19  in other cases.  Is that fair?

20  A.    Yeah, roughly.  I don't know to be exact, but that

21  sounds right.

22  Q.    Okay.  I want to start off by talking to you a little

23  bit about your current protocol for receipt of other claims

24  and lawsuits if that is okay.

25  A.    Sure.

6

1   Q.     So you are the one within the company that specifically

2   deals with reports of other claims and lawsuits, is that true?

3   A.     Yes.

4   Q.     And once you get them, you don't create an internal

5   file, correct?

6   A.     I guess myself I would.  I handle it all myself, so we

7   don't have like a document that shows it.  I just handle it

8   and proceed.

9   Q.     Okay.  Anyway, you have no system in place for tracking

10  other claims, lawsuits and injury reports, true?

11  A.     I guess the system is just me handling it all right

12  now.  We don't have -- like I don't know what you're asking I

13  guess.  We don't have a file that I save them in.  I have one

14  on my desktop just as myself doing it.

15  Q.     Have you changed your system at all since I deposed you

16  back in April of 2015?

17  A.     No.

18  Q.     Okay.  Let me hand you your deposition transcript.

19  Judge, would you like a copy?

20         THE COURT:  Yes.

21  Q.     If I could have you turn to page 35, please, and

22  specifically lines eight through ten.  I am going to read it

23  for you.  "How do you track other claims, lawsuits and injury

24  reports?  We don't have a system in place."  Did I read it

25  correctly?

7

1  A.     Yes, that is what I said.

2  Q.     That was your testimony at that time, correct?

3  A.     That's correct.

4  Q.     Nothing has changed since then, right?

5  A.     No.  I may have -- I mean the way it was worded I guess

6  depends on how you would say system, but I have a system in

7  place, but we don't have a corporate system where there is a

8  file saved somewhere.  I guess I handle it all myself.

9  Q.     So long story short, the buck stops with you, is that

10 fair?

11 A.     Yes.

12 Q.     If one of your employees receives a notice, do they

13 immediately bring it to you?

14 A.     If it is something to do with safety, yes.

15 Q.     Is that an employee protocol that your employees are

16 aware of?

17 A.     Yes.

18 Q.     Do you have any concerns over claims not getting

19 communicated to you by your employees?

20 A.     No.

21 Q.     Do you worry about missing reports of other claims and

22 lawsuits?

23 A.     No.

24 Q.     You would agree it is important to follow-up when you

25 receive one of these reports of another injury or claim,

8

1    wouldn't you?

2    A.     Yes.

3    Q.     Every product failure claim you receive needs to be

4    thoroughly investigated, true?

5    A.     Yes.

6    Q.     Because you need to assess whether you have a defective

7    product out there on the market hurting people, fair?

8    A.     That's correct.

9    Q.     If you have multiple reports of failure of the same

10   nature of the same product, that is a red flag for you, isn't

11   it?

12   A.     I would assume so, depending on what you are talking

13   about, but, yes.

14   Q.     Okay.  So if you had multiple reports of stands of a

15   particular model collapsing that were manufactured out of a

16   relatively small batch, that is going to be a red flag for you

17   that that production batch may be subject to a manufacturing

18   defect.  Is that true?

19   A.     It would I guess -- repeat the question please.

20   Q.     Sure.  If you have, say, sold 30,000 units of a

21   particular model and you have received two reports of product

22   collapses and both of those models came from the same batch of

23   730 units out of the 30 plus thousand you have produced, that

24   is a red flag to you there might be something wrong with that

25   product, right?

1    A.     I guess I am not really understanding.  Why would you

2    say 730 units?  I think if we look back in the batch

3    particular in this case was almost 11,000 units or something,

4    10,950 I believe, or something like that.

5    Q.     I'll get to that.  Would you turn to page 25 of your

6    deposition and specifically lines eleven through 15?

7    A.     Sure.

8    Q.     At page 25, eleven through 15, it reads, "And then we

9    talked about the actual batch that the STLS 41 came out of and

10   that showed that it was one among a container of 730 product

11   units, correct?"  Your answer is, "That's correct."  Is that

12   fair?

13   A.     So 730 units is the container quantity.  That is

14   separate than batch quantity.  So a 140 feet shipping

15   container coming from China, 730 units fit in that container.

16   Q.     So how many separate batches have been run from this

17   particular manufacturer that we're talking about here today?

18   A.     Sir, I don't know off the top of my head.

19   Q.     Okay.  Anyhow, if you have produced multiple batches of

20   a particular product and you are finding failure reports

21   coming from the same batch when you have sold far more than

22   what were just manufactured in that batch, you would agree

23   that could be significant in signaling a manufacturing defect

24   in the product.  Is that fair?

25   A.     So my understanding of the two cases were both

1   assembled incorrectly and out of 11,000 units of that, I

2   wouldn't say if they are assembled incorrectly that is a big

3   red flag.  I think they put it up wrong.

4   Q.    So in your mind it is a coincidence they came from the

5   same batch, fair?

6   A.    I believe almost every scout in 2013 was from the same

7   batch.  If they were both 2013 stands, it just would be the

8   same batch.

9   Q.    I agree that your defense in both Mr. Vivian's case and

10  my case was this stand was not configured correctly, but you

11  understand my client and Mr. Vivian both assert they did put

12  it up correctly?

13       MR. SANDBERG:  I don't think we should be

14  representing what Mr. Vivian asserts since he has not

15  testified and all we have is hearsay.  We have several people

16  saying what he said.

17       THE COURT:  Well, I mean the question he is asking --

18  the question is, is that fair, so overruled.  I don't know

19  whether that is alleged or not.  You all know better than I.

20  A.    Repeat the question.  I got lost there.

21  Questions By Mr. Blair:

22  Q.    You understand that both Mr. Vivian and my client are

23  both claiming that they set the stand up with the proper

24  geometry, fair?

25  A.    That is not my understanding of the situation, but

11

1    again, I don't know the details.  It is just through my

2    attorneys.  That information is not correct.

3    Q.    Okay.  Now we can agree that the Vivian stand came from

4    the same manufacturing batch as Mr. Queen's stand, correct?

5    A.    It appears that way, yes.

6    Q.    You no longer obtain your stands from that particular

7    manufacturer, correct?

8    A.    That's correct.

9    Q.    In your supplemental answers to plaintiff's second

10   interrogatories, you indicate that W.I.C., I think at that

11   time as of February 12th of 2016, had a net worth of

12   $188,000.92.  Does that sound right?

13   A.    That is very possible.  Without looking at a document I

14   wouldn't know for sure, but that sounds right.

15   Q.    In 2015 let's say your total personal compensation was

16   $72,692.  Does that sound right?

17   A.    It is possible.  I don't know for sure.

18   Q.    Okay.  This is marked as P 24.  Would you turn to page

19   two, please?  You will see second supplemental answers.

20   A.    Yes, I see that.

21   Q.    Okay.  Does that refresh your recollection that in 2015

22   you indeed made $72,692?

23   A.    Looks like -- I think looking back on this, I think the

24   first time we talked there was -- Mr. Andy asked me what my

25   salary was and I didn't pull a salary from the company until

12

1   2015, which it looks like it was, yeah, $7,692, and I guess

2   the 50,000 in 2013, but then as we dug into it, he asked also

3   distribution.  So as the company makes money you have to pay

4   taxes, so there would have been distribution separate than

5   salary.  He said yes, you need to report that instead of just

6   salary.  And that's when we did the -- so I looked back and it

7   looks like 2015 was 65,000 from distribution and 7,692 for

8   salary.

9   Q.    The interrogatory asked for you to state the total

10  compensation including salary, bonus, stock options, deferred

11  compensation or compensation of any kind, correct?

12  A.    Yes, it does, but in our company the way we work, our

13  distribution is, as tax season comes by, the company would

14  write a check to cover the tax burden.

15  Q.    At any rate, after you originally told me it was

16  $7,692, I had to go back to Andy and say I am not believing

17  this and he had to go back to you to supplement once again, to

18  provide the actual compensation you received.  Is that fair?

19  A.    I don't know the conversations that you and Andy had.

20  I know the conversations Andy and I had were as I gave him

21  those numbers, he said does that include any money that would

22  be given to you or any of the other companies you own and I

23  said no, and he said, okay, give me what that information is

24  and then I explained to him the tax situation, how we

25  operated, and I said is this something that he needs to know.

13

1   He said yes, give me that information.

2   Q.     All right.  So another mistake, is that fair?

3   A.     I don't know if it was a mistake.  Probably more of a

4   miscommunication of what you are wanting.

5          THE COURT:  I want to ask -- so when you say 65,000,

6   that is after the taxes have already been paid by the company?

7   A.     Yeah, so it is an S Corp, so the company doesn't really

8   pay income tax.  The owner of the company needs to pay

9   personal income tax, so if the company makes, let's say

10  $100,000 for an easy figure, I would be responsible for that

11  personally.  So we have to take the money from the company to

12  me to pay the IRS.

13         THE COURT:  So when you say 65,000 in distribution,

14  that is not including the money that the company paid on your

15  behalf for taxes?

16  A.     That would be -- that is the money that the company

17  would pay on my behalf, but the accounting way I guess we have

18  to do it, it goes from the company to me, so it shows as

19  distribution even though it is for taxes, and my understanding

20  is the C Corp is different in that the company just pays the

21  taxes directly.

22         THE COURT:  So I am just trying to -- I didn't quite

23  understand and I am still not.  Of the $65,000 in distribution

24  that you received in 2015, did some of that money get used to

25  pay taxes or was that the money you got after the company

14

1    already paid your taxes?

2    A.      No, that was the money to pay the taxes.

3           THE COURT:  To pay the taxes?

4    A.      Correct.

5           THE COURT:  Okay.  So you didn't get the 65,000?

6    A.      Yeah, I don't know exactly if my tax bill was 65,000

7    exactly.  I know that is how we always operate.  We pull money

8    for me to pay taxes.  So for example, in 2011 we had a good

9    year and my tax bill was high and then we had to pay quarterly

10   taxes, so with that all, we figured it would be $184,000 and

11   that I would need to pay it.  So you can see in 2011 that

12   distribution was that amount and that was to only cover.  That

13   was not compensation for me to keep.  That was compensation to

14   pay the Government for taxes.  I hope I am not being unclear.

15          THE COURT:  So in 2015 you received $65,000.  That

16   went straight to the IRS and then $7,692 in your pocket?

17   A.      So the $7,692 in my pocket would have came from

18   paycheck every two weeks, and the 65,000 would have came as

19   one lump time pay.  I don't know sitting here today how much

20   of that 65,000 got paid to taxes.  I don't know if it was the

21   whole thing.  I don't know if it was more than that, so I

22   don't know for sure.  I would have to look back at my actual

23   taxes to find out, but I know in April of the year there is

24   the tax bill due and there is the quarterly for the next year

25   and a lot of times we try to line up the distribution with

1    that.

2           THE COURT:  So out of the 65,000, some or all of that

3    went to pay taxes?

4    A.    That's correct.

5           THE COURT:  And then the rest of your compensation

6    was in the form of $7,692 in 2015?

7    A.    That's correct.

8           THE COURT:  And that is total for all of 2015?

9    A.    Yes.

10   Questions By Mr. Blair:

11   Q.    Mr. Stieren, you have a $25,000 deductible for each

12   injury claim that settled, correct?

13   A.    I believe it is different, now the policy is different,

14   but at the time of this insurance policy it was 25,000, yes.

15   Q.    The $25,000 policy was also in effect at the time that

16   Mr. Vivian's incident came about, correct?

17   A.    I'm not sure.  I would have to look back and see.  I

18   don't know what dates.  I am not positive.

19   Q.    Okay.  Well anyway, you have a relatively high

20   deductible for a company looking at a net worth of $188,000.

21   Would you agree?

22   A.    Yes.

23   Q.    And that is, obviously, going to come out of your

24   bottom line whenever you, say in 2013, are making a total

25   compensation of $50,000, true?

1  A.     Yes.

2  Q.     So if Mr. Queen's case went away or we lost in the jury

3  trial, you're off the hook for $25,000, correct?

4  A.     I'm not sure.  What did you say?

5  Q.     If you don't have to indemnify Mr. Queen, you don't

6  have to pay the $25,000 deductible, correct?

7  A.     I don't know.  I am not sure how it works.

8  Q.     Well, did you write a check to Mr. Engles for $25,000

9  whenever you had the case pending here in front of Judge

10  Williams that was settled in April of 2014?

11  A.     Again, I know we discussed it in the deposition.  I

12  know there was money paid, but it wasn't in the form of

13  insurance or deductible or anything.  It wasn't SIR, it was

14  the form of a check.  So again, I'm sorry, I don't understand

15  exactly what you are asking me.

16  Q.     Who issued that check?

17  A.     I did.

18  Q.     Okay.

19  A.     I guess I -- back up.  It would be from our accounting

20  and I would sign the check.  I don't actually issue the

21  checks, I just sign them.

22  Q.     But anyway, the check was issued from your company to

23  settle the claim, whatever it settled for?

24  A.     Right.

25  Q.     Okay.  Now if Mr. Vivian's claim goes away, again, you

17

1   are looking to save more money in not having to pay a

2   deductible or compensate directly if it is not an SIR

3   situation, right?

4   A.     As far as if it doesn't go to trial, yeah.  I guess if

5   a case goes away, obviously, we don't have to pay if that is

6   what you are asking.

7   Q.     Or if it is never brought to begin with, you don't have

8   to pay, right?

9   A.     Correct.

10  Q.     That is what you were hoping whenever you say that for

11  several months you didn't hear anything about the claim, true?

12  A.     That is not correct.

13  Q.     If you weren't hoping that, why did you not investigate

14  it?

15  A.     I feel like we did take appropriate steps to figure it

16  out.  In January I had a phone call with the attorney.  I

17  think his name is Mr. Parsey (phonetic) and the conversation,

18  I said, you know, what is the situation with this particular

19  case and he said they are saying it was bought at Wal-Mart and

20  the price was $99.96.  I said that is for sure the price that

21  Wal-Mart pays.  Are you sure it is our tree stand?  He said,

22  well, he is very confident that it was bought at Wal-Mart and

23  that was the purchase price and I said then it is not our

24  stand.  At that moment I kind of filed it for let's deal with

25  this situation later because it was in our really busy trade

18

1   show season, and that is when I got back from the trade show

2   season in March is when I talked to my attorney and said, you

3   know, I don't know for sure but we still don't know if it is

4   our tree stand.  I would like to figure this out because they

5   said it was bought in Wal-Mart and then we proceeded.

6   Q.     I am handing you and the Court a copy of an e-mail from

7   Mr. Ryan of July of 2016 to me where the existence of the

8   claim was disclosed.  This has been marked as P 21.

9           THE COURT:  You have the marked copy.

10          MR. BLAIR:  I should be giving that to you.

11          THE COURT:  Yes, let's do it that way.  So I think

12  this is already in the record somewhere.

13          MR. BLAIR:  Maybe.

14          THE COURT:  I think this is attached to your Motion

15  to Strike, second Motion to Strike.  Yes, so P 21 is the same

16  as the document at 95-2, which is Exhibit B 2 on the Motion to

17  Strike.

18          MR. BLAIR:  Okay.

19  Questions By Mr. Blair:

20  Q.     Why don't you keep that in front of you and I am going

21  to give you another document, which is a little bit different

22  than what Mr. Ryan originally attached to his e-mail.  That

23  has previously been attached, not in that form, that is

24  slightly separate document, but anyway -- I am sorry, Judge,

25  is that P 24?

1          THE COURT:  It is P 8.  P 8 is similar to but not the

2     same as what was Exhibit A at Document 95-1, Exhibit A to the

3     Motion to Strike.

4     Questions By Mr. Blair:

5     Q.     What I have handed to you -- oh, you want one.  Does

6     that appear to be the claimed letter dated December 14th of

7     2015 that you stated in your affidavit you received on

8     December 17th of 2015?

9     A.     Yes.

10    Q.     That is addressed to Sniper Tree Stands, is that

11    correct?

12    A.     That's correct.

13    Q.     Mr. Vivian's counsel is very specific that this

14    involved the collapse of a scout model STLS 41 tree stand

15    which occurred on Swingel Mountain Road, Arrow Point,

16    Pennsylvania, on October 29th of 2014, is that correct?

17    A.     That is what the letter says, yes.

18    Q.     Did you take any steps to -- well first of all, Dunhams

19    is an exclusive retailer of the STLS 41, true?

20    A.     Yes.

21    Q.     Did you take any steps when you got that letter to pull

22    up Dunham's website and do a store locater search and discover

23    whether there is a Dunhams close to Swingel Mountain Road in

24    Mineral Point?

25    A.     No.

20

1    Q.    Is there a reason you didn't do that?

2    A.    No.

3    Q.    Did you do that at any point in time moving forward?

4    A.    No.

5    Q.    What I am handing to you is the other locator and

6    Mapquest directions as attached to my reply, Document 102-2.

7    Mr. Stieren, whenever we went through the issue on personal

8    jurisdiction, you went to the store locator websites at that

9    point in time in order to identify the location of Dunhams

10   retailers and the other retailers you distributed to.  Is that

11   fair?

12   A.    Yes, I believe I did.

13   Q.    So you knew to do that, right?

14   A.    I knew that technology existed, yes, but I guess in my

15   argument there is 200 some Dunham stores, but there is also

16   probably 5,000 Wal-Mart locations, so it would be hard for me

17   to determine, regardless where he lives, where he bought the

18   tree stand.

19   Q.    Do you see the store locator search shows there is a

20   Dunhams retailer at Johnsons Galleria located at 594 Galleria

21   Drive at Johnstown, Pennsylvania?

22   A.    Yes, I see that.

23   Q.    Did you see that, if you turn the page, it says "your

24   trip to".  Does it say how many miles away that is from this

25   particular address in Swingel Mountain Road, Mineral Point,

21

1    Pennsylvania?

2    A.      Looks like it says 14 minutes, 7.8 miles.

3    Q.      Okay.  So it would make sense that stand wasn't

4    purchased at Wal-Mart and more likely to have been purchased

5    at Dunhams 7.8 miles away from the location of the accident?

6    A.      Sir, I don't know the answer to that.

7    Q.      Did you look at how far the city itself was away from

8    Mineral Point that the Wal-Mart was in?

9    A.      No, I did not.

10   Q.      Are you surprised it is a lot further away?

11   A.      There is a lot of Wal-Marts, so I would assume -- I

12   would be surprised, but again, I didn't look at that, so.

13   Q.      So if I don't know about Mr. Vivian's claim, I can't

14   call his counsel, would you agree?

15   A.      If you don't know about the claim?

16   Q.      Yeah.

17   A.      You would have no reason to call him, but yes.

18   Q.      And I can't call and compare notes with him in relation

19   to his claim, true?

20   A.      Sure, yes.

21   Q.      And I can't inform him that, hey, we got this STLS

22   model 41 from the same batch, manufacturing batch, that my

23   expert has tested the composition on and says that it is

24   woefully defective to where this product contains

25   manufacturing defects and that is why your stand would have

22

1    failed, true?

2    A.      I'm not really sure what the question was.

3    Q.      I can't put the other attorney on my leg work in terms

4    of what went wrong with his stand, correct?

5    A.      Correct, but we still need to confirm if it was really

6    our tree stand too.

7    Q.      I'll get to that.  So long story short, if Vivian goes

8    away and Queen goes away, and presuming they are both still

9    working under the $25,000 deductible, you are talking about

10   $50,000, correct?

11   A.      If they go away?

12   Q.      Yeah, and you don't have to indemnify anybody.

13   A.      Are you talking about a savings of --

14   Q.      $50,000 with two claims at $25,000 a piece for your

15   SIR.

16   A.      I am assuming the $25,000 deductible has already been

17   used up on the Queen case.

18   Q.      Well, is it policy?

19   A.      I'm not sure what that means, sir.

20   Q.      You would agree that $50,000 was your entire salary in

21   2015, correct, salary and total compensation, right?

22   A.      I think it was $72,000.

23   Q.      I misspoke.  2013 your total compensation was 50,000,

24   right?

25   A.      I'll take your word for it.  I don't have that sheet in

23

1  front of me anymore.

2  Q.    Okay, I'll move on.  You understand the way insurance

3  works that the more claims, and the more claims you pay out

4  on, your insurance rates are going to go up, correct?

5  A.    I don't know the algorithms they use.  I know there are

6  several different factors in sales and claims and how much

7  insurance company pays out, but I don't understand the details

8  of it.

9  Q.    You know that is the general premise, right?

10  A.    Yes.

11  Q.    Whenever I was up taking your deposition for the second

12  time, I had another tree stand case that involved a hang on

13  tree stand.  Do you remember we talked a little bit about

14  whether that was your product and it turned out to be an API

15  dating back to before you were involved with that brand?

16  A.    Yes, I do remember that conversation.

17  Q.    After establishing or looking through at the pictures

18  you said thank God this wasn't ours, something to that effect.

19  Do you remember that?

20  A.    I don't remember the words, but I would be thankful it

21  wasn't ours so I could see me saying that, yes.

22  Q.    Again, you are concerned about what you are going to

23  have to pay out in terms of an SIR and increasing insurance

24  premiums, true?

25  A.    That was not probably my mindset at that point.  I

24

1    don't want to be the person who would put something into

2    someone's hands that would get hurt, but, yes.

3    Q.    Do you think that running out the statute of

4    limitations on a claim is an appropriate reason to avoid

5    investigating it?

6    A.    I don't -- I am not an attorney, so I don't really

7    know.  I know there is a certain time you need to file claims

8    by, but I am not really understanding the details of it.

9    Q.    Do you approve of your counsel not contacting

10   Mr. Vivian's counsel, and when I say your counsel I mean

11   Mr. Ryan, for the purposes of running out statute of

12   limitations?

13   A.    I guess I don't think we had a conversation about that.

14   Q.    I'm just saying because that is what is reflected in

15   the body of Mr. Andy's e-mail, Mr. Ryan's e-mail of July 8th,

16   and he also asked me not to contact Mr. Vivian's counsel.

17   Were you aware of that?

18   A.    I was not aware of that, no,

19   Q.    Again, that goes back to the fact that I can't share

20   the defect with this Mr. Vivian's counsel if I don't contact

21   him, right?

22   A.    Say it again, sir.

23   Q.    I can't pass along my expert reports involving the same

24   model from the same batch we assert has a manufacturing defect

25   to Mr. Vivian's counsel if I don't contact him, true?

25

1   A.    Sure, but again, it comes back to we still would need

2   to find out if it is our tree stand in the case.

3   Q.    That ship had sailed by that point, right?

4   A.    I think the inspection hadn't been for the 22nd, and up

5   until that point we still didn't know for sure if it was ours.

6   We had gotten an owner's manual, but again, I think like I

7   told Andy, there is a lot of fraud cases and people using the

8   Sniper name.  We have already proven that to be the case.  So

9   without a further inspection with real clear pictures, I can't

10  be 100 percent confident that it was ours.

11  Q.    The first letter you received in December, we can agree

12  that it was clear as day in stating this was a Sniper STLS 41,

13  the Scout tree stand, correct?

14  A.    Sure.  At that time was when we contacted insurance.

15  Shortly after that it became a Wal-Mart tree stand at the

16  exact same price Wal-Mart sells at.  They were very confident

17  that was the case.  It would have been easy to misinterpret

18  and say they saw a picture of a scout and said this is STLS 41

19  when, in fact, it was bought at Wal-Mart and it wasn't our

20  tree stand.

21  Q.    Do you think that they pulled Sniper STLS 41 Scout out

22  of thin air in terms of what they named it?

23  A.    On the letter?

24  Q.    Yes.

25  A.    I think that there was probably some confusion between

1    the attorney and the person, the Vivian.  What the confusion

2    was or what the model was or where it was bought and what it

3    was purchased for, I don't know all of the conversations

4    between those guys.  I just know their facts weren't clear at

5    the time.

6    Q.     Did you know that I cleared those facts up in a matter

7    of a 15 minute phone call on July 20th?  Would that surprise

8    you?

9    A.     I don't think that the inspection was done yet, so that

10   would surprise me.

11   Q.     You think someone else is out there producing models

12   that have the same batch number that they produced for you in

13   the same batch as Mr. Queen's case?

14   A.     That is very possible, yes.  I do believe that is

15   happening right now.

16   Q.     You are quite familiar with Mr. Queen's case and our

17   allegation of what it involves, correct?

18   A.     I feel like I am, yes.

19   Q.     I deposed you twice over the course of, I don't know,

20   seven, eight, ten hours, right?

21   A.     Sure, yes.

22   Q.     You agree that after both of those depositions you had

23   to go back and supplement a bunch of discovery based upon

24   things that came out in that deposition that you hadn't

25   produced before, true?

27

1  A.     I know we have supplemented several things and I know

2  Andy has asked for a tremendous amount of documents and we

3  worked very hard to provide them.  I feel like everything that

4  you have asked for -- I know he has asked me questions several

5  different ways to say are you sure we do have everything and

6  I'll say wait, what about this, does this count?  Yes, okay,

7  we need to supplement our answer.  But it has always been we

8  worked very hard to give you everything you wanted.

9  Q.     A lot of the things that you ended up having to

10 supplement wasn't material that I was additionally asking for,

11 but material that I had already found and presented to you and

12 asked why it hadn't been produced, true?

13 A.     I guess.  Can you give me an example?

14 Q.     How about the Beach complaint?  How the about the

15 Engles complaint?  How about the existence of API, which did

16 hundreds of thousands of dollars of product sales that went

17 through Illinois?  How many do you want?

18         MR. SANDBERG:  Your Honor, the earlier Motion for

19 Sanctions was withdrawn and it is so reflected in the Court

20 record.  It is pleading 51 where you reflect that Mr. Blair

21 withdrew that motion.  My understanding, but you may have more

22 experience than I, is when a motion is withdrawn, it is the

23 same as if it was never filed and --

24         THE COURT:  No, it is still there in the record.

25 Things still happened.  We had a hearing and I listened, you

28

1    know, I listened to argument and not only that, when he filed

2    this motion he said I am incorporating my first motion.

3            MR. SANDBERG:  Well, again, that is why I am raising

4    the question.  When you withdraw a motion --

5            THE COURT:  I'll tell you, as far as I am concerned

6    the circumstances surrounding that first Motion to Strike are

7    relevant.  In fact, highly relevant to -- it could be highly

8    relevant to what is the proper outcome to this motion.

9            MR. SANDBERG:  Thank you.

10           MR. BLAIR:  Let me get back to the Queen allegations.

11   Questions By Mr. Blair:

12   Q.    You went and ordered your exemplars that your experts

13   tested from the manufacturer in China, true?

14   A.    Yes.

15   Q.    That wasn't the same factory that -- well, that wasn't

16   the same factory that manufactured the stand that my client

17   purchased, true?

18   A.    I don't remember off the top of my head.

19   Q.    Well, you did change manufacturers in 2013, correct?

20   A.    It would have been 2014 we changed.

21   Q.    Okay.  If my -- if the number of my client's stand is

22   7W1013, that means that it was manufactured in the tenth week

23   of 2013, right?

24   A.    That -- somewhat.  So 7W would be the factory.  10

25   would be the date.  Sometimes if it is blanket PO, it would

29

1    cover right around when the shipments happen, and 14 would be

2    the year.

3    Q.     Would it surprise you that 7W is not the lead batch

4    number off of the stands that your experts used to do their

5    testing?

6    A.     If it was ending in 14, then it probably wouldn't be 7W

7    because it would be a different factory.

8    Q.     And it was in 2014 that you actually -- let me think

9    back.  It was actually April of 2014 that I took your

10   deposition and subsequent thereto, you went and ordered

11   exemplars from the manufacturer, right?

12   A.     Maybe.  I guess I don't recall back.  There was a

13   time -- I don't remember what the exact date was.  If I could

14   see the batch number I would be able to tell you if it is the

15   same factory or not.

16   Q.     When you offered or actually through Andy to get me an

17   exemplar from that manufacturer, you knew that wasn't going to

18   be the manufacturer from the batch that my client had

19   purchased from?

20   A.     No, the specs would have been the same, but it wouldn't

21   have been the same factory.

22   Q.     You know the specs were not the same, right, as it

23   turns out?

24   A.     I am not sure if they were.  I would assume they were

25   supposed to be.

30

1          THE COURT:  Mr. Blair, you have tried to correct

2    yourself a couple of times.  When we're referring to Mr. Ryan,

3    let's refer to Mr. Ryan.  You said Andy a couple of times.  I

4    know you corrected yourself.

5          MR. BLAIR:  Force of habit.  I know.

6          THE COURT:  While he is getting his papers,

7    Mr. Stieren, on that last point, so you are the one who

8    collected up the exemplars to provide for testing to the

9    experts in this case?

10   A.    Yes.

11         THE COURT:  Okay.  So the exemplars that your expert

12   used were produced -- were from stands that were produced by a

13   new company, not the one that produced the stand that

14   Mr. Queen used?

15   A.    I think what the situation was there was -- so we

16   switched factories from 2013 to 2014 and we didn't -- there

17   was no 2013 from that factory left and we don't have a good

18   relationship with that factory, so if I called and said can

19   you give me two to make, they would not do that.

20         THE COURT:  I understand.  I think we had some

21   discussion about this at the time, but I don't recall, so I am

22   sorry I cut you off.  So you didn't have access to the 2013

23   exemplars?

24   A.    Correct.  So the best we could do, and I had told our

25   attorneys this, Mr. Ryan, that I can call and have the factory

31

1    that is making the Scout right now produce samples.  It is a

2    different factory and that is what we ended up doing.

3            THE COURT:  That is where you got the exemplars that

4    you gave to plaintiff's attorney as well?

5    A.     Correct.  I think we air shipped them over from China.

6    They made two of them.

7            MR. BLAIR:  I'll clarify that in a moment.

8    Questions By Mr. Blair:

9    Q.     So these are carbon steel tubing specifications from

10   W.W. Industrial Corps quality assurance manual that I marked

11   as Plaintiff's 1.

12           THE COURT:  I think -- isn't this also in the record

13   already?

14           MR. BLAIR:  If it is, I thought it would have been

15   baits numbered.  Not baits numbered, but stamped up here, but

16   it could be.

17           THE COURT:  This is the same as Document 102-9,

18   Exhibit I, to your reply.

19           MR. BLAIR:  Okay.

20           THE COURT:  You marked it here as P1.

21   Questions By Mr. Blair:

22   Q.     Mr. Stieren, if you look at carbon steel tubing

23   specifications, specifically carbon and manganese, those give

24   the acceptable levels by weight percentage of carbon and

25   manganese, correct?

32

1    A.      Just so we're -- so the record is clear, this is from

2    our quality assurance documents and I think it is at the end

3    of it and it shows what the specifications should look like.

4    This isn't what we would follow.  I think we follow Chinese

5    standard Q 195 or something.  I would have to look back, but

6    it is basically a guideline when we created the Q A document

7    back -- I think it was created 13 years ago as a reference.

8    We use the same steel specifications.  A lot of the tree

9    stands now are made at the same factory and they use the same

10   steel, so we use the same as the industry standard.  I believe

11   it is Q 195.

12   Q.      Do you not remember testifying in the deposition

13   whenever I specifically asked you about those documents that

14   those are the industry standards that have been used for

15   years?

16   A.      The Q A document?

17   Q.      Yes, the specific document that I was asking you about

18   in your deposition you told me were the carbon steel tubing

19   specifications that had been the industry standard for a long

20   time.  Do you remember that?

21   A.      That is what we use, the industry standard right now.

22   Q.      So that is your industry standard?

23   A.      The one that we use right now is the industry standard.

24   Q.      Do you recall telling me that what was reflected in the

25   quality assurance manual, carbon steel tubing specifications

1    were the industry standard when I deposed you?

2            MR. SANDBERG:  Can we refer to page and line so we

3    can see what it says?

4    Questions By Mr. Blair:

5    Q.     I'm going to get to it, but do you remember that?

6    A.     Not off the top of my head.  I want to point out on the

7    specification sheet, the general one in the Q A document, it

8    uses 11 gauge, 16 gauge, 14 gauge.  The industry uses metric

9    system, it is not in gauges, so I just want to clarify that

10   this is not something that we follow, it is just showing the

11   chart of gauges and the wall thicknesses per each gauge, so it

12   is saying 18 gauge tube for wall thickness is .049, so it is

13   giving you the thickness of what the gauge is.

14   Q.     It also sets forth the composition, correct?

15   A.     What is that?

16   Q.     It also sets forth the composition, right?

17   A.     In this particular chart for whatever the specification

18   is, yes.

19   Q.     I'll come back to that.  So we have the carbon steel

20   tubing specifications that are in your quality assurance

21   manual, correct?

22   A.     There is a chart listed here.  I'm not sure what you

23   are asking yet.

24   Q.     Okay.  Judge, I believe this is also in the record.  In

25   fact, I am certain it is.

34

1          THE COURT:  So now we're talking about P 3.  P 3 is

2     in the record and you are asking him about document P 3, but

3     it has already been filed.  There is two documents that look

4     like this.  This one is dated 1-21-16, which is

5     Document 102-10.  The other -- okay, so you can go ahead.

6     Questions By Mr. Blair:

7     Q.     Do you see the carbon steel tubing testing results that

8     are there under element where it says carbon and manganese?

9     A.     Yes.

10    Q.     And those are registered as eleven and ten percent by

11    weight respectively on two different stands?

12    A.     I see that, yes.

13    Q.     And 44 percent and 45 percent respectively as to

14    manganese, correct?

15    A.     Yes.

16    Q.     And those are in compliance with the carbon steel

17    tubing specifications that is in your quality assurance manual

18    that we just looked at a moment ago, true?

19    A.     Sir, I don't know if it shows the same as the chart.  I

20    know it lines up with the steel that we use.  We have used the

21    same steel since existence and it is the same as everybody in

22    the industry.

23    Q.     Could you look at Exhibit I that we were looking at

24    previously?

25    A.     Sure.

35

1          THE COURT:  Okay, Exhibit I is Document 102-1.

2     Exhibit I to your reply?  Can you clarify for me, is this

3     Document, 102-9, you guys are having an argument about what

4     this is, so I just want to know, what is it?

5          MR. BLAIR:  It is quality assurance -- the carbon

6     steel tubing specifications that are contained within W.I.C.'S

7     quality assurance manual in relation to the use of carbon

8     steel end slanters.

9          THE COURT:  Okay.  Is that accurate, Mr. Stieren, or

10    not?

11    A.    Yeah, so we basically --

12         THE COURT:  It is in your quality assurance manual,

13    correct?

14    A.    Yes.

15         THE COURT:  But you were wanting to qualify that

16    because it sounded like you were saying but this isn't really

17    what we go by, because there is some other standards that the

18    Chinese use that we actually go by?

19    A.    Yeah, so this is basically -- I think it is a print out

20    maybe from the ASTM chart or something.

21         THE COURT:  What is ASTM?

22    A.    International testing.  I don't know for sure what it

23    stands for, but basically -- you guys know what it stands for,

24    ASTM?  Anyways, I think it is U.S. structure of testing like

25    you can send something to an ASTM lab and they'll test it for

36

1    you.

2    Questions By Mr. Blair:

3    Q.    All right.  So I just want you to compare 201-1 with

4    the numbers that you just read off for me as to the element

5    testing that your experts used.  Can you do that for carbon

6    and manganese?

7    A.    Okay, so it says -- I am sorry, so you want me to read

8    this in comparison with this one?

9    Q.    What does it say for carbon, eight percent and

10   15 percent, right?

11   A.    Yes.

12   Q.    The ones your experts tested found to be eleven percent

13   and ten percent, correct?

14   A.    Yes.

15   Q.    So that is in compliance with the specifications you

16   have in the quality assurance manual, correct?

17   A.    It would be in compliance with this chart.  Again, this

18   doesn't really perform what we actually use.  This is just a

19   chart showing specifications from an ASTM print out.

20   Q.    This is what is in your manual for quality assurance,

21   right?

22   A.    Yes.

23   Q.    For manganese that level in your quality assurance

24   manual is 30 percent to 60 percent, right?

25   A.    Yes.

37

1  Q.     The manganese in the other testing results is

2  44 percent and 45 percent respectively, right?

3  A.     Yes.

4  Q.     So that is also good in compliance with carbon steel

5  tubing specifications in your W.I.C. quality assurance manual,

6  right?

7  A.     Yes.

8          MR. BLAIR:  Judge, this is going to be the document

9  that you said looked just like it.  I think it is going to

10 be --

11         THE COURT:  102-12, which is Exhibit L to your reply

12 and it is dated 1-18-2016, so we can refer to it as that.

13 Questions By Mr. Blair

14 Q.     Sir, this is the compositional analysis that is

15 identified as Document 102-12 for Mr. Queen's stand.  Can you

16 read the carbon composition for me?

17 A.     It says less 10.01.

18 Q.     So there is no detectible level of carbon whatsoever,

19 right?

20 A.     I am not sure what detectable level is.  I know it says

21 .01.

22 Q.     What is safe for manganese?

23 A.     It reads .2.

24 Q.     That is 20 percent, right?

25 A.     I believe so, yes.

38

1   Q.     Okay.  So those are woefully inconsistent with that in

2   your quality assurance manual, right?

3   A.     The way it is listed here, but I need to emphasize it

4   is Q 195 that the industry uses and this is like -- this is

5   listed right here.  I am assuming at the time we created this

6   document there was an ASTM -- it looks like right here it

7   might match up -- ASTM 29-12.  Again, I am not positive what

8   it is from.  I know we don't follow that as a guideline.  We

9   follow whatever the industry follows.

10  Q.     Okay, 102-12 compared with 102-11, which was the

11  exemplar your expert tested that you got from the Chinese

12  manufacturer, is woefully different in carbon composition and

13  manganese, true?

14  A.     I am not sure.  Are these two different reports from

15  two different tree stands?  Is that what you are saying?

16  Q.     I am saying 102-11 is the composition of Mr. Queen's

17  stand.

18            THE COURT:  12.

19  Q.     I am sorry, 12.  102-11 is the metal composition of the

20  stands you had manufactured in China, correct?

21  A.     I apologize.  I don't know where you guys are getting

22  102-11 and 12.  Is that listed somewhere?  I am missing it.

23            THE COURT:  Sorry.

24  A.     I don't have --

25            THE COURT:  Let's establish, because these are expert

39

1    reports from defense expert, right?

2              MR. BLAIR:  Right.

3              THE COURT:  Everyone agrees 102-10 is Mr. Saunder's

4    expert report, Testing Composition of an Exemplar?

5              MR. SANDBERG:  That's correct, Your Honor.

6              THE COURT:  102-12 is Mr. Saunder's report relating

7    to his tests of the tree stand in this case, Mr. Queen's?

8              MR. BLAIR:  That's right.

9              THE COURT:  Those are the experts.  These are his

10   views of the ASTM A, 29-12 requirements.  Those are the ones

11   that he chose.  Their expert, right?

12             MR. BLAIR:  Mr. Stieren chose him for their expert.

13   He went and got them from China.  I think I understand.

14             THE COURT:  I am talking about -- let me -- just

15   these are what your expert used?

16             MR. RYAN:  Correct.

17             THE COURT:  What Mr. Stieren chose to send to him was

18   the actual exemplars.  I am talking about the standards,

19   right?

20             MR. BLAIR:  These are not the standards, these are

21   the compositional analysis results.

22             THE COURT:  I understand that.  These grave

23   requirements on the far right, those are standards, are they

24   not?

25             MR. BLAIR:  That is the first I have looked at that.

1    I think they are, but I am not certain.  That is a good

2    question.

3              THE COURT:  He is trying to explain that, that this

4    is one bit of standards.  He has something else in there, Q A,

5    and there is some other standard out there too.

6              MR. BLAIR:  I think he is referring to Chinese

7    standard, but these are not in Chinese standard terms.

8              THE COURT:  Understood.  Okay, sorry to interrupt.  I

9    wanted to make sure that I am on the same page as everybody

10   else.

11   Questions By Mr. Blair:

12   Q.    So P 102-12, which is the accident stand, composition

13   reflected -- I am sorry -- yes, P 102-12, which is the

14   accident stand, is woefully deficient compared with the

15   exemplars you got for your expert's test, true?

16   A.    I am not qualified to say one or the other.  I know

17   these numbers are different, but they also came from different

18   factories, so it looks, from my understanding, is the one I

19   have that is not marked is the one that we just got from China

20   and air shipped over and the one that is marked W2-12 came

21   from the Queen stand.  That is what I am understanding.

22   Q.    You would agree that these test results reflect that

23   these stands are not being, or in the past, have not been

24   manufactured uniformly, true?

25   A.    I think they all meet the Q 195 standard and they are

41

1    all safe, but it looks like if these reports are accurate, the

2    chemical analysis results have different weights in them.  I

3    am not able to say what is stronger or weaker.  I am just

4    reading the report.

5    Q.    Back to my original question.  As far as the different

6    chemical composition, they are not uniform between the stands

7    we have here, correct?

8    A.    And I am assuming they probably pulled from different

9    steel manufacturers or something for the two different stands

10   because they are made in two different parts of China.

11   Q.    You are aware that the construction of Mr. Queen's case

12   is that the stand collapsed under his weight as he was going

13   up the ladder, right?

14   A.    That is what I have been told.

15   Q.    It wasn't a red flag in your mind whenever you got

16   another stand STLS 41, the Scout, that was also identified

17   from Mr. Vivian's counsel as having collapsed on him?

18   A.    I'm not understanding what you are saying.

19   Q.    Didn't something go off in your head, say we already

20   have another one that the claim is it collapsed and here is

21   another one, that could be significant?

22   A.    Sure, but I also need to understand if it is, in fact,

23   our tree stand.  Like there is a diligence process that I

24   would need to follow also.

25   Q.    Well, you have a due diligence obligation to me and to

42

1  the Court in discovery, true?

2  A.    That's correct.

3  Q.    And there is no possible prejudice to you if you

4  disclosed an incident that ends up being completely immaterial

5  and never comes into evidence, true?

6  A.    I also don't want to put a bunch of work on everybody

7  if it is not even our tree stand.  I don't feel like there is

8  harm in me doing the diligence on my end to try to figure out

9  if it is our tree stand before letting Andy know.

10  Q.    Now you disclosed the Beach case after I found it,

11  right?

12  A.    Sir, I am not sure.  I know Andy printed off a report

13  of some API stuff.  The API stuff was very confusing because

14  there was a lot of dates back, and he said is this one of

15  yours and I said I don't know, let's look.

16  Q.    You remember me deposing you back in October of 2014,

17  don't you?

18  A.    Yes.

19  Q.    At that point in time I brought to your attention the

20  Engles matter that hadn't been previously disclosed, right?

21  A.    Yes.

22  Q.    That was the case here in front of Judge Williams,

23  right?

24  A.    I don't remember who the judge was on it.

25          MR. BLAIR:  Judge, I am sorry, I'm looking for the

43

1    first thing I handed you.

2         THE COURT:  Are you talking about P 25 or P 24,

3    Fourth Supplemental Answers and the objections?  That is P 25.

4    That is the first thing you handed me, which was because I

5    asked for it.

6         MR. BLAIR:  I'll come back to it.  There it is.

7         THE COURT:  What is he referring to?

8         MR. BLAIR:  He is referring to interrogatory number

9    seven, page two.

10        THE COURT:  Of P 25?

11        MR. BLAIR:  Yes, P 25.

12   Questions By Mr. Blair:

13   Q.    See, originally you told me that you hadn't received

14   any reports, notices or complaints in your initial answer,

15   correct?

16   A.    That's correct.

17   Q.    And then in deposition I brought out the Engle's

18   complaint and I brought out the Beach petition, correct?

19   A.    Possibly.  I don't remember exactly.

20   Q.    Then after your deposition in October of 2014, you

21   disclosed these additional incidents that I identified in the

22   deposition, right, you supplemented?  That is where it says

23   first supplemental answer, right?

24   A.    Yes.

25   Q.    The Beach matter, did that end up being one of your

44

1    products?

2    A.    I don't recall.  I would have to look.  I am not sure.

3    Q.    Why are you handling disclosure of Engle's and Beach

4    differently than you did with respect to Vivian?

5    A.    Why would you say it is different?

6    Q.    Well, you didn't know a whole lot about the Beach claim

7    whenever I talked to you about that.  You didn't know a whole

8    lot about the Engle's claim or couldn't recall much about

9    that, but you went ahead and disclosed it after I brought it

10   up in deposition about -- so my question, even though you had

11   limited information about those claims, you went ahead and

12   disclosed them, but you didn't do the same for Mr. Vivian.

13   Why?

14   A.    I would say Vivian on a new case, I feel like it is

15   reasonable to find out if it is our tree stand before we bring

16   it to anyone's attention.

17   A.    Don't you think it would be good if I could have an

18   opportunity to do my own investigation and find out how

19   material it is to my case?

20   A.    Sure.  I think we gave that opportunity.  I don't

21   understand how the time lines work, but I knew the trial was a

22   long ways away, so I didn't understand the harm in trying to

23   figure out whose tree stand it was before letting everybody

24   know.

25   Q.    Well, discovery closed on May 20th and I didn't get the

1    document until July 8th.

2    A.    Okay, I didn't know that.

3    Q.    Okay.  You got the document in December of 2017 well

4    before we had even taken -- I am sorry, 15th -- well before we

5    had even taken or gotten Mr. Ryan's expert reports and his

6    deposition.  You understand why I would want to be able to ask

7    your experts about this other claim, right?

8    A.    I guess I don't understand what the time lines of

9    everything are.  I just know in January we had the phone call

10   and my attorney, Mr. Parady, said we're for sure it was bought

11   at Wal-Mart and the the price was this?  At that time I was on

12   the road almost constantly until March.  At that time when I

13   reviewed the documents, that is when I talked to Andy, or

14   sorry, Mr. Queen, and I said I am pretty sure it is ours, but

15   we have to proceed with inspection until we further know for

16   sure.

17   Q.    According to your affidavit, you received an e-mail

18   attaching the STLS 41 instruction manual at the end of

19   January, correct?

20   A.    That's correct.

21   Q.    And in order to make the determination of whether that

22   was an STLS 41, Sniper STLS 41 Scout model tree stand, all you

23   had to do was look at the front page of the front cover,

24   right?

25   A.    Sure, but please also understand from January to March

46

1    I think I had eleven trade shows that I went to.  We travel

2    around the United States within an enclosed trailer, show

3    after show in our business from January to March.  That is

4    when all of our business is booked.  That is when we make our

5    living or attempt to.  So it is easy in my mind to say in

6    January of '16 when I had that conversation, and we're

7    confident it is a Wal-Mart tree stand or Scout that was sold

8    through Wal-Mart, that is not ours, whatever the case would

9    be, to file that to deal with it later.  It is not I ignored

10   it, it is just that I didn't understand the harm in waiting

11   until March.  I didn't expect it to come to this.  I wasn't

12   trying to harm anyone by waiting.  It was just the nature of

13   my business.

14   Q.     You were produced for deposition in October, right?

15   A.     October of 2014 I think, yes.

16   Q.     Is that a better time of year for you?

17   A.     I don't -- January to March is the worst time of year.

18   I don't know if there is a very good time of year with us

19   being a small business that runs hard, but it is better than

20   January to March, but still not a great time.  That is when we

21   do our big meetings with individual customers.

22   Q.     And at the end of January, you also receive the photos

23   of Mr. Vivian's stand, which showed the batch number, right?

24   A.     I believe it was all in one e-mail that I had filed

25   away.  I think it was on the 27th of January.

47

1   Q.     That shows the stand also bent, hanging in the tree,

2   right?

3   A.     There was photos attached.  They were really pixely,

4   but I don't remember exactly.  I know there was photos of the

5   batch and there was one of it at the site.

6   Q.     What kind of phone do you have?

7   A.     What kind of phone?  An Iphone.

8   Q.     On my Iphone I can pull up pictures and documents from

9   e-mails.  Are you unable to do that on your Iphone?

10  A.     Sure, I can do that, yes.

11  Q.     So it would have taken you a matter of five seconds to

12  look at the front of the manual and determine it was, indeed,

13  your product, right?

14  A.     Again, sir, so you understand the position, on the 16th

15  of January, having the phone call, we were confident at that

16  time it was Wal-mart tree stand.  In my head I say, okay, file

17  this away.  The e-mail came in, I put it in the figure this

18  out later or address this situation later and went on with my

19  trade shows until I caught up back with Mr. Ryan in March.

20  Q.     So you caught up with Mr. Ryan on the issue in March,

21  true?

22  A.     I believe so.  I'm not positive.

23  Q.     This is Document 101-3.  It is the affidavit that you

24  filed along with the response to the motion, second motion to

25  strike your pleadings.  Judge I have a copy here for you if

48

1  you need it.  Can you look at paragraph 11 and read that?

2  A.    I did not review the users manual provided on

3  January 27th until May 27th, so I apologize.  It was not

4  March.

5  Q.    So your busy season was over during March.  You still

6  don't do anything until end of May, correct?

7  A.    I would say our busy season goes through April, but for

8  whatever reason it must have been March or maybe we had a

9  phone call prior to that.  I don't know.  I guess it was May.

10  Also keep in mind after we probably do 15 trade shows in the

11  spring, and I am not making excuses for being too busy, but 15

12  trade shows and then we got to figure out what happened.  As

13  being on the road for three or four months, it is a very busy

14  time for us.  The intention is not to not disclose the case,

15  the intention is to try to figure out is this our tree stand

16  and if it is, disclose what we need to do for information.

17  Q.    So you say in your affidavit that you have seen

18  products offered for sale on the Walmart.com website that are

19  identical to the makes and models W.W. Industrial distributes.

20  Now what products are we talking about?

21  A.    So to explain the Wal-Mart situation, I believe

22  Wal-Mart's online website is moved to more of an E-bay style

23  platform where people can post things or maybe an Amazon

24  style.  I am not really sure.  There are several stages to

25  this; the first being there is a supplier in China right now

49

1    that we used to do business with that we no longer do business

2    with that has actively continued to sell and promote Sniper,

3    even though we have attempted to not have that happen,

4    identical products, work batch, instruction manual to the T.

5    He copied it and continued to market it.  We red handed caught

6    them selling to Europe and now we can see it for sale online

7    from that supplier.

8    Q.    The supplier you identified as Yang Zo (phonetic), that

9    wasn't Wal-Mart, right?

10   A.    The factory is not Wal-Mart, no.

11   Q.    That is who you identified online as selling the

12   product over in Europe, right?

13   A.    Yeah.  So what happens from what I can tell, the Yang

14   Zo Cali factory will supply product to whoever wants to buy

15   it.  It will be Sniper product.  They can distribute however

16   they want.  Now in America, there is a lot of what I call

17   garage shops that are buying these products off of Ali Baba

18   and different Chinese websites and bringing them in and

19   selling them on websites as manufacturers.  I think it happens

20   not just in the tree stand industry, but I know it has

21   happened a lot on purses and different things, but we can tell

22   it is actively happening with Sniper trademark right now.

23   Q.    You own the Sniper trademark, correct?

24   A.    That's correct.

25   Q.    It is your testimony that Wal-Mart is out there

50

1    infringing on your Sniper trademark with impunity?

2    A.    I don't think they're doing it on purpose.  Here is an

3    example.  We have products on there right now and we don't

4    sell them to Wal-Mart.  How they get them, I am not positive.

5    I don't know.  Are they ours?  I would assume so.  Can they

6    not be ours and sold through a different channel coming from a

7    different supplier?  That is possible.

8    Q.    Why did you not attach any of these online sales that

9    Wal-Mart is doing of Sniper products to your response?

10   A.    We don't sell to Wal-Mart.

11   Q.    But you are telling me website --

12        THE COURT:  Let me ask you something.  So when you

13   say Wal-Mart is selling Sniper products, do you mean when you

14   go on Wal-Mart's website it says Sniper STLS 41?  You can buy

15   the exact same thing that you can buy at Dunhams right here

16   online and it is W.I.C.'S Sniper tree stand?

17   A.    Yes.

18        THE COURT:  So if I go on Wal-Mart's website right

19   now I'll be able to find Sniper products there?

20   A.    I would assume so, yeah.

21        THE COURT:  You have seen them there on Wal-Mart's

22   website?

23   A.    Yes.

24        THE COURT:  When they are marketed as Scott Model

25   STLS 41 tree stand by Wal-Mart, does it anywhere say anything

51

1   else that would indicate that it is a W.I.C. Inc., tree stand

2   or just the fact that it is a Sniper tree stand?

3   A.     I am not sure I know.  It says Sniper and I know it

4   uses our model.  The problem with the scenario we face right

5   now, we don't know -- it is like Amazon and E-bay right now.

6   We don't control the source, so it could be our tree stand

7   from somewhere.  Maybe somebody secondhand buying it or, like

8   I said, garage shop.  There is another scenario where, you

9   know, it is not our product and somebody is making it or

10  buying it from that supplier.  You can tell -- you can

11  actively buy Scout STLS 41 that is identical from China, you

12  buy 100 units, bring it in and they try to make money off of

13  it.

14           THE COURT:  But when you look at it on the website it

15  says Sniper tree stand.  Wal-Mart is selling Sniper tree

16  stands?

17  A.     Yes.

18           MR. BLAIR:  I can tell you I have searched the heck

19  out of Wal-Mart and I can't find --

20           MR. SANDBERG:  Let's not have counsel testifying

21  about what he has done, and then I think we're really going a

22  little far saying I did this outside of Court and let me tell

23  you about it.

24           THE COURT:  That's true.

25           MR. BLAIR:  Let me get back.

1    Questions By Mr. Blair:

2    Q.     That exhibit you attached about them selling the STLS

3    41, the Scout, it doesn't say anything about Sniper, did it?

4    A.     I'm not sure what you are asking.  The exhibit?  Which

5    exhibit?

6    Q.     Judge, this is 101-4.  This is what you gave us an

7    example of, this STLS 41, being available elsewhere, correct?

8    A.     This is to show what is happening in China, so this is

9    this factory marketing in Ali Baba, which from what I

10   understand is like Ebay where someone can go on and you could

11   order the Scout through this factory.

12   Q.     Well, could you order a Sniper Scout from it?

13   A.     I would -- they have our art work and everything.  I

14   would assume it would come identical to our product.

15   Q.     They don't advertise it as Sniper.  Did you notice

16   that?

17   A.     That is probably because we yelled at them, but I will

18   tell you that it will come identical with the same instruction

19   manual and everything.  I can see the model number.  They put

20   JKL in front of it.  That's JKL-STLS 41.

21   Q.     Sir, you don't have a proprietary interest in any of

22   the other models, is that correct?

23   A.     There is no patent on them, no.

24   Q.     There is nothing wrong legally with what they are

25   doing, right?

53

1   A.      I disagree, because they have our art work in there.

2   Q.      Well, there is no art work here that they are

3   purporting to sell it under your brand name, correct?

4   A.      I know when we caught them doing it in Europe, they

5   used the Sniper name.

6   Q.      Did you think Mr. Vivian purchased his stand in Europe?

7   A.      No, I didn't think he purchased his stand in Europe,

8   but I think it is reasonable to think it is possible that if

9   he bought it on Wal-Mart and they had a Wal-Mart price and

10  they were confident with that, I figured that it is possible.

11  Q.      You don't think Mr. Vivian bought an order of 100 sets

12  from Yang Zo as they set forth in the minimum order on the

13  second page, right?

14  A.      No, I think it is more of a problem of the garage shops

15  or archery shops, I don't know who, but it is possible they

16  buy them and up charge them and post them.  I don't know for

17  sure.  I know there are a lot of products that we do not sell

18  to Wal-Mart that is listed on Wal-Mart.

19  Q.      Have you ever gone into a store and seen a Sniper brand

20  product on the store shelf at Wal-Mart?

21  A.      No, but they are online.  Dot com strategy is much

22  different than retail strategy.

23  Q.      I would agree but you were told specifically what

24  Wal-Mart Mr. Vivian bought it off the shelf from, right?

25  A.      If I was told that, I don't recall.  Just for the

54

1   record, the way it looks, this must be a copy out of our

2   product catalog that they posted on the internet because it

3   even has page 12 on the bottom left hand corner, so that would

4   be -- if it doesn't say Sniper it was because it was out of

5   our product catalog.  Looks like they copied and pasted on the

6   website.

7   Q.    This is Plaintiff's Exhibit 16, which I don't believe

8   is in the record anywhere.  Can you give me the date of that

9   document?

10  A.    April 6th of 2016.

11  Q.    That is a demand letter, correct, that Mr. Vivian's

12  counsel sent to your counsel, Parske (phonetic), right?

13  A.    It looks like that way, yes.

14  Q.    Look at the third page.  It says we're authorized to

15  accept $125,000 to resolve the claim, correct?

16  A.    Yes.

17  Q.    Do you see it says in September of 2014 Mr. Vivian

18  purchased a Sniper tree stand from a Wal-Mart in Edinsburg,

19  Pennsylvania, right?

20  A.    That is what it says, yes.

21  Q.    There is no suggestion this was an online purchase,

22  right?

23  A.    Again, I don't know.  I mean it could refer to him

24  residing in there to make the order.  I don't know.

25  Q.    At this point you still haven't looked at the materials

55

1    in your receipt, correct?

2            MR. SANDBERG:  Well first of all, he hadn't asked him

3    when, if ever, he saw this letter since it didn't go to him.

4            THE COURT:  Okay.  Well, sustained.  You can ask when

5    he saw the letter.

6            MR. BLAIR:  Pardon me?

7            THE COURT:  You want to ask if he saw this letter.

8    Questions By Mr. Blair:

9    Q.    Sir, did you ever see this letter?

10   A.    I don't know for sure.

11   Q.    Was there a -- well, was a settlement demand

12   communicated to you?

13   A.    I believe at some point, but I can't recall a date.

14   Q.    Were the specifics of the accident provided to you

15   beyond what you had originally been notified of by your

16   counsel?

17   A.    Not until after the inspection.

18   Q.    In any event, your counsel as of, or the day of the

19   document was April -- can you give me the document date again?

20   A.    April 6th of 2016.

21   Q.    So as of April 6th of 2016, your counsel at least knew

22   it was not purchased online, correct?

23   A.    I can't recall that.  I don't know what he felt at that

24   time.  I think our internal feeling at that time was still

25   that there was confusion within each other because they were

56

1   still very confident that Wal-Mart was the place of purchase.

2   Q.    Did you ever ask for additional information and whether

3   this was purchased online?

4   A.    Not until after we had gotten back from our trade shows

5   and everything.

6   Q.    This is P 19.  So that is a letter of May 31st from

7   your attorney back to the folks at Friday and Cox who

8   represent Mr. Vivian, right?

9   A.    Looks like that, yes.

10  Q.    That was the response to your demand letter as stated

11  in the first sentence of that letter, right?

12  A.    It appears that way, yes.

13  Q.    And if you look through the letter, do you see any

14  suggestions that the tree stand was not a Sniper STLS 41 Scout

15  tree stand from W.I.C.?

16  A.    I think the only thing would be on F, because I said

17  the only way we really can figure this out is if they can

18  provide a receipt or something.

19  Q.    They had already provided you the user manual, photos

20  of the batch number.  You stated in your response that is

21  sufficient for you to pretty well identify the product, right?

22  A.    Again, but we have the second issue of it is very

23  common for China to be supplying this, so if it was sold at

24  Dunhams, it is reasonable in my head that we know that we did

25  that.

1  Q.      You see that Mr. Parske points out a number of things

2  that he thinks that Mr. Vivian is at fault for in causing the

3  accident.  Do you see that there?

4  A.      Yes, I do.

5  Q.      Nowhere does he suggest that this thing did not

6  collapse, true?

7  A.      Does he suggest that it did not collapse?

8  Q.      Does he make any assertion in response to your

9  settlement demand whenever he is identifying things that

10  Mr. Vivian purportedly did wrong that the stand did not

11  collapse as he asserted in his original letter back in

12  December of 2017?

13  A.      No.

14  Q.      I am sorry, 2015.  That's correct, right?

15  A.      That's correct.

16  Q.      Have you said anything to Wal-Mart about infringing

17  upon your trademark?

18  A.      No, but I don't -- I wouldn't know where to go from

19  that.  I don't know if they are infringing.  I know they are

20  selling a lot of our product.  I don't know how they are

21  getting it or it is possible that it is not our product, but I

22  have not contacted Wal-Mart, no.

23  Q.      You have a lot of lawyers that you employ, don't you?

24  A.      No, I don't.

25  Q.      The Sniper of the Scout STLS -- the Sniper STLS 41, the

58

1    Scout tree stand, was exclusively sold at Dunhams, right?

2    A.    I have to look back.  I think in 2013, yes.

3    Q.    And if another retailer had it on their shelves it

4    would not be called a Sniper STLS 41 Scout tree stand, it

5    would be called something else, correct?

6    A.    You are talking about 2013?

7    Q.    Has something changed?

8    A.    Well, Dunham's doesn't carry our products anymore,

9    so --

10   Q.    At the time that you gave your deposition on

11   October 28, 2014, was it true that you could not find a Sniper

12   STLS 41 Scout tree stand called by that name at any other

13   retailer other than Dunhams?

14   A.    As far as I am aware of, but there is also the issue

15   that I brought up on the China.  I don't as I sit here today,

16   I don't know, but, yes, if it was made from us, then there is

17   only one retailer that could buy and that was Dunhams.

18   Q.    If it was the same design as the STLS 41, it would be

19   called something else, correct?

20   A.    We made a design similar for Menards and we called it

21   something else in 2013.

22   Q.    Okay, but if it is purchased from Dunhams you know it

23   is Sniper STLS 41, the Scout, and it is not going to be called

24   something else the same as what it is at Dunhams elsewhere,

25   right?

59

1   A.     If it was bought in 2013 at Dunhams, it would have been

2   called the Scout, that's correct.

3   Q.     That was true as of your deposition in October 28th of

4   2014, right?

5   A.     Yes.

6   Q.     All right.  So I want to make sure that I have the time

7   line down here.  You personally received a letter notifying

8   you of Mr. Vivian's claim on December 17th of 2016, right?

9   A.     It is dated the 14th.  It must have been a few days

10  after that, so it sounds right.

11  Q.     You put your insurance carrier on notice of the claim

12  on December 31st of 2016, right?

13  A.     I believe I contacted them to get an attorney to reach

14  out to them to figure out what was going on.  That probably in

15  that process notified the insurance carrier because I used my

16  agent to do that for me.

17  Q.     You know you have an obligation to them to report

18  claims, otherwise they can deny coverage, right?

19  A.     I guess.  I am not sure of the details on that.

20  Q.     Okay.

21  A.     I am assuming at some point you have to tell them.

22  Q.     Do you recall whenever I put you guys on notice of this

23  claim it took me two letters to get a response back from your

24  insurance company?

25  A.     I am not aware of that.

60

1    Q.    Do you remember receiving two letters from me?

2    A.    No.

3    Q.    When did you first notify Mr. Ryan of this report?  He

4    referenced April of 2016 previously.  Is that consistent with

5    your recollection?

6    A.    I don't know for sure without asking Mr. Ryan I guess.

7    Q.    You have got Mr. Ryan's e-mail address, right?

8    A.    That's correct.

9    Q.    You got his cell phone number, right?

10    A.    Yes.

11    Q.    You could have simply forwarded the materials that you

12    received back in December of 2015 very easily, correct?

13    A.    Sure I could have, but, you know, I was trying to

14    figure out if it was our tree stand at that time.

15    Q.    So you could have forwarded him the correspondence you

16    received December 17th, right?

17    A.    Yes, I could have.

18    Q.    You could have forwarded to him the information from

19    January that you got from your attorney, correct?

20    A.    Yes.

21    Q.    You could have forwarded him the information and

22    documents that you received in late January at any time,

23    right?

24    A.    Yes.

25    Q.    You still have a copy in front of you?  Judge, this is

61

1   the actual pleading, the response of W.W. Industrial that was

2   Document 101.  Could you turn to page nine?  Do you see the

3   last sentence that says Mr. Stieren is required to either

4   visually inspect the stand or review the literature

5   accompanying the product in order to confirm whether a

6   particular stand is one that W.W. Industrial distributes,

7   correct?

8   A.     Yes.

9   Q.     Who were you required by?

10  A.     It would be ours.  I guess that would be a policy that

11  we want to make sure it is our tree stand.

12  Q.     So that is an internal company policy, correct?

13  A.     I would say -- I would say it is reasonable for us to

14  expect that we figure out whose tree stand it is before we do

15  anything else.

16  Q.     You set that company policy yourself, correct?

17  A.     Yes.

18  Q.     So you require of yourself to either visually inspect

19  the stand or review the literature accompanying the product

20  before disclosing it to me?

21  A.     I would say in this circumstance there was a few

22  extraordinary things, one being the Wal-Mart and the price of

23  the Wal-Mart, and then two, we know the Chinese situation that

24  is going on, so I feel like it is reasonable for us to try to

25  get a receipt and get as much information as we can to try to

62

1   figure it out before we proceed.

2   Q.      That is not a requirement that is imposed by the Court,

3   correct?

4   A.      Not that I am aware of.

5   Q.      You keep saying the Wal-Mart price thing.  Where are

6   you seeing other Sniper STLS 41 Scout model tree stands that

7   are being retailed at Wal-Mart or online for 99.99?

8   A.      I think that the price they came up with was $99.96.

9   What stuck out on that, I think several years ago Wal-Mart

10  made a policy to drop from 99 to 96 from some report they had

11  and it was retail behavioral report, so when they said $99.96,

12  that is the only person who retails anything ending in 96 was

13  Wal-Mart.  It stuck out in my head.  They are confident it was

14  bought at Wal-Mart and the exact price was a Wal-Mart price.

15  At that point was when I filed it away to figure it out later.

16  Q.      You are not disclosing this claim as partly due to

17  Wal-Mart's roll back prices philosophy?

18  A.      Say it again.

19  Q.      Your not disclosing this claim in a timely manner is

20  partly attributed to Wal-Mart rolling back the prices policy?

21  A.      No, I didn't feel like it was our tree stand at that

22  time because of that.  It was a policy when they come up with

23  exact price and the phone call I had with Mr. Parske at that

24  time was are you sure it is Wal-Mart and are you sure it is

25  the $99.96 because that is not our tree stand.  He said yes,

63

1    they are confident.   Then I said, well, it is not our case.

2    They have the two man stand they sell for $99.96.

3    Q.      You are aware my client testified that over the course

4    of his lifetime he owned something like ten ladder stands

5    alone, correct?

6    A.      Yes, I remember that.

7    Q.      That is pretty common whenever it comes to avid

8    hunters, they are going to be buying multiple stands across

9    various locations that they need stands set up and across the

10   various hunting seasons, right?

11   A.      Sir, I don't know for sure.   I know that usually buyer

12   habits are they buy one thing and they continue to buy the

13   same thing over and over again.   I don't know for sure what

14   Vivian had in his mind.   I didn't know what he was thinking.

15   I just know what the information was provided to me.

16   Q.      But as far as the sales habits go of your consumers,

17   what you are seeing is that people buy on a regular basis

18   multiple, multiple tree stands who are avid hunters, true?

19   A.      I would say there is a big spectrum.   Again, there is

20   not one buyer.   There is maybe a guy that buys 100 tree stands

21   and someone that buys one and hunts once every three years.

22   Q.      So the person who buys 100 tree stands, do you think

23   they might get confused as to whether they bought one in

24   particular at Dunhams versus Wal-Mart?

25   A.      In my experience, and again this is just my opinion,

64

1    people -- they stick to stores.  They are Wal-Mart buyers or

2    Bass Pro buyers.  Again, I don't know what he was thinking.  I

3    just know the information that was brought to me.  That is all

4    I know.

5    Q.    Could you hand me or look at the document I have

6    previously given you, which was P 21?

7    A.    Mine aren't marked.

8    Q.    That was correspondence from Mr. Ryan that I think was

9    already in the record, so we didn't end up using that exhibit.

10   A.    This one here?

11   Q.    Yep.  It is the e-mail from Andy to me of July 8th.

12         THE COURT:  All right, let's use how it is identified

13   in the record would be helpful.

14         (Whereupon a discussion was held off the record.  The

15   following proceedings were held in open Court.)

16         THE COURT:  Okay, we're back on the record.

17   Questions By Mr. Blair:

18   Q.    Will you look at Document 101, which was the response

19   filed to my motion?

20   A.    I think this is it.  Can you confirm that for me?

21   Q.    It should say Document 101 at the top center.

22   A.    That's right.

23   Q.    Could you turn to page two?  Do you see the

24   parenthetical at the end of the first paragraph?

25   A.    The last paragraph you said?

1   Q.    The end of the first paragraph.  End of the first

2   paragraph, it says, "W.W. Industrial's counsel incorrectly

3   indicated in correspondence dated July 8th of 2016 (.95-2)

4   that the manual was e-mailed to Mr. Stieren on May 27th of

5   2016 when, in fact, Mr. Stieren received the e-mail on

6   January 27th of 2016 during one of W.W. Industrial's busier

7   times of the year."  Did I read it correctly?

8   A.    Yes.

9   Q.    If I had filed the motion and taken that as a

10   satisfactory response, I wouldn't have known that you actually

11   received the material some four months earlier, correct?

12   A.    I don't know.  I think the conversation with Andy and I

13   when he was asking me -- I was on the road at the time and I

14   said I didn't know what the time lines were, but as soon as I

15   got back into the office I would go through the e-mails and

16   tell him all of the dates.  That is when we found out

17   January 27th was when I had gotten the e-mail.

18   Q.    Okay.  Well anyhow, it is not correct that you had

19   gotten it on January 27th, you got it four months earlier,

20   right?

21   A.    January 27th was the date.

22   Q.    You have produced hundreds of thousands of ladder

23   stands, right?

24   A.    I guess.  I don't know the number.  There is a lot, but

25   I don't know if it is hundreds of thousands.

66

1    Q.    Well, it is over 100,000, right?

2    A.    Yes.

3    Q.    The only two reports that you have received of ladder

4    failures are on the STLS 41, correct?

5    A.    I think that is our highest volume ladder stand that we

6    have, so that would be, to just put the numbers would make

7    sense.

8    Q.    Well, you got 30,000 that were produced roughly as of

9    your deposition back in April of 2015, correct?

10   A.    Yes.

11   Q.    You have over 100,000 total, right?

12   A.    I would have to look back at documents, but over the

13   years, possibly.  I think there is several different makes and

14   models.  As far as ladder stands go, I think that is probably

15   the number one.

16   Q.    Okay.  So with over 100,000 stands that you put into

17   production, the only two that you have received product

18   failure complaints on, specifically collapse, is the STL 41,

19   and of those, those both came from the same manufacturing

20   batch, correct?

21   A.    7W 1013; it would have been all of 2013 production.

22   Q.    Well, was there only one production in 2013?

23   A.    For the STL 41, yes.

24   Q.    Your accident reconstruction expert, Mr. Smith,

25   testified in deposition, "Well, you would think if there were

67

1    more -- there were 30,000 manufactured at the same time, so if

2    there were 30,000 manufactured with the same metal, you would

3    think there would be more than just this one."  You understand

4    the significance of where he is going with that, right?

5    A.    I think he is showing the ratio between products out

6    there and failures.

7    Q.    And the answer to the question that he is posing there

8    was in your hands at the time I deposed him, right, that this

9    isn't the only one?

10   A.    I don't know, I need -- I don't know when you deposed

11   him, sir.

12   Q.    I deposed him on March 25th of 2016, right?  I mean if

13   you will accept that as the date, you already had the Vivian

14   incident that apparently he didn't know about and I didn't

15   know about, right?

16   A.    Yeah, I don't think we knew at the time.  We were not

17   confirmed whether or not it was our tree stand, but we had the

18   information that we had.

19   Q.    And if I had gotten that information, I could have

20   asked or responded to Mr. Smith in deposition in regard to his

21   commentary there about why aren't we seeing another one, true?

22   A.    You could have asked him questions about it, yes.

23          MR. BLAIR:  Judge, this is marked SP 12.  I don't

24   believe it is elsewhere in the pleadings.  To give you proper

25   orientation, it would be like landscape?

68

1          THE COURT:  All right, P 12 is just a group of

2    photographs, one of which is the top photograph is already in

3    as Exhibit M to your response at 102-13, but the remainder of

4    the photographs are in.

5    Q.     Mr. Stierens, did that appear to you to be the photos

6    you received of Mr. Vivian's stand?

7    A.     I believe so, yes.

8    Q.     And do you have the first photo oriented correctly?

9    A.     Oriented correctly.

10   Q.     Landscape style up and down?

11   A.     Yes.

12   Q.     You can see that the ladder, excuse me, the platform

13   extension of the ladder bent inwards.  Do you see that?

14   A.     Yes.

15   Q.     You understand that it is my client's contention that

16   his stand also bent inwards, correct?

17   A.     I think from what I remember last was the lower ladder

18   bent in or out.  I don't remember, but this is a different

19   part that bent.

20   Q.     And you understand that both of your experts contend

21   that Mr. Queen's stand could not possibly have collapsed

22   inward, correct?

23   A.     I'm not sure what they have said.  I have to look back

24   at the reports.

25   Q.     You can look at the photo again.  You can see that the

69

1  stabilizer strap has, or ratchet strap has already been

2  secured to that stand and is holding it to the tree, correct?

3  A.    From what I can tell of the picture, that is a ratchet

4  strap, but I am not positive.  From my understanding of this

5  case was he had the ratchet strap on and not the stabilizer

6  straps.

7  Q.    Ratchet straps are going to secure the tree more firmly

8  than the criss cross straps are, correct?

9  A.    I would say it is a different type of stability.  Not

10  necessarily.  They do two different things.

11  Q.    Right, because once you get to the point in the

12  installation process where you have the ratchet straps

13  installed, the criss cross straps are at that point

14  irrelevant, true?

15  A.    They still help stabilize it side to side and they help

16  stabilize it so that the ladder can't bend out because it is

17  still holding the top, criss crosses behind the tree and then

18  holding the ladder in place.

19  Q.    So it is duplicative, true?

20  A.    They both need to be in place to have it be safe.

21  Q.    Judge, this is my expert's report.  All I am going to

22  do is establish the time line.  I am not going through the

23  specifics.  I don't know if you need it as an exhibit or not.

24        THE COURT:  Well, it is already in.  Again, you filed

25  this April 26th report as one of your exhibits to your reply

1    and that is at 102-8.

2            MR. BLAIR:  Okay.

3            THE COURT:  It has also now been marked as P 17, same

4    document.

5            MR. BLAIR:  It is just a deposition notice.  Do you

6    want a copy of that?

7            THE COURT:  Well, if you want to refer to it, sure.

8    This is P 7.  I don't think this is in the record at this

9    time.  It is a deposition notice.

10           MR. BLAIR:  That is the wrong notice.  Here is the

11   Notice of Deposition for Dr. Ramsey of May 19 of 2016 marked

12   as Plaintiff's 18.

13           THE COURT:  Okay, Plaintiff's 18 now also, which is

14   deposition notice.

15   Questions By Mr. Blair:

16   Q.    Just for the purposes of timing, can you look at the

17   date of Dr. Ramsey's report there?  April 26th of 2016,

18   correct?

19   A.    Yes, I see that.

20   Q.    He was subsequently deposed on May 19 of 2016, right?

21   A.    Yes, looks like it.

22   Q.    At that point in time when Mr. Ryan deposed my expert

23   again, he was at that point well aware of the Vivian claim,

24   right?

25   A.    Yes, he was.

71

1   Q.      Judge, handing you what has been marked P 20, which is

2   a series of e-mails.

3           THE COURT:  I believe I have read these already as

4   well.

5           MR. BLAIR:  I don't think that is the same.

6           THE COURT:  Okay, so this is a new pair?

7           MR. BLAIR:  Yep.

8           THE COURT:  P 20, then I can read it.  Anyone

9   disagree this is a series of e-mails sent back and forth?  We

10  don't need this witness to lay foundation for documents that

11  we all agree as to what they are.

12          MR. BLAIR:  It is between their counsel.

13  Questions By Mr. Blair:

14  Q.      So could you look at page two there and specifically --

15          THE COURT:  Page two of which exhibit now?  You are

16  on P 20?

17          MR. BLAIR:  Yes.

18  Questions By Mr. Blair:

19  Q.      If we look at P 20, Jesse Drummond is Mr. Vivian's

20  counsel.  That is an e-mail of July 7th of 2016 about halfway

21  down to Mr. Parske, who is your counsel, correct?

22  A.      Yes.

23  Q.      And the first two lines read, "I wish you would have

24  asked to do this four plus months ago.  We're up against the

25  statute of limitations now and we'll have to prepare the case

72

1    for suit within the next three to four weeks."  That is the

2    first time Mr. Vivian's counsel, to your knowledge, had filed

3    suit, correct, had threatened to file suit, right?

4    A.    I am not positive.  I don't know.

5    Q.    Well, you see that occurred at 2:11 p.m., correct?

6    A.    I see it, 2:11.

7    Q.    You will recall that your counsel disclosed it to me in

8    the parking lot the evening of July 7th, correct?

9    A.    I am not sure about that.

10   Q.    That is what it says in your response.  We'll leave it

11   at that.  You know that if a case gets filed it becomes public

12   record, right?

13   A.    I'm not aware of that either.  I assume so, but again,

14   I am not -- I don't fully understand the law and when things

15   get recorded, so.

16   Q.    You know that I scoured the filings throughout the

17   United States in order to try to find cases against your

18   company, which is what led to the Beach case and to the Engles

19   case, right?

20   A.    Sure, yes.

21   Q.    So the first time that anyone decides to disclose it to

22   me was when there is the first threat this case would be

23   filed, correct?

24   A.    Again, I don't know.  I don't think that Mr. Parske and

25   Mr. Andy were discussing -- I don't know for sure if there was

73

1    discussions back and forth between the two attorneys.  I

2    didn't talk to Mr. Andy at all about it being filed,

3    threatened for suit, so I don't know.

4         MR. BLAIR:  Now I have marked this as P 6, my

5    expert's disclosures in the cover letter for Mr. Ramsey's

6    original report.

7         THE COURT:  Okay, why?  This witness has been on the

8    stand now for almost two and a half hours.  Why do you need to

9    ask him about things that are going on between counsel?

10        MR. BLAIR:  It will become apparent.

11        THE COURT:  It hasn't in every case so far.  I can

12   read these documents.  I have read the ones you already

13   submitted.  You can make argument, you know.  You don't need

14   to make argument to me through a witness.  There isn't a jury

15   here.

16   Questions By Mr. Blair:

17   Q.    Okay.  Sir, can you read the dates of that e-mail where

18   my expert report was disclosed?

19   A.    Thursday, November 5th of 2015 at 11:00 a.m.

20   Q.    Sir, you haven't been truthful with us this entire time

21   about when you first received notice of the Vivian claim, have

22   you?

23   A.    That is incorrect.

24        THE COURT:  I have P 27.

25   Q.    Judge, what I marked as P 27 is the letter of

74

1   October 21st of 2015 to Sniper Tree Stands, is that correct,

2   Mr. Stieren?

3   A.     Yes.

4   Q.     And you see that was sent via certified mail on

5   October 21st of 2015, correct?

6   A.     Yes.

7   Q.     And that is to the same address that the other

8   notification was sent to, correct?

9   A.     That's correct.

10  Q.     And the notification reads almost -- well, virtually

11  identical to the one you received in December of 2015, right?

12  A.     That's correct.

13  Q.     It says that Mr. Vivian sustained as a result of the

14  collapse of a Scout Model STLS 41 tree stand, which occurred

15  on Swingel Mountain Road, Mineral Point, Pennsylvania on

16  October 29th of 2014, correct?

17  A.     Yes.

18  Q.     And if you turned to the third page, you can see the

19  return receipt having been received by Friday and Cox or sent

20  back to Friday and Cox in the upper left hand corner on what

21  looks like October 16th of 2015?

22  A.     I'm not sure.  Is that saying that it got returned?  I

23  am not sure what this means.

24  Q.     That means that is the return receipt that we want back

25  showing it was delivered.

1    A.      I understand.

2    Q.      And you can see that it is signed for there on the

3    second page?

4    A.      Yes.

5    Q.      So this is before I even got into disclosing my

6    expert's reports, hadn't produced any of them for deposition,

7    hadn't done any of your expert discovery work, we hadn't done

8    rebuttal work or supplemental work, right?

9    A.      I am not sure of the time line.  All I know is I was

10   traveling for shows and there is a stack of papers on my desk

11   and the only one I opened was the one that was dated that I

12   sent to Andy.  I never received this.

13   Q.      That was in October of 2015, right?

14   A.      I believe it was December 14th was the first time I was

15   notified of it.

16   Q.      Right.  That is dated October 15th, right?

17   A.      This one is dated October 21st of 2015.

18   Q.      You testified earlier that you are not going to miss

19   claim reports whenever they come in, correct?

20   A.      No, but I would have had two envelopes from the same

21   attorney on my desk.  They were close to the same dates

22   together, so I would have received them both, but the first

23   time I would have read it was whenever I returned from

24   wherever I was at.

25            MR. BLAIR:  Judge, I don't have any further

76

1    questions.  I appreciate your patience.

2            THE COURT:  Okay, so I am going to give you all an

3    opportunity.  I want to clarify a couple of things on

4    Plaintiff's Exhibit P 27.

5    Questions By The Court:

6    Q.    There is a signature on page two from Joy somebody.

7    A.    Joy Yandle is how you pronounce it.  She is our front

8    desk lady.

9    Q.    Is that her signature?

10   A.    Yes.

11   Q.    So she signed for this in October?

12   A.    That is the way it appears, yes.

13   Q.    But what you are saying is -- you would have gotten

14   this, but you didn't see it until you had the other one in

15   December?

16   A.    I remember opening -- there was two envelopes identical

17   when I opened the mail, and that is when I had sent it to -- I

18   think it was December 17th.

19   Q.    So you remember there were two envelopes?

20   A.    Sure.  There were two envelopes, but it was the same

21   letter.

22   Q.    Okay.  Now you testified about there being Sniper tree

23   stands sold on the Wal-Mart website.

24   A.    That's correct.

25   Q.    There are today, correct?

77

1    A.      The last time I checked.  I haven't been on there

2    recently.

3    Q.      Is Woodberry Outfitters an authorized dealer for you?

4    A.      Yes, they are.

5    Q.      Okay.  So Wal-Mart sells Woodberry Outfitters STLS 41

6    on their website, which is perfectly appropriate because you

7    sell them to Woodberry, right?

8    A.      Yes.  So that's what I am saying.  The one scenario

9    would be if they are buying through someone.  Is Woodberry

10   listed on there?

11   Q.      It is -- I am looking at it right now, looking at the

12   Wal-Mart website because I want to clarify.  Woodberry you

13   sell to?

14   A.      Yes.

15   Q.      This is what you are talking about, right?  Take a

16   look.

17   A.      Yes, that's correct.

18   Q.      On the Wal-Mart website they are selling your stands

19   through Woodberry?

20   A.      Okay.

21   Q.      Now was there a time when Wal-Mart was selling your

22   stands that they weren't supposed to on their website that you

23   are aware of?

24   A.      Like from our other -- we have another company called X

25   Stand Tree Stands.  I don't know who all sells them.  I don't

78

1   know if they are all listed on there, but every one of the

2   products is sold from someone.  Like Sears.com is the same

3   way.  I don't know.  I don't think they all show the source of

4   Woodberry Outfitters.  Woodberry Outfitters would be a

5   legitimate case.  If it says Woodberry, that would be our

6   stand because they would buy through us and ship.  Maybe they

7   ship direct.  I don't know for sure how Wal-Mart.com is.

8   Q.     I am just trying to clarify.  Obviously, you are

9   selling stands and if it is coming from Woodberry that is

10  legitimate?

11  A.     That is legitimate.

12          THE COURT:  All right.  Cross?  Any questions?

13          MR. SANDBERG:  Just a few.

14                      CROSS EXAMINATION

15  Questions by Mr. Sandberg:

16  Q.     But back in 2013 you were distributing through Dunhams?

17  A.     Yes.

18  Q.     And you weren't distributing through anyone else back

19  at that time?

20  A.     Not that -- no, I think the Scout was Dunhams only.

21  Q.     And just to clarify, this stand, this model stand in

22  2013, how many different production lots did you have?  How

23  many times did you make an order to the manufacturer to

24  produce a lot?

25  A.     Just one, because Dunhams just orders once for the

1    whole year.

2    Q.    Okay.  So how much was in that lot that you ordered in

3    2013?

4    A.    It was just shy of 11,000.  I think it was like 10,950

5    if I remember correctly.

6    Q.    And then all of those 10,950, approximately, are

7    shipped over to you in shipping containers?

8    A.    Yeah.  They would go directly to the Dunhams DC.

9    Q.    It went to Dunhams Distribution Centers?

10   A.    Correct.

11   Q.    Because you give the addresses and tell them to ship

12   them direct to those people?

13   A.    Yes.

14   Q.    And L.J. Smith is one of our experts.  You understand

15   that?

16   A.    Yes.

17   Q.    And he also was involved in inspecting the Vivian

18   accident stand?

19   A.    Yes.

20        MR. SANDBERG:  Thanks.

21        THE COURT:  Redirect as to my questions or

22   Mr. Sandberg's?

23        MR. BLAIR:  No.

24        THE COURT:  Mr. Stieren, you can step down.

25        All right, any additional witnesses or evidence in

80

1    addition to what is in the record?  I'll go through all of

2    these in a moment in terms of the exhibits that you have

3    added.  Some are duplicative, others are not.  Do you have any

4    additional --

5          MR. BLAIR:  Judge, I have one affidavit from my

6    expert to supplement with just in relation to the relevance of

7    the Vivian incident to his opinions.  I have one e-mail that I

8    would like to supplement the record with.

9          THE COURT:  Okay.  Before we get to that, any

10   objections to the Court considering any of the exhibits,

11   whether they were filed or submitted today?

12         MR. SANDBERG:  No, Judge.

13         THE COURT:  Okay.

14         MR. BLAIR:  This is Exhibit P 30, which is an

15   affidavit of my metalurgist, Chris Ramsey.

16         THE COURT:  Have you been given a copy of that?

17   Objections?  No objection.  This is not already in, right?

18         MR. BLAIR:  It is not.

19         THE COURT:  Okay, so I have Exhibit P 30.  It is a

20   three page affidavit.  Really, it is two pages of text.

21         MR. BLAIR:  Judge, this is a series of e-mails

22   between Mr. Ryan and I marked as Plaintiff's 22.

23         THE COURT:  Okay, Plaintiff's 22.  I believe this is

24   already in the record.  Well, one page of it was.  Just the

25   first page at Document 102-7, but this is one, two, three,

1    four, five pages long, so we have P 22.  All right, any

2    additional evidence?

3          MR. BLAIR:  No, Judge.

4          THE COURT:  Any evidence from the defense before we

5    do argument?

6          MR. SANDBERG:  No, Judge.

7          THE COURT:  Okay.  So I will consider all of the

8    exhibits that were submitted today, the testimony, the

9    attachments to the motions and if there is anything else

10   already in the record that someone wants to point me to, I

11   will consider that as well.  Argument?

12         MR. BLAIR:  Judge, since we started this case some

13   two years ago, the whole discovery process has just been a

14   complete comedy of errors and it is really not funny, so that

15   is probably not the best term to use, but even after our last

16   hearing on the Motion to Strike, we have had numerous

17   additional documents produced.  They have had to supplement

18   their discovery multiple times.  They produced testing

19   documentation for the first time that they supplemented with

20   in their initial disclosures to where they are relying on in

21   their defense after my expert discovery had been completed and

22   supplemental discovery work.  They can't get the --

23         THE COURT:  Well, I need to make sure I understand

24   that last thing you said.  The testing documentation that I

25   have seen from their expert is the testing of their exemplar

82

1    and the test, I guess it was destructive testing of the stands

2    in this case itself, from Mr. Saunders.  Mr. Ramsey used

3    Mr. Saunders' conclusions as to the stand that is the subject

4    of the case.  Mr. Ramsey had tested different exemplars and so

5    I have two reports from Saunders and one from Ramsey that were

6    included within the motion practice as it relates to this

7    Motion to Strike.  I believe there are other reports in the

8    record, of course, but those are the ones that I focused on.

9            MR. BLAIR:  Sure.

10           THE COURT:  So when you talk about is there some

11   other testing that was disclosed as part of initial

12   disclosures, are you talking about Saunders' reports?

13           MR. BLAIR:  I am specifically talking -- well, I

14   think that Saunders did address those, but after my expert's

15   deposition had been concluded and five days I believe it was

16   before they produced their expert reports, they produced this

17   four times testing documentation.  They amended their initial

18   disclosures identifying it as a document they intended to rely

19   upon in their defense.  That was the first testing showing

20   that there had been any actual analysis of the ladder itself

21   as opposed to the platform.

22           THE COURT:  But again, I want to know what you're

23   talking about.  Is it these two documents or something else?

24           MR. BLAIR:  No, Judge, it is something else.

25           THE COURT:  That is what I am trying to understand.

83

1          MR. BLAIR:  It is the subject of the argument we have

2    over supplemental and rebuttal testing.  They have a motion to

3    exclude on that.  That has been fully briefed elsewhere.

4          THE COURT:  Yes.  No, I have read those as well, but

5    those -- what you are talking about are testing of something

6    other than the ladder.

7          MR. BLAIR:  Yes.  So Mr. Stieren, from the beginning,

8    tells me that I can only get, through counsel, that I can only

9    get one of these from China.  Don't know at that point in time

10   they are from a different manufacturer.  Come 2015 whenever we

11   go to get these exemplars, the whole issue is this is a

12   manufacturing defect case and they are offering me exemplar

13   stands that don't contain the manufacturing defect case.

14         THE COURT:  Let me ask you about that.  We have

15   talked -- when I heard that today I could not recall if that

16   has been something that has been discussed with the Court

17   previously or not.  I seem to remember this being a topic that

18   we talked about when we were discussing the exemplars a year

19   ago.  I don't know if it was that long ago, but months ago at

20   a minimum.

21         MR. BLAIR:  Yes, that was quite a ways back that we

22   had discussed it with the Court and I think it only manifested

23   itself subsequent to that point in time, after we got into the

24   defense expert testing, what they had done with their

25   exemplars.

84

1        THE COURT:  Are you saying though that they hid from

2   you the fact that these exemplars came from a manufacturer, a

3   factory, other than where the tree stand that is the subject

4   of this litigation was manufactured?

5        MR. BLAIR:  Well, I think they know that the

6   exemplars that were being obtained and they offered to obtain

7   for me were not going to be coming from the same manufacturer.

8   Whether they did that to try to pull the wool over my eyes, I

9   don't know.

10        THE COURT:  What I am trying to establish is, because

11   I can't recall, there was discussion about these exemplars.

12   Were you told and was the Court told, I don't remember, but

13   there was discussion about the exemplars.  Were you told here

14   are some exemplars of the ladder and by the way, these are

15   from a different factory because we don't even use that same

16   factory anymore?  Was that said to you when you were given the

17   exemplars?

18        MR. BLAIR:  No, I got my own exemplars from off the

19   internet.  I didn't accept their request because I wanted more

20   representative exemplars that were already on the market as

21   opposed to what they would be manufacturing for me.

22        THE COURT:  Okay.  So where were your exemplars

23   manufactured?  Do you know?

24        MR. BLAIR:  Well, there is a batch that identifies a

25   manufacturing facility, but those, regardless of where they

85

1    came from, they were not in compliance with the specifications

2    like those that were offered to be manufactured.

3            THE COURT:  We're getting to that.  I am just trying

4    to just understand, very specifically, what everyone

5    understood to be the case when the exemplars were being tested

6    and I didn't recall and I don't know if anyone told me

7    differently, but I did not recall that you had obtained your

8    exemplars on your own.

9            MR. BLAIR:  Yes.

10           THE COURT:  You didn't know one way or the other when

11   you used the exemplars if they came from the same factory, you

12   just knew they weren't the same batch.  Is that a fair

13   statement?

14           MR. BLAIR:  Correct.

15           THE COURT:  They used some exemplars that were, as we

16   know now, also not from the same factory.

17           MR. BLAIR:  Correct.

18           THE COURT:  Was that disclosed to you?

19           MR. BLAIR:  No.  I eventually learned that I guess in

20   February through some additional pointed interrogatories that

21   I served.

22           THE COURT:  Okay, so you can continue.  I wanted to

23   just know the history on the exemplars so I was clear.

24           MR. BLAIR:  Sure.  So there has just been excuse

25   after excuse made.  You look at the whole Wal-Mart Yang Zo

1   thing.  It ultimately doesn't hold water and it is not a

2   reason in itself for not having disclosed the claim a long

3   long time ago.  You saw today that they actually received the

4   notice back in October of 2015.  I had not even gone into my

5   expert discovery, as I mentioned, prior to them receiving

6   this.  They said that they were investigating.  Their

7   investigation was woefully undiligent.  In the course of a 15

8   minute phone call with counsel for the claimant, it was

9   absolutely apparent it was their product, it was the same

10  batch number, and you know, he was pleased as punch that he

11  now knows what the manufacturing defect is.  I think you read

12  into that -- I think there was an intention to keep me from

13  getting in touch with this other counsel.  In Andy's letter he

14  specifically asks me not to contact their counsel because they

15  wanted to apparently run out the statute of limitations.  So

16  Andy, having received notice in April, I have no idea why they

17  would not disclose it because I didn't see any legal

18  justification as to why it shouldn't be disclosed immediately,

19  regardless of the extent of their investigation, and now we're

20  talking at that point five months after the factory received

21  it.

22          So aside from Mr. Stieren not doing his due diligence

23  back in October, December, January when he received the

24  materials, that brings us to April and there is still no

25  answer as to why it was not disclosed.  We had a settlement

87

 1    conference on July 21st scheduled that was cancelled at the

 2    eleventh hour, and in their defense, and I agreed to not

 3    contact the counsel if they were going to come to the table

 4    with real money and we can get this done.  They called up and

 5    said we're not going to pay anything close to what you have

 6    indicated is what it is going to take to settle, so this is

 7    going to be frivolous.

 8         At that time they were already aware that this

 9    particular accident stand was from the same batch number.  You

10    will see that in the e-mail between Andy and I.  As part of

11    that conversation with the counsel out in Pennsylvania where I

12    learned it is the same batch number, I passed it along to Andy

13    on the 20th, the day before we were supposed to have the

14    settlement conference.  His response was L.J., as in L.J.

15    Smith, their expert, had told me that.  I said it seems that

16    you know a lot about the claims, and I am paraphrasing, but

17    that is what you are going to read in the exhibit I just gave

18    you, and the response was well, I don't feel like I am under

19    an obligation to disclose information that I learned from L.J.

20    Smith and the lawyer in Chicago being the lawyer that has been

21    retained for Mr. Stieren in the Vivian claim.  So the 28th of

22    July I finally get a formal discovery response that it's

23    providing supplemental information, specifically requesting

24    the batch number of the Vivian stand, and at that point it is

25    disclosed after I have already done my due diligence and

88

1    determined that the batch number was the same as Mr. Queen's

2    stand.  Now why Andy didn't have an obligation to supplement

3    his discovery responses to let me know that whenever we were

4    facing a settlement conference the following day is completely

5    beyond me, because the implications to my liability case are

6    huge and they were directly responsive, the batch number, and

7    the other instance is directly responsive to my discovery.

8    But nonetheless, he had disclosed the claim letter back on

9    July 8th and did nothing to supplement while we're in limbo

10   pending a settlement conference.  So he waits until a week

11   after the settlement conference had been scheduled to actually

12   disclose the batch number.

13        Now what I find just beyond coincidental is that the

14   first time Mr. Vivian's counsel says I got a statute of

15   limitations coming up, we been dealing with you for months and

16   months, why didn't you disclose this or why didn't you ask for

17   inspection months ago.  Now I got a statute of limitations

18   approaching and I am going to have to file suit in the next

19   three or four weeks.  Bingo.  They threaten to file suit.

20   They know that I scour these pleadings because I am suspicious

21   of whether Mr. Stieren is going to be forthright based upon

22   not having disclosed the Beach case and Engle's case in the

23   past that I had to find on my own, so as soon as this is going

24   to become public record I run into Andy in the parking garage

25   and it was probably about 6:30 at night, 2:11 p.m. was the

89

1    date that there had been the threat that he was going to file

2    suit in the next three or four weeks.  That was the triggering

3    event where they said we got to disclose it, he's going to

4    find out about this.  So they didn't know anything more on the

5    7th than they knew back in April whenever Andy found this

6    information out.  It was only that there was going to be an

7    inspection taking place and they were using the same expert

8    for that inspection in the Vivian case that they were in my

9    case.  I find it beyond coincidence with the timing of things

10   there.

11          You know, whether Mr. Stieren did or did not look at

12   his e-mail, there is no excuse for that.  It is January 27th.

13   It takes two seconds to pull that up and determine

14   definitively it is his product.  Waiting four months as the

15   quality assurance coordinator for the company, that just

16   shouldn't fly.

17          They got a response to settlement demand of May 31st

18   where there is no dispute from their counsel this was an STLS

19   41 model, no dispute that it collapsed, still not disclosed.

20   You got Dr. Ramsey conducting his rebuttal reports and

21   deposition testimony and they know all along there is this

22   other claim and that it appears to have happened just like

23   Mr. Queen says when their experts say it can't happen, it

24   can't collapse inward.  You heard Mr. Stieren say yeah, it

25   collapsed inward.  In Mr. Ramsey's deposition he is getting,

1    you know, interrogated for his opinion that it did collapse

2    inward, so Andy is sitting there knowing that there is this

3    other claim that involved the collapse inward.

4         THE COURT:  Look, there is a legitimate dispute about

5    whether or not it collapsed inward.  It bent.  That is what we

6    know, it bent.  So did the Vivian stand.  They both bent.

7         MR. BLAIR:  Here is the distinction.  That one was

8    still in the stand and there was documentation showing that it

9    bent inward.  That is the distinction between what we're

10   talking about in the sets of facts.

11        THE COURT:  But the Court certainly can't conclude

12   that it bent inward at this stage.

13        MR. BLAIR:  I was not asking for that.

14        THE COURT:  Yeah, I mean what seems to me to be the

15   salient point is that it bent.  Even if it bent backwards,

16   isn't that still relevant?

17        MR. BLAIR:  I agree.

18        THE COURT:  Yeah, maybe the guy didn't have the

19   straps on, but it bent.  That is like a contributory

20   negligence issue seems like to me, depending on what the jury

21   concludes.

22        MR. BLAIR:  I absolutely agree that that's the issue

23   and the Vivian stand specifically supports, as my expert's

24   affidavit sets forth, that it highly supports our case that

25   this can happen and did happen like Mr. Queen's allegations.

91

1   The whole thing is, they could never have suffered any

2   prejudice by disclosing this claim.  If it turned out to be

3   not their product, it doesn't matter.  I mean I am not

4   prejudiced, they are not prejudiced, but whenever you get a

5   notice in October of 2015 and withhold it for I don't know

6   what, ten months at that point in time, nine months, that is a

7   whole different ballgame to where great prejudice resulted to

8   me because I can't go back and redo the case.

9       THE COURT:  Has anyone tested the composition of

10   Vivian's stand yet?

11       MR. BLAIR:  No.  I wish I would have had the

12   opportunity to do that and get to the bottom of it nine months

13   ago.  No, that hasn't been done.  As far as manufacturing

14   procedures go, it lends itself to the fact if they are

15   manufacturing in the same batch, they are going to be rolling

16   off the production line uniformly.  So the other thing there

17   was the entire argument in the response was no harm, no foul.

18   It wasn't that there was some legal justification that this

19   should not have been disclosed long, long ago.

20       THE COURT:  Well, no.  I mean there is two components

21   to it.  Essentially we don't know if it is ours.  We're not

22   100 percent certain and then no harm, no foul, is argument

23   number two.

24       MR. BLAIR:  Yes, and 100 percent certainty is by no

25   means the standard for discovery in the Southern District of

92

1    Illinois.  They are supposed to be producing information

2    reasonably available to them.  That has been available to them

3    for a long, long time.  I mean they have a motion to strike my

4    expert.

5           THE COURT:  The rules are the same across the country

6    by the way.  It is not just here.

7           MR. BLAIR:  I know.  I might have missed a local rule

8    or something.  They have motion to strike my expert's opinions

9    for a number of arguments, but for lack of foundation partly

10   based upon their expert's contention this can't happen as Dr.

11   Ramsey says, and here we have another incident that this says

12   just that.  So when you talk about prejudice, I mean that is

13   huge.  I mean I don't think that there is much merit to their

14   motion, but nonetheless it would have been nice to have this

15   nine months ago and let him opine on it.

16           I think this comes down to money, frankly.  I think

17   Mr. Stieren is not wanting to pay $25,000 deductibles left and

18   right.  When he gets a claim I think he is hoping they just go

19   away.  As I mentioned, I had to send two claim letters before

20   I got contact from the insurance company.  I think this is a

21   matter of money and I think that it is a matter of fool me

22   once, shame on you, fool me about the ninth or tenth time now,

23   shame on you or shame on me I guess as the saying goes.  So I

24   appreciate the Court's time.

25           THE COURT:  Okay.

93

1          MR. SANDBERG:  Thanks, Judge.  I had 20 minutes

2     planned, I'll try to cut it to ten.

3          THE COURT:  Take 20 if you like.

4          MR. SANDBERG:  So the question is, is it untimely

5     supplementation and what harm from that untimely

6     supplementation.  The Court says these are the factors that

7     governs sanctions when it is claimed to be untimely

8     supplementation; prejudice to the party, inability to cure the

9     prejudice, likelihood of trial disruption, bad faith or

10    willfulness involved in not disclosing earlier.

11         Let's briefly talk about those things.  Well, we

12    doubt there is any prejudice here and we do submit if there

13    is, and we're going to talk about this, the prejudice can be

14    cured.  And we're not --

15         THE COURT:  How can I possibly conclude there is no

16    prejudice on these facts?

17         MR. SANDBERG:  I'll get to that.  I'll address it.

18         THE COURT:  I mean at best you can say -- at best you

19    can say we're not sure, but I don't even think you can say

20    that.  At best you could say that, because the best case

21    scenario you could have is you go back and test this thing and

22    turns out that its composition is right in line with what it

23    is supposed to be.  That is the only way and I don't even know

24    that that would cure it because it still pressed inward.  But

25    we don't know that right now.  It hasn't been tested.

94

1    Discovery closed back in May.  I mean how on earth could I say

2    there is no prejudice?

3            MR. SANDBERG:  Well, one of the issues in that regard

4    is it has to be a similar accident.

5            THE COURT:  It has to be relevant.  The composition

6    of the metal is highly relevant.  Your own expert found that

7    the stand that Mr. Queen was on, the subject of this lawsuit,

8    has got less than one percent carbon in it.  Now, he used --

9    it is interesting and I want to ask you about this.  He used

10   two different standards.  He used the ASTM 829-12 grade 1010

11   requirements when testing the exemplar.  Those are two, eight

12   and 13 percent.  Your exemplars are right in the middle.  Then

13   when he did his report on this on the actual stand, it said

14   max .06.  I don't know what that means, but it is grade 1050 I

15   believe.  But in any event, it is less than one percent

16   carbon.  Apparently he said if there is no carbon in it, it is

17   not even steel.  So that is pretty relevant, isn't it?

18           MR. SANDBERG:  Well, the relevant -- we can talk

19   about at length what the composition of it is.  The question

20   is what is the strength of it, not what is the composition of

21   it.  Our expert is going to talk about the strength of the

22   metal as tested, as tested in the accident stand.  Plaintiff's

23   expert chose not to do that analysis.

24           THE COURT:  Yeah, so we can argue about that

25   deficiency, okay, but we're talking about disclosure.  So one

1    of the things that plaintiff's expert opined on is there is a

2    number of factors that are causally contributing to it

3    bending.  Now he says it collapsed.  Maybe he is wrong about

4    that.

5         MR. SANDBERG:  We all agree it bent as you

6    summarized.

7         THE COURT:  Maybe it didn't go in.  Maybe your

8    witness -- maybe they set it up straight like this and it bent

9    backwards because they didn't have the straps on, but it bent,

10   and his expert, Mr. Ramsey, is saying the composition is a

11   contributing factor here because it is of inferior grade.

12   There is no carbon in this thing.  It is not even steel.

13        MR. SANDBERG:  He is saying that.

14        THE COURT:  Yeah, in his April report.

15        MR. SANDBERG:  Yes, he says that.

16        THE COURT:  Yes.  So from their standpoint, how can I

17   conclude that the composition isn't a relevant factor, and

18   when you have exemplars that are all over the map and you have

19   got -- yet the one other source that we all are aware of, that

20   here is a stand with the ladder that was manufactured in the

21   exact same place and the same year, same batch.  It was one of

22   apparently 11,000, not 720, but that is probably the best one

23   to test to compare to the stand in question in this case if

24   you are going to test one, or you can just assume that it has

25   the same composition, less than one percent.  Might have

96

1      something to do with it bending.

2              MR. SANDBERG:  Well, again, it might have something

3      to do with it bending, but the real question is, again, have

4      you tested how strong the steel is, if specified.

5              THE COURT:  That is your expert's opinion and that

6      all goes to weight, but is it relevant to the question, what

7      it's made of, at all.  I mean --

8              MR. SANDBERG:  For it to be relevant to come into

9      evidence, "It must appear or the evidence must reasonably tend

10     to show that the instrument or agency which caused the injury

11     was in substantially the same condition at the time the other

12     accidents occurred at the time the accident complained of was

13     caused."  So we got to really look --

14             THE COURT:  That is gobbledey gook.

15             MR. SANDBERG:  It is from the Court, but that's all

16     right.

17             THE COURT:  I don't care.  Is it the Seventh Circuit

18     that says that?

19             MR. SANDBERG:  No, this is Illinois law on similar

20     accidents, 536 N.E. 2d, 831.

21             THE COURT:  We're not talking about that even.  We're

22     talking about the same batch, the composition, how are these

23     ladders made.

24             MR. SANDBERG:  Judge, we have the tests.  We have the

25     tests on this stand.  Having the test on another stand isn't

97

 1   going to say -- you know, what does it say as to this stand?

 2   It is on another stand.  If it's the same, we have the same

 3   issues in front of the jury.  If it is different, we still

 4   have this stand's evidence in front of the jury.  So I mean

 5   the prejudice, not knowing the composition of that stand isn't

 6   going to tend to prove anything.  We know the composition of

 7   this stand.

 8            THE COURT:  So if we assume that the stands are of

 9   similar composition and that one also bent, was it supposed

10   to?

11            MR. SANDBERG:  I don't think we can only look,

12   because the cases do say you got to look at the circumstances

13   of the accident.  There has to be some similarity, Judge.

14            THE COURT:  So now we're getting back into that

15   topic.  Now whose decision is it on whether or not it is going

16   to come into evidence?

17            MR. SANDBERG:  (Indicating.)

18            THE COURT:  No, it is the District Judge.

19            MR. SANDBERG:  I was speaking generically, but it is

20   a judge's decision.

21            THE COURT:  Right, but what I talked to all of you

22   about, what I will order disclosures on, is things that are

23   relevant to that ultimate evidentiary determination.  So is

24   this relevant?  It absolutely is.  Ultimately, how much --

25   whether it is going to be admissible or not, I tend to think

1    that there is good reason to believe, based on what I see that

2    it might be, but granted, I might be wrong about that because

3    I don't make that particular decision, but we're in -- we're

4    supposed to be in the discovery phase.

5         MR. SANDBERG:  I think we still need to look at it as

6    to any prejudice.  If it is a dissimilar accident, it is not

7    -- it doesn't have any importance as to what went on in this

8    case.  The mere composition of the steel is not a factor as to

9    what caused the accident, because again, if that one is

10   different, it is different.  It doesn't say anything -- we

11   know what this one is.  That is a fact.  The parties can argue

12   about the implications of the fact.  If another stand is or is

13   not, it's not relevant to showing what this one is.  That is

14   why, you know, if we go out and get the composition of the

15   stand, what does it prove?

16        THE COURT:  If you have dissimilar in composition --

17   if you have similar in composition and as a consequence of

18   that this one bends as well, now why wouldn't that be

19   relevant?

20        MR. SANDBERG:  The question is, is this the

21   explanation for why it bends?  That is the issue.

22        THE COURT:  Right, and their expert opines it is part

23   of the explanation.

24        MR. SANDBERG:  And whether or not he can refer to

25   this accident comes down to whether it is similar.

1          THE COURT:  Well, similar is -- it depends on what

2     we're talking about in the case of similarities.

3          MR. SANDBERG:  Sure.  Cases say you got to look at

4     similarities of the accidents as to what was the agency that

5     caused the accident.  At least we can argue these points as to

6     what the stand conditions were and what was going on between

7     the two accidents.

8          As to the Vivian accident -- so this is all from L.J.

9     Smith.  He was there.  He talked to the plaintiff, but it is

10    secondhand, so I want to be clear that it is not a proved

11    fact.

12         THE COURT:  Wouldn't he want to have the opportunity

13    to go examine that, cross examine your guy?

14         MR. SANDBERG:  He had the opportunity to go to the

15    examination.  He didn't go to the examination.

16         THE COURT:  Was it incumbent upon him to show up for

17    the testing that you set up after the close of discovery?

18         MR. SANDBERG:  It wasn't incumbent on him, but if he

19    wanted to find out whether it is a similar accident, he has to

20    develop some evidence.  This isn't evidence.  This is just

21    what L.J. Smith reported to us to be able to have a chance of

22    getting it into evidence.

23         THE COURT:  That might be the case once we're done

24    with discovery, which we are.  We finished back in May.  So

25    all of these inquiries are for counsel to make and use their

1    expert to do so and then you argue about whether or not it is

2    admissible at the end.

3         MR. RYAN:  Your Honor, may I shine in on a point?

4         As far as the testing set up in Pennsylvania, you

5    mentioned we set it up.  Just so you are clear, that wasn't

6    something we set up.  It was something the lawyer in Chicago

7    who is working on the case with Mr. Stieren set up.  I was not

8    sure if you understood that.  You might have been referring to

9    us, the defendant in general, but just so you know, that was

10   set up by somebody other than us.

11        THE COURT:  Right, it was set up by defense counsel

12   for the other case.

13        MR. RYAN:  Correct.

14        THE COURT:  Understood.  It was not you personally.

15        MR. SANDBERG:  Correct.  As to the Vivian accident,

16   there is no question Mr. Stieren, you know, admittedly in

17   January, should have focused on what was in front of him and

18   did not.  Why?  He thought it sounded like it came from

19   Wal-Mart.  Why?  Because they said it was Wal-Mart and

20   secondly as he explained today, it had a Wal-Mart signature

21   type price, 99.96, because Wal-Mart apparently does this 96

22   instead of 99 for reasons that are beyond our explanation.  So

23   he had double indication that it was not something that he had

24   to worry about.  So Mr. Stieren claims busyness as the reason

25   why he didn't investigate the Vivian accident sooner.  His

1    busyness as an excuse for late disclosure is just as valid for

2    him in W.I.C. as it is for Mr. Blair who claimed busyness just

3    last month as an excuse for not filing responses to motions on

4    time.  This Court said that Mr. Blair's excuse was inadequate

5    and Mr. Stieren's excuse of busyness is equally inadequate.

6    But busyness and his thinking it is Wal-Mart is the

7    explanation for why Mr. Stieren did not follow up on what he

8    had.  It is not an excuse.

9              THE COURT:  So in his affidavit everybody concedes

10   that by May you had every reason to believe that it is one of

11   his products, so then it is another two months plus.

12             MR. SANDBERG:  Six weeks.  Early July.

13             THE COURT:  Well, your disclosure, your official

14   disclosure didn't go out until --

15             MR. SANDBERG:  The end of --

16             THE COURT:  -- end of May, but the garage meeting

17   then.

18             MR. SANDBERG:  Then was followed up with e-mails and

19   knowledge about the inspection, etcetera.

20             THE COURT:  But you all knew about it as of April?

21             MR. SANDBERG:  Yes, sir.

22             THE COURT:  Okay, so it was actually -- have to tack

23   on another month.  What possibly could be an acceptable basis

24   for sitting on it that long?

25             MR. SANDBERG:  The hope that we were going to finally

102

1    pin down whose it was and --

2         THE COURT:  But by then he has every reason to

3    believe it is his.  I mean this whole thing about Wal-Mart,

4    you know, he has Ali Baba selling it, but -- what Wal-Mart is

5    doing right now, I haven't seen any evidence to suggest that

6    Wal-Mart is illegally selling his product.  Right now they are

7    selling it through Woodberry, but there is nothing at all to

8    suggest that online they are selling his product illegally.

9    It is every reason to believe that when they were talking

10   about where it was bought, that it was in a store.

11        MR. SANDBERG:  And it is every reason to believe --

12   he did have every reason to believe it was in a store.  You

13   know, the bottom line, and I'll conclude, is composition of

14   the steel.  Again, I think we know what this composition is.

15   That is what the jury can consider, the experts can opine on.

16   The composition of some other stand at some other time is not

17   going to be proved or disproved by testing some other stand.

18   It isn't going to change what we have in front of us as to

19   what the composition was of this stand.

20        THE COURT:  So did that question -- does the

21   composition of another product that is manufactured by the

22   same factory and had an arguably -- may or may not have the

23   same composition, doesn't that in any way go to the weight of

24   the testing and the weight of the evidence as to the nature of

25   the defect, or not?  I am just throwing this out there.

103

1          MR. SANDBERG:  When you have the actual accident

2     stand as to what it -- we know what it is.  Testing of

3     something else isn't going to change that.

4          THE COURT:  What about his expert's opinion that

5     because of the fact that your expert says you can't have an

6     inward bend when the stand is set up properly, and here we

7     have an inward bend --

8          MR. SANDBERG:  It is a different part of the stand,

9     and according to Mr. Smith, it actually twisted to the right

10    according to what he reported.  It is not the easiest thing to

11    see in the photo, but that is what he said he saw from looking

12    at it, it was really a twist to the right when the right leg

13    goes into the ground because they have this loose stabilizer

14    bar.  Normally the stabilizer bar would keep it from going

15    back and forth, if you understand.  The legs -- in other

16    words, it is not supposed to rock.  The stabilizer bar is to

17    hold it in position.  The stabilizer bar is loose.

18         THE COURT:  If it penetrates the ground, which is

19    what my understanding is of what happened, then --

20         MR. SANDBERG:  The stabilizer bar should help prevent

21    that.

22         THE COURT:  How so?

23         MR. SANDBERG:  Because it is just -- well, in essence

24    you are holding on to it and it is going to resist it twisting

25    because it is gripping it.

104

1        THE COURT:  So the stabilizer bar prevents this?

2        MR. SANDBERG:  Would help prevent that, yes, sir,

3   along with the straps, the criss cross straps as we chose to

4   call them.

5        THE COURT:  Uh huh.  So, nevertheless, you have an

6   inward bend.

7        MR. SANDBERG:  Well again, we're not agreeing it is

8   inward bend.  Mr. Smith says it was twist to the right and,

9   you know, again, if you twist something to the right, part of

10  it is going to go inward and part of it outward.

11       THE COURT:  Shouldn't that be something the experts

12  get to argue over as opposed to simply deciding to cut off

13  their access to that discovery by not disclosing it?

14       MR. SANDBERG:  Well, by disclosing it late, again, we

15  would not -- of course, that is the Court's decision.  We had

16  plenty of time before the trial and we would, of course, not

17  oppose if they wanted to find or have their own expert look at

18  the Vivian stand.  We don't control the Vivian stand, but we

19  can ask for it and assist in that regard, but we would not

20  oppose that.  We would agree to it if that is what they want

21  to do.

22       THE COURT:  So your request is they be allowed to

23  redo their expert through testing of this and formulating?

24       MR. SANDBERG:  I still question the testing, but I

25  was going to the facts of the accident.  We don't oppose their

105

1    ability to determine the facts of the accident.  I think the

2    facts are relevant.  I still say the composition of that stand

3    is not particularly relevant to the composition of this stand.

4          THE COURT:  So then let's talk about what you think

5    would be appropriate.  You think you should be able to do a

6    new expert report and come up with opinions based upon

7    whatever he believes is appropriate after considering the

8    facts of this accident?

9          MR. SANDBERG:  Yes, sir.

10         THE COURT:  And wouldn't that have been, again,

11   wouldn't that have been something that would have been more

12   appropriate during the discovery period?

13         MR. SANDBERG:  Of course.

14         THE COURT:  I mean there really isn't a good excuse

15   for not disclosing this, is there?

16         MR. SANDBERG:  Other than what we have said.

17         THE COURT:  I mean what you have said, is that really

18   a legitimate excuse for not disclosing it once it gets into

19   counsel's hands?

20         MR. SANDBERG:  Well, once it got into counsel's hands

21   in late April, you know, we did try to figure out ourselves

22   what we were going to do at that point in time.

23         Do you want to add anything to that Andy?

24         MR. RYAN:  There is nothing to add, Your Honor,

25   beyond what Mr. Stieren has testified to.

1          THE COURT:  And presumably counsel wasn't aware that

2    Mr. Stieren hadn't disclosed this October letter?

3          MR. SANDBERG:  Correct.

4          THE COURT:  He, you know, testified here toward the

5    end that he got two letters and the one he gave you all was

6    the December letter.

7          MR. SANDBERG:  That is the one he sent on to his

8    agent and insurer.

9          THE COURT:  Okay.  Anything else?

10         MR. SANDBERG:  Thank you.

11         THE COURT:  Do you want to respond?  We got a few

12   more minutes.

13         MR. BLAIR:  I would say if you read Dr. Ramsey's

14   affidavit, he makes it abundantly clear how relevant it is to

15   his opinions.  Specifically says the unsupported column length

16   that you are looking at between the stabilizer bar and

17   platform, you are expected to see a stress concentration right

18   above the coupling sleeves.  There is a stress concentration

19   just above the coupling sleeves and there is coupling sleeves

20   between the third ladder section and the ladder section

21   extension and just above that coupling sleeve is where you see

22   the failure in Mr. Vivian's incident.  It is exactly what he

23   was saying the entire time.

24         One other thing that I will add.  You know, if we had

25   gotten this nine months ago -- I mean, we haven't had a like

1    exemplar we could do any testing on.  You know, it wasn't the

2    three ladder sections that we had with Mr. Vivian's stand that

3    show deformation now.  We could have done exemplar testing on

4    an actual like exemplar if that would have been feasible given

5    the pendency of the other claim to where, you know, we would

6    have a whole lot more here.  So I think it is beyond just

7    composition testing that we're dealing with.

8            THE COURT:  Okay, so how would you have used the

9    Vivian ladder to do -- I mean, you're doing destructive

10   testing of somebody else's ladder who has a case that has yet

11   to be filed.

12           MR. BLAIR:  I agree with you.  You know, that would

13   have to be something that would be worked out with their

14   counsel.  I don't know that the ladder sections are material

15   at this point in time to Mr. Vivian's claim because that is

16   not where the failure occurred.  In that particular stand it

17   was right above the coupling in the ladder extension, which

18   is, obviously, still carbon steel tubing, but I don't know

19   that we need that.  But there is no reason that we couldn't

20   stick another platform section on the three existing ladder

21   sections that are still attached and do testing.  I don't know

22   that they even need that particular section.

23           THE COURT:  Okay.  So if the Court grants your

24   request, essentially what I would be -- I am going to do a

25   report and recommendation to the District Judge on this.  If I

1    were to recommend that the pleadings be stricken -- I mean

2    that is essentially saying you get default judgment.  I mean

3    really all that is left at that point is damages, right?

4         MR. BLAIR:  Right.

5         THE COURT:  Why would that be appropriate versus what

6    they are essentially now asking for is to allow you to go do

7    whatever it is you want to do with the ladder?

8         MR. BLAIR:  Well, number of reasons.  I don't know

9    what I am going to be able to do with the ladder with the lead

10   time of February trial setting we're looking at now.

11   Additionally, I don't think this is something that can be

12   rewound.  The workup in the case would have been fundamentally

13   different, the opinions would have been different from the

14   beginning, and I mean you're going to have to start at square

15   one if we're going to do this all over again by reopening

16   discovery and essentially starting anew.  So it would be a

17   horrendous waste of resources and I am never going to get back

18   to where I would have been if I would have found out about

19   this in October of 2015 whenever they first received notice.

20   There is particular prejudice -- I know that we hadn't settled

21   this case, but it was getting to the stage that we were and

22   you were going to pound on us to settle, I expect, if it was

23   anything else like the other settlement conferences.  I mean

24   if this case had settled, I would have never been the wiser

25   and, you know, this obviously has a big impact on my liability

109

1  case which goes to my damages.  You know, it is just time and

2  time again that we have seen the discovery violations and I

3  mean if there is ever a time that you just have to say enough

4  is enough with what we have seen in this case to justify

5  striking the pleadings, that is what we're looking at here.

6            THE COURT:  Would you agree to the composition itself

7  is less relevant than simply the mechanism, now that we know

8  that -- since we know that the composition of your ladder is

9  zero carbon or something close to it.

10           MR. BLAIR:  No.  I think it is all the more

11  important.  They are saying that composition doesn't matter at

12  all and this can't even happen.  Mr. Vivian's stand -- I mean

13  we don't have the composition testing, but logic would suggest

14  that it is probably going to have the same composition and we

15  have the second failure involving the same composition that

16  they say this can't happen.  They are essentially saying my

17  client is lying and this can't happen, and then we have

18  another exemplar out there, or actually accident stand out

19  there with the same composition.  I think it is more relevant

20  than ever.

21           THE COURT:  Okay.  Anything further?

22           MR. SANDBERG:  Judge, we talked about the stabilizer.

23  Obviously, this isn't against a tree, but I thought it would

24  just show you how it is positioned.

25           THE COURT:  Sure, I understand it is on the pictures.

1  What I didn't understand and still, to be honest with you,

2  don't fully, is how the stabilizer bar, which is holding it at

3  a particular distance from the tree, how that prevents this.

4         MR. RYAN:  Mr. Stieren might be able to explain it,

5  Your Honor.

6         MR. STIEREN:  If you want, I can explain the

7  different components of the ladder stand.

8         THE COURT:  I am just curious about the one aspect of

9  it I think is what it boils down to.

10        MR. BLAIR:  One more thing, I know I gave copies to

11 Mr. Stieren of his deposition transcripts and I would

12 encourage you to read the transcripts and take a look at how

13 many "I don't know", "I don't remember off the top of my

14 head."  "If that is the case, then you would have to show me

15 something."  I mean we had an argument about whether Chicago

16 is in Illinois.  The response that I got is, well, you are

17 going to have to go through Chicago, Illinois, leaving the

18 Chicago depot.  I would have to check a map.  I mean that is

19 literally the response that I got, so.

20        THE COURT:  Mr. Stieren, if you want to come look at

21 how he is describing it?  So the stabilizer bar --

22        MR. STIEREN:  This bar attaches from the ladder stand

23 and goes to the tree and straps around the tree and prevents

24 the ladder from pushing into the tree, and when it is tied to

25 the tree it prevents a little bit of side to side, but the

1    biggest part of side to side is the stabilizers, there is two

2    criss cross that goes down and it attaches right around here,

3    so when the criss cross straps are tied to the tree, you can't

4    twist it side to side.

5            THE COURT:  So we have talked about getting forward

6    to the tree, we talked about this type of movement, right?  I

7    am talking about this (indicating), when it sinks.

8            MR. STIEREN:  SO the stabilizer bars help that.  It

9    is tied to the tree and the stabilizes attach to the bark.  So

10   a twist, if that is what the stabilizer straps are for, and

11   then once the user gets up to the top, he puts a ratchet strap

12   over the top.  So the criss cross straps in this, it really

13   helps when you are climbing up before you put the ratchet

14   strap on too.

15           THE COURT:  Okay.  All right, here.  I am going to

16   return that to you.

17           MR. BLAIR:  Judge, can I submit the complete

18   transcripts, the exhibits, or how would you like them?

19           THE COURT:  Don't I have them?

20           MR. BLAIR:  I think they were individual pages that

21   were attached when we were citing things in the motions.

22   Maybe I gave you one to read along with.

23           THE COURT:  I have Stieren, 4-23-2015.  Looks to me

24   like the entire deposition.

25           MR. BLAIR:  Here is 10-28-14, the second deposition.

112

1        THE COURT:  All right, I'll issue report and

2   recommendation on this at some point in the hopefully not too

3   distant future.  We're adjourned.

4        MR. RYAN:  Judge, I do have one thing.  I am sorry.

5   There was financial information discussed with Mr. Stieren

6   before that we produced pursuant to protective order that was

7   agreed on before, so I would ask that the transcript be at

8   least under protective order until we have the opportunity to

9   designate portions that we want sealed that gets into the

10  confidential financial information that Mr. Stieren talked

11  about.

12        THE COURT:  Isn't it in his depo?

13        MR. RYAN:  It is, but the deposition -- we also

14  designated portions of that confidential.

15        THE COURT:  Okay.  Well, I mean at this point you are

16  going to get a chance -- you are going to look at the depo and

17  you are going to ask to redact stuff?

18        MR. RYAN:  In the transcript.

19        THE COURT:  Okay, that will be fine.

20        All right, we're adjourned.

21

22

23     (Court is adjourned.)

24        I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.

25
    SS/Barbara Kniepmann                    December 21, 2016

113

1                              I N D E X

2    WITNESS

3                                              PAGE  LINE

4    NATHAN STIEREN

5         DIRECT EXAMINATION                    3     3

6         CROSS EXAMINATION                     78    14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25