IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JORDAN QUEEN

        Plaintiff,

vs.                               Case No. 14-CV-519-DRH-SCW

W.I.C., INC. d/b/a
SNIPER TREESTANDS,

        Defendant.

**MEMORANDUM AND ORDER**

**HERNDON, District Judge**:

## I. Introduction and Background

Now before the Court are defendant's motions to exclude Santo Steven BiFulco, M.D. (Doc. 120) and Karen Grossman Tabak, Ph.D., C.P.A. (Doc. 122) as plaintiff's proposed experts. Naturally, plaintiff opposes both motions (Docs. 128 &129), to which defendant replied (Doc. 130). For the following reasons, the motions are granted.

Plaintiff Jordan Queen brought the present lawsuit alleging that he was injured after his tree stand, a Scout Model STLS41 tree stand, used for deer hunting collapsed. (Doc. 2). The tree stand was distributed by the defendant. Plaintiff alleges that on October 12, 2013, while he was at the top of the stand's ladder, the ladder bent, causing him to fall. As a result of the fall, plaintiff claims that he suffered serious injuries. Because of said injuries, plaintiff alleges that he

incurred medical expenses and lost wages, and that he will continue to lose wages, due to the debilitating condition of his right leg and ankle.

## II. <u>Legal Standard</u>

"A district court's decision to exclude expert testimony is governed by FEDERAL RULES OF EVIDENCE 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.,* 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)). Federal Rule of Evidence 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Manpower, Inc. v. Ins. Co. of Pa.* 732 F.3d 796, 806 (7th Cir.

2013) *(citing Daubert,* 509 U.S. at 589); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College,* 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony").

Courts in the Seventh Circuit conduct a three-step analysis under *Daubert*. *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007).[1] First, the district court must determine whether the person whose testimony is offered is in fact an expert, as codified in Rule 702 through "knowledge, skill, experience, training, or education." *Id.* (citing Fed.R.Evid. 702). Notably, although "extensive academic and practical expertise" sufficiently qualify a potential witness as an expert, *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). *Smith*, 215 F.3d at 718 (citing *Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")).

---

[1] The Court notes the Seventh Circuit has also described the *Daubert* analysis as a two-step process. *See Chapman v. Maytag Corp.,* 297 F.3d 682, 686 (7th Cir. 2002). However, as *Chapman* simply combines the first two steps described in *Ervin* as a single test of reliability, whether the analysis is described as a three-step or two-step process does not substantively change the Court's analysis.

Secondly, the district court must determine the expert's reasoning or methodology is reliable. *Ervin,* 492 F.3d at 904; *see Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho*, 526 U.S. at 147). Specifically, the testimony must have a reliable basis in the knowledge and experience of the relevant discipline, *Kumho*, 526 U.S. at 149 (internal quotations removed), consisting in more than subjective belief or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *Daubert*, 509 U.S. at 590.

Further, as to reliability, *Daubert* provided the following non-exhaustive list of relevant factors: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert*, 509 U.S. at 593-94).

Nonetheless, there is no requirement that courts rely on each factor, as the gatekeeping inquiry is flexible and must be "tied to the facts" of the particular case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591); *see also Chapman*, 297 F.3d at 687. Thus, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his [or her] conclusions." *Smith*, 215 F.3d at 718 (citing *Kumho,* 526 U.S. at 153).

The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th

Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). Accordingly, the court's gatekeeping function requires focus on the expert's methodology; "[s]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595; *Walker,* 208 F.3d at 587).

Once a party calls into question an expert's qualification under *Daubert*, it is the party supporting that expert who carries the burden of persuasion to convince the court that said expert is qualified. Fed.R.Evid. 702 advisory committee's note 2000 Amend.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); See also *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

"It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Id.* (citing *Kumho*, 526 U.S. at 159 (Scalia, J., concurring) (stating that the trial court's function under *Daubert* is to exercise its discretion "to choose among reasonable means of excluding expertise that is *fausse* and science that is junky")). However, as an expert must explain the methodologies

and principles that support his or her opinion, he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)).

Lastly, the district court must consider whether the proposed testimony will assist the trier of fact in its analysis of any issue relevant to the dispute. *See Smith*, 215 F.3d at 718; *Chapman*, 297 F.3d at 687; *Daubert*, 509 U.S. at 592. It is crucial that the expert "testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury.'" *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Pentek Corp.,* 157 F.3d 512, 519 (7th Cir. 1998)). However, the expert need not have an opinion as to the ultimate issue requiring resolution to satisfy this condition. *Smith,* 215 F.3d at 718 (citing *Walker*, 208 F.3d at 587).

Based on the legal standard set forth above, the Court now turns to the individual experts' testimony challenged in this case.

### III. Analysis

#### a. Dr. Santo Steven BiFulco

Dr. Santo Steven BiFulco was hired to prepare a life care plan outlining Queen's "needs for treatment and medical services, as well as equipment necessary that he is reasonably certain to utilize in order to maximize his medical and rehabilitative potential" following the injury at issue (Doc. 121-4, pg. 3). Defendant argues that BiFulco's life care plan and related testimony must be

excluded. Specifically, defendant challenges BiFulco's qualifications as an expert, his methodologies, and the reliability of his opinions.

Santo Steven BiFulco, M.D., graduated from the University of South Florida College of Medicine in 1986. Thereafter, he completed a one year internship in internal medicine at Stony Brook University and the Nassau County Medical Center. Subsequent to completing his internship, Dr. BiFulco spent three years as a resident in Physical Medicine and Rehabilitation, and Rheumatology at Stony Brook University and the Nassau County Medical Center. Upon completing his residency in 1990, Dr. BiFulco entered private practice, where he has remained for the last 27 years.

Currently, Dr. BiFulco is a licensed physiatrist (Doc. 121-5). He maintains active medical licenses in both Florida and New York; holds multiple clinical appointments; retains memberships of several professional associations including the American Academy of Physical Medicine & Rehabilitation; and is certified as a Certified Life Care Planner by the International Commission on Health Certification (Doc. 128-3). Plaintiff also notes that Dr. BiFulco has provided medical testimony in over 30 state court cases since 2011 (Doc. 128-1). However, as of this date, there is no indication that BiFulco has been qualified to offer expert testimony in federal court or in state of Illinois (Doc. 121-1, pg. 32). Despite this fact, in reviewing Dr. BiFulco's qualifications, it appears that he possesses the necessary "knowledge, skill, experience, training, or education" to

qualify generally as a life care planner subject to a case specific analysis. Fed.R.Evid. 702.

In carrying out its "gatekeeping" functions, this Court must also assess the reliability of the methodology employed by Dr. BiFulco in reaching his opinions. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. With regard to BiFulco's methodology and reasoning, the Court finds that they are *not* based on more than subjective belief and unsupported speculation.

Dr. BiFulco indicates that his life care plan was based on a review of Queen's medical records and a September 10, 2015, examination of Queen, which lasted less than two hours (Doc. 121-1, pgs. 36-37). Defendant contends that BiFulco's opinions are not grounded in a proper basis because Dr. BiFulco relied on his own assessment of Queen to develop his life care plan and opinions as to Queen's condition and future needs, rather than the assessments prepared by Queen's treating physicians. In addition, defendant also argues that Dr. BiFulco's report exceeded the scope of his expertise and fails to establish the reliability of his opinions.

Upon review of the report and relevant exhibits, it is clear that BiFulco's report and opinions fail to satisfy *Daubert*'s reliability standard. An expert must explain the methodology and principles supporting his opinion, and that opinion must amount to "more than a 'bottom line.'" *Minix v. Canarecci,* 597 F.3d 824, 835 (7th Cir.2010). Here, BiFulco's report sets forth recommendations that are

unsupported by the medical records generated by Queen's treating physicians, and BiFulco fails to explain the basis for his additional treatment recommendations and valuations.

In response to defendant's motion, plaintiff submitted an article entitled *Life Care Planning: A Natural Domain of Physiatry*, in an attempt to support the proposition that BiFulco's position as a physiatrist allows him to determine what medical conditions remain relevant to plaintiffs future care, regardless of what the medical records state (Doc. 128-2). However, plaintiff fails to demonstrate how BiFulco meets any standard that allows a physiatrist to offer opinions about Queen's specific surgical and orthopedic needs, different from those offered by Queen's treating physicians.

Dr. BiFulco's recommended care plan suggests multiple treatments that are neither supported by Queen's medical records, nor recommended by Queen's treating physicians. Dr. BiFulco's report and his deposition testimony fail to provide insight into the methods by which BiFulco reached the conclusions that Queen required extensive physical therapy, massage therapy, mechanical traction, intersegmental traction, electrical stimulation, muscle stimulation, ultrasound, trigger point injections, steroid injections, and anesthetic blocks. None of Queen's treating physicians recommended those proposed treatments; Dr. BiFulco never ordered any additional diagnostic tests; Dr. BiFulco never spoke to Queen after that initial examination; he never spoke to any of Queen's family members; and he never spoke to Queen's treating physicians (Doc. 121-1, pg. 43; 56-57) Also, Dr.

BiFulco testified he was not asked to arrive at a diagnosis or make a prognosis of Mr. Queen's condition separate from what was already in Queen's medical records (Doc. 121-1, pg. 59-60).

Further, plaintiff failed to show that BiFulco's methodology, in arriving at his opinions, is readily recognized as reliable. It is undisputed that BiFulco did not conduct any scientific tests or experiments in order to arrive at his conclusions about Queen's life care plan. He simply relied on his template to develop the plan without any indication as to the methods or basis for his additional treatment suggestions. There is no indication that his methods can or have been tested, and no indication that his methodology has been generally accepted in the scientific community. He also fails to indicate that his methods and reporting style have been peer reviewed.

BiFulco has not subjected his methodology to peer review, did not prepare the initial report himself, and did not discuss the life care plan with Queen's treating physicians in order to validate his proposed treatments. He also failed to describe the basis for his life care plan— specifically those additional treatments not recommended by Queen's treating physicians—and the methodology employed to reach those conclusions. Moreover, his nurse practitioner Ashley Literski prepared the draft life care plan that was forwarded to BiFulco she he could add information from Queen's medical records and from BiFulco's examination. (Doc. 121-1) BiFulco could not estimate how much of the plan he

prepared and how much was prepared by Literski, who has not been qualified as an expert (*Id.*).

A very significant *Daubert* factor is whether the proffered scientific theory has been subjected to the scientific method. As was touched on above, Dr. BiFulco offered no basis for his projections regarding the frequency of Queen's future care and its costs. An expert must explain the methodologies and principles that support his opinion; he cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp.*, 619 F.3d at 761. Here, the methodology employed by BiFulco cannot be tested, has not been subjected to peer review, and is not generally accepted in the relevant scientific communities. In fact, his treatments are not even supported by Queen's medical records.

Queen's testimony and medical records do not identify any additional medical treatment or medical services received after his July 17, 2014 follow-up visit with Dr. Gardner to support BiFulco's proposed course of treatment. Further, plaintiff fails to demonstrate how BiFulco meets any standard for physiatrists to offer these opinions that far exceed the recommendations of plaintiff's treating physicians. Neither BiFulco's CV, nor his testimony indicate that he is qualified to proffer opinions about Queen's specific surgical and orthopedic needs, or about Queen's need for additional treatment modalities independent of those suggested by his treating physicians. In certain fields, such as medicine, an expert's specialization in the more specific field is certainly necessary to offer an expert opinion. S*ee, e.g., Pipitone v. Biomatrix, Inc.*, 288

F.3d 239 (5th Cir.2002). Here, BiFulco is a licensed physiatrist without any orthopedic expertise. Given that plaintiff failed to establish a standard for a physiatrist to offer these opinions, the Court finds that BiFulco's opinion is not reliable and not based on proper methodology.

An opinion without foundation in the record has no probative value, and so is neither relevant within the meaning of Rules 401 and 402 nor helpful to the trier of fact within the meaning of Rule 702. *Norwest Bank, N.A.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *7 (N.D. Ind. Jan. 29, 1997), citing *Buckner v. Sam's Club, Inc.,* 75 F.2d 290, 294 (7th Cir.1996). Given that BiFulco's opinions on Queen's future medical treatment have no foundation in the record, and his methods prove unreliable, it follows that BiFulco's cost valuation opinion based on those recommended treatments also lacks a proper foundation. Thus, the Court agrees that the proposed treatments and cost estimates in BiFulco's life care plan are not scientifically reliable.

Once a party calls into question the qualification under *Daubert*, it is the party supporting that expert who carries the burden of persuasion to convince the court that said expert is qualified. Fed.R.Evid. 702 advisory committee's note 2000 Amend. The Court is simply not convinced by plaintiff's arguments to support BiFulco's report and opinions. Accordingly, the Court finds that BiFulco's opinions are not reliable or based on proper methodology. Based on this evidence and the fact that plaintiff bears the burden of persuasion to support their

proffered expert, the report and testimony of Dr. Santo Steven BiFulco will be disallowed.

### b. Karen Grossman Tabak

Defendant also moves to exclude the testimony and opinions of Karen Grossman Tabak, Ph.D., C.P.A., plaintiff's forensic economist (Doc. 122). Defendant does not challenge Tabak's qualifications as an expert, but rather her methodology and economic projections about the present value of plaintiff's future medical care. Specifically, defendant argues that Tabak's opinions and testimony must be excluded because "her testimony and opinions are based solely on [Santo Steven] BiFulco's and his nurse practitioner Ashley Literski's inadmissible life care plan," and because "Tabak did not independently evaluate the costs BiFulco and Literski attributed to their life care plan items" (Doc. 122). The Court agrees.

"Unlike an ordinary witness, [ ], an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Fed.R.Evid. 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge [ ] is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. However, in this case, based on the Court's exclusion of Dr. BiFulco's report, it follows that Tabak's report and testimony are also barred.

*Daubert* instructed courts to not be concerned with reliability of the conclusions generated by valid methods and reasoning, but instead determine the

validity of the principles and methodology underlying conclusions and inferences. *Winters v. Fru–Con, Inc.*, 498 F.3d 734, 742 (7th Cir.2007). Here, the Court previously excluded Dr. BiFulco's report based on speculation and unsupported conclusions. Given that Tabak based her opinions on the now excluded life care plan, her testimony is, likewise, barred. Therefore, defendant's motion to exclude the report of Karen Grossman Tabak's is granted.

### IV. Conclusion

Accordingly, the Court **GRANTS** the defendant's motions to exclude testimony of Santo Steven BiFulco (Doc. 120) and Karen Grossman Tabak (Doc. 122).

**IT IS SO ORDERED.**

Signed this 5th day of September, 2017.

Digitally signed by Judge David R. Herndon
Date: 2017.09.05 13:13:17 -05'00'

**United States District Judge**